# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# NEWPORT NEWS DIVISION

BOBBY BLAND, DANIEL RAY      :
CARTER, JR., DAVID W. DIXON,     :
ROBERT W. MCCOY, JOHN C.       :
SANDHOFER and DEBRA H.        :
WOODWARD,                            :
                                    :
        Plaintiffs,            :
                                    :
v.                                 :       CASE NO:  4:11cv45
                                    :
B. J. ROBERTS, individually and     :
in his official capacity as Sheriff    :
of the City of Hampton, Virginia,    :
                                    :
        Defendant.          :

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendant, B.J. Roberts, Sheriff of the City of Hampton ("Sheriff Roberts"), by counsel, and pursuant to Fed. R. Civ. P. 56(c), hereby submits this Memorandum of Law in Support of Motion for Summary Judgment.   Plaintiffs, former appointees of Sheriff Roberts, allege that Sheriff Roberts violated their First Amendment rights to free speech and freedom of association when, following his reelection in November 2009,  he failed to reappoint them.   Plaintiffs allege a connection between Sheriff Roberts' decisions and their support for his opponent, James Adams.

The political underpinnings of this action are indisputable.  Adams worked for Sheriff Roberts for 16 years, rising through the ranks to the position of Lt. Col., third in command of the Hampton Sheriff's Office.  He resigned in 2009 specifically to oppose Sheriff Roberts, a Democrat, as the Republican candidate in the November 2009 election.   Deposition of James Adams, Aug. 23, 2011, Ex. 1, p. 78.  Adams lost the

election, and admits he may run against Sheriff Roberts again. *Id.*, p. 44.  Since then, Adams has actively participated in the preparation of this lawsuit to serve his own political end, including attending the initial meeting between plaintiffs and their counsel, and meeting with plaintiff's counsel at least three additional times to provide extensive background information about the Sheriff's office and proprietary documents retained from his tenure. *Id.*, pp. 54-60, 68.    Clearly, Adams stands to benefit politically from this lawsuit.

For the reasons stated below, including plaintiffs' admitting that they kept their views secret and no evidence that Sheriff Roberts either knew whom plaintiffs supported or made his reappointment decisions on that basis, Sheriff Roberts asks the Court to enter summary judgment in his favor, and to dismiss plaintiffs' claims under Fed. R. Civ. P. 56 (c), with prejudice.

## I.   STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56(B)

1.     Sheriff Roberts, first elected Sheriff of the City of Hampton in 1992, was reelected in November 2009, for a term commencing on January 1, 2010.  Affidavit of B.J. Roberts, Ex. 2, ¶ 3.

2.     Sheriff Roberts' opponent in the 2009 election, James Adams, worked for Sheriff Roberts for 16 years, holding the position of Lt. Col. in 2009, third in command, when he resigned to oppose Sheriff Roberts.   Ex. 1, p. 78.  All of Sheriff Roberts' appointees knew Adams because of his long tenure and high rank; indeed, many of Sheriff Roberts' appointees had worked along side of Adams for years and/or maintained personal friendships with Adams. Ex. 2, ¶ 4.

3.      In the fall of 2009, Sheriff Roberts attended one meeting for each of the Sheriff's Office three shifts, to announce his reelection campaign, and to ask for his appointees' support. Deposition of B.J. Roberts, Oct. 4, 2011, Ex. 3, p. 109. [1]

4.      During the 2009 campaign, Sheriff Roberts had no knowledge of whether plaintiffs or any other appointee supported him or Adams. Ex. 2, ¶ 5. If aware, his senior administrative staff, Colonel Bowden, Major Wells-Major, Major Richardson, or Capt. McGee, did not provide that information to him. *Id.* Sheriff Roberts' senior staff did not inform him of who volunteered for the campaign, or sold tickets for the golf tournament. Ex. 3, pp. 114, 145. Sheriff Roberts never asked his senior staff "about the political leaning or the political involvement of the plaintiffs in 2009" and did not charge his senior staff with "going out into the work force and making his positions known with respect to his reelection." Deposition of Karen Bowden, Oct. 4, 2011, Ex. 6, p. 67-68.

5.      Sheriff Roberts did not require any employee to volunteer for his campaign, or to buy or sell tickets for the golf tournament. Nor did Sheriff Roberts condition reappointment on participation in his campaign. In fact, Sheriff Roberts reappointed many individuals who neither bought nor sold golf tournament tickets and/or who did not in any way participate in the campaign. Ex. 3, pp. 144, 155; Affidavit of Karen Bowden, Ex. 7, ¶¶ 6 – 7; Affidavit of Kenneth Richardson, Ex. 8, ¶ 5.

6.      Major Richardson did not speak with employees to solicit their support for Sheriff Roberts' reelection. Deposition of Kenneth Richardson, Oct. 12, 2011, Ex.

---

[1] Plaintiffs disagree on what Sheriff Roberts said at these meetings, some even admitting that they "read between the lines" in interpreting his comments. See e.g., Deposition of Bobby Bland, Aug. 22, 2011, Ex. 4, p. 42, ("he said he was the best candidate ... You know, you have to just read between the lines...."); Deposition of Debra Woodward, Aug. 23, 2011, Ex. 5, p. 32-33 ('I believe [what he was] saying....'). However Sheriff Roberts phrased his request for support, plaintiffs must prove that *they* made protected speech, that Sheriff Roberts knew about *their* speech, and that *their* speech was the "but for" cause of his failure to reappoint them.

3

9, p. 60.  As he did every year, Major Richardson asked Sheriff's Office workers to sell tickets to the Sheriff's annual golf tournament.  *Id.*, p. 55.  Major Richardson had "a roster, and I just give everybody five tickets and ask them to go ahead and sell the tickets for me." *Id.*, p. 56.  Major Richardson kept track of who took tickets and how much money each returned.  He did not share that information with Sheriff Roberts or anyone else.  Ex. 8, ¶ 3.  In 2009, many employees did not buy or sell tickets.  *Id.*

7.     Employees were not required or coerced into buying or selling golf tournament tickets or participating in the campaign.  Bland admitted that he was not coerced to buy tickets, or told he had to buy tickets as a condition of employment.  Ex. 4, p. 52.   Dixon returned golf tournament tickets unsold, and admitted that employees who did not volunteer for the golf committee or help with the Sheriff's campaign were reappointed.  Deposition of David Dixon, Aug. 22, 2011, Ex. 10, p. 29, 33.  McCoy volunteered to help Sheriff Roberts' campaign once during the 2009 election, and admitted that no one from the Sheriff's senior staff told him if you do not support the Sheriff you're going to be out of here; only fellow deputies suggested that.  Deposition of Robert McCoy, Aug. 22, 2011, Ex. 11, p.43.  Sandhofer, admitting his participation was not coerced, fundraised for the golf tournament and told Col. Bowden he would find places for Sheriff Roberts' signs.  Deposition of John Sandhofer, Aug. 23, 2011, Ex. 12, p. 28, 66.  Woodward bought tickets for the golf tournament. Ex. 5, p. 34-35.

