EXHIBIT

3

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

------------------------------------

BOBBY BLAND; DANIEL RAY CARTER, JR.;
DAVID W. DIXON; ROBERT W. McCOY;
JOHN C. SANDHOFER; and
DEBRA H. WOODWARD,

         Plaintiffs,

v.

                                    CASE NO.
                                    4:11-CV-45

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

         Defendant.

------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF B. J. ROBERTS,
TAKEN ON BEHALF OF THE PLAINTIFFS

Virginia Beach, Virginia

October 4, 2011

Appearances:

        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
        By: JAMES H. SHOEMAKER, JR., ESQUIRE
           Counsel for the Plaintiffs

        PENDER & COWARD
        By:  JEFF W. ROSEN, ESQUIRE
           Counsel for the Defendant



1    No.

2         Q.        Okay.  And in December of 2009, you

3    declined to reappoint the plaintiffs in this case and

4    you apparently also declined to reappoint some others.

5    I know -- who are the others that you declined to

6    reappoint in December of 2009, to the best of your

7    recollection?

8         A.        One was Sammy Mitchell.  I think Deputy

9    Wheeler.  Deputy Davis.  And another female.  I just

10   can't remember her name right now.

11        Q.        How about Ken Darling?

12        A.        And Ken Darling.

13        Q.        The other female wasn't Pikett, or Piatt,

14   Pikett, the lady we subpoenaed?

15        A.        No, sir.

16        Q.        Why did you decide not to reappoint

17   Wiggins?

18        A.        I'm sorry?

19        Q.        Why did you decide not to reappoint

20   Wiggins?

21        A.        Deputy Wiggins had missed enormous amount

22   of work time and it was determined that she was not --

23   would not be a good deputy to continue on with in the

24   next term.

25        Q.        Is that Tameka Wiggins?

1          A.      I believe so.

2          Q.      Who brought her deficiencies with respect

3    to work time to your attention?

4          A.      That was Major Richardson.

5          Q.      Were there any other reasons you failed to

6    reappoint Wiggins?

7          A.      And according to her work area and working

8    and not -- the lack of ability to get to work.   That

9    was it.

10          Q.      Why did you not reappoint Sammy Mitchell?

11          A.      Sammy Mitchell was a duty lieutenant, and

12    he had had numerous problems in the training area and

13    also running his shift.   We found that his shift was

14    lacking the supervision that was necessary so found it

15    necessary not to reappoint him.

16          Q.      You remember how close to retirement he

17    was?

18          A.      No, sir.

19          Q.      Was he -- he was a 20-plus-year employee,

20    wasn't he?

21          A.      No, sir.

22          Q.      He wasn't?

23          A.      I do know that, that he was not, because I

24    hired him.

25          Q.      When did you hire him?   Do you remember?

1      A.      Probably in -- somewhere in '95, '94.  I'm

2   not sure of the dates.

3      Q.      All right.  Davis, that was a female?

4      A.      Sergeant.  A male.

5      Q.      All right.  You don't remember the first

6   name?

7      A.      No.

8      Q.      Why did you not reappoint Sergeant Davis?

9      A.      Sergeant Davis, same thing, had supervision

10  problems.  Had problems, I believe, coming to work.  I

11  think that was part of it.  And also I think following

12  direction.  I believe that's one of the things where I

13  found it necessary not to reappoint him for my next

14  term.

15     Q.      Who brought to you the information

16  regarding Sergeant Davis that caused you not to

17  reappoint him?

18     A.      That would be Major Richardson.

19     Q.      I don't think I asked that question about

20  Mitchell.  Did someone come to you about Mitchell or

21  did you come to that on your own?

22     A.      That would be Major Richardson and along

23  with Colonel Bowden, but basically Major Richardson.

24     Q.      Why does this fall under Major Richardson's

25  purview?

1    2009 or September of 2009 when you learned that a

2    couple of deputies were on Jim Adams' Facebook page?

