IN THE UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

BOBBY BLAND, DANIEL RAY CARTER,
JR., DAVID W. DIXON, ROBERT W.
MCCOY, JOHN C. SANDHOFER, and
DEBRA H. WOODWARD

        Plaintiffs,

                                            CASE NO:  4:11-CV-45

v.

B.J. ROBERTS, individually and in his official
capacity as Sheriff of the City of Hampton,
Virginia

        Defendant.

## PLAINTIFFS' MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, Bobby Bland, Daniel Ray Carter, Jr., David W. Dixon, Robert W. McCoy,

John C. Sandhofer and Debra H. Woodward ("Plaintiffs"), by counsel, state as follows for their

Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment:

## I.      INTRODUCTION

The Plaintiffs have sued Sheriff B. J. Roberts, Sheriff of the City of Hampton (sometimes

referred to herein as the "Sheriff"), for violation of their First Amendment rights.  Sheriff

Roberts terminated each of the Plaintiffs in response to, and in retaliation for, their expressions

of support for Sheriff Roberts' political opponent, their affiliation with Sheriff Roberts'

opponent, and their refusal to provide support for or affiliate with Sheriff Roberts during the

2009 election cycle.

## II.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the Court must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. *Russell v. Microdyne Corp.*, 65 F.3d 1229 (4th Cir. 1995).  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000), the United States Supreme Court held that on summary judgment the trial court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 530 U.S. at 138, citing, *Anderson v. Liberty Lobby*, 477 U.S. 242, 250-251 (1986).  The court went on to state that the trial court should give credence to evidence favoring the non-movant, but only that evidence supporting the moving party that is essentially uncontradicted by sources of objective evidence or disinterested witnesses. *Id.*

## III.   APPLICABLE LEGAL STANDARD

This suit alleges that Sheriff Roberts discharged the Plaintiffs because they failed to associate with his political campaign and because certain of them actively spoke in favor of his opponent or against his campaign.  The allegations state two separate First Amendment claims, each of which, standing alone, entitle the Plaintiffs to relief:  1) a political affiliation claim under *Elrod v. Burns*, 427 U.S. 347 (1976) and *Branti v. Finkel*, 445 U.S. 507 (1980) and 2) a claim for protected employee speech on a matter of public concern under *Pickering v. Board of Education of Township High School District*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983).  The first claim is being asserted by all Plaintiffs.  The latter claim is being asserted by Carter, Dixon, McCoy and Woodward, but not Sandhofer and Bland.

The Supreme Court held in *Elrod*, and reiterated in *Branti,* that the First Amendment prohibits dismissal of public employees because they are not "affiliated with or sponsored by" a certain political entity. *Branti*, 445 U.S. at 517, quoting *Elrod*, 427 U.S. at 350.  There is only

one exception to this rule: when political affiliation constitutes "an acceptable requirement for . . . government employment." *Id.* Under this standard, when a public employee holds a "confidential" or "policy making" position, his employer *may* be justified in discharging him because of his party affiliation, but *only* if the employer can show that the political affiliation is an appropriate and necessary job requirement for the effective performance of the office. *Branti*, 445 U.S. at 518. Accordingly, "the ultimate inquiry is not whether the label 'policy maker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate the party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* In the present case, even if there were a "policymaker" or "confidant" among the Plaintiffs, it is still Sheriff Roberts' burden to prove that political affiliation and loyalty are a necessary job requirement.

As to the Plaintiffs' political expression claims, the *Pickering-Connick* analysis involves a two phase assessment to determine whether a public employee's speech is constitutionally protected. The first question is whether the employee spoke on a matter of "public concern." *Connick*, 461 U.S. at 147-48. If so, and in the instant case there appears to be no dispute that the issue involved a matter of public concern, the court balances "the interests of the employee, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

There is no doubt that discussion of a candidate's suitability for office and debate on their qualifications are squarely within the First Amendment's citadel. *Buckley v. Valeo*, 424 U.S. 1, 14 (1976); see also *Roth v. United States*, 354 U.S. 476, 484 (1957). The First Amendment affords the broadest protection to such political expression in order to "assure [the] unfettered

interchange of ideas for the bringing about of political and social changes desired by the people."
*Roth*, 354 U.S. at 484.

There has been considerable variation of these standards in cases involving deputy sheriffs. The Fourth Circuit first applied the *Elrod-Branti* standard in *Jones v. Dodson*, 727 F.2d 1329 (4th Cir. 1984). *Dodson* considered the claims of two deputy sheriffs who alleged they were dismissed by a sheriff because of their political affiliations and expressions. The court held that a discharge because of political affiliation could not be justified as a matter of law under the *Branti* test. *Dodson*, 727 F.2d at 1338. The court stated:

> [W]e do not believe that the duties of deputy sheriffs, no matter what the size of the office, or the specific position of the power involved, or the customary intimacy of the associations of the office, or the undoubted need for mutual trust and confidence within any law enforcement agency, could be found to involve policy making related to partisan political interest and to involve access to confidential information bearing . . . unpartisan political concerns.
>
> *Dodson*, 727 F.2d at 1338, citing *Branti*, 445 U.S. at 519 – 520 n. 14.

The Fourth Circuit retreated from *Dodson* in *Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997). In *Jenkins*, ten North Carolina deputy sheriffs brought suit against a newly elected sheriff alleging that he discharged them because they failed to associate themselves with his political campaign and because they actively spoke and campaigned for his opponent. In an *en banc* decision, the Fourth Circuit criticized the *Dodson* court's failure to dissect and analyze the specific duties of the deputies involved. The court held that deputies who serve as law enforcement officers in North Carolina fall within the narrow exception to the general rule of conferring First Amendment protection announced in *Elrod* and *Branti* and, as a result, their political affiliation and speech were not protected. *Jenkins*, F.3d at 1164-1165. It is clear in

4

*Jenkins* that the criticisms of *Dodson* are, as a practical matter, limited to that decision's broad pronouncements that "no deputy sheriff can ever be a policymaker" or "confidant." *Id.* It is equally clear that the *Jenkins* decision is limited to "law enforcement officers" who patrol with general and immediate powers of arrest. *Jenkins*, F.3d at 1165. The *Jenkins* court stated:

> We limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed. Because the deputies in the instant case were *law enforcement officers*, they are not protected by this limitation.

In *Knight v. Vernon*, 214 F.3d 544 (4th Cir. 2000), the Fourth Circuit examined a fact situation similar to the case presented here. Ms. Knight, a jailor, did not claim that she engaged in affirmative political speech, rather she claimed that her failure to affirmatively support the incumbent sheriff got her fired after the election. The district court granted the sheriff summary judgment relying on *Jenkins* in holding that Ms. Knight, a jailor, had duties sufficient to bring her within the policy maker exception to the *Elrod-Branti* rule. *Knight v. Vernon*, 23 F. Supp. 2d 634, 646 (M.D.M.C. 1998).

The Fourth Circuit reversed the district court's granting of summary judgment to the sheriff. The Fourth Circuit noted that the responsibilities of a jailor, such as Ms. Knight, are "routine and limited in comparison" to those of a deputy sheriff law enforcement officer. The court stated "[W]e noted in *Jenkins* that a deputy is a sworn law enforcement officer. This means that a deputy has the general power of arrest, a power that may be exercised in North Carolina only by an officer who receives extensive training in the enforcement of criminal law." *Knight*, 214 F.3d at 550. The court went on to note that "Ms. Knight was not out in the county engaging in law enforcement activities on behalf of the sheriff, nor was she involved in

communicating the sheriff's policies or positions to the public." *Knight*, 214 F.3d at 550, citing

*Jenkins*, 119 F.3d at 1164.