8.     Adams even admitted that, during his tenure "[m]ost of the time I didn't get tickets … I was not told I needed to buy or sell … I don't think anybody knew whether I bought tickets or not, to be honest with you." Ex. 1, p. 77.   Bland's wife,

who worked for Sheriff Roberts from 2006 through her voluntary resignation in June 2009, never worked for Sheriff Roberts' campaigns, voluntarily purchased golf tournament tickets, and was "not aware of any requirement for political loyalty for continued employment." Deposition of Eva Bland, Aug. 24, 2011, Ex. 13, pp. 16-17.

9. Col. Bowden and Major Wells-Major contacted those on the two shifts scheduled to be off on Election Day, approximately 40-45 employees, for assistance at the polls. Agreeing to work the polls was not a precondition of reappointment, and Col. Bowden did not discuss with Sheriff Roberts who did or did not volunteer. Sheriff Roberts reappointed many deputies who did not volunteer. Ex. 7, ¶¶ 3 – 6.

10. Sheriff Roberts does not have a Facebook page and has never looked at Facebook, or Adams' Facebook page. Sheriff Roberts knew that Carter's name was on Adams' page, learning that from Col. Bowden and Carter himself, but does not believe he learned about McCoy's being on Adams' page until after the election. Ex. 3, pp. 104 – 106. A picture of Carter's wife, who also worked at the Sheriff's office, was on Adams' Facebook page alongside Carter. Deposition of Daniel Carter, Jr., Aug. 22, 2011, Ex. 14, p. 43. Sheriff Roberts reappointed Carter's wife. Ex. 2, ¶ 18.

11. The cookout hosted by Deputy Ramona Larkins in September 2009 was a birthday party to which she invited her entire shift; it was not a campaign event for Adams. Deposition of Crystal Cooke, Oct. 11, 2011, Ex. 15, p. 36. Many people from the Sheriff's Office attended. Adams did not campaign, "he was just there." Ex. 11, p. 42. Sheriff Roberts learned about the party after it happened and that Adams attended, but did not know who else was there and did not look at pictures of that event. Ex. 3, pp. 114 -115. Many deputies who attended the birthday party were

reappointed by Sheriff Roberts, including Deputies Ferguson, Blizzard, Rawles, Larkins, and others.  Ex 1, p. 93.

12.     Following his reelection, and pursuant to Va. Code § 15.2-1603, Sheriff Roberts reviewed all appointees for reappointment.    In making reappointment decisions, Sheriff Roberts did not consider, or discuss with his administrative staff, whether any appointee had supported him or Adams. Sheriff Roberts met with and solicited input from members of his administrative staff, who, in the chain of command, were supervisors.  Sheriff Roberts and his administrative staff discussed the overall operation of the office, staffing levels, budget restraint shortfalls, and personnel issues.  Sheriff Roberts made all reappointment decisions.  Ex. 2, ¶¶ 6 – 8; Ex. 3, p. 144; Ex. 6, p. 55.

13.   In December 2009, Sheriff Roberts had 190 appointees, including 128 full-time sworn deputies and 31 full-time civilians, for a total of 159 full-time appointees, plus 3 unassigned active duty military, and 28 part-time appointees.  Ex. 2, ¶ 9.

14.     Sheriff Roberts did not reappoint 12 out of 159 full-time employees, three civilians and nine deputies: the six plaintiffs, Bobby Bland, Daniel Carter, Jr, David Dixon, Robert McCoy, John Sandhofer, and Debra Woodward; and six other employees, Kenneth Darling, Curtis Davis, Sammy Mitchell, James Sutherland, Desiree Weekes, and Tameka Wiggins. Ex. 2, ¶ 10.

15.     Pursuant to Va. Code § 15.2-1609, the Virginia Compensation Board fixes the number of full-time deputies allotted to each sheriff in Virginia based on the ratio of deputies to inmate population.  Ex. 3, pp. 120-121, 135.  Because of the declining population in the Hampton City Jail, Sheriff Roberts anticipated a reduction in

the number of full-time deputy positions.   Ex. 2, ¶ 11.   In September 2009, Sheriff Roberts received from state officials, the "FY10 Budget Reduction Amounts for Sheriffs and Regional Jails pursuant to FY10 Governor's Budget Reduction Plan dated September 8, 2009 and Compensation Board Action on September 16, 2009."   The FY10 budget reduction for Hampton was set at $405,756.00.   Ex. 2, ¶ 12.

16.   Sheriff Roberts decided to replace civilian appointees with sworn deputies, to maintain the number of sworn deputies available, if needed, to work in the jail.   Sheriff Roberts elected to fill three civilian positions, held by plaintiffs Bland and Woodward, and by Kenneth Darling, with sworn deputies.   Woodward, Bland, and Darling all counted against Sheriff Roberts' deputy allotment.   Ex. 3, pp. 121, 123. Since December 2009, because of additional reductions from the Compensation Board, Sheriff Roberts has filled five other civilian positions with sworn deputies.   In the last two years, Sheriff Roberts has lost eight funded deputy positions. *Id.*, p. 121.

17.   Sheriff Roberts chose not to reappoint nine deputies, including the remaining four plaintiffs, after reviewing personnel files, soliciting input from supervisors, and considering the need for harmony and efficiency in the workplace. Sheriff Roberts considered each of the nine deputies whom he did not reappoint disruptive or their performance to be unsatisfactory, and believed that their presence hindered the harmony and efficiency of the Sheriff's Office.   Ex. 2, ¶ 13.

18.   As for the non-plaintiffs, Sheriff Roberts did not reappoint Sgt. Curtis Davis because of his problems being a supervisor, coming to work, and following direction. Ex. 3, p. 75.   Sheriff Roberts did not reappoint Lt. Sammy Mitchell "because he had numerous problems in the training area and also running his shift... We found that his shift was lacking the supervision that was necessary." *Id.*, p. 74.   Sheriff

Roberts did not reappoint Dep. James Sutherland because he had violated policy by personally bringing shoes in for an inmate. *Id.*, p. 153. Sheriff Roberts did not reappoint Dep. Desiree Weekes because she "very rarely came to work" and "left the shift... in some binds," had been demoted from Sgt. because she could not perform those duties, and there were allegations of problems in the jail, including a purported romantic involvement with an inmate. *Id.*, p. 154. Sheriff Roberts did not reappoint Dep. Tameka Wiggins because she "had missed an enormous amount of work time" and exhibited "the lack of ability to get to work," and it was determined that she ... would not be a good deputy to continue" with the department. *Id.*, pp. 73-74.