3        A.      Yes, sir.

4        Q.      Tell me how you learned about that.

5        A.      The only -- the only one that came to mind

6    is -- was Carter, I believe.  And I'm not sure how I

7    got the information that it was on -- it was on

8    Facebook.

9        Q.      Do you remember where you were when you

10   learned about it?

11       A.      No.  That's a good little time ago.  I

12   don't quite remember where it was.

13       Q.      Okay.  Were you at work?  Do you know that?

14       A.      Probably at work.

15       Q.      And someone told you about this?

16       A.      Yeah.

17       Q.      Do you remember, was it an officer who told

18   you about it?

19       A.      I said I don't know.  I don't recall how I

20   got the information.

21       Q.      But my question, though, is -- I'm just

22   trying to, you know, get more information about what

23   your memory precisely is.  Do you know if the person

24   who told you was one of your senior officers?

25       A.      No.  I do know it was just in general and

1   what I -- if I remember right -- and I don't remember

2   how I got the information.  That's number one, but the

3   -- it was just talk and I -- I never saw it, so I don't

4   know when it was.

5        Q.      Did any of your senior officers ever look

6   at it?

7        A.      I don't know that to be -- I don't know.

8        Q.      So your testimony is you never looked at

9   Jim Adams' Facebook page?

10       A.      No, I have not.

11       Q.      And you don't know of any of your senior

12  officers who looked at Jim Adams' Facebook page?

13       A.      I don't know.  No one has told me that

14  they've seen it, that they looked at it.  That I can

15  remember.  I just know that I didn't.

16       Q.      Did there ever come a time when you learned

17  that Robert McCoy, Wayne McCoy, was on Jim Adams'

18  Facebook page?

19       A.      Only until late after -- I think it was

20  after the election.

21       Q.      But you're not sure about that?

22       A.      No, but I believe it was after the

23  election.  But I'm not sure.

24       Q.      Did you ever learn that Tameka Wiggins was

25  on his Facebook page?

106

1        A.       No, I didn't know that until the

2    depositions.

3        Q.       Are you aware of any other of your

4    employees being on Jim Adams' Facebook page prior to

5    November -- prior to the election in November of 2009?

6        A.       No, I don't.

7        Q.       Have you ever been on Facebook?

8        A.       Pardon me?

9        Q.       Have you ever been on Facebook?

10       A.       No, I have not.

11       Q.       No one in your office maintains a Facebook

12   presence for the Hampton sheriff's office on Facebook?

13       A.       No, not for the Hampton sheriff's office,

14   that I know of.

15       Q.       And you never had any discussions with any

16   of your senior officers about any of your employees

17   being on Jim Adams' Facebook page?

18            MR. ROSEN:  Object to the form of the

19   question.  You can answer it.

20       A.       I -- I don't recall how I knew that -- who

21   told me the facts of being -- them -- anyone being on

22   the Facebook.  All I know is that I did know that

23   Carter had -- and one of the reasons I knew, because he

24   told me.

25

1       A.      Just that?

2       Q.      Yes, sir.  I'm just going to ask you a

3  question right now about 22.  Yeah, 22.  Some of it

4  does, I think, go to the top of the next page.

5       A.      Okay.

6       Q.      Did you ever give your employees a talk --

7  my first question is did you ever give your employees a

8  talk where you used the phrases "long train" and "short

9  train"?

10      A.      Yes, sir, I did say that.

11      Q.      Tell me what you told your employees on

12  that occasion.

13      A.      I -- in a meeting I said that I'm -- I have

14  a long training -- train, meaning that I got a lot of

15  supporters.  You ought to consider -- you ought to

16  consider this train because the other -- don't get on

17  -- don't get on a short train because it really don't

18  have a lot of supporters.  That's what I meant and

19  that's what I said.

20      Q.      Did you use the phrase "the man I fed for

21  16 years"?

22      A.      I don't talk like that, Counselor.  No.

23      Q.      Did you say that, "I'm going to have this

24  job as long as I want it"?