In dealing with the assertion that Ms. Knight "must have taken the same oath" as a

deputy sheriff law enforcement officer, the court stated:

> The record does not support such a conclusion. However, even if
> Ms. Knight did take such an oath, it would not change our
> decision. As we emphasized in *Jenkins*, we 'examine the job
> duties of the position' and Ms. Knight's duties as a jailor were
> essentially custodial. She simply lacked the special status of a
> deputy sheriff . . .

> *Knight,* 214 F.3d at 551.

In *Knight*, the sheriff additionally argued that Ms. Knight did not proffer sufficient

evidence on summary judgment to show that she was fired for political reasons. *Knight*, 214

F.3d at 551-552. The Fourth Circuit disagreed. The court noted that the sheriff asked for Ms.

Knight's political loyalty. It further noted that the sheriff's top officers used "shift meetings to

solicit department employees" for various types of support for the sheriff. *Id.* The sheriff in

*Knight* made affirmative statements that he would require Ms. Knight's support and adverse

consequences could result if he did not get it. After he won the election and fired her, he

attempted to claim that the firing was due to an unauthorized leak to the press regarding financial

record keeping and financial practices within the sheriff's' office. The Fourth Circuit held that

on all these facts a reasonably jury could conclude that the reasons proffered by the sheriff for

her firing were pretextual and that the real reason was political affiliation. The Fourth Circuit

remanded for a full trial on Ms. Knight's First Amendment claims. *Knight*, 214 F.3d at 552.

## IV.    STATEMENT OF DISPUTED MATERIAL FACTS

The Plaintiffs list the disputed material facts under three general categories: the nature of the Plaintiffs' employment and their right to First Amendment protections; facts demonstrating Sheriff Roberts' intolerance to political opposition and knowledge of Plaintiffs' statements and affiliations; and a *seriatim* response to Defendant's "Statement of Undisputed Material Facts Pursuant to Local Rule 56(B)".

**A.    Nature of Plaintiffs' Employment and their Right to First Amendment Protections.**

1.    Sheriff Roberts does not have responsibility for law enforcement in the City of Hampton. *Ex. 1*, Sheriff Roberts Deposition ("Roberts' Dep.") pp. 11-12, 18.

2.    Under Virginia law, in order to function as a law enforcement officer one must attend the Virginia Department of Criminal Justice Services' ("DCJS") "Basic Law Enforcement" course. *Ex. 1,* Roberts Dep. pp. 11-12, 18; *Ex. 2*, Bowden Dep.[1], pp. 17-18; *Ex. 3*, Adams Declaration ("Dec.") ¶4; see also *Ex. 4*, 6 VAC 20-20-30, Va. Code §9.1-101 & 102. None of Sheriff Roberts' employees attend the "Basic Law Enforcement" course, and the Plaintiffs never attended this course before their terminations. *Ex. 1*, Roberts Dep. pp. 11, 12-18; Carter Dec. ¶3 *Ex. 7*, Dixon Dec. ¶ 3; *Ex. 8*, McCoy Dec. ¶ 3; *Ex. 9*, Sandhofer Dec. ¶3. Accordingly, none of them were law enforcement officers. *Id.*

3.    In Sheriff Roberts' own way of saying it:  "In order to patrol and have immediate powers of general arrest, an officer must attend the DCJS 'Basic Law Enforcement' course." *Ex. 1*, Roberts Dep. pp. 11-12, 18.  He then confirmed that his employees do not attend the course. *Id.*

---

[1]  Col. Karen Bowden is the second most senior officer in the Hampton Sheriff's Office and is responsible to the Sheriff for all aspects of its operation. *Ex. 2*, Bowden Dep., p. 5.

4.      Two general curricula are offered by the DCJS.  The "Basic Law Enforcement" course and the "Basic Jailor and Court Services" course.  *Id.*  The Basic Law Enforcement course offered by DCJS is far more exacting and is approximately twice as long as the Basic Jailor course.  *Ex. 2*, Bowden Dep. pp. 17-18.  The Plaintiffs (excluding Bland and Woodward who were civilian employees) attended the Basic Jailer course.  *Ex. 1*, Roberts Dep. pp. 11-12, 18.

5.      Because they do not attend the Basic Law Enforcement Course, Sheriff Roberts' deputies do not have "general powers" of "immediate arrest," however, under Hampton Sheriff's Office Policy No. 602, Deputy Sheriffs may make arrests for "blatant" violations that occur "in their presence."  The Policy states in part:

> [T]he Hampton Police Division is the primary law enforcement agency that is charged with the responsibility of handling adult and juvenile offenders.  However, when violations are committed *in the presence* of deputies they are bound by oath of office to identify, apprehend, arrest and seek to convict all adults who have violated the laws of the Commonwealth of Virginia . . . .
>
> The Hampton Sheriff's Office is not the primary law enforcement agency for the City of Hampton *and does not routinely intervene in law enforcement*, however, deputies are bound to act under *blatant violations* and the following guidelines are offered. . . .
>
> *See* Hampton Sheriff's Office Policy No. 602, *Ex. 5* (emphasis added).

6.      Three of the Plaintiffs in this action (Dixon, Carter and McCoy) were employed at the time of their terminations as jailors, their section known within the Hampton Sheriff's Office as the Corrections Division.  *Ex. 6*, Carter Dec. ¶2; *Ex. 7*, Dixon Dec. ¶2; and *Ex. 8*, McCoy Dec. ¶2.  One of the Plaintiffs (Sandhofer) was employed as a civil process server in the Hampton Sheriff's Office Civil Process Division at the time of his termination, but had spent most of his time in the office as a jailor.  *Ex. 9*, Sandhofer Dec. ¶2.  Two of the Plaintiffs (Bland and

Woodward) were employed in non-uniformed, non-sworn administrative positions. *Ex. 11*, Woodward Dec. ¶2.

7.      The Plaintiffs' job descriptions are attached as *Ex. 12* (Corrections: Carter, Dixon, McCoy), *Ex. 13* (Civil Process:  Sandhofer), *Ex. 14* (Training:  Woodward), and *Ex. 15* (Finance: Bland).

8.      None of the Plaintiffs have ever arrested anyone while employed in the Hampton Sheriff's Office.  *Ex. 6* Carter Dec. ¶2-3; *Ex. 7* Dixon Dec. . ¶2-3; *Ex. 8* McCoy Dec. . ¶2-3; *Ex. 9* Sandhofer Dec. ¶2.

9.      The Plaintiffs had no leadership responsibility, policy-making responsibility or responsibility for speaking for the Sheriff when they were employed by the Hampton Sheriff's Office.  *Ex. 6* Carter Dec. ¶2-3; *Ex. 7* Dixon Dec. ¶2-3; *Ex. 8* McCoy Dec. ¶2-3; *Ex. 9* Sandhofer Dec. ¶2-3; *Ex. 10* Bland Dec. ¶2-4; *Ex. 11* Woodward Dec. ¶2-4.  None of the Plaintiffs were ever consulted about Hampton Sheriff's Office Policy.  *Id.*

10.     The Plaintiffs were not confidants of the Sheriff or custodians of confidential information when they were employed by his office.  *Ex. 6* Carter Dec. ¶2-3; *Ex. 7* Dixon Dec. ¶2-3; *Ex. 8* McCoy Dec. ¶2-3; *Ex. 9* Sandhofer Dec. ¶2-3; *Ex. 10* Bland Dec. ¶2-4; *Ex. 11* Woodward Dec. ¶2-4.