19.    All deputies appointed by Sheriff Roberts are sworn and are trained by the Dept. of Criminal Justice Services ("DCJS"). Ex. 2, ¶ 19. They have arrest powers, as set forth in Hampton Sheriff's Office Policy and Procedures No. 602, Arrest Procedures for Adults and Juveniles. Ex. 19.

## Bobby Bland

21.    Bland was the Finance Officer/Procurement and Accounts Payable. In that position, Bland was privy to Sheriff Roberts' confidential financial information, including inmate canteen funds, departmental budgets, bank accounts, and audits. Also responsible for accounts payable and receivables, Bland represented Sheriff Roberts to outside vendors. Ex. 2, ¶ 14; Job Description, Ex. 19.

22.    Sheriff Roberts filled Bland's position with a sworn deputy. Ex. 2, ¶ 11.

23.    Bland believes Sheriff Roberts did not reappoint him because "he maybe thought I was ... going to oppose him ... maybe he thought I was going to go with the opposition." Ex. 4, p. 26-27.

24.   Bland only discussed the election with his co-worker Woodward, admitting that he "would never talk to anyone else about [his] political views ... [because it] would get out." Ex. 4, p. 36-38.  Even Bland's wife, Eva Bland, did not know whom he supported. Ex. 13, p. 21.  Bland never said anything derogatory about Sheriff Roberts before or during the campaign, and has no knowledge that senior officers or Sheriff Roberts knew whom Bland was supporting.  Ex. 4, pp. 28-29, 53-54.

25.   Bland voluntarily contributed to Sheriff Roberts' campaign, purchasing raffle tickets for the golf tournament and helping to set up electronic equipment the night of the election.  Bland admitted that he was not coerced to buy tickets, or told that he had to buy tickets as a condition of employment.  Bland did not actively support Adams' candidacy, contribute money to his campaign, or go to any campaign functions.  Ex. 4, pp. 28, 42, 43, 45, 48, 52.

**David Dixon**

26.   Dixon was a sworn deputy.

27.   Sheriff Roberts did not reappoint Dixon because of his violation of the Standards of Conduct in insulting and using profanity toward a co-worker. When Dixon exited the election booth, in referring to Sheriff Roberts' campaign literature, he told Frances Pope, "you can take this f---ing s---, stuff, and throw it in the trash can." Ex. 3, p. 127.  Sheriff Roberts also considered Dixon's rocky tenure, during which the Sheriff had transferred Dixon multiple times between the jail and civil process, because of Dixon's own admission that he could not handle working as a supervisor in the jail. Ex. 3, p. 147.

28.     Dixon only told a few close friends whom he "could trust not to disclose that you were supporting someone else," about his support for Adams.  Ex. 10, p. 19. "[A]round the office, I tried to keep it as quiet as I could, yes sir." *Id.*, p. 31.

29.     Dixon claims that he had an Adams bumper sticker on his car and "assumed" that Sheriff Roberts saw it.  Ex. 10, p. 19. Dixon did not talk to Sheriff Roberts or his senior staff about his support for Adams, maintaining, "I'm pretty sure he knew I was supporting Adams," simply because they were close friends. *Id.*, pp. 41, 43.

30.     Dixon returned golf tournament tickets unsold, and admitted that Sheriff Roberts reappointed employees who did not volunteer for the golf committee or help with the Sheriff's campaign.  Ex. 10, pp. 29, 33.

### Robert McCoy

31.     McCoy was a sworn deputy.

32.     Sheriff Roberts did not reappoint McCoy because of his long-standing difficulties in getting along with other employees.  "[H]e had some difficulties in almost every area we had worked... heated arguments with deputies when he was in civil.  We switched him up and brought him back to corrections.  I just felt that at that particular time that it would be better for us to sever ties with Wayne." Ex. 3, pp. 130, 148.

33.     McCoy only told people about his support for Adams whom he was confident would not disclose it.  Ex. 11, pp. 22-23.  McCoy admitted to having no evidence that Sheriff Roberts terminated him because he supported Adams; he just "assumed" Sheriff Roberts knew.  "I feel that possibly maybe some of the – couple of the people that – that I talked to may have informed him that I was not – not

supporting him, I was supporting Adams." *Id.*, p. 27, 32.  McCoy admitted he was good friends with Adams and went on his Facebook page to wish him good luck. *Id.*, p. 21.  He has no evidence that Sheriff Roberts looked at Facebook.  *Id.*, pp. 27-28, 30-31.

34.     McCoy volunteered to help Sheriff Roberts' campaign once during the 2009 election, and admitted that no one from the Sheriff's senior staff told him if you do not support the Sheriff you're going to be out of here; only fellow deputies suggested that. Ex. 11, p. 43. McCoy did not contribute money to Adams or campaign for him; he just voted for him. *Id.*, p. 20.

## John Sandhofer

35.     Sandhofer was a sworn deputy, assigned to civil process.

36.     Sheriff Roberts did not reappoint Sandhofer because Sandhofer did not "integrate[] well with [the Sheriff's] staff."  This was Sandhofer's first law enforcement job, he had been there for a short while, and the Sheriff did not consider it a good fit. "[I]t didn't appear that he liked what he was doing." Sandhofer's supervisors believed that, "he did not follow all the directions if he thought he needed to do something different." Ex. 3, pp. 128, 149.

37.     Sandhofer "attempted to try and keep it [support of Adams] secret as possible," and never told Sheriff Roberts or his administration that he was not going to support the Sheriff.  Sandhofer has no information that anyone told the Sheriff whom he supported.  Ex. 12, pp. 31,42-43, 73.

38.     Sandhofer claims that Sheriff Roberts knew he supported Adams because his girlfriend had an Adams bumper sticker on her car and Sandhofer rode in the car with her.  Ex. 12, pp. 30-31.  Further, Sandhofer's girlfriend told him the

Sheriff walked past her at the polls, turned, and stared. *Id.,* p. 25. Based on that "connection … I know that the sheriff knew that I didn't support him." *Id.,* p. 31.

39.    During the 2009 campaign, Sandhofer did fundraising for the golf tournament and told Col. Bowden he would find places for Sheriff Roberts' signs. He admits his participation was not coerced. Ex. 12, pp. 28, 66. He declined to work the polls, saying that his family came first. *Id.,* p. 26-27.