25      A.      No, sir.

1    anything like that?

2         A.       No, I don't.

3         Q.       Who do you -- who did you place in charge

4    of promoting ticket sales to your golf event in 2009?

5         A.       I don't know if I placed anyone in charge

6    of it.  Richardson had tickets.  I don't know if any

7    other persons got tickets.

8         Q.       Do you put anyone in charge of putting that

9    event on?

10        A.       Captain Unnoppet and before that -- oh, who

11   did it?  Every -- we -- I mean it was a collective

12   thing, Counselor, where almost everybody worked on to

13   put it on.

14        Q.       Did any of your senior officers ever come

15   to you and tell you which employees were supporting you

16   and which were not?

17        A.       No, sir.

18        Q.       Now, did there come a time in either late

19   August of 2009 or early September, 2009, when you

20   learned about a cookout that was attended by Jim Adams,

21   Danny Carter, John Sandhofer, Robert McCoy, and --

22   Robert McCoy?

23        A.       I knew -- I knew about the birthday party,

24   but I didn't know who had come.  I knew Adams was

25   there.

1     Q.     How did you learn that Adams was there?

2     A.     I'm -- you know, I don't know anyone in

3  particular that said that -- who was there.  I never

4  really asked who was there, but I believe -- I don't

5  know if Colonel Bowden told me or not.  I think it

6  might have been Colonel Bowden.

7     Q.     Do you recall ever looking at a computer

8  screen with pictures of that event on it?

9     A.     No, sir.

10    Q.     Did any of your senior officers report to

11 you that they had seen pictures of people who attended

12 that event?

13    A.     No, sir.

14    Q.     Do you know how Colonel Bowden learned

15 about the event?

16    A.     No, I don't.  She would have to tell you.

17    Q.     Were you ever present when any of your

18 senior officers spoke to any of your employees about

19 your strengths as sheriff?

20    A.     Was I present when that happened?

21    Q.     Yes.

22    A.     No, sir.

23    Q.     After this occasion where you mentioned the

24 long train and short train, I asked you about paragraph

25 22 before.  You made that talk to different groups of

1    your employees, didn't you?  That talk wasn't just

2    given on one occasion, it was given to each shift, was

3    it not?

4         A.      That's correct, sir.

5         Q.      After you spoke to Danny Carter's shift,

6    did you and Danny Carter have a conversation?

7         A.      Yes, we did.

8         Q.      Tell me about that conversation.

9         A.      While I was speaking to the shift, and he

10   seemed agitated and I thought he had become -- looked

11   pretty angry in the meeting, and I knew that was

12   unusual.  So as I was walking out, he was walking out,

13   and I asked him as he walked out, I said:  Danny, is

14   there something you want to talk to me about?  And we

15   walked -- he said:  Yes, if you don't mind.

16              And I walked out with him, and he started

17   -- he started the conversation about his wife.  He got

18   upset that -- the fact that we disciplined her.  I'm

19   not even sure if they were married at the time, but

20   yes, they -- they probably was.  He got upset because

21   we had to discipline her because she left -- as control

22   operator, she left the sally port gates open and also

23   the door to the jail.  He said that the disciplinary

24   board did not give -- get enough information and he

25   became -- raised his voice and got loud.  He said I

```
 1            MR. ROSEN:  Objection to the form of the
 2    question to the extent it calls for a legal conclusion
 3    or mischaracterizes testimony.
 4            You can answer.
 5       A.      It's my belief that I cannot dismiss a
 6    person for political reasons.
 7
 8    BY MR. SHOEMAKER:
 9       Q.      Okay.  Why did you fire Debbie Woodward?
10       A.      I didn't reappoint Debra.
11       Q.      Why did you not reappoint Debbie Woodward?
12       A.      I didn't reappoint Ms. Woodward because she
13    was -- she was placed in a deputy's position.  She was
14    a civilian in a deputy's position.  She was in
15    training.  We had already -- we knew that we were going
16    to have to -- our number of deputies were being reduced
17    because our inmates were being -- were reduced, being
18    that we had so many in the regional jail.
19            Ms. Woodward was a super -- she worked in
20    that position in training.  And we truly wanted someone
21    in there to -- that could train and that was a deputy.
22    I had asked her from time to time did she want to be a
23    deputy.  She told me no.  And I believed her
24    supervisors had asked her did she want to become a
25    deputy.  So we evaluated, and all our civilian
```