**B.      Sheriff's Intolerance for Political Opposition and Knowledge of Plaintiffs' Statements and Affiliations.**

1.      In late summer of 2009, before Sheriff Roberts was to stand for re-election in November, Plaintiffs Carter and McCoy made statements on Jim Adam's campaign Facebook page indicating their support of Adams' campaign.  *Ex. 6*, Carter Dec. ¶9-11; *Ex. 8,* McCoy Dec. ¶10; *Ex. 1*, Roberts Dep. pp. 103-104, 106; *Ex. 2*, Bowden Dep. pp. 43-44; *Ex. 16*, McGee Dep. pp. 71-72.

2.     The evidence in the record is such that there can be no doubt that Carter's and McCoy's presence on Adams' campaign Facebook page clearly evinced, and was understood by the Sheriff and his senior staff as evincing, their support for Adams.  *Ex. 2*, Bowden Dep. at p. 43[2]; *Ex. 16*, McGee Dep. pp. 71-72, 85-86; *Ex. 27*, Mitchell Dep. ¶4; *Ex. 22*, Coronado Dec. ¶6; *Ex. 20*, Darling Dec. ¶7.

3.     Captain Robert McGee ran the Court Services/Civil Process Division within the Hampton Sheriff's Office.  His testimony regarding Jim Adams' Facebook page is illuminating:

> Q:  Did there ever come a time in 2009 when you learned that Danny Carter was on Jim Adams' Facebook page basically supporting Jim Adams for Sheriff?
>
> A.  Yes.
>
> Q.  How did you learn about that?
>
> A.  It was told to me by one of the supervisors in the division [Sgt. Ford]
>
>                             . . .
>
> Q.  Did you have – ever have any discussions with anyone else about the fact that either Danny Carter or Wayne McCoy were on Jim Adams' campaign Facebook page?
>
> A.  I believe it was Lt. Harding.
>
> Q.  And what conversations – what did you say to Lt. Harding?
>
> A.  She was there, I believe, when Sgt. Ford had told me.  We were together.
> Q.  What did Lt. Harding have to say about it?
>
> A.  Everyone was basically shocked that they would put a photo up on the website.
>
> Q.  Why was everyone shocked about that?

---

[2] "Q.  Okay.  Do you remember there coming a time when it was learned that Danny Carter was on Facebook supporting Jim Adams?  A:  Yes." *Ex. 2*, Bowden Dep. at p. 43.  She learned about McCoy being on Adams' Facebook page at the same time.  *Id.*

A.  Basically, that they appeared not to be supporting the Sheriff.

*Ex. 16*, McGee Dep. pp. 71-72.

4.      Col. Bowden informed Sheriff Roberts of Carter and McCoy having posted supporting statements on Jim Adams' campaign Facebook page in the fall of 2009, prior to election day, but she does not remember the exact time.  *Ex. 2*, Bowden Dep., pp. 43-44; see also Defendant's Memorandum in Support of Summary Judgment, ¶10, p. 5.  These postings were reported to Bowden by Major Belinda Wells-Major.  *Ex. 2*, Bowden Dep. pp. 43-44.

5.      In late August, 2009, Danny Carter co-hosted a cookout at Buckroe Beach in Hampton with Ramona Larkin (now Ramona Jones), another deputy within the Hampton Sheriff's Office.  The cookout occurred just before the Labor Day weekend and the official "kick off" of the final stretch of the 2009 election cycle.  *Ex. 6*, Carter Dec. ¶8-11.  Danny Carter invited Jim Adams to the cookout.  *Id.; Ex. 17*, Larkin Dec. ¶5.

6.      Upon Larkin's return to work the Monday after the cookout, she was approached by her supervisor, Lt. Crystal Cooke, who stated to her "I heard Jim Adams was at your cookout" or words to that effect.  *Ex. 17*, Larkin Dec. ¶3.  Larkin acknowledged to Cooke that Adams had been present and that he had been invited by Danny Carter.  *Id.*

7.      Shortly after Larkin's conversation with Lt. Cooke, she was approached by Major (then Captain) Kenneth Richardson.  *Ex. 17*, Larkin Dec. ¶4.  Richardson inquired as to who attended the cookout, and Larkin confirmed that Jim Adams was there.  *Id.*  Major Richardson stated to Larkin that the cookout had the appearance of a campaign event and stated specifically that "it does not look good".  *Id.*  Major Richardson informed Larkin that she needed to explain to the Sheriff that Carter had invited Adams, not her.  *Ex. 17*, Larkin Dec. ¶5.

8.    Three of the six Plaintiffs in this action, Deputies Carter, McCoy and Sandhofer, attended the cookout at which Adams was present in late August, 2009. *Ex. 6*, Carter Dec. ¶8-12; *Ex. 8*, McCoy Dec. ¶9; *Ex. 9*, Sandhofer Dec. ¶9. Pictures of the event showing Sandhofer and McCoy in attendance were posted on Facebook in late summer or early fall, 2009, and are attached as Exhibit 18. *Ex. 8*, McCoy Dec. ¶9; *Ex. 9*, Sandhofer Dec. ¶0, , Ex. A to Sandhofer Dec. Sheriff Roberts clearly learned of the cookout and Adams' attendance shortly after it occurred. *Ex. 1*, Roberts Dep. pp. 114-115. The Sheriff learned this from Col. Bowden. *Id.*

9.    It is clear from the statements of Major Richardson, Captain McGee and to some extent from the Sheriff and Col. Bowden, that news of Carter and McCoy being on Facebook and Jim Adams attending the cookout discussed above, not only was made known to the Sheriff and Hampton Sheriff's Office senior staff, but caused a great deal of discussion among them. *Ex. 1*, Roberts Dep. pp. 103-104, 114-115; *Ex. 2*, Bowden Dep. pp. 43-44; *Ex. 16*, McGee Dep. pp. 71-72; *Ex. 17*, Larkin Dec. ¶¶4-5.

10.    In early September of 2009, the Sheriff made a speech that was repeated to three shift changes of correctional deputies and to at least one additional meeting of court service and administrative employees. *Ex. 6* Carter Dec. ¶16-18; *Ex. 7* Dixon Dec. . ¶14; *Ex. 8* McCoy Dec. ¶16; *Ex. 9* Sandhofer Dec. ¶15; *Ex. 20*, Darling Dec. ¶7. There is overwhelming evidence in the record that he made the following statements or statements substantially similar to the following at most of the meetings:

a)    "Don't be getting on Facebook supporting my opponents." *Ex. 22*, Coronado Dec. ¶6; *Ex. 20*, Darling Dec. ¶7; *Ex. 21*, Mitchell Dec. ¶4; *Ex. 6*, Carter Dec. ¶16-18; *Ex. 7*, Dixon Dec. ¶14; *Ex. 8*, McCoy Dec. ¶14; *Ex. 9*, Sandhofer Dec. ¶15.

b)    "I am going to have this job as long as I want it." *Id.*

c)    "My train is the long train." *Id.; Ex. 28*, Wheeler Dec. ¶5.

d)      "If you want to get on the short train with the man I fed for 16 years, you're going to be out of here." *Id.*

e)      "This is a bad economy and people are knocking down my door for these jobs." *Id.*

11.      It was clear to many witnesses that when Sheriff Roberts gave the speech outlined above to Danny Carter's shift change he appeared to be angry. *Id.* At the conclusion of the speech, before Carter's shift change, he made a direct and angry approach to Carter, and led him outside. *Ex. 6, Carter Dec.* ¶16-18; *Ex. 21*, Mitchell Dec. ¶3-4. While the only witnesses to the content of the conversation were Sheriff Roberts and Carter, it was clear to other witnesses that the exchange was an angry one. *Id.* The Sheriff proceeded to berate Carter about the Facebook entry in support of Adams and concluded the conversation by saying to him "You've made your bed, now you're going to lie in it, after the election you're out of here." *Ex. 6*, Carter Dec. ¶16-18.