40.    Sandhofer admitted that Ramona Larkins' cookout was not a political event for Adams, but was attended by friends and family. Ex. 12, p. 70.

### Debra Woodward

41.    Woodward was Training Coordinator. In that position, she was privy to confidential personnel information, including employment applications, criminal background checks, and all internal and DCJS training records. Woodward represented Sheriff Roberts in interactions with the public, including applicants, new hires, DCJS, and outside trainers brought into the jail. Ex. 2, ¶ 16; Job Description, Ex. 20.

42.    Sheriff Roberts filled Woodward's position with a sworn deputy. Ex. 2, ¶ 11. Sheriff Roberts had asked her from time to time if she wanted to become a deputy, but she repeatedly declined. Ex. 3, p. 120.

43.    Woodward kept her support for Adams "secret" and did not actively support Sheriff Roberts as in past elections, remaining "neutral." Ex. 5, pp. 12, 14. Woodward "believes" someone told Sheriff Roberts that she was supporting Adams, because she was not participating in the campaign, and because she and Adams were friends. *Id.,* pp. 36-37.

44.   Woodward bought tickets for the golf tournament and never said anything negative about Sheriff Roberts to his senior staff.  *Id.*, pp. 35, 38.

### Daniel Carter, Jr.

45.   Carter was a sworn deputy.   Carter's wife, also a sworn deputy, was reappointed by Sheriff Roberts.  Ex. 2, ¶ 18.

46.   Sheriff Roberts failed to reappoint Carter because of his inability to separate himself from his wife while they were working.   Ex. 3, p. 129.   Carter inappropriately inserted himself into a disciplinary action involving his wife's failure to secure a jail door, provoking a heated argument with Sheriff Roberts over the manner in which his wife was disciplined.  *Id.*, p. 116.   Sheriff Roberts "had to make a determination if – could I keep both of them, the wife and him.  And I thought he – that was the first time any deputy had raised the level of our conversation the way he did, and I just didn't feel that it would be to my best interests and my officer's best interests to keep him or keep both of them."  *Id.*, p. 129.

47.   Carter also had disciplinary actions taken against him for errors leading to the improper release of several inmates.  Ex. 14, p. 11.

## II.   ARGUMENT

### A.   Legal Standard

Summary judgment is appropriate in the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).   Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party fails to make a sufficient showing on an essential element of the claims on which he bears the burden of proof, the moving party prevails.  *Id.* at 248-49; *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).   While the court draws all inferences in favor of the non-moving party, speculative assertions will not suffice.   *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1989).

Under Virginia law, sheriffs' deputies serve at the will of the sheriff and have no property interest in continued employment.   See Va. Code § 15.1-48; *Jenkins v. Weatherholtz*, 719 F. Supp. 468 (W.D.Va. 1989).   However, a sheriff may not refuse to hire a person in retaliation for constitutionally protected political expression or for political association.   See *Harris v. Wood*, 888 F. Supp. 747, 751 (W.D. 1995), aff'd, 89 F.3d 828 (4th Cir. 1996).   Here, the undisputed facts reveal no violation of the First Amendment because none of the plaintiffs publicly expressed support for Adams. Further, there is no support for plaintiffs' claims that Sheriff Roberts knew who they supported and, most significantly, the absence of any causal nexus between plaintiffs' alleged support for Adams and Sheriff Roberts' decision not to reappoint them.   Sheriff Roberts is entitled to judgment on plaintiffs' First Amendment claims as a matter of law.

### B.   Plaintiffs Fail to Establish a First Amendment Retaliation Claim

In Count I, plaintiffs claim that Sheriff Roberts did not reappoint them in retaliation for their support of his opponent.   They contend that Sheriff Roberts' action violated their First Amendment right to engage in constitutionally protected speech. See *Rankin v. McPherson*, 483 U.S. 378 (1987); *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968).

In order to prove that an adverse employment action violated their First Amendment right to freedom of speech, plaintiffs must satisfy the three-prong test set forth in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998).

First, the public employee must have spoken as a citizen, not as an employee, on a matter of public concern. Second, the employee's interest in the expression at issue must have outweighed the employer's "interest in providing effective and efficient services to the public." Third, there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action.

*Ridpath v. Board of Governors of Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (quoting *McVey*, 157 F.3d at 277-78) (internal citations omitted).

### 1. Plaintiffs Cannot Establish that they Spoke Out on a Matter of Public Concern

Sheriff Roberts does not dispute that an election is a matter of public concern. See *Connick v. Myers*, 461 U.S. at 146 (to implicate a matter of public concern, speech must relate to a "matter of political, social, or other concern to the community."). However, the record reflects that plaintiffs did not speak out.

In *Smith v. Frye*, 488 F.3d 263 (4th Cir. 2007), cert. denied, 552 U.S. 1039 (2007), the Fourth Circuit affirmed the district court's dismissal of a First Amendment speech claim where the lower court found that the plaintiff had not spoken or expressed herself. The plaintiff, a magistrate judge's clerk, alleged that she was fired because her employer "believed" she supported her son's candidacy for clerk rather than the incumbent. "[T]he district court concluded that because [the plaintiff] does not allege she said or did anything in support of her son's candidacy (i.e. she does not allege she exercised First Amendment rights) that her claim failed as a matter of law." *Id.* at 762. "In [her] own words, which we accept as true, Judge Frye dismissed her not because of what her views or affiliation *were* but because of, again using [her] own word, what he 'believed' they might have been." *Id.* at 762, no. 2 (emphasis in original).

In *Fields v. County of Beaufort*, 699 F. Supp. 2d 756 (D.S.C. 2010), the plaintiff did "not allege that she did or said anything in support of any candidate for Clerk of Court; rather, she asserts that she remained neutral and that Smith construed her silence during the campaign to mean that she did not support Smith's re-election." *Id.*, at 762. Based on that, the court had "serious doubts about whether [the plaintiff] has established that she spoke out as a citizen, and not as an employee, on a matter of public concern, particularly in light of *Frye*." *Id.*

The evidence here raises more than "serious doubts" about whether plaintiffs spoke out in public; plaintiffs' admitted secrecy, unilateral beliefs, and/or alleged neutrality, prove otherwise.  In fact, there is no evidence that anyone spoke out against Roberts or in support of Adams.  Among other things, plaintiffs admit that:

- they kept their support for Adams "secret" (Bland, Woodward, and Sandhofer) or "private" (Dixon)

- they only told a friend or friends at work they could "trust not to disclose," (Bland and Dixon)

- they "believe" Sheriff Roberts saw an Adams bumper sticker (Dixon)

- they "believe" Sheriff Roberts saw a girlfriend's Adams' bumper sticker and stared at the girlfriend at the polls (Sandhofer)

- they "just assumed he knew" (McCoy)

- they believe "maybe [the Sheriff] thought I was going to oppose him" (Bland)

- they remained "neutral" (Woodward)

In addition, McCoy, Dixon, and Woodward claim that Sheriff Roberts knew they were supporting Adams because of their friendships with Adams, former Lt. Col., third

in command, and co-worker.  According to plaintiffs' logic, they would charge Sheriff Roberts with the knowledge that anyone in the Sheriff's Office who knew, worked with, or was friendly with Adams had shifted his or her allegiance to Adams, thereby speaking out.  Given Adams' former role, plaintiffs cannot use their friendships with Adams as evidence of constitutionally protected expression.