1    positions, made determinations that we needed to put

2    deputies in those positions because we needed to be

3    able to systematically -- if we need a deputy to go on

4    the floor, we would have someone available, someone to

5    -- especially being that she was just a clerk in the

6    training office, we needed a deputy.

7        Q.      Did anyone ever say to her: Hey, Debbie,

8    you've either got to become a deputy or we're not going

9    to reappoint you?

10       A.      I don't know that to be the case.

11       Q.      You mentioned that the number of deputy

12   positions was going down?

13       A.      Counselor, when the -- they determine your

14   staffing, you get three to one, three -- you get one to

15   three deputies to population.  Population had been

16   declining for a number of years.  In the past two years

17   we've lost three and then five positions, I think it's

18   a total of eight positions, deputy positions through

19   the comp board, and so we had to make a determination

20   what could we do to bring in more deputies.  We had so

21   many people that were working for us that were admin

22   that had full deputy positions.  So we made a

23   determination almost across the board that we were

24   going to use those positions for deputies.  Actually --

25       Q.      Who made that determination?

123

1    to go to the academy and for our in service.  Deputy

2    Youngblood does that and also becomes -- she's what is

3    already a training officer.  And at the same time she

4    schedules and also trains.

5

6    BY MR. SHOEMAKER:

7        Q.      When was Deputy Youngblood moved into that

8    position?  Do you know?

9        A.      I don't know the date, but right after I

10   didn't reappoint -- I believe right after I didn't

11   reappoint Ms. Woodward.

12       Q.      So are all your -- do all your civilian

13   employees count against your deputy allotment?

14       A.      Not all, but the majority of them.  She was

15   one that did.

16       Q.      Uh-huh.  Were there any -- did Bobby Bland

17   count against your deputy allotment?

18       A.      Yes, sir.

19       Q.      Who else counted against your deputy

20   allotment?

21       A.      Mr. Darling.

22       Q.      He was uniformed when he left, wasn't he?

23       A.      No, sir.

24       Q.      Anyone else?

25       A.      Mr. Darling, Ms. Woodward, and Bobby Bland.

127

1    I -- it was my understanding he used the word f---ing,

2    You can take this f---ing s---, stuff, and throw it in

3    the trash can.

4         Q.      By that stuff, he's referring to your

5    campaign literature?

6         A.      That's correct.

7         Q.      You never interviewed Dixon to get his side

8    of it, did you?

9         A.      No, I did not, sir.

10        Q.      And none of your senior officers ever

11   interviewed Dixon to get his side?

12        A.      I don't know if they did or not.  I made

13   that decision.

14        Q.      How much does it cost to send somebody

15   through basic jailer school?

16        A.      Counselor, I really don't know.  We -- it's

17   not an individual thing.  We pay accordingly.  For

18   example, if you have 100 deputies, you pay that -- you

19   pay an amount every year for that.

20        Q.      Okay.

21        A.      And then we can send 40 if need be.

22        Q.      Do you know how much it is for 100

23   deputies?

24        A.      I don't know.  I'd have to find out.

25        Q.      Is it more than $20,000?

1     A.     I don't know.

2     Q.     What document would say -- who would know

3 how much that costs?

4     A.     We'd have that, the charge from the

5 academy.

6     Q.     When you say, "we," who in your office

7 knows most about that?

8     A.     Colonel Bowden.

9     Q.     Have you told me all the reasons you

10 decided not to reappoint David Dixon?