12.      Sheriff Roberts fired Deputy Dixon because Dixon allegedly said to Frances Pope, one of Sheriff Roberts' poll workers on election day and referring to Sheriff Roberts' campaign material: "You can throw that fucking shit away." *Ex. 1*, Roberts Dep. pp. 126-127. The Sheriff made it clear that the reason for the firing was Dixon's use of the foul language. *Id.* Sheriff Roberts' testimony clearly demonstrates that he was aware of Dixon's opposition to him. *Id.* But the invective contained within the alleged statement is made up from whole cloth. *Ex. 22*, C. Coronado Dec. ¶7; *Ex. 29*, K. Coronado Dec. ¶2. Krystal and Cayetano Coronado were at the polling station at the exact time this occurred. *Id.* As the Coronados left the voting location, Frances Pope, Sheriff Roberts' poll worker, stated to the Coronados, "You are not going to believe what Dixon said. He told me that I could 'throw that stuff away.'" *Id.* Pope was referring to Sheriff Roberts' campaign literature that she was handing out. *Id.* The Coronados

report that Pope was very animated when she reported this, but she did not relate that Dixon used any type of expletives or obscene language.  *Id.*

13.     Neither Sheriff Roberts nor any of his subordinates bothered to investigate Dixon's alleged use of expletives or foul language.  *Ex. 1*, Roberts Dep. pp. 126-127.  No one even bothered to ask Dixon about the incident before he was fired.  *Id.*

14.     Sheriff Roberts created a culture where he and his most senior staff, while at work, routinely approached employees and solicited them to provide services in support of the Sheriff's re-election efforts or exhorted them to support the Sheriff.  *Ex. 6*, Carter Dec. ¶¶12-16; *Ex. 7*, Dixon Dec. ¶¶13-14; *Ex. 8*, McCoy Dec. ¶¶13-14; *Ex. 9*, Sandhofer Dec. ¶¶13, 15. Despite laws and regulations[3] restricting use of public assets and employees, while on public paid status, Sheriff Roberts made the public resources available within his office his own, including his employees' time paid for by taxpayers.  *Id.*

15.     He held campaign meetings at the Sheriff's Office during the work day.  *Id.*  The seminal meetings in this case at which Sheriff Roberts exhorted his employees about Facebook and Adams' "short train" were – everyone of them – on the clock.  *Id.*  He used office copiers and computers to create campaign-related documents.  *Id.*  He used Sheriff's Office employees, while on the clock, to work his annual barbeque/golf tournament political fund-raising event.  *Id.* Senior staff solicited employee help with Sheriff Roberts' re-election efforts at work.  *Id.; Ex.*16, McGee Dep. p. 77 (Captain McGee:  "I spoke to Sheriff's employees about supporting the Sheriff"); *Id.*, pp. 77-78 (Captain McGee:  "I asked employees 'to support the Sheriff.  And if you can't support the Sheriff, then just be neutral.'")[4]; *Ex. 20*, Darling Dec. ¶6 ("the Sheriff's

---

[3] See *Commonwealth of Virginia Political Activity Policy*, *Ex.* 30, p. 28.
[4] Captain McGee also testified as follows:  Q.  Did any of your seniors ever say that to you or group that you were part of within the Hampton Sheriff's Office, you know: I hope you can

senior subordinates coerced employees to sell tickets and/or buy tickets to campaign fund raising events and to otherwise support his political campaign"); *Ex. 21*, Mitchell Dec. ¶3 (Mitchell heard Major Kenneth Richardson and Captain Robert McGee say to lower ranking employees "If you don't support the Sheriff, you're going to be out of here" and "If you don't support the Sheriff, you're not going anywhere" as well as other statements); *Ex. 22*, Coronado Dec. ¶¶ 4-5 ("Captain Hardy[5] and other supervisors would frequently say that the Sheriff would find out who supported him and who did not, and the clear implication was that your job or career would be in jeopardy if you opposed him.")

     16.     Sheriff Roberts' senior staff tracked, noted and monitored both the levels of support provided by employees as well as any reluctance to provide support and signs of opposition. *Ex. 17*, Larkin Dec., ¶¶4-5 (Major Richardson interrogating Larkin about who attended the cookout); *Ex. 18*, Richardson Dep. p. 56 (Major Richardson: "[I] had a roster, and I just give everybody five tickets and ask them to go ahead and sell the tickets for me"); *Ex. 2*, Bowden Dep. pp. 43-44, Defendant's Memorandum ¶10, p. 5 (Col. Bowden learned of Deputy Carter and Deputy McCoy on Jim Adams' Facebook page from Major Belinda Wells-Major[6] and when she learned of this fact from Major Wells-Major she told the Sheriff.); *Ex. 1*, Sheriff Roberts Dep. pp. 114-115 (learned of the cookout attended by Adams from Col. Bowden); *Id.*, *Ex. 2*, Bowden Dep. pp. 58-59 (the senior officers within the Hampton Sheriff's Office assisted

---

support the Sheriff but if you can't, I want you to stay neutral? . . . Q.  How about the Sheriff himself?  Did you ever hear the Sheriff himself say that?  A.  He probably said that at the meeting.  Something to that effect.

[5] Captain Hardy was a senior officer within the Hampton Sheriff's Office in the Court Services Division.

[6] Major Belinda Wells-Major was in charge of the Hampton Sheriff's Office Support Services Division.

in the Sheriff's 2009 re-election effort and solicited employees' involvement); *Ex. 16*, McGee

Dep. pp. 74-75 (the cookout with Adams in attendance and photos of the event came to light in

the early fall of 2009); *Id.*

**C.      Plaintiffs' Seriatim Response to Defendant's Statement of Undisputed Facts.**

Sheriff Roberts lists 47 facts that he claims to be undisputed and material at pages 2-13 of

his Memorandum of Law in Support of Motion for Summary Judgment.  The Plaintiffs set forth

their *seriatim* response below, all disputed material facts asserted by the Plaintiffs in Section IV

of this Memorandum, including all facts asserted in IV.C., are incorporated, by this reference,

into each paragraph set forth below:

1.      The facts asserted in paragraph 1 are undisputed, but neither are they material to

the issue of whether Plaintiffs' claims should survive summary judgment and be heard at trial.

2.      The facts asserted in paragraph 2 are undisputed, but neither are they material to

the issue of whether Plaintiffs' claims should survive summary judgment and be heard at trial.

3.      The facts asserted in paragraph 3 are disputed to the extent paragraph 3 attempts

to assert that that is all Sheriff Roberts said at the shift change meetings.  These are the meetings

at which the speech outlined in paragraph B.10 occurred.  All facts asserted in Plaintiffs'

paragraph B.10, *supra*, are incorporated into this paragraph by reference as if fully set forth

herein.

4.      The facts asserted in paragraph 4 are disputed.  It is clear that Sheriff Roberts had

full and actual knowledge of the affirmative expressions and statements of support provided to

his opponent, Adams, by Deputies Carter, Dixon and McCoy as discussed in paragraphs B.1-6,

*supra*.  Moreover, each of the Plaintiffs had provided significant support to Sheriff Roberts' re-

election efforts prior to 2009.  *Ex. 6* Carter Dec. ¶13; *Ex. 7* Dixon Dec. . ¶11 *Ex. 8* McCoy Dec. .