As for Carter's and McCoy's claims regarding adding their names to Adams' Facebook page, Sheriff Roberts testified that he has never looked at Facebook. McCoy even admitted that he did not know if the Sheriff ever looked at Adams' Facebook page, he just "assumed" Sheriff Roberts knew.  As with Adams' friendships, simply adding their names to Adams' Facebook page is not sufficient evidence, in this context, that plaintiffs spoke out as citizens. A picture of Carter's own wife was on Adams' Facebook page with Carter, yet Sheriff Roberts reappointed her.   Likewise, where Ramona Larkins' birthday party was not a campaign event for Adams, and where Sheriff Roberts had no knowledge of who attended the party, plaintiffs' mere attendance among many who worked in the Sheriff's Office does not amount to protected political expression.  Adams admitted there were numerous deputies there, in addition to plaintiffs. Ex. 1, p. 93.

Having failed to establish that they spoke out or expressed themselves, plaintiffs' retaliation claim fails.  However, even assuming *arguendo* that plaintiffs did speak out, they cannot satisfy the remaining *McVey* criteria.

### 2.  Plaintiffs Cannot Establish That Their Interest Outweighed Sheriff Roberts' Interest

Next, under *McVey*, "the employee's interest in the expression at issue must have outweighed the employer's 'interest in providing effective and efficient services

to the public.'" *Ridpath,* 447 F.3d at 316 (citation omitted). The Supreme Court has stated that,

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency.

*Connick v. Myers,* 461 U.S. 138, 151 (internal citations omitted).

Courts have found significant the interest of law enforcement officials, agreeing that, "[t]he need for harmony in the workplace is substantially heightened in public safety positions." *Harris v. Wood,* 888 F. Supp. at 753 (citing *Dunn v. Carroll,* 40 F.3d 287 (8th Cir. 1994)). This is particularly true of Virginia sheriffs, who are liable for the acts of their deputies, the safety of their deputies, and the safety of the public. See Va. Code § 15.1-41, et. seq.

As detailed in his deposition testimony and Affidavit, Sheriff Roberts considered each of the nine deputies whom he did not reappoint disruptive or their performance to be unsatisfactory, and believed that their presence hindered the harmony and efficiency of the Sheriff's Office. Ex. 2, ¶ 13. Sheriff Roberts' "'interest in providing effective and efficient services to the public,'" outweighs plaintiffs' alleged speech. *Ridpath,* 447 F.3d at 316 (citation omitted).

### 3. Plaintiffs Cannot Establish a Causal Nexus

Finally, *McVey* requires that, "there must have been a sufficient causal nexus between the protected speech and the retaliatory employment action." *Ridpath,* 447 F.3d at 316. In a First Amendment discharge case, the burden of proof is allocated as

follows:  "The initial burden lies with the plaintiff, who must show that his protected expression was a substantial or motivating factor in the employer's decision to terminate him.  If the plaintiff successfully makes that showing, the defendant may avoid liability if he can show, by a preponderance of the evidence, that the decision to terminate the plaintiff would have been made even in the absence of the protected expression, more simply, the protected speech was not the but for cause of the termination."  *Wagner v. Wheeler*, 13 F.3d 86 (4th Cir. 1993) (internal quotations and citations omitted).

The Fourth Circuit has characterized the causation requirement in First Amendment retaliation cases as "rigorous" because the protected speech must have been the "but for" cause of the adverse employment action.  *Ridpath*, 447 F.3d at 318 (citing *Huang v. Bd. of Governors*, 902 F.2d 1134, 1140 (4th Cir. 1990)).   "This necessarily means that the employer, or the responsible official, knew of the protected speech."  *Whatley v. S.C. Dept. of Public Safety*, 2006 WL 3918239 (D.S.C. 2006).

In *Litchford v. Williams*, 2005 WL 1000425 (W.D.Va. 2005), the plaintiffs were strong supporters of the incumbent sheriff, who lost his re-election campaign.  When the newly elected sheriff terminated them, they raised, *inter alia*, a First Amendment retaliation claim.  In denying the sheriff's summary judgment motion, the court relied on the plaintiff's "wide array of evidence," including that: the plaintiffs were "the most active and vocal supporters" of the incumbent; in individual meetings with the plaintiffs, the defendant asked them specific questions about their work for his opponent and made it clear that their support for his opponent was the reason for their terminations; and the defendant admitted in deposition that "his determination of whether to rehire an employee 'would depend upon how hard he campaigned against

me.'"  *Id.* at *5.  The court determined that this evidence "is certainly sufficient to allow a favorable finding as to causation."  *Id.*

In contrast, the evidence plaintiffs present is insufficient to support the requisite causal nexus between their alleged speech and Sheriff Roberts' decisions not to reappoint them.  As detailed above, Sheriff Roberts had legitimate reasons for his decisions.  There is no evidence that plaintiffs spoke, that Sheriff Roberts knew of or discussed plaintiffs' alleged support for Adams in making his decisions, or failed to reappoint plaintiffs on that basis.

Plaintiffs cannot satisfy the causation requirement based on Sheriff Roberts' attending shift meetings, announcing his reelection campaign, and asking his appointees for their continued support.   The Sheriff is permitted to ask his appointees for support.  There is no evidence to suggest that plaintiffs' attendance at a birthday party, use of Facebook, failure to sell golf tournament tickets, or to otherwise volunteer for the campaign, were the "but for" cause of Sheriff Roberts' reappointment decisions.  In fact, those plaintiffs who participated in Sheriff Roberts' campaign admit their participation was not coerced and Sheriff Roberts reappointed a substantial number of employees who did not participate in the campaign.