11     A.     I did, sir.

12     Q.     Why did you choose not to reappoint John

13 Sandhofer?

14     A.     John, I didn't reappoint John Sandhofer

15 because I didn't think he integrated that well with the

16 -- with my other -- with my staff.  That was just my --

17 on me.  And I didn't think that he would -- I didn't

18 want to continue his employment or reappoint him.

19     Q.     Have you told me all the reasons that you

20 decided not to reappoint John Sandhofer?

21     A.     Yes, sir.

22     Q.     And John Sandhofer has a bachelor's degree

23 from James Madison University.  Do you have any idea

24 how many of your rank-and-file deputies have bachelor's

25 degrees, you know, from solid colleges?

129

```
 1          A.      Quite a number.  Quite a number.

 2          Q.      Do you have any idea of the percentage?

 3          A.      No, I don't, but quite a number of them

 4   have college degrees.

 5          Q.      Were you aware that I think he also has a

 6   master's from William and Mary?

 7          A.      No, sir.  I wouldn't -- I didn't know he

 8   had a master's from anywhere.

 9          Q.      All right.  Why did you terminate Danny

10   Carter?  Why did you choose not to reappoint Danny

11   Carter?

12          A.      Because of the conversation, the

13   conversation we had after the meeting.  I had to make a

14   determination if -- could I keep both of them, the wife

15   and him.  And I thought he -- that was the first time

16   any deputy had raised the level of our conversation the

17   way he did, and I just didn't feel that it would be to

18   my best interests and my office's best interests to

19   keep him or keep both of them.  I didn't believe that

20   he could separate himself from his wife while they were

21   working.

22          Q.      Okay.  Have you told me all the reasons you

23   chose not to reappoint Danny Carter?

24          A.      Yes, sir.

25          Q.      Why did you choose not to reappoint Wayne
```

1    McCoy?

2         A.       Wayne, Deputy McCoy, formerly Deputy McCoy,

3    we had had -- he had had a lot -- not a lot.  He had

4    had some difficulties in almost every area we had

5    worked.  We worked in.

6              And so arguments, heated arguments with

7    deputies when he was in civil.  We switched him up and

8    brought him back to corrections.  I just felt that at

9    that particular time that it would be better for us to

10   sever ties with Wayne and move forward on some of the

11   things we wanted to accomplish.

12        Q.       He had, I think, 20 years of service with

13   you and you chose not to reappoint him; is that

14   correct?

15        A.       I don't know the years that he had, but it

16   might be to that effect.

17        Q.       At 25 years if you are of sufficient age,

18   you can get full retirement from your office; is that

19   correct?

20        A.       25 years and 50.

21        Q.       25 years of service and at least 50 years

22   of age?

23        A.       That's correct.

24        Q.       Are there any documents in your office that

25   explain the retirement benefit?

135

1    protesting about the fact that people who did not live

2    in Hampton were circulating your petitions?

3         A.      No, sir.

4         Q.      This ratio issue that you talked about a

5    few minutes ago, the ratio of deputies to inmate

6    population, who would -- who was working with you on

7    balancing that ratio and dealing with that issue, if

8    anyone?

9         A.      Counselor, no one has to work with me to

10   balance it.  That comes from the compensation board.

11        Q.      Okay.  But you obviously -- you say you

12   chose not to reappoint Bland and Woodward because of

13   this issue.  Correct?

14        A.      Partly, yes.

15        Q.      And were you working with anyone in making

16   that determination to not reappoint the two people in

17   the fall of 2009?

18        A.      The colonel, Colonel Bowden, and I think

19   Wells-Major and I believe Major Richardson, we

20   continually talked about it.  It's not just in this --

21   in 2009.  We've talked about this from -- since 2005

22   and '6.

23        Q.      You don't recall Danny Carter doing any

24   campaign work for you during the 2009 campaign, do you?

25        A.      No, I don't recall him -- I wouldn't -- I

1       Q.      Were there deputies in your department that

2    did not participate in your campaign?