¶12; *Ex. 10* Bland Dec. ¶7; *Ex. 11* Woodward Dec. ¶6.  They all declined to do so in 2009.  *Id.*

Each of the Plaintiffs supported Jim Adams and felt close affinity to him.  *Id.*  He had been one

of their most senior leaders for 16 years.  *Id.*  It is important to note that some of the Plaintiffs

were uniquely well known to Sheriff Roberts and his senior leadership.  *Ex. 11*, Woodward Dec.

¶5.  Bland and Woodward both worked in the executive suite providing close daily

administrative support to the Sheriff and his most senior leaders.  *Id.*  They were among that

relatively small caste of employees who would gather with the Sheriff in his conference room to

celebrate his birthday.  *Id.*  In fact, Woodward made his cake every year.  *Id.*  Woodward

traveled to Florida with Sheriff Roberts to provide him with administrative support at a National

Sheriff's Association Conference.  *Id.*  Sandhofer had been the Executive Director of a well

known downtown Hampton marketing organization and his skills were seen as valuable to

Sheriff Roberts' political standing downtown.  *Ex. 9*, Sandhofer Dec. ¶8.  Senior officers were

frequently seeking Sandhofer's political assistance with the downtown business community.  *Id.*

He was the only "rank and file" deputy on the Sheriff's golf tournament committee.  *Id.*

     5.     The facts set forth in paragraph 5 are disputed.  Most of the Plaintiffs were very

well known employees within Sheriff Roberts' office as discussed in paragraph 4, *supra*.

Political support within the office was obviously not only noticed but tracked.  See  B.¶¶9, 14-

16, *supra*.  Their failure to provide the significant and enthusiastic support they had provided in

previous years was obvious.  *Id.; Ex. 11,* Woodward Dec. ¶6; *Ex. 3.*

     6.     The facts set forth in paragraph 6 are disputed  There is overwhelming evidence in

the extant record that Major Richardson and other senior leaders coerced employees to

participate in Sheriff Roberts' campaign.  *See* B.¶¶9, 14-16, *supra*.

7.     The facts set forth in paragraph 7 are disputed, there is overwhelming evidence in the record that employees were coerced into buying and/or selling golf tournament tickets and participating in the Sheriff's campaign. *Id.* That not all activities were coerced or coerced at all times is not a dispositive material fact.

8.     The facts set forth in paragraph 8 are disputed. It is acknowledged that Jim Adams, as a Lieutenant Colonel, was likely not told that he needed to buy or sell tickets to events. There is ample evidence in the extant record that support for the Sheriff was coerced. *See* B.¶¶9, 14-16.

9.     The facts asserted in paragraph 9 are disputed to the extent they assert that "Col. Bowden did not discuss with Sheriff Roberts who did or did not volunteer." There is ample evidence in this record that senior officers within the Hampton Sheriff's Office were attuned to and deeply concerned with political opposition to Sheriff Roberts and assuring that his subordinate employees supported him. *See* B.¶¶2-11, *supra.* Both Col. Bowden and Sheriff Roberts acknowledge that Col. Bowden reported the Facebook postings of Carter and McCoy to the Sheriff after Major Wells-Major reported same to her. *Id.* Ramona Larkin was subjected to detailed interrogation after it was learned that she co-hosted a cookout in August, 2009, which Jim Adams attended. *Ex. 17*, Larkin Dec. ¶¶2-5.; see B.6-7, *supra.* Sheriff Roberts admits that he knew about Adams' attendance at the cookout in late August of 2009 because he was told by Col. Bowden. *Ex. 1*, Roberts Dep. pp. 114-115. It is entirely reasonable to infer that Sheriff Roberts learned about Dixon's opposition to him (Frances Pope incident) through his chain of command, it was cited by Sheriff Roberts as the sole reason for Dixon's firing. *Ex. 1*, Roberts Dep. pp. 126-127.

10.     The statement of facts set forth in paragraph 10 are disputed.  It is obvious that the Sheriff and his senior staff knew of Carter's and McCoy's presence on Facebook very early in the campaign.  *See* B.¶¶2-11, *supra*.  The Defendant asserts in paragraph 10 "a picture of Carter's wife . . . was on Adams' Facebook page alongside Carter . . . Sheriff Roberts re-appointed Carter's wife."  The picture that appeared was Carter's user icon that every Facebook user has.  It is clear from the body of the posting that the content of the posting was Carter's alone.  *Ex.* 6, Carter Dec. ¶¶8-10; *Ex. B.* to Carter Dec.  The posting itself is from "Danny Carter."  *Id.*  Danny Carter's personal Facebook page also publicly noted his support for Adams.  *Id.*  Carter's icon happened to be a picture of him and his wife on their wedding day.  *Id.*

11.     The facts set forth in paragraph 11 are disputed.  There is ample evidence in the extant record, listed *supra*, that the cookout was viewed by Sheriff Roberts and his senior leadership as a campaign event.  *See* B.¶¶2-11, *supra*.

12.     The facts set forth in paragraph 12 are disputed.  The assertion that Sheriff Roberts reviewed all appointees "met with and solicited input from members of his administrative staff [and supervisors]" is a sham.  It is clear that John Sandhofer's second level supervisor, who would have attended any weekly staff meetings with Sheriff Roberts at which the issue of Plaintiffs' reappointment was supposedly discussed, was mystified as to why Sandhofer was being terminated.  *Ex. 16*, McGee Dep. pp. 63-64, 68-69.  He was satisfied with Sandhofer's performance and inquired with his subordinate lieutenants whether any of them had problems with Sandhofer or had reported problems with Sandhofer.  *Id.*  All replied in the negative.  *Id.*  Captain McGee further testified that he does not remember attending any staff meeting in late 2009 where Sandhofer or any of the other Plaintiffs were discussed.  *Ex.16*, McGee Dep. pp. 44-45.  Major Richardson supervised three of the Plaintiffs, Carter, Dixon and

McCoy, as director of corrections. *Ex.19*, Richardson Dep. pp. 48-49; *Ex. 6*, Carter Dec. ¶20;

*Ex. 7*, Dixon Dec. ¶16; *Ex. 8*, McCoy Dec. ¶18.  Major Richardson was their second level

supervisor and their shift supervisors were Lt. Crystal Cooke (for McCoy), Lt. Harris Lewis (for

Dixon) and Lt. Sammy Mitchell (for Carter.) *Id.*  Major Richardson testified that he could not

remember giving any detailed or specific input to the Sheriff regarding the performance of either

Carter, Dixon or McCoy. *Ex. 19*, Richardson Dep. pp. 48-49.  He further testified that he

received all of his performance information from their direct supervisors, *i.e.,* Lieutenants

Cooke, Lewis and Mitchell. *Id.*  None of the lieutenants remember providing any input to Major

Richardson or anyone else regarding Carter's, Dixon or McCoy's performance in 2009. *Ex. 25*,

Lewis Dep. pp. 15, 37-38; *Ex. 26*, Cooke Dep. pp. 12-13.  It is critical to note that performance

evaluations of Hampton Sheriff's Office employees are given at the end of the calendar year. *Ex.*

*1*, Roberts Dep. pp. 85-100.  All of the Plaintiffs in this case received either "above average" or

"outstanding" overall performance assessments on their last performance evaluations prior to

their terminations. *Id.*  It is also important to note that the Hampton Sheriff's Office maintained

a "progressive discipline" policy in order to "document" performance and work problems so that

employees can "learn from them." *Ex. 16*, McGee Dep. p. 44.  Only two of the Plaintiffs had

any recorded admonishments of any kind in their file (Carter and Woodward) and in each case

the memorandum was more than five years old at the time of their respective terminations. *Ex.*

*11*, Woodward Dec. ¶12; *Ex. 6,* Carter Dec. ¶20.  Sheriff Roberts testified in his deposition that

he did not reappoint Bland or Woodward, or give them a chance to become uniformed deputies,

because Deborah Davis had significant performance issues with them and, in the case of

Woodward, had requested that she be terminated. *Ex.1*, Roberts Dep. pp. 125, 150.  This is

blatantly false. *Ex. 24*, Deborah Davis Dec. ¶6.  Davis held both Woodward and Bland in high

20

regard, believed they were excellent employees and she never noted any lapses in their performance. *Id.*

13.     The facts set forth in paragraph 13 are not disputed, but it is asserted that they are not material to the dispositive issue before the Court.