In sum, there is no evidence that Sheriff Roberts failed to reappoint plaintiffs because of their purported political conduct. Sheriff Roberts, faced with the Compensation Board's reduction and seeking efficiency and harmony in his office, reappointed 178 of 190 employees.  Three civilian positions, including those held by plaintiffs Bland and Woodward, were filled with sworn deputies.  Sheriff Roberts had legitimate reasons for his decisions regarding nine others, including plaintiffs McCoy, Dixon, Carter, and Sandhofer.  Under the *McVey v. Stacy* analysis, plaintiffs cannot

prove that Sheriff Roberts' failure to reappoint them violated their First Amendment right to freedom of speech.

### C. Plaintiffs Fail to Establish a First Amendment Association Claim

Typically, a public employee may not be terminated for his political affiliation. *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion); *Branti v. Finkel*, 445 U.S. 507 (1980). "[T]he First Amendment forbids government officials to discharge or threaten to discharge public employees for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990).

The Fourth Circuit employs "a two-part formulation of the *Elrod-Branti* analysis" to determine the appropriateness of a party affiliation requirement. *Fields v. County of Beaufort*, 699 F. Supp.2d at 763. The court must "'examin[e] whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan or political interests … or concerns.'" *Stott v. Haworth*, 916 F.2d 134, 140 (4th Cir. 1990) (citing *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241-42 (1st Cir.), cert. denied, 481 U.S. 1014 (1986)). If so, the court then "'examine[s] the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement.'" *Id.* at 142.

Finally, even if the position in question is the type to which the *Elrod-Branti* protections extend, the plaintiff must demonstrate a direct causal connection between his political association and termination. See *Knight v. Vernon*, 214 F.3d 544, 550 (4th Cir. 2000) (while political allegiance was not an appropriate requirement for the

position of jailer, if plaintiff was fired "for inadequate job performance or for some other non-political reason, nothing we say here would invalidate her discharge"); *Fields*, 699 F. Supp. 2d at 764 ("even assuming that the Plaintiff's position was the type of position to which *Elrod's* protections extend, it nevertheless appears that the Plaintiff has again failed to show a direct connection between Smith's political association, the Plaintiff's political association, and the Plaintiff's termination.").

Here, plaintiffs fail to state a First Amendment political association claim as a matter of law.

### 1.    Plaintiffs Carter, Dixon, Sandhofer, and McCoy

In *Jenkins v. Medford,* 119 F.3d 1156, 1164 (4th Cir. 1997), cert. denied, 522 U.S. 1090 (1998), the Fourth Circuit held "that newly elected or re-elected sheriffs may dismiss deputies either because of party affiliation or campaign activity.  Either basis serves as proxy for loyalty to the sheriff."[2]  In *Jenkins*, the plaintiff, a deputy sheriff, was "a sworn law enforcement officer" who had "the general power of arrest, a power that may be exercised in North Carolina only by an officer who receives extensive training in the enforcement of criminal law."  *Knight v. Vernon*, 214 F.3d at 550.

Analyzing the deputy's function, and noting that "the office of the deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable," the Fourth Circuit determined that a deputy

---

[2]  While *Jenkins* arose in North Carolina, the Fourth Circuit has recognized that, "the law in this circuit is clear that sheriffs in Virginia have the right to lawfully terminate their deputies for political affiliation reasons." *Pike v. Osborne*, 301 F.3d 182, 186 (4th Cir. 2002) (Hamilton, J. concurring).

"may be lawfully terminated for political reasons under the *Elrod-Branti* exception to prohibited political terminations." *Jenkins*, 119 F.3d at 1163-1164.  The Fourth Circuit "limit[ed] dismissals ... to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff... to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed." *Id.* at 1165.

In *Knight v. Vernon*, 214 F.3d 544, the Fourth Circuit elucidated its holding in *Jenkins*, stating that, "[t]he central message of *Jenkins* is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement."  In *Knight*, the plaintiff was a jailer, occupying the "'lowest level' position,'" whose responsibilities were "routine and limited in comparison to those of a deputy sheriff."  She "worked mostly at the jail performing ministerial duties," including filing out paperwork, feeding and cooking, distributing medicine, monitoring personal hygiene, and checking on the inmates.  Her "contact with the public was limited to overseeing visitors to the jail and occasionally transporting inmates to prisons or medical facilities." *Id.* at 549 - 550.  Based on her limited function, the Fourth Circuit held that the jailer's political allegiance was not an appropriate requirement for her position, entitling her to First Amendment protection.

Here, *Jenkins* dictates that political allegiance was an appropriate requirement for plaintiffs Carter, Dixon, Sandhofer, and McCoy.  Under Virginia law, deputy sheriffs have arrest powers.  See Va. Code § 19.2-81(A)(2).  Virginia law also requires all full-time deputy sheriffs to complete a course of instruction established by the Virginia Dept. of Criminal Justice Services ("DCJS").  See Va. Code § 15.2-1612.1.   All Hampton Sheriff's Office deputies attend DCJS training and have arrest powers.   Ex. 2, ¶ 19; Ex. 16.

Further, plaintiffs McCoy, Sandhofer, Dixon, and Carter all have extensive law enforcement training.  Ex. 17, Training Records.  McCoy and Dixon moved between jail and court assignments.   During Sandhofer's short tenure, he worked in civil process.  Further, all four of these former deputies sought and received approval for "Extra Duty Employment," comprising security work outside of the Sheriff's Office during which they are in uniform and armed.  Ex. 2, ¶ 20; Ex. 18, Applications for Extra Duty Assignments.

*Jenkins* dictates that political affiliation is an appropriate requirement for the deputy sheriff positions in the Hampton Sheriff's Office.   Former deputies Carter, Dixon, Sandhofer, and McCoy fall within the *Elrod-Branti* exception and cannot raise a political association claim, as a matter of law.

### 2.   Plaintiffs Bland and Woodward

Woodward's  position  as  Training  Coordinator  and  Bland's  as  Finance Officer/Procurement and Accounts Payable, are not protected positions under *Elrod-Branti*.  First, these positions "'relate[] to partisan or political interests ... or concerns.'" *Stott v. Haworth*, 916 F.2d at 140 (citing *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d at 241-42).   "[T]he ultimate question under *Branti* is whether local directors make policy *about matters to which political ideology is relevant....*" *Fields v. Prater*, 566 F.3d at 387 (emphasis in original).   In other words, there must be "a rational connection between shared ideology and job performance." *Stott*, 916 F.2d at 142 (quoting *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988)).