3              MR. SHOEMAKER:   What's the question?

4              MR. ROSEN:  Were there deputies that did

5    not participate in your campaign.

6              MR. SHOEMAKER:   That he knows about them?

7              MR. ROSEN:  Yes.

8       A.      Did I know the number?

9

10   BY MR. ROSEN:

11      Q.      Yes.

12      A.      No.  No.

13      Q.      Did you know who did -- were there deputies

14   that did not buy tickets to your golf tournaments?

15   That were reappointed.

16      A.      I'm sure there was.

17      Q.      Did you even know who had sold tickets to

18   your golf tournaments when making the reappointment

19   decisions?

20      A.      No, sir.

21      Q.      Did you know whether any of the plaintiffs

22   in this case were not supporting you when you made your

23   reappointment decisions?

24      A.      No, sir.

25      Q.      Okay.  Did any of them tell you that they

145

1   were not supporting you?

2        A.      No, sir.

3        Q.      Did any of them buy tickets to your golf

4   tournament that you know?

5        A.      I don't know.  I don't know.  I didn't know

6   if they did or not.

7        Q.      Did you determine who bought tickets to

8   your golf tournament when you were making your

9   reappointment decisions?

10       A.      No, sir.

11       Q.      All right.  Did you know who was -- who had

12  volunteered to work in your campaign when you made your

13  reappointment decisions?

14       A.      No, sir.

15       Q.      Did you know whether the plaintiffs had or

16  had not worked on your campaign when they were -- you

17  made the reappointment decisions?

18       A.      No, I did not know that.

19       Q.      Do you know whether those people had worked

20  in your campaign in the past?

21       A.      Some I do, some I don't.

22       Q.      Now, Mr. Shoemaker asked you the reasons

23  for your decision not to reappoint other, various

24  deputies.  In addition to the reasons you've outlined,

25  did you also consider their discipline records, if any?

BY MR. ROSEN:

1     Q.     Let me ask, what problems did he have?

2     A.     He -- he had come up through the ranks as sergeant and he -- he said he could not handle the work in the jail as a supervisor, so would I -- would I -- well, would I demote him, and I -- because he was having problems supervising. He just couldn't take it. So we did that.

Then he went over to -- I believe he went over to civil process. And then he wanted to -- when we needed another training officer, he asked to be -- could he do that. So I did that for him.

And then he worked in there for awhile, then said that he -- he could not handle that. He was having such pressures in there, in training. So I said, Okay, David.

Then we moved him over to -- back into civil. Being there, little bit of difficulties. Then we wanted to do some transfers and make some movement in civil process, so then we moved him into the jail. That's the last point of contact with us.

Q.     Did you consider his past employment history when deciding whether or not to reappoint him?

A.     I did.

Q.     Now, did his use of profanity on election

1   day violate the rules of conduct for deputies?

2          A.      I think so, sir.  I just was -- it's

3   unforgiving to publicly say those things to a fellow

4   employee, regardless of whatever you thought.  To use

5   that language to that particular person.  Or any

6   deputy.

7          Q.      And did you also consider his disciplinary

8   record?

9          A.      I did, sir.

10         Q.      Okay.  As far as Robert McCoy, had he been

11  the subject of an excessive force lawsuit?

12         A.      Yes, he had been.

13         Q.      Did you consider that when making the

14  decision whether or not to reappoint him?

15         A.      That weighed a little, small amount.  I

16  looked at that.  I knew about the case.

17         Q.      All right.  Did he have difficulty getting

18  along with other employees?

19         A.      It appeared that he did.

20         Q.      Okay.  Did he also -- do you know whether

21  he had any counts or records of violations of protocol?

22         A.      I don't know that right at this particular

23  moment, sir.

24         Q.      All right.  With regard to Sandhofer, how

25  long was he with the department?

149

1        A.        I believe roughly a year and a half, maybe.

2        Q.        What was his background?  Where did he come

3    from?

4        A.        He had worked in, I think it's event -- we

5    -- through the -- for a number of years we had events

6    on Friday nights and Saturday nights downtown, and I

7    think he headed up that.