14.     The facts set forth in paragraph 14 are not disputed, but it is asserted that they are not material to the dispositive issue before the Court.

15.     The facts set forth in paragraph 15 are not disputed, but it is asserted that they are not material to the dispositive issue before the Court.

16.     The facts asserted in paragraph 16 are disputed to the extent Sheriff Roberts seeks to assert that his decision to terminate Woodward and Bland was essentially the result of reductions from the state compensation board.  Sheriff Roberts has made a practice in the past, when converting a position from civilian to deputy, of asking the incumbent if they wanted to become a uniformed deputy. *Ex. 24*, Davis Dec. ¶7.  It is an anomaly and deviation from previous practice that neither Bland nor Woodward were given that opportunity before their terminations. *Id.*

17.     The facts set forth in paragraph 17 are disputed.  There is ample evidence in the record that any "review of personnel files," solicitation of "input from supervisors" or consideration of "the need for harmony and efficiency in the workplace" was a sham.

18.     The facts set forth in paragraph 18 are not disputed, but they are not material.

19.     The facts set forth in paragraph 19 are disputed.  See II.A.1-11, *supra.*

20.     There is no paragraph 20.

## **BOBBY BLAND**

21.     The facts set forth in paragraph 21 are disputed.  Senior officers within the Hampton Sheriff's Office came to Bland during the 2009 campaign season and asked that he perform various tasks in support of the Sheriff.  *Ex. 10*, Bland Dec. ¶8.  In all years prior to 2009, Bland had provided very active support to the Sheriff in his various re-election and campaign fund-raising efforts.  *Ex. 10*, Bland Dec. ¶7.  In prior years, Bland had taken an active role in putting out yard signs, working the polls on election day, handing out literature, selling tickets to fund-raising events, attending fund-raising events and performing virtually every element of campaign support service typically needed in any political campaign.  *Ex. 10,* Bland Dec.  ¶7.  In 2009, Major Belinda Wells-Major approached Bland and asked him to provide various types of support that he had provided in the past.  *Ex. 10,* Bland Dec.  ¶8.  Bland declined to do so.  *Id.* Moreover, it was well known to Sheriff Roberts that Bland was extremely close to Deborah Davis, the Director of Administration within the Hampton Sheriff's Office.  *Ex.* 10, Bland Dec. ¶2; *Ex. 24*, Davis Dec. ¶8.  In fact, Bland had worked very closely with Davis throughout virtually his entire tenure with the Hampton Sheriff's Office.  *Id.*  Davis left the Hampton Sheriff's Office in 2008.  *Id.*, see also *Ex. 24*, Davis Dec.  ¶2.  Davis became Jim Adams' campaign treasurer in early 2009.  *Id.*  It was also well known to Sheriff Roberts and his senior officers that Bland was a close friend of Jim Adams.  *Id.*  Sheriff Roberts himself noted Bland's involvement in his past campaigns and lack of involvement in the 2009 campaign.  *Ex. 1,* Roberts Dep. pp. 135-136.

22.     The fact set forth in paragraph 22 is not disputed, but it is not material.

23.     The fact set forth in paragraph 23 is an isolated statement, Bland incorporates by reference his response to paragraph 21 above.

24.     The facts set forth in paragraph 24 are disputed.  Bland concedes that his claim is not based on First Amendment "expression", but rather on Sheriff Roberts' perceptions of his "affiliation" with Adams and his failure to affiliate with Sheriff Roberts.  Bland incorporates by reference his response to paragraph 21 above.

25.     The facts set forth in paragraph 25 are disputed.  Bland incorporates by reference his responses set forth above at ¶¶21-24.  Bland was closely affiliated with Deborah Davis who was Jim Adams' campaign treasurer.  *Ex. 23*, Bland Dec. ¶7-8; *Ex. 24*, Davis Dec. ¶8.

### DAVID DIXON

26.     It is not disputed that Dixon was a sworn deputy.  Dixon was not a law enforcement officer and had very limited powers.  Plaintiff Dixon incorporates by this reference II.A.1-11, *supra*.

27.     The facts set forth at paragraph 27 are disputed.  Sheriff Roberts plainly knew of Deputy Dixon's opposition to his candidacy, Sheriff Roberts testified that Dixon was fired for a statement he made on election day 2009 to one of his poll workers, Frances Pope, a Hampton Sheriff's Office employee.  *Ex. 1*, Roberts Dep. pp. 126-127.  Sheriff Roberts testified that Dixon was fired for stating to Pope, "You can throw this fucking shit away".  *Id.*  Dixon did tell Frances Pope that she could throw Sheriff Roberts' campaign literature away and he indicated his support for Adams, but he used no invective and was not disrespectful or hostile to Pope.  *Ex. 7*, Dixon Dec. ¶8.  One of the most salient facts indicating that Sheriff Roberts' termination of Dixon was a political event is Sheriff Roberts' acknowledgment that Dixon was never even asked if it happened, let alone what happened or why.  *Ex. 1*, Roberts Dep. pp. 126-127.  In years prior to 2009, Dixon had performed many services in support of Sheriff Roberts' re-election efforts, including handing out literature, placing yard signs, working the polls, attending campaign

events, selling tickets to campaign events, etc. *Ex. 7*, Dixon Dec. ¶11.  He did none of these

things in 2009.  *Id.*  Sheriff Roberts himself remembers Dixon supporting his campaigns in the

past, but did not note any support from Dixon in 2009.  *Ex. 1*, Roberts Dep. pp. 135-136, 137.

28.     The facts set forth at paragraph 28 are disputed as to Dixon's expressions outside

of the office.  Dixon testified that he had a bumper sticker on his car and his expressions to

Frances Pope on election day at the polls are obvious.  Plaintiff Dixon incorporates by references

his responses at paragraph 26-27 above.

29.     The facts set forth at paragraph 29 are disputed.  Plaintiff Dixon incorporates by

this reference the facts set forth at paragraphs 26-28, *supra*, as well as those facts set forth at

II.B.1-16.

30.     The facts set forth at paragraph 30 are not disputed, but the fact that Sheriff

Roberts did not fire everyone is not material.

### ROBERT McCOY

31.     It is not disputed that McCoy[7] was a sworn deputy.  McCoy was not a law

enforcement officer and had very limited powers.  Plaintiff McCoy incorporates by this reference

II.A.1-11, *supra*.

32.     The facts set forth at paragraph 32 are disputed.  It is clear that Sheriff Roberts

knew about Deputy McCoy's posting of affirmative support for Jim Adams on the Adams

campaign Facebook page and attendance at the cookout with Adams.  *Ex. 1*, Roberts Dep. pp.

103-104, 106.  Sheriff Roberts knew of the cookout attended by Adams.  *Ex. 1*, Roberts Dep. p.

114-115.  Roberts apparently learned of the cookout and Adams' attendance from Col. Karen

Bowden.  *Id.*, p. 115.  Major Richardson knew that McCoy attended the cookout.  *Ex. 19*,

---

[7] McCoy may be referred to in some of the depositions and pleadings as "Wayne" as most
employees within the Hampton Sheriff's Office knew him by that name.