In  their  positions  as  Finance  Officer  and  Training  Coordinator,  Bland  and Woodward implemented Sheriff Roberts' policies and goals, had discretion, made decisions,  and  necessarily  provided  Sheriff  Roberts  with  truthful  information  upon

which he made decisions and set policy.  See *Jenkins*, 119 F.3d at 1162.  As set forth in Sheriff Roberts' Affidavit, he depended on Bland to demonstrate fiscal responsibility, by providing accurate financial information necessary for budgets and audits, and managing appropriately inmate canteen funds, and accounts payable and receivable. Ex. 2, ¶ 15.  Likewise, Sheriff Roberts depended on Woodward to ensure that all appointees' training obligations were satisfied and that the application and hiring process for prospective employees ran smoothly.  Ex. 2, ¶ 17.  All of these tasks were necessary to further Sheriff Roberts' policies and his administration of the Sheriff's Office.

Second, Bland and Woodward were both "privy to confidential information." Bland, as Finance Officer, had access to considerable financial information, including inmate canteen funds, departmental budgets, bank accounts, and audits.  Also responsible for accounts payable and receivables, Bland represented Sheriff Roberts to outside vendors.  Specifically, Bland was involved "with the preparation of the annual operating budget and the annual jail cost audit," "coordinate[d] all financial aspects of the inmate Work Release Program," "maintain[ed] vendor files," "monitor[ed] the status of all pending purchase orders and requisitions," and reconciled four Sheriff's Office bank accounts on a monthly basis.  Ex. 19.

Likewise, Woodward, as Training Coordinator, had access to personnel files, training records, and to information about applicants and potential new hires.  Ex. 20. She was privy to confidential personnel information, employment applications, criminal background checks, and all internal and Dept. of Criminal Justice Services' training records.  Woodward represented Sheriff Roberts in interactions with the public, including applicants, new hires, and outside trainers brought into the jail.  "I was

25

responsible for all of the deputies' and civilian staff's training.  I scheduled all the training, coordinated it.  I had to keep track of all of the training records of each employee to make sure that they received all of their annual training to meet all of the accreditation.  And, also, I was a liaison to the Hampton Roads criminal justice – or the training academy when – and I would schedule deputies to go for their training at the academy to be recertified and other – you know, other duties as assigned." Ex. 5, p. 11.

Their duties were not "ministerial," as with the jailer in *Knight*.  Upon examination of the job duties of the positions they held, Bland and Woodward cannot state a cognizable political association claim.

### 3.   Even if Entitled to *Elrod-Branti* Protection, Plaintiffs Cannot Establish Causation

Assuming for argument's sake, that plaintiffs are entitled to the *Elrod-Branti* protections, they have not established causation, or that their lack of participation in Sheriff Roberts' campaign, or, conversely, their alleged support of Adams, were factors in their termination.  As established above, Sheriff Roberts did not base his decisions on plaintiffs' political affiliation.

### D.   Sheriff Roberts is Entitled to Qualified Immunity in his Individual Capacity

Sheriff Roberts is entitled to qualified immunity on plaintiffs' individual capacity claims.  Government officials who perform discretionary functions are not liable for damages under § 1983 where their conduct does not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects public officials from lawsuits where they have taken reasonably discretionary acts in carrying

out their duties, and balances "[t]he public interest in deterrence of unlawful conduct and compensation of victims ... with independence and without fear of consequences." *Id.* at 819.  The Fourth Circuit has opined that, "the purpose of qualified immunity is to remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991) (citing *Mitchell v. Forsythe*, 472 U.S. 511, 526 (1985)).

"[W]hether an individual official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).  In undertaking a qualified immunity analysis, the Court must first consider whether "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201(2001).

If a constitutional right has been infringed, "the next sequential step is to ask whether the right was clearly established ... in light of the specific context of the case." *Id.*  It must be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Id.* at 202; *Pike v. Osborne,* 301 F.3d 182, 185 (4th Cir.2002).  See *Massenburg v. Adams*, 2010 WL 1279087, 4 (E.D.Va. 2010) (citing *Snider v. Jefferson State Cmty. Coll.,* 344 F.3d 1325, 1328 (11th Cir.2003)) ("For a constitutional right to be clearly established in a given case, the right's contours must be so clear that every, objectively reasonable official must understand that what the

defendant, in the context of the circumstances of the case, is doing clearly violates the right.").

Here, as addressed above and incorporated for purposes of this qualified immunity argument, plaintiffs cannot establish the infringement of their First Amendment rights. With regard to their speech claims, plaintiffs cannot satisfy the *McVey* test. With regard to their political association claims, plaintiffs are not entitled to the *Elrod-Branti* protections. On neither claim does plaintiffs' evidence demonstrate the requisite causal nexus; they cannot show that Sheriff Roberts failed to reappoint them in retaliation for their protected expression or infringed on their political association rights. However, even assuming a constitutional violation, Fourth Circuit law regarding the constitutionality of sheriffs' terminating appointees remains unsettled and plaintiffs' claimed constitutional rights are not clearly established.

In *Stickley v. Sutherly*, 416 Fed. Appx. 268, 2011 WL 893760 (4th Cir. 2011), the Fourth Circuit granted qualified immunity in a First Amendment retaliation claim brought by a police officer against a police chief and town manager. The court reiterated its oft-stated view that, "where a sophisticated balancing of interests is required to determine whether the plaintiff's constitutional rights have been violated, only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected." *Id.* at 272 (quoting *McVey v. Stacy*, 157 F.3d at 277). See *Pike v. Osborne*, 301 F.3d 182 at 185.

Here, the law was not clear in the Fourth Circuit in December 2009 that, in failing to reappoint plaintiffs, Sheriff Roberts should have known he was violating their First Amendment right to free expression. In *Pike v. Osborne*, two former sheriff's dispatchers claimed they were terminated in retaliation for supporting the sheriff's

opponent. The sheriff claimed that he did not rehire them because of confidentiality concerns. Even taking the "thin and circumstantial" evidence that they were the most vocal supporters of the incumbent, and the only two terminated, *id.* at 185, in the light most favorable to the plaintiffs, and assuming they had established a free speech violation, the Fourth Circuit granted the sheriff qualified immunity, stating:

> In determining whether a retaliatory employment decision violates the First Amendment, we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting efficiency of the public services it performs through its employees." ... We have recognized that in these cases "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a "particularized balancing" that is subtle, yet difficult to apply, and not yet well defined. Given this "difficult-to-apply balancing test, we cannot conclude that in this case a First Amendment violation was so clearly established that a reasonable official in Sheriff Osborne's position would know, without having to engage in guesswork, that the plaintiffs' interest in commenting on an issue of public concern outweighed the sheriff's interest in maintaining a loyal and efficient sheriff's department.