8        Q.        So was this his first law enforcement job

9    with the sheriff's department?

10       A.        Yes.

11       Q.        Did it appear to be a good fit for him with

12   the sheriff's department, in your view?

13       A.        I didn't think it was, as he worked.  In

14   interviewing him getting on, I thought it was.  But

15   then it didn't appear that he liked what he was doing

16   with us.

17       Q.        Did he follow direction well?

18       A.        I wouldn't know, sir.  I wasn't his

19   supervisor.

20       Q.        Did you get input from his supervisor to

21   make the determination whether or not to --

22       A.        They thought that he did not follow all the

23   directions if he thought he needed to do something

24   different.

25       Q.        In his previous job was he the boss?

153

1  had a very hard time controlling his shift, and we --

2  all the -- many of the problems we had as far as

3  disciplinary and control was on his shift.  It was

4  recommended to me not to -- would I not reappoint him.

5      Q.      Did he also have issues at the Greyhound

6  bus station?

7      A.      Yes, I believe that's been a couple of

8  years ago, but before that he -- I believe he carried

9  an inmate to the bus station and left him there.  So we

10 had to deal with that.

11     Q.      Okay.  As far as James Sutherland

12 (phonetic), who was not reappointed the same time, did

13 he have issues, problems while working as a deputy?

14     A.      Yes.  He had a little bit -- had problems

15 understanding what we were trying to accomplish.  And

16 working.  But I believe the biggest one that really

17 made us have to look at it, I think he brought in some

18 shoes for an inmate.  Which was totally against the

19 policies of the -- of the -- of corrections.  That he

20 personally brought them in.  And I -- he was

21 recommended not to be reappointed.

22     Q.      Now, Desiree Weeks, was she another deputy

23 not reappointed?

24     A.      Desiree Weeks.

25     Q.      Okay.  And why was she not reappointed?

154

1      A.       That's the one I couldn't think of.

2               Same thing.  Missing time from work,

3  horrendous ability to -- she had been a sergeant and we

4  had to demote her because she could not perform those

5  duties.  Allegations of problems in the jail.  So I did

6  not reappoint her.

7      Q.       Was she romantically involved with an

8  inmate?

9      A.       That was -- we never could lock that in.

10  Someone said that was some of the problems she had in

11  the jail.

12      Q.       That was an allegation?

13      A.       Allegation.

14      Q.       Tameka Wiggins?

15      A.       Tameka Wiggins was -- again, very rarely

16  came to work.  Left the shift really in -- in some

17  binds that we thought it was necessary not to reappoint

18  her.

19      Q.       When you made the decision not to reappoint

20  these deputies, did you ever consider their -- who they

21  were supporting during the election?

22      A.       No, sir; no, sir; no, sir.  Didn't matter.

23      Q.       You were asked by counsel if you knew

24  whether the plaintiffs, the six plaintiffs, worked on

25  your campaign.  Did you keep track of who worked on

155

1  your campaign?

2      A.      I did not, sir.

3      Q.      So is it fair to say you didn't know which

4  of the deputies -- well, which of the deputies worked

5  on your campaign?

6      A.      No, I wouldn't -- I didn't know.

7      Q.      Were you in charge of coordinating that?

8      A.      No, sir.

9      Q.      Who coordinated that?

10     A.      Some of it was done through Richardson,

11 some was done through Colonel Bowden maybe, and then

12 some might have been done through one of my civilian

13 helpers, but -- that did some work for me.

14     Q.      Did deputies volunteer to work on your

15 campaign?

16     A.      That's correct.

17     Q.      Was it a condition of employment?

18     A.      No, sir.

19     Q.      Did all your deputies do it?

20     A.      No, sir; no, sir.

21     Q.      Same question with regard to buying golf

22 tickets or barbecue tickets.  Was that a condition of

23 employment?

24     A.      No, sir.

25     Q.      Did all deputies buy them?