Richardson Dep. pp. 80-82.  Col. Karen Bowden testified in her deposition that she learned of

Deputy McCoy being on Jim Adams' campaign Facebook page, supporting his campaign, at the

same time she learned of Danny Carter's online support for Adams.  *Ex. 2*, Bowden Dep. pp. 43-

44.  Bowden testified that when she learned of their support, "I may have told the Sheriff."  *Id.*,

p. 44.  McCoy always received either outstanding or above-average performance evaluations.

*Ex. 8*, McCoy Dec. ¶5.  None of his supervisors told him of any performance deficiencies prior

to his termination.  *Id.*

33.    The facts set forth in paragraph 33 are disputed.  See response to paragraph 32,

above.

34.    The facts set forth in paragraph 34 are disputed.  See response to paragraph 32,

above.

## JOHN SANDHOFER

35.    It is not disputed that Sandhofer was a sworn deputy.  Sandhofer was not a law

enforcement officer and had very limited powers.  Plaintiff Sandhofer incorporates by this

reference II.A.1-11, *supra*.

36.    The facts set forth in paragraph 36 are disputed.  Captain McGee was Sandhofer's

second level supervisor.  *Ex. 16*, McGee Dep. p. 11.  Captain McGee was genuinely baffled

when Sandhofer was fired.  *Id.* At 63-69.  None of Sandhofer's supervisors had any information

or belief that he was performing poorly.  *Id.*

37.    The facts set forth in paragraph 37 are disputed.  Sandhofer was well-known to

Sheriff Roberts because he was hired from a prominent downtown Hampton marketing

organization.  *Ex. 9*, Sandhofer Dec.  ¶8.  Sheriff Roberts used Sandhofer for significant

marketing efforts and fund raising in 2008.  *Id.,* ¶8. In early 2009, Sandhofer was approached by

Col. Bowden and asked to obtain prominent sign locations among downtown Hampton businesses.  Bowden asked Sandhofer to do this because she knew that his experience as Executive Director of Hampton Eventmakers had made Sandhofer well known to downtown Hampton businesses. *Id.* ¶8.  Sandhofer did not comply with Col. Bowden's request. *Id.*  In 2008, Sandhofer had obtained approximately $2,500 in donations for the Sheriff's golf event. *Id..*  He did not participate in that event at this level in 2009.  Sandhofer attended the cookout event which was attended by Adams in late August of 2009. *Id..* ¶9.  Photographs of this event surfaced on Facebook shortly thereafter. *Id.* ¶9; see also *Ex. 18* (photographs of event).  Captain McGee acknowledges photographs of the cookout surfacing in the late summer of 2009. *Ex. 16*, McGee Dep. pp. 73-75.  It is obvious that Major Richardson viewed this as a political event. *Ex. 17*, Larkin Dec. ¶¶4-5.

38.     The facts set forth at paragraph 38 are admitted, but are only among many reasons Sheriff Roberts knew of Sandhofer's opposition to him. *See* paragraph 37, supra.

39.     The facts set forth at paragraph 39 are disputed.  Sandhofer did not comply with Col. Bowden's request to find sign locations in downtown Hampton. *Ex. 9*, Sandhofer Dec. ¶8. See response to paragraph 37, *supra*.

40.     The facts set forth at paragraph 40 are disputed.  See paragraphs II.B.¶¶1-16 and paragraph 37, *supra*.

## DEBRA WOODWARD

41.     The facts set forth at paragraph 41 are disputed.  The first sentence in 41 is uncited.  There is no support in the record for the assertion.  In fact, Woodward had no access to confidential information in her job as training coordinator. *Ex. 11*, Woodward Dec. ¶3.  While

Woodward did have limited contact with the public it was in a ministerial, clerical capacity. *Ex. 11,* Woodward Dec. ¶3; *Ex. 24*, Davis Dec. ¶3.

42.     It is unknown to the Plaintiffs whether Sheriff Roberts filled Woodward's position with a sworn deputy. This fact is immaterial. Plaintiff Woodward disputes that Sheriff Roberts offered her the opportunity to become a uniformed deputy before she was terminated. *Ex. 11*, Woodward Dec. ¶2.

43.     The facts set forth in paragraph 43 are disputed. In early 2009 when campaign petitions were being circulated in order to place candidates' names on the ballot for the November election, Lt. George Perkins within the Hampton Sheriff's Office was circulating a petition. *Ex. 11*, Woodward Dec. ¶7. Lt. Perkins was circulating a petition on behalf of Sheriff Roberts. *Id.* Plaintiff Woodward believed this to be unlawful and protested Perkins' activity to Perkins and to Sgt. John Meyers and St. Sharon Mays. *Ex. 11,* Woodward Dec. ¶7. It is clear that other senior officers within the Hampton Sheriff's Office learned of Woodward's protesting Perkins' activity. *Id.* As of November, 2009, Woodward had been employed by the Hampton Sheriff's Office for 11 years in administrative staff positions. *Ex. 11,* Woodward Dec. ¶1. In years prior to 2009, Woodward had always provided significant support to the Sheriff by working his political events, fund raising events, manning the polls on election day, placing yard signs, handing out literature, etc. While she purchased golf tournament tickets in 2009 because she felt coerced to do so, she performed no other support roles for the Sheriff that year. It was well known in the Hampton Sheriff's Office that Woodward was close to Jim Adams. *Id;* see also *Ex. 3*, Adams Dec. ¶6.

44.     The facts set forth in paragraph 44 are disputed. See paragraph 43, above.

## DANNY CARTER

45.     It is not disputed that Carter was a sworn deputy.  Carter was not a law

enforcement officer and had very limited powers.  Plaintiff Carter incorporates by this reference

II.A.1-11, *supra.*

46.     The facts set forth at paragraph 46 are disputed.  Sheriff Roberts clearly testified

in his deposition that the reason he terminated Carter was because of the conversation he and

Carter had immediately following Sheriff Roberts' "long train"/"short train" speech exhorting

employees not to get on Facebook and threatening them with termination.  *Ex. 1*, Roberts Dep.

pp. 115-116.  Sheriff Roberts' explanation of that conversation as being related to Carter's wife

is inherently not believable, every witness in this record who attended those meetings said that

the subject matter involved employees on Facebook and Sheriff Roberts threatening to fire

anyone who openly opposed him.  *Ex. 22*, Coronado Dec. ¶6; *Ex. 20*, Darling Dec. ¶7; *Ex. 21*,

Mitchell Dec. ¶4; *Ex. 6*, Carter Dec. ¶17; *Ex. 7*, Dixon Dec. ¶14; *Ex. 8*, McCoy Dec. ¶14; *Ex. 9*,

Sandhofer Dec. ¶15.  The idea that this conversation had to do with a dispute about Carter's wife

is entirely contrived.  *Id.*

47.     While Carter had one disciplinary action taken against him for an error, it

occurred more than five years prior to his termination.  *Ex. 6*, Carter Dec. ¶20.  All of his

evaluations were above average or outstanding.  *Ex.6*, Carter Dec. ¶20.

## V.     ARGUMENT

The Hampton Sheriff's Office has, for years, been a highly political environment.

Campaign after campaign, the Sheriff has held meetings with his employees, primarily at shift

change, to persuade employees to support him in various ways.  His senior officers roamed the

workplace at the height of the political season seeking employees to put out signs in the community, work the polls, distribute literature, sell and buy tickets to campaign events, etc.