*Id.* at 185 (internal citations omitted).

In 2007, the Fourth Circuit indicated that a speech claim based on what the employer "believed" about the employee's views or affiliation, was insufficient as a matter of law. See *Smith v. Frye*, 488 F.3d at 762, no. 2. In 2010, the District of South Carolina believed that under *Frye*, even neutrality did not amount to expression. See *Fields v. County of Beaufort*, 699 F. Supp. 2d 756. It was not clearly established that plaintiffs' purported "speech" was constitutionally protected.

Considering plaintiffs' political association claim, in *Fields v. Prater*, 566 F.3d 381 (4th Cir. 2009), the Fourth Circuit expressed the same narrow view of when a right is clearly established in that context.

In *Jenkins*, we acknowledged that the caselaw applying *Branti* had been "conflicting and confusing." ... See also *Pike v. Osborne*, 301 F.3d 182, 186 (4th Cir. 2002) (Hamilton, J., concurring in the judgment) (observing that "*Jenkins* is confusing, at best" when applied to a slightly different context than that at issue in the case). ... Because application of the principles of *Branti* and *Jenkins* to new situations invariably requires particularized inquiries into specific positions in the context of specific systems, it is not always easy to say that there is a clearly drawn line between those positions for which consideration of political affiliation is allowed and those for which it is not.

*Id.* at 389.

The *Fields* court held that the defendants had violated the plaintiff's First Amendment rights by considering the plaintiff's political affiliation, based on a factually similar case. However, the court granted the defendants qualified immunity, because "we do not think that [the earlier case] would have *clearly* put defendants on notice that their conduct was unconstitutional." *Id.* at 390 (emphasis in original). As one court has stated, "In light of *Fields*, qualified immunity will not be destroyed by the mere existence of a similar case on point, provided that some factual distinctions can be drawn." *LeSueur-Richmond Slate Corp. v. Fehrer*, 752 F. Supp. 2d 713, 719 (W.D.Va. 2010).

Here, it was not clearly established that political allegiance was an inappropriate requirement for sworn deputy sheriffs with arrest powers, law enforcement training, precluding Sheriff Roberts from terminating plaintiffs Carter, Dixon, Sandhofer, and McCoy. Nor was the law clearly established that plaintiffs Woodward and Bland, privy to confidential personnel and financial information, were entitled to the *Elrod-Branti* protections. No case directly on point put Sheriff Roberts on notice that their "specific positions in the context of [the Hampton Sheriff's Dept.'s] specific system[]," did not allow for "consideration of political affiliation." *Fields v. Prater*, 566 F.3d at 389.

### E.     Sheriff Roberts Cannot be Sued in his Official Capacity

A suit for damages against a Sheriff in his official capacity, like other Virginia constitutional officers, is considered a suit against the state and is barred by the Eleventh Amendment.  See *Smith v. McCarthy*, 2009 WL 50022 (W.D.Va. 2009); *Hussein v. Miller*, 232 F. Supp.2d 653 (E.D.Va. 2002); *Blankenship v. Warren County*, 918 F. Supp. 970, 974, on recons., 931 F. Supp. 447, 449 (W.D.Va. 1996); *McCoy v. Chesapeake Correctional Ctr.*, 788 F. Supp. 890, 893 (E.D.Va. 1992).  See also *Ram Ditta v. Maryland Nat'l Park and Planning Comm.*, 822 F.2d 456, 457-58 (4th Cir. 1987).  Thus, the Eleventh Amendment immunizes Sheriff Roberts, in his official capacity, from plaintiffs' § 1983 claims.

## III.   CONCLUSION

For the reasons set forth above, defendant B.J. Roberts respectfully requests the Court (1) to find as a matter of law that plaintiffs have failed to establish First Amendment violations and that Sheriff Roberts is entitled to qualified immunity, and (2) to enter summary judgment in Sheriff Roberts' favor and dismiss plaintiffs' claims, with prejudice.

B. J. ROBERTS, SHERIFF, Individually
and in his official capacity as Sheriff
of the City of Hampton, Virginia

By:_____/s/_____
                          Of Counsel

Jeff W. Rosen, Esquire
Virginia Bar No. 22689
*Attorney for B. J. Roberts, Sheriff, Individually and*
*in his official capacity as Sheriff of the City of*
*Hampton, Virginia*
Pender & Coward
222 Central Park Avenue
Virginia Beach, Virginia  23462
Phone:  (757) 490-6253
Fax:  (757) 497-1914
Email:  jrosen@pendercoward.com


Lisa Ehrich, Esquire
Virginia Bar No. 32205
*Attorney for B. J. Roberts, Sheriff, Individually and*
*in his official capacity as Sheriff of the City of*
*Hampton, Virginia*
Pender & Coward
222 Central Park Avenue
Virginia Beach, Virginia  23462
Phone:  (757) 490-6253
Fax:  (757) 497-1914
Email:  lehrich@pendercoward.com

Jeffrey A. Hunn, Esquire
Virginia Bar # 45487
*Attorney for Sheriff B.J. Roberts*
Pender & Coward
222 Central Park Avenue
Virginia Beach, Virginia  23462
(757) 490-6253
(757) 497-1914
jhunn@pendercoward.com

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 9th day of December, 2011, I electronically filed a *Memorandum of Law in Support of Motion for Summary Judgment* with the clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

          James H. Shoemaker, Jr., Esq.
          Virginia Bar #33148
          Jason E. Messersmith, Esq.
          Virginia Bar #77075
          Patton, Wornom, Hatten & Diamonstein, L.C.
          12350 Jefferson Avenue, Suite 300
          Newport News, VA  23602
          (757) 223-4580/Fax (757) 223-4518
          jshoemaker@pwhd.com
          jmessersmith@pwhd.com

          William W. Hoyle, Jr., Esq.
          Virginia Bar #21725
          William W. Hoyle, Jr., P.C.
          10401 Warwick Boulevard
          Newport News, VA  23601
          (757) 596-1850/Fax (757) 596-1925
          habeas@erols.com
          *Counsel for plaintiffs*

                        _____/s/_____
                        Jeff W. Rosen, Esquire
                        Virginia Bar No. 22689
                        *Attorney for B. J. Roberts, Sheriff, Individually and*
                        *in his official capacity as Sheriff of the City of*
                        *Hampton, Virginia*
                        Pender & Coward
                        222 Central Park Avenue
                        Virginia Beach, Virginia  23462
                        Phone:  (757) 490-6253
                        Fax:  (757) 497-1914
                        Email:  jrosen@pendercoward.com