The Sheriff has had little or no regard to violating Virginia policy and applicable law related to conducting campaign activities "on the clock" and appears to be in plain violation of the *Hatch Act*[8] arising from the Hampton Sheriff's Office receipt of federal money for the housing and transportation of federal prisoners.

Nine separate witnesses, four non-parties and five parties, have testified in depositions and in declarations that Sheriff Roberts came to shift change meetings in late summer of 2009 and threatened employees about getting on Facebook and supporting his opponent.  He made it clear that open opposition to him would result in terminations.  It is clear from the record that the Sheriff's senior officers reported up the chain of command all observed political activity and leanings in the office.  Major Richardson did it with respect to the cookout.  Major Wells-Major did it with respect to the Facebook postings of Carter and McCoy.[9]  Likewise, it is clear that Frances Pope reported David Dixon's remark at the polls up the chain of command as well.  The record is replete with evidence that senior officers sought employees' support for the Sheriff on a routine basis.  It is critical to note that the Sheriff himself, in his deposition, did not deny critical, salient facts.  He testified for instance that he could have had discussions with senior officers about Carter and McCoy being on Adams' Facebook page but had no memory of it.  *Ex. 1*, Roberts Dep. at p. 107.  Speaking of the shift change meetings where he mentioned the "long train" and "short train" Sheriff Roberts testified "[I]t's possible that I could have mentioned Carter being on Adams' Facebook page . . . but I don't recall ever doing that."  Nine people have testified that he did – no one has testified that he did not, not even him.

---

[8]  See Ex. 30, p. 28.
[9]  Major Wells-Major reported it to Col. Bowden who, in turn, reported it to the Sheriff.

A.    **Four of the Plaintiffs Engaged in Clear and Affirmative Expressions of Political Support for Sheriff Roberts' Opponent.**

It is clear that Deputies Carter, Dixon, McCoy and Woodward made affirmative expressions of political support for Jim Adams that are protected under the First Amendment. Carter and McCoy expressed their support for Jim Adams on Facebook. It is clear that this caused a significant buzz within the Sheriff's Office. Their statements were reported all the way up the chain of command through Major Wells-Major, Col. Bowden and ultimately to the Sheriff. The Plaintiffs have introduced the testimony from nine witnesses who attest to the Sheriff's statements at the shift change meetings clearly threatening employees if they engaged in the same conduct engaged in by Carter and McCoy.

David Dixon told a campaign worker that she could throw Sheriff Roberts' campaign literature away. The campaign worker, Frances Pope, a deputy within the Hampton Sheriff's Office, was shocked. She reported the statement up the chain of command. Dixon's statement incensed the Sheriff. As a result, the Sheriff terminated Dixon. He did so without having anyone ask Dixon what had actually happened. There is no dispute about that remarkable fact. A fact finder in this action could reasonably conclude that had Dixon told an Adams' supporter that he could throw Adams' literature away, that Sheriff Roberts would have taken no action.

Debbie Woodward complained and protested Lt. George Perkins' circulating a petition in support of Sheriff Roberts because Perkins was not a resident of Hampton. She related her complaints to Sgt. Sharon Mays, Sgt. John Meyers and Lt. George Perkins, among others. In talking to Sgt. Mays, Woodward learned that another non-resident of Hampton was circulating petitions. Woodward had various conversations in the executive suite about this matter. Most of the conversations were with Sgt. Mays. Sgt. Mays regularly had lunch with Major Wells-Major, Deputy Harper (who is Col. Bowden's sister), and Col. Bowden. Moreover, their offices were in

the same general area in which these discussions were held.  A fact finder could easily infer, on

the totality of these facts, that Debbie Woodward's protests were viewed by Sheriff's Office

senior officers as political speech against Sheriff Roberts or in favor Jim Adams' candidacy.

**B.      All of the Plaintiffs Engaged in Political Affiliation with Adams and Refrained from
         Political Affiliation with Roberts.**

Carter, McCoy and Sandhofer attended the cookout which was also attended by Adams

and, according to Major Richardson, it "did not look good" and appeared to be a "campaign

event."  The cookout was significant enough to be reported to Sheriff Roberts by Col. Bowden.

*Ex. 1*, Robert Dep. pp. 114-115.  It is clear why this cookout is being discussed between Col.

Bowden and Sheriff Roberts – it is precisely because of the identical assessment made by Major

Richardson – it appeared to them to be a campaign event and "it did not look good."  In any

event, it is clear that a jury could conclude that Sheriff Roberts bore animus against anyone

associating or affiliating with Adams at what was clearly perceived to be a campaign event.

Why else is a cookout the subject of inquiry for Major Richardson and the topic of discussion

between Col. Bowden and Sheriff Roberts?

All of the Plaintiffs refrained from providing the Sheriff with the political support they

had provided him in the past.  Plaintiffs each enthusiastically provided significant support to

Sheriff Roberts' re-election efforts prior to 2009.  All of the Plaintiffs were close to Jim Adams.

Bland and Woodward were close to both Adams and Deborah Davis, Adams' campaign

treasurer.  Moreover, Bland and Woodward were clearly part of the Sheriff's executive suite

though they served only in clerical, administrative capacities.  All of the Plaintiffs had, prior to

2009, distributed campaign literature, manned polls on election day, sold tickets to campaign

events, attended campaign events, put out yard signs and performed other significant services in

support of Sheriff Roberts' re-election efforts.  While one or two of the Plaintiffs begrudgingly

bought tickets to the Sheriff's golf tournament, none of them engaged in the full-throated active support they had provided in the past.

The totality of the facts in this case militate heavily for finding violations of both protected rights of free expression and political association. The Sheriff obviously held retaliatory and politically motivated animus. The evidence is clear that his intent to abridge rights of expression and political affiliation was manifest in the shift change meetings. At the very least, the evidence on this point creates an issue for trial. The work environment was imbued with politics and requirements of political loyalty. It is clear that the Plaintiffs supported the Sheriff in the past but shifted their support to Jim Adams in 2009. This resulted in their refraining from engaging in support activities they had engaged in the past for Sheriff Roberts. All of these factors combine to create issues of fact for trial.

### Qualified Immunity

The Defendant is not entitled to qualified immunity because he did not include it as an affirmative defense. In any event, he testified very clearly in his deposition that he understood firing employees because of political affiliation or political speech was unlawful. Given his testimony, he cannot now claim qualified immunity. Roberts Dep. p. 112.

**WHEREFORE,** the Plaintiffs respectfully request that the Defendant's Motion for Summary Judgment be denied and this matter proceed to trial.

Respectfully submitted,

**BOBBY BLAND, DANIEL RAY CARTER, JR., DAVID W. DIXON, ROBERT W. MCCOY, JOHN C. SANDHOFER AND DEBRA H. WOODWARD**

By: _____ */S/* _____
James H. Shoemaker, Jr.

James H. Shoemaker, Jr., VSB No. 33148
Jason E. Messersmith, VSB No. 77075
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4580
Facsimile: (757) 223-4518
jshoemaker@pwhd.com
jmessersmith@pwhd.com
*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jeff W. Rosen, Esquire
Jeffrey A. Hunn, Esquire
Pender & Coward
222 Central Park Avenue, Suite 400
Virginia Beach, Virginia  23462-3026
Telephone: 757-490-6253
Facsimile: 757-497-1914
jrosen@pendercoward.com
jhunn@pendercoward.com
*Counsel for Defendant*

_____/S/_____
James H. Shoemaker, Jr., VSB No.  33148
Jason E. Messersmith, VSB No.  77075
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: (757) 223-4580
Facsimile: (757) 223-4518
jshoemaker@pwhd.com
jmessersmith@pwhd.com
*Counsel for Defendants*