IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION


-------------------------------------
BOBBY BLAND; DANIEL RAY CARTER, JR.;
DAVID W. DIXON; ROBERT W. McCOY;
JOHN C. SANDHOFER; and
DEBRA H. WOODWARD,

                Plaintiffs,                         CASE NO.
                                                    4:11-CV-45
v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

                Defendant.
-------------------------------------


DEPOSITION UPON ORAL EXAMINATION
OF B. J. ROBERTS,
TAKEN ON BEHALF OF THE PLAINTIFFS


Virginia Beach, Virginia

October 4, 2011


Appearances:

        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
        By: JAMES H. SHOEMAKER, JR., ESQUIRE
            Counsel for the Plaintiffs

        PENDER & COWARD
        By:  JEFF W. ROSEN, ESQUIRE
            Counsel for the Defendant

Exhibit 1

## Page 2

INDEX

DEPONENT        EXAMINATION BY        PAGE

B. J. ROBERTS    Mr. Shoemaker        4, 156
                 Mr. Rosen            139

EXHIBITS

NO.  DESCRIPTION                        PAGE

1   Plaintiffs' First Set of Interrogatories    57
    and Request for Production of Documents to
    Defendant

2   9/28/11 letter to James H. Shoemaker, Jr.,    66
    Esq., from Jeff W. Rosen, Esq.; facsimile
    transmission coversheet

3   1/19/09 Hampton Sheriff's Office Civilian/    84
    Administrative Performance Evaluation Form
    re: Debbie Woodward; Woodward
    051-055

4   1/17/08 Hampton Sheriff's Office Civilian/    86
    Administrative Performance Evaluation Form
    re: Debbie Jones; Woodward 056-060

5   12/31/08 Hampton Sheriff's Office Employee    87
    Performance Evaluation/Counseling Form re:
    Daniel Carter; Carter 096-100

6   12/18/07 Hampton Sheriff's Office Employee    89
    Performance Evaluation/Counseling Form re:
    Daniel Carter; Carter 101-105

7   12/22/08 Hampton Sheriff's Office Employee    90
    Performance Evaluation/Counseling Form re:
    David Dixon; Dixon 095-099

8   1/14/08 Hampton Sheriff's Office Employee    92
    Performance Evaluation/Counseling Form re:
    David Dixon; Dixon 100-104

## Page 3

EXHIBITS (cont'd.)

NO.  DESCRIPTION                        PAGE

9   1/15/08 Hampton Sheriff's Office Civilian/    93
    Administrative Performance Evaluation Form
    re: Bobby Bland; Bland 079-088

10  12/31/05 Hampton Sheriff's Office Civilian/    94
    Administrative Performance Evaluation Form
    re: Bobby Bland; Bland 084-088

11  12/31/08 Hampton Sheriff's Office Employee    95
    Performance Evaluation/Counseling Form re:
    Robert McCoy; McCoy 055-059

12  12/31/07 Hampton Sheriff's Office Employee    97
    Performance Evaluation/Counseling Form re:
    Robert McCoy; McCoy 060-064

13  2/4/09 Hampton Sheriff's Office Employee    98
    Performance Evaluation/Counseling Form re:
    John Sandhofer; Sandhofer 105-109

14  11/4/08 Hampton Sheriff's Office Employee    99
    Performance Evaluation/Counseling Form re: John
    Sandhofer; Sandhofer 110-114

## Page 4

Deposition upon oral examination of B. J.
ROBERTS, taken on behalf of the Plaintiffs before
Juanita Harris Schar, RMR, CCR, CRR, a Notary Public
for the Commonwealth of Virginia at large, commencing
at 9:22 a.m. on October 4, 2011, at the law offices of
Pender & Coward, 222 Central Park Avenue, Suite 400,
Virginia Beach, Virginia; and this in accordance with
the Federal Rules of Civil Procedure.

- - - - -

B. J. ROBERTS, was sworn and deposed on
behalf of the Plaintiffs as follows:

EXAMINATION
BY MR. SHOEMAKER:

Q.    Sheriff, good morning.  As you know, I'm
Jamie Shoemaker and I represent six plaintiffs who
filed suit against you in the U.S. District Court for
the Eastern District of Virginia for First Amendment
violations and wrongful termination.

Have you ever given a deposition before?

A.    Yes.

Q.    Okay.  So you're probably aware then that
the testimony you're about to give here today bears the
same weight and dignity as if we were in a mahogany-
walled courtroom in downtown Norfolk.  So it's

## Page 5

important that we build as clear a record as possible.
And to that end, I'm going to ask you to verbalize your
responses.  You may have -- you sat through our first
round of depositions.  You'll see how some folks will
say "uh-huh" and "uh-uh" or they'll try and shake their
head.  I'm actually guilty of this sometimes myself and
I've been doing this for 20 years.  So it's important
to make a conscious effort to try to verbalize your
answers clearly.

Are you under any conditions here today
that would affect your ability to answer my questions
and to answer them fully?

A.    No.

Q.    Okay.  Would you first start by giving me
your educational background.

A.    I --

Q.    First state your full name for the record.
I'm sorry.

A.    Billy Joe Roberts.

Q.    And would you please describe your
educational background.

A.    I have a high school diploma.  Also, I have
a degree in Business Management from Hampton
University.

Q.    Okay.  And I don't know that I need to go

6

1  all the way back, not to be too impolite and get deeply
2  into age, but when did you graduate from high school?
3      A.   '68.
4      Q.   And did you do any military service around
5  high school?
6      A.   No.
7      Q.   At some point you were a Hampton police
8  officer?
9      A.   Newport News.
10     Q.   Newport News police officer.  When did you
11 join the Newport News police force?
12     A.   1971, I believe.
13     Q.   Okay.  How long were you a police officer?
14     A.   11 and a half months.
15     Q.   Then what happened?  What did you do?
16     A.   Went to Hampton University.  In 1973.
17     Q.   And you went full-time?
18     A.   That's correct.
19     Q.   And when did you graduate from Hampton
20 University?
21     A.   In '85.
22     Q.   So you did a detour somewhere along the
23 line?
24     A.   While I was there working, I got my degree.
25     Q.   Oh, I see.  What did you do at Hampton

7

1  University?
2      A.   I started out as -- in security and ended
3  up being the chief and director of public safety.
4      Q.   And when did you leave that position as
5  chief and director of public safety at HU?
6      A.   1992 I was elected sheriff.
7      Q.   All right.  And I didn't realize that.  So
8  you went right from chief of Hampton security police
9  department to being elected sheriff?
10     A.   That's correct.
11     Q.   How did you prepare for today's deposition?
12 If you did anything to prepare for it.
13     A.   Met with my attorney, and any information
14 that he had asked me for, I gave it to him that your
15 office had asked for.
16     Q.   Did you review any e-mails authored by you?
17     A.   No.
18          Because...
19          MR. ROSEN:  You answered the question.
20          THE DEPONENT:  Okay.
21
22 BY MR. SHOEMAKER:
23     Q.   You were about to explain why you --
24 apparently you didn't review e-mails.  What were you
25 about to say?  You said, "Because" and --

8

1      A.   Because I didn't prepare any.
2      Q.   Do you use e-mail?
3      A.   Very, very seldom.
4      Q.   Did you review any e-mails authored by
5  Captain Wells-Major?
6      A.   No.
7      Q.   Do I have that rank right?  Is she a
8  captain?
9      A.   She's a major.
10     Q.   Major.  Okay.  Did you review any e-mails
11 authored by Lieutenant Rich?
12     A.   No.
13     Q.   Did you review any e-mails authored by
14 Captain Richardson?
15     A.   No.
16     Q.   Is he a major, too?
17     A.   He's a major.
18     Q.   Did you review any e-mails at all in
19 preparation for your deposition today?
20     A.   The e-mails that were directed from my
21 attorney's office.
22     Q.   That were produced to me?
23     A.   Yes.
24     Q.   So you don't remember reviewing any e-mails
25 authored by, say, Lieutenant Cook, Crystal Cook?

9

1      A.   No, sir.
2      Q.   You don't remember reviewing any e-mails
3  authored by Lieutenant Harry Lewis?
4      A.   No, sir.
5      Q.   How about any e-mails authored by Sergeant
6  Ford?
7      A.   No, sir.
8      Q.   All right.  Do you have a desktop in your
9  office?
10     A.   I do, sir.
11     Q.   And do you use that to write e-mails from
12 time to time?
13     A.   Yes, from time to time.
14     Q.   Do you have a laptop that you use?
15     A.   No, sir.
16     Q.   Is the desktop in your office the only
17 computer that you use to write e-mails?
18     A.   That's correct.
19     Q.   And I guess you also use that computer to
20 receive e-mails?
21     A.   That's correct, sir.
22     Q.   Do you use a home computer to write e-mails
23 at all?
24     A.   None at all.
25     Q.   Do you even have a home computer?

3 (Pages 6 to 9)

## 10

1     A.    I do.

2     Q.    But you never write e-mails on it?

3     A.    No, sir.

4     Q.    I want to talk a bit or ask a bit about the

5   training and education that deputies get when they are

6   hired by you. My understanding is that there is a

7   school called -- and correct me because I know I'm

8   going to get it wrong -- the Hampton Roads Regional

9   Justice Training Academy?

10    A.    That's correct, sir.

11    Q.    Do I have the name right?

12    A.    That's right.

13    Q.    And when deputies are hired into your

14  office, they attend a course there called the basic

15  jailer course?

16    A.    That's correct, sir.

17    Q.    And that course is approximately 60 days in

18  length?

19    A.    I believe it's -- I believe it's eight

20  weeks.

21    Q.    Eight weeks.

22    A.    Eight weeks.

23    Q.    I think that would roughly work out, if you

24  don't count the weekends, to 60 days.

25    A.    All right.

## 11

1     Q.    Now, the deputies that are hired by you do

2   not have to attend the basic law enforcement class

3   offered by that academy, do they?

4     A.    No, they don't.

5     Q.    And that basic law enforcement class,

6   that's approximately twice as long as the basic jailer

7   class?

8     A.    I would -- I believe so.

9     Q.    Could you delineate for me the difference

10  in functions between your office and your powers and

11  the office -- I'm going to use an example -- the office

12  held by Danny Diggs up in York County? Danny has law

13  enforcement officers -- has a law enforcement function

14  and he also has court services and civil process

15  function. Could you explain the difference between the

16  powers that you hold versus the power that he holds?

17          MR. ROSEN: Objection to the extent it

18  calls for a legal conclusion. You can answer if you

19  can.

20    A.    Okay. I don't believe our powers are any

21  different, but he has the responsibilities for law

22  enforcement. In Hampton, the law enforcement --

23  primarily, law enforcement is done by the Hampton

24  Police Department. In York County, Sheriff Diggs does

25  law enforcement, court services, but he does not have

## 12

1   the jail. I have the jail.

2

3   BY MR. SHOEMAKER:

4     Q.    Do you know for a sheriff like Diggs who

5   has the law enforcement function, is his office

6   budgeted differently from your office? Or is it -- or

7   do you know?

8     A.    I don't know.

9     Q.    Does he fall under the same statutory

10  authority that you fall under, or does he fall under a

11  different statutory authority?

12          MR. ROSEN: Again, same objection, calls

13  for a legal conclusion. If you can answer, you can.

14    A.    I believe all sheriffs in Virginia fall

15  under the same statute.

16

17  BY MR. SHOEMAKER:

18    Q.    Okay. Back to the basic jailer's course,

19  do you know what subjects the basic jailer's course

20  covers?

21    A.    Some court security, firearms training,

22  powers of arrest, and functions of the jail as

23  practical matters is cell searches, defensive tactics.

24  And I believe they still do a verbal judo portion where

25  you talk the inmate down from any problems.

## 13

1     Q.    Have you ever attended either the basic

2   jailer's course or the basic law enforcement course?

3     A.    I've graduated from the basic law

4   enforcement course.

5     Q.    Back when you were a Newport News police

6   officer?

7     A.    That's correct.

8     Q.    And is that the last time you took that --

9   had to go through that curriculum?

10    A.    That's correct.

11    Q.    Do you know of any difference in admission

12  requirements between the basic jailer's course and the

13  basic law enforcement course?

14    A.    I think -- no, I don't.

15    Q.    You don't think there are any at all?

16    A.    Any difference?

17    Q.    Yes, sir. Any educational requirement

18  differences or experience differences?

19    A.    None whatsoever.

20    Q.    Is there a difference in cost to you

21  whether or not you send deputies to the basic jailer's

22  course or if you chose to send them to the basic law

23  enforcement course?

24    A.    I don't know the difference of that cost.

25    Q.    Now, your office is accredited by what

4  (Pages 10 to 13)

14

1  organization, Sheriff?
2      A.   National Commission for Correctional
3  Healthcare, American Corrections Association, and
4  CALEA. That's a national association for law
5  enforcement.
6      Q.   Say that last one again, please.
7      A.   CALEA.
8      Q.   What does it stand for?
9      A.   It's really the national law enforcement
10  accreditation association.
11     Q.   How long have you -- has your office held
12  those accreditations?
13     A.   Wow. I believe for the past nine years for
14  ACA, or American Correction; ten years for NCCAC, which
15  is national healthcare; and just three years for the
16  CALEA, national law enforcement.
17     Q.   Which of the three -- and let's put the
18  healthcare accreditation aside a second. Your
19  healthcare is taken care of by a contractor, isn't it?
20     A.   No, sir. We self-op. We do it. I do it.
21     Q.   You self-operate?
22     A.   That's right.
23     Q.   So you hire the physicians yourself?
24     A.   Yes, my director does.
25     Q.   Was there a time when you used to contract

15

1  that out?
2      A.   That's correct.
3      Q.   When did that change?
4      A.   We've been self-op for probably around six
5  years, six, seven years.
6      Q.   All right. Of the other two, the American
7  Corrections Association and the national law
8  enforcement association, which of the two is more
9  onerous or more stringent?
10         MR. ROSEN: Object to the form of the
11  question. If you can answer.
12
13  BY MR. SHOEMAKER:
14     Q.   Well, is either of those two considered
15  more difficult or stringent to meet?
16     A.   No, sir.
17     Q.   What subjects do they look at, these two
18  organizations, American Corrections Association and the
19  national law enforcement association? What do they
20  look at when they're determining whether or not to
21  accredit you?
22     A.   In the American Corrections Association,
23  they are dealing with the care of the inmates, your
24  facility. They deal with the lighting. Has to do with
25  -- they basically -- it's basic care of the inmate.

16

1      Q.   Is it food quality?
2      A.   Well, no, not necessarily, but food
3  scheduling.
4      Q.   Okay. Do they both deal with the same
5  things or are they -- do they differ at all?
6      A.   They differ.
7      Q.   How do they differ?
8      A.   The CALEA law enforcement does not take in
9  consideration anything in corrections.
10     Q.   So what are they looking at?
11     A.   They look at if we have a holding cell, are
12  we up to standards there. That's in courts. They look
13  at our civil area, how we serve civil process.
14  Communications, how we are communicating back through a
15  home radio system. We use -- we have one at our civil
16  process area and HD -- HPD communications handles the
17  rest of that for us. They look at our booking area
18  because that is a law enforcement portion that's
19  normally done by the primary law enforcement office,
20  and we do that for the Hampton Police Department. So
21  we get -- we have to be looked at in that area.
22     Q.   Anything else?
23     A.   Basically, some of the things that we do,
24  do not -- as far as tactical teams for the law
25  enforcement we do not do so we get a waiver for those.

17

1      Q.   What else do you get waivers for?
2      A.   Patrol. And I don't recall all the -- any
3  of the others.
4      Q.   What about evidence handling?
5      A.   I don't believe we get a waiver for any
6  evidence handling.
7      Q.   Do they have --
8      A.   We do -- because we do have the evidence
9  that we have to handle. And we turn it over to the
10  police department.
11     Q.   My understanding is that you issued a
12  memorandum somewhere around 2002, 2003 -- I've not seen
13  a copy of it yet, but that the purpose of the
14  memorandum was to make it clear that your deputies did
15  not have arrest powers. You remember issuing a
16  memorandum like that?
17     A.   I'd have to see it so I can review it.
18     Q.   Do your deputies have arrest powers?
19     A.   Yes.
20     Q.   They do?
21     A.   Yes.
22     Q.   The same arrest powers I have?
23     A.   No. The Code says that the deputies have
24  arrest powers.
25     Q.   Did there come a time when one of the

5 (Pages 14 to 17)

18

1  accreditation agencies had a problem with that?
2      A.    I don't think they had a problem.  We had
3  to assure that if a person -- if we had policy that
4  directed us on how we are to do our arrests, were we
5  following the guidelines.  And the rules of DCJS, which
6  are the training academy, purely states that if you are
7  to patrol and have immediate arrest powers, you have to
8  go to the law enforcement academy.
9      Q.    And your folks do not go to the law
10 enforcement academy?
11     A.    No, they don't go to the law enforcement
12 academy, but any incidental arrest in our range of
13 work, we have the ability to make arrests.
14     Q.    Your ability to make an arrest is if they
15 come across a problem or they have a fugitive that
16 escapes.  My understanding of their ability to arrest
17 is they have the power to detain and call the police.
18 Is that --
19     A.    No, no.  If it's in the realm of my
20 everyday responsibilities, they have the power to
21 arrest.
22     Q.    So they have the power to arrest in the
23 jail and in the court -- in the courthouse?
24     A.    Courts.  And if they're serving a civil --
25     Q.    And if you're transporting a prisoner?

19

1         MR. ROSEN:  You can't both talk at the same
2  time.  You cut him off.  Let him finish his answer.
3         MR. SHOEMAKER:  You're right.
4
5  BY MR. SHOEMAKER:
6      Q.    I'm sorry about that.  Go ahead.
7      A.    Any areas that I'm responsible for, DCJS
8  says I have the power of arrest.
9      Q.    But your deputies do not have the power to
10 go out and patrol and arrest?
11     A.    That's correct.
12     Q.    What is --
13         MR. ROSEN:  Object to the extent it calls
14 for a legal conclusion.  And you've answered it.  And I
15 would also object to this line of questioning for
16 relevance.  Go ahead.
17
18 BY MR. SHOEMAKER:
19     Q.    What is DCJS?
20     A.    It's our state department of training.
21     Q.    Is it Department of Criminal Justice
22 Services?
23     A.    That's what it is.
24     Q.    And do they -- now, do they have an
25 accrediting function with respect to your office?

20

1      A.    No, sir.
2      Q.    You spoke of them a minute ago as if you
3  had to adhere to their guidance.  Is that fair?
4      A.    Only meaning what you get -- you have to
5  put your -- put your deputies where they are trained to
6  be.  And that's if you go through the academy for basic
7  jail, then court services, that's what you -- that's
8  what they should be working.
9      Q.    Does DCJS issue you written guidance?
10     A.    Only through the academy.
11     Q.    And what kind of guidance are you issued
12 through the academy?
13     A.    When a person is certified that they have
14 graduated from the academy through basic jailer -- they
15 call it jailer and court services -- then we know the
16 person is -- has the ability to do the work that they
17 are trained to do.
18     Q.    Okay.  That ability to do the work they are
19 trained to do, does DCJS have regulation-making
20 authority?  Do you know?
21     A.    Not that I know of.
22     Q.    So this restriction that the deputy do the
23 work that he is trained to do, is that in state
24 regulations somewhere?
25     A.    DCJS is an arm of the state regulatory

21

1  system, I believe.
2      Q.    But sitting here -- and you know, I
3  probably should know this myself.  Sitting here, you're
4  not aware of whether or not there's a set of regs that
5  DCJS issues?
6      A.    I can only say -- speak to that DCJS is
7  responsible for the academies of the state and the
8  state trains our deputies on the iss -- on the subject
9  matter that I spoke of before.
10     Q.    Okay.  The American Corrections Association
11 accreditation, do you have a file on that at your
12 office?
13     A.    A file on the --
14     Q.    On the accreditation.
15     A.    I'm not understanding you.
16     Q.    Do you have any documents related to your
17 ACA accreditation at your office?
18     A.    Yes, sir.
19     Q.    What kind of documents do you have at your
20 office related to the ACA accreditation?
21     A.    I mean, we -- what we -- what we do every
22 day, we have to have files on hand and when they come
23 back for reaccreditation, they look at all of our
24 files.  We have hundreds of files.
25     Q.    Do you have a document at your office that

22

1   says what their standards are?
2       A.   Yes.
3       Q.   Do you know what that document is called?
4       A.   No, I do not.
5       Q.   Who's responsible for keeping that
6   document?
7       A.   A Lieutenant Harper.
8       Q.   Now, you went through this accreditation
9   process approximately nine years ago; is that correct?
10      A.   I believe so.
11      Q.   When that process -- when you were doing
12  that, what did they do?  Did they send a team out to
13  your jail?
14      A.   That's correct, sir.
15      Q.   Do you remember how long they were there?
16      A.   I'd say around three days.
17      Q.   Okay.  And do you remember how many people
18  they sent?
19      A.   I think it was about three.
20      Q.   And did they give you some sort of exit
21  briefing when they left?
22      A.   Yes.
23      Q.   When they left, did they tell you then that
24  you were accredited, or did they tell you they were
25  going to get back to you?

23

1       A.   You -- you are not accredited.  After that,
2   you have to go through -- before a commission.
3       Q.   And it is a commission composed of ACA
4   officials?
5       A.   That's correct.
6       Q.   How long do you go in front of the
7   commission after that team leaves, the three-member
8   team leaves?
9       A.   The next time there's a conference, and
10  usually they have two conferences per year.
11      Q.   Do you remember there being correspondence
12  that went back and forth between your office and ACA
13  officials about the accreditation process?
14      A.   I don't remember exactly, but I'm -- I'm
15  probably sure there were some communications back and
16  forth.
17      Q.   Would Lieutenant Harper be responsible for
18  having that as well?
19      A.   I would think so.
20      Q.   Similar questions with respect to the CALEA
21  accreditation.  And am I right, it's CALEA, which I'm
22  not sure you remembered exactly what all that -- what
23  the acronym -- it's an acronym, CALEA?
24      A.   Yes.
25      Q.   But it's also known as the National Law

24

1   Enforcement Association?
2       A.   No, Commission on Law Enforcement
3   Association.
4       Q.   And similar questions with respect to that.
5   Is there a standards document issued by CALEA?
6       A.   Yes, it is.
7       Q.   Does Lieutenant Harper have that as well?
8       A.   She should.
9       Q.   That accreditation process, you said you
10  went through that about three years ago?
11      A.   That's correct, sir.
12      Q.   And could you describe that process for me?
13      A.   It was --
14          MR. ROSEN:  Again, I'm going to object to
15  this ongoing line of questions being irrelevant to the
16  issues in this case.
17          Go ahead.
18      A.   I think it was a two-team accreditors or
19  assessors and they spent I think roughly two days there
20  going through files of what we -- what we were
21  responsible for, the holding cells, civil process, and
22  communications.
23
24  BY MR. SHOEMAKER:
25      Q.   Okay.  And when they left did they give you

25

1   an exit briefing?
2       A.   That's correct.
3       Q.   Were they able to tell you then you were
4   accredited?
5       A.   No, sir.
6       Q.   What was the process after that?
7       A.   Same.  If you had any deficiencies, you got
8   a chance to correct them before you went before the
9   commission.
10      Q.   And do you remember, would there have been
11  any correspondence between you and CALEA officials on
12  this issue?
13      A.   I would think so, sir.
14      Q.   Would Lieutenant Harper have that if it
15  exists?
16      A.   Probably so.
17      Q.   Let's switch gears a bit here.
18          What is a master deputy?
19      A.   A master deputy is an officer who the --
20  the Virginia comp board gave us the authority, or the
21  General Assembly gave us the authority through the comp
22  board to give career deputies an opportunity to -- that
23  were not going to move up in the ranks and who could
24  serve as supervisors or whatever and maintain a level
25  of competence, give them a chance to move up into

7 (Pages 22 to 25)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

26

1   another salary area.
2       Q.   Okay.  And what is the process for becoming
3   a master deputy?
4       A.   First you -- now, I don't recall
5   everything, Counselor, but the -- you would have to be
6   evaluated and also maintain a firearms record that
7   would be higher than a normal deputy, be able to
8   complete the training, the -- all your in-service
9   trainings, and go before a -- we have to have a panel
10  for them to go forward to become a master deputy.
11      Q.   And does the panel administer like an oral
12  examination?
13      A.   No.  No, sir.
14      Q.   What does the panel do?
15      A.   It reviews, and I'm -- and I'd have to see,
16  but they review all their records in between the time
17  when you have to come back again and determine if you
18  still have maintained all the duties and
19  responsibilities that you have to be a master deputy.
20      Q.   Do you know if a deputy had to have a
21  certain evaluation average to become a master deputy?
22      A.   I'm not sure.
23      Q.   Just to get a little clearer about that, do
24  you know -- you know, I think your evaluation forms
25  have average, above average, then outstanding.  Is that

27

1   right?
2       A.   Yes.
3       Q.   A deputy who's gotten nothing but average
4   evaluations, can they become a master deputy?  Do you
5   know?
6       A.   I'd have to look at the regs.
7       Q.   There are regs on how you become a master
8   deputy?
9       A.   Yes.  There's a system on how you become --
10      Q.   Is that put out by the state, or is that
11  put out by your office?
12      A.   Provided by the state.  Master deputy
13  program.
14      Q.   Who in your office would be responsible for
15  maintaining the records of what those standards are?
16      A.   I believe Lieutenant Harper.
17      Q.   And so she would probably have those
18  standards?
19      A.   I would think so.  If not her, certainly,
20  human resources.
21      Q.   Do you know approximately how many
22  uniformed personnel work for you?
23          MR. ROSEN:  What time?
24
25

28

1   BY MR. SHOEMAKER:
2       Q.   For throughout this deposition, unless I
3   indicate otherwise, I'm referring to the time period of
4   fall of 2009.
5          So do you know how many deputies worked for
6   you in the fall of 2009?
7       A.   Not exactly, sir.
8       Q.   Do you know roughly?
9       A.   I'd say approximately 160.  Just...
10      Q.   All right.  Do you have any idea what
11  percentage of those rank-and-file deputies were master
12  deputies at that time?
13      A.   No, I don't, Counselor.
14      Q.   Would you know whether or not it's less
15  than ten percent?
16      A.   Probably less than ten.
17      Q.   Could it be less than five percent?
18      A.   I don't think so.  I just don't know for
19  sure what the number is.
20      Q.   All right.  Fair enough.
21          Are there -- are you aware of deputies
22  who've attempted to become master deputies and who have
23  failed?
24      A.   Failed, I don't know if we use the word
25  "failed."  I don't -- I'd have to look at how that

29

1   becomes in effect.  I do know deputies who would not
2   re -- re -- came back as a master deputy because of
3   things before the board met.  So I'd have to look that
4   up for you.
5       Q.   Who would be responsible for keeping those
6   records?
7       A.   Human resource probably.
8       Q.   Who's responsible for human resources?
9       A.   Mrs. Wesley.
10      Q.   What is her title?
11      A.   Director of human resources.
12      Q.   Who was director of human resources in the
13  fall of 2009?
14      A.   Mrs. Bland, I believe.
15      Q.   The question I'm about to ask, I'm asking
16  about the time period December, 2009-January, 2010.
17  Who would have been in your office responsible for
18  hiring?
19      A.   2009?  Human resources.
20      Q.   Describe the hiring process for me as it
21  existed at the end of 2009 and beginning of 2010.
22      A.   More than likely we would have announced
23  vacancies through the newspaper.  I think we even put
24  it into the Hampton Notes, their information for
25  employment.  After that, the review process of the

ADAMS HARRIS REPORTING, INC.
(757)631-0458

**30**

1  applications is done through human resources. Then --
2       MR. SHOEMAKER: If we can take a quick
3  break, my secretary just dropped some stuff off.
4       MR. ROSEN: Sure.
5
6       (Recess)
7
8  BY MR. SHOEMAKER:
9       Q.   Sheriff, we were talking about how -- about
10 your hiring process as it existed at the end of '09 and
11 in early 2010. You had said that vacancies might be
12 announced in the newspaper, they might be announced in
13 something called Hampton Notes. Would vacancies have
14 been announced anywhere else?
15      A.   I believe on line. I think we -- through
16 on line. I'm not sure about that, Mr. Shoemaker.
17      Q.   Would you do that on your own website?
18      A.   Yeah, probably, if it's done now.
19      Q.   Now, who would have been responsible for
20 the hiring process at this point?
21      A.   I said Ms. Bland, but it probably was Mr.
22 Unnoppet.
23      Q.   So what is Hampton Notes?
24      A.   That's something from the Hampton -- City
25 of Hampton. They send out different things that have

**31**

1  to do with employment or anything that they do.
2       Now, I may even be calling that the wrong
3  thing, Hampton Notes, but I can give you the correct
4  name.
5       Q.   Does it just go to city employees?
6       A.   City employees, yes.
7       Q.   Is it an electronic document?
8       A.   Now it is, I believe, but during that
9  period of time if you wanted to know if there was any
10 -- in fact, let me correct myself on that. It's when
11 it rolls on the TV, telling what's about Hampton and if
12 there's any employment things, and we have been on
13 that. Can't tell you we were on in that period of time
14 you were asking.
15      Q.   So is Hampton Notes -- if it's on Hampton
16 Notes would it then go on that Hampton cable channel?
17      A.   We've been on there. I don't know if we --
18 we are still on there, but we've been on there.
19      Q.   All right. Would the Hampton Notes --
20 would it go to every Hampton employee or just go to
21 managers?
22      A.   I don't know. That's a city-managed...
23      Q.   You think it's called Hampton Notes?
24      A.   I can find the correct name for it, but I'm
25 not sure if it's Hampton Notes or not.

**32**

1       Q.   All right. And you said your practice
2  would also be to run an ad in the newspaper?
3       A.   That's correct.
4       Q.   Would it just be the Daily Press or would
5  you run it in other newspapers?
6       A.   We have been in others. I just don't know
7  what they did during that particular time.
8       Now, more than likely we kept an ad going,
9  our process continued on. It wasn't just for any
10 period of time.
11      Q.   Okay. The process, the hiring process, the
12 applications would come in and HR would review them?
13      A.   That's correct.
14      Q.   And then who would conduct interviews?
15      A.   We have -- we determine a panel of folks,
16 of deputies, and then they would make recommendations,
17 I believe to the colonel, who's -- Colonel Bowden, and
18 then she would interview them. Then I would interview
19 them.
20      Q.   Okay. The panel of deputies, does that
21 panel vary from time to time?
22      A.   Yes, it does.
23      Q.   And so they would make recommendations to
24 Colonel Bowden and Colonel Bowden would make
25 recommendations to you?

**33**

1       A.   I would interview them.
2       Q.   You would do the interview?
3       A.   Uh-huh.
4       Q.   Would anybody do the interview with you?
5       A.   Sometimes she would do them with me.
6  Sometimes I do them alone.
7       Q.   All right. Are background checks done for
8  all employees at the Hamp -- or all deputies at the
9  Hampton sheriff's department?
10      A.   Yes.
11      Q.   How long has that been the case?
12      A.   Mr. Shoemaker, I can't remember that we
13 didn't have -- haven't done it in years, the background
14 check.
15      Q.   I wouldn't ask this question, but I read
16 the papers this morning and apparently they don't do
17 background checks in LA.
18      MR. ROSEN: That was not a question. That
19 was just a comment. You don't have to respond to that.
20      THE DEPONENT: I didn't.
21
22 BY MR. SHOEMAKER:
23      Q.   I'm going to go back to the accreditation
24 agencies for just a minute. Does the ACA have a
25 component to their accreditation process that deals

9 (Pages 30 to 33)

34

1  with the human resources management?
2      A.    I believe they do.
3      Q.    And do you remember anything about what
4  their standards are with respect to human resources
5  management?
6      A.    No, I don't.
7      Q.    Do you remember them requiring a gradual or
8  a -- a gradual discipline process or gradations of
9  discipline required by the ACA?
10     A.    No, I don't.  I don't recall them -- that
11  particular policy.
12     Q.    Has there ever come a time when the City of
13  Hampton asked you or wanted you to put your HR
14  management under the City of Hampton?
15     A.    No, sir.
16     Q.    Has there ever been any discussion with the
17  City of Hampton about that?
18     A.    No, sir.
19     Q.    Has there ever come a time when the City of
20  Hampton wanted to integrate your HR record system with
21  the city's record system?
22     A.    I believe that's already done.  That's been
23  integrated.  For time and pay, we do that.
24     Q.    For time and pay?
25     A.    For computers.  Yes.

35

1      Q.    So paychecks are issued from some central
2  place for the sheriff's office?
3      A.    That's correct.  We have to go through
4  finance.
5      Q.    City finance?
6      A.    Uh-huh.
7      Q.    What about the actual maintenance of the
8  personnel record?  Is that -- does the city keep a copy
9  of the personnel record?
10     A.    No.
11     Q.    Is there an electronic personnel record, or
12  is it just a paper personnel record?
13     A.    I believe just paper.
14     Q.    Does the city administer your health
15  insurance as well?
16     A.    Yes.
17     Q.    How about FMLA leave?  Does the city
18  administer that?
19     A.    That's correct, sir.
20     Q.    Are there ever issues with FMLA where the
21  city's administering the leave and let's say you're not
22  sure where the employee is on absences, you want to
23  discipline the employee, but you've got to check with
24  the city first?
25          MR. ROSEN:  Objection to the form of the

36

1  question.  You can answer if you can.
2      A.    I'm not clear on your question, sir.
3
4  BY MR. SHOEMAKER:
5      Q.    Well, the FMLA has some protections for
6  employees.  You know, they can be out for a certain
7  amount of time for major illnesses.
8      A.    Uh-huh.
9      Q.    Do you have anything to do with determining
10  how long an employee can be out or do you rely entirely
11  on the city for that?
12     A.    Because we rely on the city for that, we
13  give them the information and they -- they are the
14  distributors of that because of everything has to come
15  through them.
16     Q.    So you just defer to the city on that.
17  They're managing it, you defer to them?
18     A.    That's right, sir.
19          MR. ROSEN:  I object to relevance.  You've
20  answered the question.
21
22  BY MR. SHOEMAKER:
23     Q.    Does CALEA have a human resources component
24  to their accreditation process?
25     A.    I believe they do.

37

1      Q.    Do you remember having to institute
2  gradations of discipline in order to meet either of
3  these accreditation processes?
4      A.    For the most part, we had already had a
5  coherent policy.  I'm not sure if we had to tweak ours
6  or not.
7      Q.    What is your policy on discipline?
8      A.    Can you be more specific on the -- what
9  kind of discipline?
10     Q.    Well, what I've been told -- I don't think
11  I've seen a policy on it, but what I've been told is
12  that there's a policy that says something to the effect
13  of for a first infraction there will be a verbal
14  counseling, a second one will be a write-up, for a
15  third there will be something more significant.  Does
16  that ring a bell?
17     A.    That would depend on the infraction.
18     Q.    Could you describe that to me?
19     A.    I believe if -- if a person, for example,
20  is late a couple of times, I think the supervisor has
21  the ability to do a written negation that he should not
22  be late and all of that.  I don't know exactly what
23  would make that go any higher.  For example, if there's
24  a deputy that has done something very egregious in the
25  facility or wherever we are working, certainly, we

38

1 wouldn't give the supervisor an opportunity to do a
2 written. I think that would have escalated to maybe
3 going through a disciplinary board.
4 Q. Okay.
5 A. So that would depend on what you...
6 Q. Well, generally, if you know, does the
7 office employ gradations of discipline when dealing
8 with employee, you know, shortcomings, infractions? Do
9 you know?
10 A. Yes, we do have that in part of the
11 disciplinary process.
12 Q. Okay. I'm going to ask you some questions
13 about the types of discipline meted out by the
14 sheriff's office, and my time -- the time I'm asking
15 about is what your memory allows. I'm not asking about
16 just 2009. I'm asking about whatever you can remember
17 in terms of the questions I'm about to ask regarding
18 discipline.
19 Can you remember any instances when a
20 deputy has lost a weapon?
21 A. Yes.
22 Q. Can you tell me what you can remember about
23 any incidents like that?
24 A. We had a deputy, I guess maybe a year, year
25 and a half ago, to lose his weapon in the vehicle. And

39

1 he went before -- went before the disciplinary board,
2 and they recommended termination and he was terminated.
3 Q. Do you remember what his name was?
4 A. Ford.
5 Q. Was that Sergeant Ford?
6 A. That's correct.
7 Q. Can you remember any other instances where
8 a deputy has lost their weapon?
9 A. That was -- no, that was it for me.
10 Q. Have there been any instances where a
11 deputy has been disarmed by a prisoner? That you can
12 remember.
13 A. Not that I can remember. If you have
14 something there, you could refresh me, but I don't
15 recall.
16 Q. Do you ever remember any situations where a
17 deputy has broken their weapon?
18 A. No. Not that I can remember.
19 Q. Do you remember any incidents where a
20 deputy -- and by deputy, I mean any uniformed member.
21 I'm not limiting my questions to just rank-and-file
22 deputies. I'm including sergeants, lieutenants,
23 captains. Do you remember any incidents where a deputy
24 has lost ammunition?
25 A. I don't recall it.

40

1 Q. Okay. Do you remember any incidents where
2 a deputy has lost any type of equipment? Other than
3 what you've told me.
4 A. No, I -- not right offhand, I don't
5 remember.
6 Q. There is a -- there was a lieutenant named
7 Mitchell; is that correct?
8 A. That's correct.
9 Q. Do you remember Mitchell was in charge of
10 firearms safety at one point?
11 A. Yes.
12 Q. Do you remember Mitchell accidentally
13 discharging his weapon and shooting himself in the
14 hand?
15 A. Yes.
16 Q. And do you remember that happening a second
17 time?
18 A. Yes.
19 Q. When did those two events occur?
20 A. I don't have the information in front of
21 me. I don't know.
22 Q. They occurred -- I mean do you know if they
23 occurred in 2008 or before? Do you know whether or
24 not --
25 A. I -- I don't know the dates.

41

1 Q. Do you remember what happened to him the
2 first time he shot himself in the hand?
3 A. I'd have to review it. I really don't know
4 exactly what happened.
5 Q. He wasn't terminated, correct?
6 A. That's correct.
7 Q. Did he stay head of firearms safety?
8 A. I don't know if he did or not, but I'd have
9 to see.
10 Q. Do you remember where that accident
11 occurred?
12 A. I'm thinking in the Carmel Center.
13 Q. Firing range?
14 A. No, I don't believe -- yeah. Yeah. Thank
15 you. That was at the firing range.
16 Q. Did the second incident happen at the
17 Carmel Center?
18 A. I believe it did.
19 Q. All right. The Carmel Center, they don't
20 still do that, do they, or do they?
21 A. We use the front side and we have equipment
22 in the back side where it used to be the lockup.
23 Q. Was he disciplined at all as a result of
24 either of those two incidents?
25 A. I believe he was, but I don't know what it

42

1    was, what happened.
2        Q.   Do you remember any situations where
3    deputies have been in vehicular accidents with
4    sheriff's vehicles that was the deputy's fault?
5        A.   Yes, sir.
6        Q.   Can you tell me what you remember about
7    those incidents?
8        A.   I don't know any specific one, but I can
9    tell you that we go through an accident panel and they
10   determine if in fact it was the deputy's fault, and the
11   deputy for the most part would have to pay for the
12   accident. For the accident, the damage to our vehicle
13   or anyone that we are responsible for.
14       Q.   Can you remember any specific vehicle
15   accidents, sitting here today?
16       A.   No. It -- no, I can't. Because most of
17   them are backing into the sally port, that kind of
18   damage, and I don't know particularly which ones.
19       Q.   Do you remember any vehicle accidents that
20   were serious where there were substantial injuries
21   involving deputies?
22       A.   We had an accident maybe about two years
23   ago, but it wasn't the deputy's fault. Someone crashed
24   into and rear-ended her.
25       Q.   Do you remember who that deputy was?

43

1        A.   Cherry.
2        Q.   Other than Lieutenant Mitchell, do you
3    remember there ever being any other accidental
4    discharges of weapons?
5        A.   When I first came into the office, we had a
6    deputy to discharge a weapon in the J -- old JDR
7    building. This is probably in about '93, '94, after I
8    got there. Can't remember that person's name, but it
9    was a discharge.
10       Q.   Do you remember what happened to that
11   person?
12       A.   Probably reprimanded. I don't know if he
13   was suspended in any way. I just don't recall.
14       Q.   And you don't remember any other accidental
15   discharges other than this person in the early '90s and
16   Lieutenant Mitchell?
17       A.   That's all I can recall at this particular
18   time.
19       Q.   Do you remember any incidents where a
20   deputy has had to face some level of discipline because
21   of dishonesty?
22       A.   I don't recall. I don't recall anyone.
23       Q.   Have you ever had a deputy, you know, take
24   money from your canteen fund or any of your funds?
25       A.   Had this person, wasn't a deputy, but the

44

1    case did not -- we wanted to -- we did the case,
2    investigated. It wasn't determined that they took
3    money. They just did not do the correct paperwork for
4    it. And I never was able to determine if -- through
5    our investigation that she had actually took the money.
6        Q.   Who was this person?
7        A.   I -- I am not -- I got -- I just can't
8    remember her name right now.
9        Q.   It was a female?
10       A.   Yes.
11       Q.   Do you remember when this was?
12       A.   Around '8. '08.
13       Q.   Who else would have been involved in
14   examining that situation?
15           MR. ROSEN: Object as to relevance. You
16   can answer it.
17       A.   Probably through the investigative part of
18   it, if we had Lieutenant Rich, and now he's a captain,
19   but during that time I believe he might have been the
20   one to investigate it.
21
22   BY MR. SHOEMAKER:
23       Q.   Do you remember who would have investigated
24   the Lieutenant Mitchell issue with the two discharges?
25       A.   It might have been Lieutenant McGee at the

45

1    time.
2        Q.   Now, would there be records related to
3    those two incidents?
4        A.   I would think so.
5        Q.   And how about this incident regarding the
6    female that Lieutenant Rich had investigated?
7        A.   I would think we still have them in the
8    file.
9        Q.   Do you know if that female is still
10   employed by your office?
11       A.   No, she's not employed.
12       Q.   Was she terminated as a result of this
13   incident?
14       A.   Not that one, but I'm not -- I'm not clear
15   on the next incident having to do with checks not filed
16   on time. I think we may have terminated her for that.
17       Q.   Had Sergeant Ford -- when Sergeant Ford was
18   terminated for losing his weapon, had he ever been
19   disciplined prior to that for anything?
20           MR. ROSEN: I object to the form of the
21   question. I'm not sure. I think it mischaracterizes
22   the testimony. You can answer if you can. I don't
23   remember him saying he was terminated.
24
25

12 (Pages 42 to 45)

46

BY MR. SHOEMAKER:

1  Q.   Wasn't Sergeant Ford terminated?
3  A.   Yes.
4       MR. ROSEN:  Okay.

BY MR. SHOEMAKER:

7  Q.   Had he ever engaged in any infractions
8  prior to the point when he lost the weapon and was
9  terminated?
10      A.   I don't recall. I don't recall any
11 incident. Early on I think he -- he got -- got a
12 ticket for driving too fast in Southampton.
13      Q.   In a sheriff's vehicle?
14      A.   That's correct.
15      Q.   Do you remember when that ticket was?
16      A.   Oh. Probably in about '94, '93, '94.
17      Q.   Do you remember any other incidents
18 involving honesty where any of your employees, deputy
19 or civilian, were disciplined for some sort of breach
20 of integrity or lack of honesty?
21      MR. ROSEN:  Objection, asked and answered.
22 You can do it again.
23      A.   I don't recall any other.
24
25

47

BY MR. SHOEMAKER:

2  Q.   Do you recall any deputies or employees
3  having to be disciplined for insubordination?
4  A.   I don't recall that at the moment,
5  Counselor.
6  Q.   Do you have a general memory that there
7  have been employees or deputies disciplined for
8  insubordination?
9  A.   I don't recall one way or the other.
10 Q.   Have you had any deputies or employees get
11 DUIs or DWIs either while driving one of your vehicles
12 or while driving their own personal vehicle?
13 A.   I've never -- I don't recall if this person
14 was -- I don't recall if they were driving one of --
15 one of our vehicles -- when I say ours, departmental
16 vehicles -- or not. I don't recall how far that was,
17 but yes, a lady, she was an administrative person. I
18 don't recall her last name, but I think it's Tormey
19 (phonetic).
20 Q.   Tormey?
21 A.   Tormey. She was arrested and --
22 Q.   She was driving her personal vehicle?
23 A.   I'm not sure. I have to -- I can't recall
24 that.
25 Q.   But she wasn't a deputy?

48

1  A.   She was not a deputy.
2  Q.   Did she drive at all as a function of her
3  job, or was she --
4  A.   Yes.
5  Q.   She did?
6  A.   Sometimes she would drive an administrative
7  car.
8  Q.   And you don't recall when this was?
9  A.   Probably somewhere around '96. '96, '95,
10 '96.
11 Q.   Are you aware of any other employees of
12 yours who have received DUIs or DWIs?
13 A.   No. Not that I remember.
14 Q.   What would happen if an employee, say a
15 deputy -- are your deputies allowed to take their
16 sheriff vehicles home?
17 A.   Yes.
18 Q.   Are they allowed to drive it for personal
19 errands?
20 A.   It depends on the errand. If it -- if they
21 are coming back and forth, yeah.
22 Q.   Some departments have a policy you can take
23 it anywhere in the jurisdiction. Is that what you do?
24 A.   That's correct.
25 Q.   What would the process be if one of your

49

1  deputies got a DUI or DWI while driving one of your
2  vehicles?
3       MR. ROSEN:  Objection, calls for
4  speculation. You can answer if you can.
5  A.   If that happened, they would be terminated.

BY MR. SHOEMAKER:

8  Q.   All right. Similar line of questioning,
9  only I'm going to drop the infraction down a notch.
10 Are you aware of any deputies or any of your employees
11 having received any serious moving infractions, like
12 reckless driving or -- let's say just being charged
13 with reckless driving.
14 A.   I don't recall any.
15 Q.   What would happen -- what would the process
16 be if one of your employees were convicted of reckless
17 driving in one of your vehicles?
18      MR. ROSEN:  Again, calls for speculation.
19
20 BY MR. SHOEMAKER:
21 Q.   If you know. If there's a policy.
22 A.   I don't know if there's a general per se
23 what that would be, but I wouldn't know what happened
24 because you have to deal with the circumstances of the
25 incident.

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

50

1    Q.    All right. Fair enough.
2          I'd like you to remember for me what
3    firings have been done, what terminations have been
4    done, for cause that you can remember. Deputies or
5    employees who have been terminated for some reason.
6          MR. ROSEN: Well, okay. Object to the form
7    of the question to the extent that it calls for a legal
8    conclusion. You can answer it if you can. Do you know
9    what that means?
10         THE DEPONENT: Yes.
11         MR. ROSEN: Okay.
12    A.    I'm not able to -- at this particular time
13   to sit down and just name all the folks that --
14
15   BY MR. SHOEMAKER:
16    Q.    Can you name anybody?
17    A.    Well, I just named Ford. Ms. Tormey, I
18   named her.
19          I just -- I just can't come up with any
20   names at this time.
21         MR. ROSEN: I also have an additional
22   objection to that question since the sheriff does not
23   need cause to fire someone under Virginia law. Go
24   ahead.
25

51

1    BY MR. SHOEMAKER:
2    Q.    Well, I mean, you have a grievance policy,
3    right?
4    A.    That's correct.
5    Q.    And you have a gradual discipline process,
6    correct?
7    A.    That's correct, sir.
8    Q.    Another category I want to ask you about.
9    Can you remember any deputies or employees being
10   disciplined for early releases? Early or inappropriate
11   releases of prisoners?
12    A.    Yes.
13    Q.    Tell me what you can remember about that.
14    A.    I had to terminate a Sergeant Rose. He
15   released -- he had had more than one release through
16   the course of the time, but he released a --
17   inappropriately released an individual and did not
18   inform the supervisor that it had happened. Through
19   our back-up system the next day, we found out that the
20   person had been released, went back to him to see about
21   the release. He left his post and went to retrieve --
22   to get the -- to find out where the person was and he
23   went on and brought the person back. In his own POV.
24   And so when all of that happened, during the course of
25   a period of time, he was terminated.

52

1    Q.    Can you remember anyone else who was
2    disciplined for the early or inappropriate release of a
3    prisoner?
4    A.    We've had a number of early releases, and
5    some have been terminated. I can't recall. I think
6    Deputy Wiggins, he was -- he released an inmate before
7    -- before it was time to release him. And I think he
8    -- and he was terminated.
9    Q.    Do you remember when that was
10   approximately?
11    A.    I'd say in '09.
12    Q.    Can you remember any others?
13    A.    I think your client, Danny Carter, released
14   -- was involved with the releasing of an inmate. He
15   was not terminated. It was -- it was paper, but he had
16   gotten disciplined through suspension, I believe, and
17   that happened twice on him with paperwork. So -- and
18   he -- I think he was suspended. I'm not sure of that.
19    Q.    All right. Anyone else you can remember?
20    A.    Wow. It's over almost 19 years.
21    Q.    I know, I know.
22    A.    Had a sergeant -- and I'll get that name
23   for you, it escapes me at the moment, but she didn't
24   supervise a release, a proper release and her signings,
25   and she was terminated.

53

1    Q.    Do you remember when that was?
2    A.    That was in '10. I believe in '10.
3    Q.    And you don't remember her name?
4    A.    I -- as we go along I...
5    Q.    Can you remember any others who were
6    terminated for an improper or inappropriate release?
7    A.    Not at this moment.
8    Q.    Can you remember any others that you have
9    not already told me about who received some level of
10   discipline for an early or inappropriate release of a
11   prisoner but were not terminated?
12    A.    No, I can't. I know there -- Counselor, it
13   just depends on the circumstances of the release.
14    Q.    I understand.
15    A.    If it's paper and we shared, we may not
16   terminate.
17    Q.    Right.
18    A.    But if it's the total responsibility was on
19   you, that's -- that's -- we probably terminated the
20   person.
21    Q.    All right. But sitting here, you can't
22   remember any incidents other than what you've already
23   told me about where there's been an inappropriate or
24   early release, the employee received some level of
25   discipline but it was short of termination?

14  (Pages 50 to 53)

54

1      A.    No, not at this time.
2      Q.    But it sounds like you're fairly confident
3  there are probably some like that?
4      A.    I can't recall at this time.
5      Q.    All right.  And I just want to go back one
6  more time.  You can't remember any other terminations
7  for cause, a type of cause that I have not mentioned to
8  you?
9      A.    No, I don't.
10         MR. ROSEN:  Again, object to the form of
11  the question.
12
13  BY MR. SHOEMAKER:
14      Q.    Sir, are you covered by a policy of
15  insurance in this case?
16      A.    Yes.
17      Q.    And what insurance is that?
18      A.    Virginia Risk Management.
19      Q.    And have they issued any kind of
20  reservation of rights to you about this case?
21      A.    No, sir.
22      Q.    So as far as you know, they are both
23  defending and indemnifying for loss in this case?
24         MR. ROSEN:  Objection to the form of the
25  question to the extent it calls for a legal conclusion.

55

1  You can answer if you know what that means.
2      A.    No, I'm not going to.  You want to explain
3  to me?
4
5  BY MR. SHOEMAKER:
6      Q.    As far as you know, you are covered in this
7  case by an insurance policy?
8      A.    That's correct.
9      Q.    And that's both for the cost of defense and
10  the cost of any judgment that could result?
11         MR. ROSEN:  Object to the form of the
12  question.
13      A.    I believe so, sir.
14
15  BY MR. SHOEMAKER:
16      Q.    And the insurance company hasn't given you
17  something saying, Hey, we might not do that?
18      A.    No.
19      Q.    Have you had to submit any reports about
20  this case to the insurance company?
21      A.    Not that I know of.
22      Q.    Have you had to submit any reports about
23  this case to anyone other than your lawyer?
24      A.    No.
25      Q.    You haven't had to submit one to the city

56

1  or to an auditor of any kind?
2      A.    No, sir.
3         Counselor, let me go back.  I'm sure we had
4  to send risk management the lawsuit that you -- that
5  was sent to me.  We sent it directly to them.
6      Q.    Is that, as far as you know, all you did,
7  is send the lawsuit?
8      A.    Yes, as far as I know.
9      Q.    You didn't send any explanation?
10      A.    No, they don't ask for any.
11      Q.    All right.
12      A.    Mr. Shoemaker, I'm going to get a little
13  water if it's all right with you.
14         MR. ROSEN:  Can we just take a two-minute
15  break?
16         MR. SHOEMAKER:  In fact, maybe five
17  minutes.
18         MR. ROSEN:  That's fine.
19
20         (Recess)
21
22  BY MR. SHOEMAKER:
23      Q.    Couple more questions about the insurance
24  issue.  Is there a private insurance company involved
25  in your insurance coverage, or is it just a state

57

1  policy?
2      A.    State.
3      Q.    And that's all you have?
4      A.    Yes.  Just state, I believe.
5      Q.    Do you know what the limits of coverage
6  are?
7      A.    I believe it's $1 million.
8      Q.    Do you know if that's in the aggregate or
9  is that per claim?
10      A.    Now, I just believe it's $1 million.
11      Q.    All right.  I'm going to show you a
12  document that I'm going to go ahead and have labeled
13  Plaintiff's Exhibit 1.
14
15         (Plaintiff's Exhibit No. 1 was marked
16  for identification.)
17
18  BY MR. SHOEMAKER:
19      Q.    Sir, I'd like for you to take a couple of
20  minutes and review this document.
21      A.    (Moved head up and down).
22      Q.    Okay?
23      A.    Okay, Counselor.
24      Q.    Sheriff, have you ever seen this document
25  before?

ADAMS HARRIS REPORTING, INC.
(757)631-0458

58

1    A.    Yes.
2    Q.    Do you remember when you saw it?
3    A.    Not the exact time.  I don't see a date on
4  here.
5    Q.    All right.  Have you been asked to gather
6  these documents?
7    A.    Yes.
8    Q.    I'm going to refer you to item three on
9  page 11.
10    A.    Is that C, sir?
11    Q.    Page 11, item three.
12        All the pages are different.
13        MR. ROSEN:  Mine is different than yours.
14        THE DEPONENT:  Yes, they are.  That's 11.
15        MR. ROSEN:  This is -- this is what you
16  handed me.  This is what you handed the sheriff you
17  marked.
18        MR. SHOEMAKER:  I'm sorry.
19        MR. ROSEN:  They're different documents or
20  different pages.
21        MR. SHOEMAKER:  No, they're not different.
22  What the problem is, is all of them, the pagination is
23  all page 11.  There's a mistake -- I don't know why,
24  but the computer didn't -- something happened.
25        MR. ROSEN:  So it's the same document?

59

1        MR. SHOEMAKER:  Same document.  Pagination
2  is messed up.
3        MR. ROSEN:  All right.  So they're all page
4  11.
5        MR. SHOEMAKER:  Did you ever see Spinal
6  Tap?  It goes to 11.
7        MR. ROSEN:  Yes.
8
9  BY MR. SHOEMAKER:
10    Q.    I need you to go to request for production
11  number three, and I'll flip to it right there.
12    A.    Yes, sir.
13    Q.    Okay.  Do you have any documents that
14  you're aware of responsive to item three?
15    A.    No, sir.
16    Q.    I want to take a few minutes and discuss
17  your campaign organization in 2009.  Did you form a
18  committee for your reelection?
19    A.    Yes, sir.  It's the one that always stays
20  in place.  Different people come in and out of it.
21    Q.    Do you remember in 2009 who was involved on
22  your committee to reelect you?
23    A.    A Mr. Roland White.  My treasurer was Karen
24  Bowden.  I think Ross Mugler did some things for me,
25  but I don't recall what -- we didn't have a title.  He

60

1  worked on my campaign.
2    Q.    Anyone else?
3    A.    That -- that was the nucleus of my
4  committee, I believe.
5    Q.    Did you have an executive assistant in 2009
6  that sometimes assisted the committee?
7    A.    No.  No.
8    Q.    Who was your secretary in 2009?
9    A.    Mrs. Lawson.
10    Q.    What was her first name?
11    A.    Sylvia.
12    Q.    What was her title?
13    A.    She's my secretary.
14    Q.    Do you also have an executive assistant?
15    A.    Yes.
16    Q.    And who is that?
17    A.    Her name is Dawn Smith.
18    Q.    Dawn?
19    A.    Dawn, D-A-W-N.
20    Q.    And what is her title?
21    A.    Executive assistant to me.
22    Q.    Both of these jobs are -- do you have a
23  manning document that says how many jobs you can have,
24  how many positions you can have in the sheriff's
25  department?

61

1    A.    No.
2    Q.    You have a personnel budget and it's up to
3  you to decide --
4    A.    That's correct.
5        MR. ROSEN:  Let him finish the question
6  before you answer.
7        THE DEPONENT:  Okay.
8
9  BY MR. SHOEMAKER:
10    Q.    You have a budget and it's up to you to
11  decide what personnel you need?
12        MR. ROSEN:  Object to the form of the
13  question.  You can answer it.
14    A.    In the -- in the budget, the compensation
15  board has how many positions you can have or you are
16  going to have.  And I -- it's up to me to hire for
17  those positions.
18
19  BY MR. SHOEMAKER:
20    Q.    Okay.  And I imagine that compensation
21  board varies from jurisdiction to jurisdiction,
22  depending on the size of the jurisdiction?
23    A.    That's correct.
24    Q.    And both of these positions, the secretary,
25  Mrs. Lawson, and Dawn Smith, were state-funded

62

1  positions, right?
2      A.    Mrs. Lawson is, and Dawn Smith is a -- one
3  of my city-funded positions.
4      Q.    That's funded by the City of Hampton?
5      A.    That's correct.
6      Q.    How many city-funded positions do you have?
7      A.    I can't tell you for sure, but I know she
8  is and I'm not sure if one of my deputies is.  A deputy
9  position.
10     Q.    A uniformed deputy?
11     A.    That's correct.
12     Q.    That would be a senior deputy, wouldn't it?
13     A.    Not necessarily.  They are -- and I'm not
14 sure, but I believe we used to have a position that the
15 city funded, and I'm not sure if they continually
16 funded it or not.
17     Q.    Okay.  If the city funds a position, is
18 there any difference in how those employees are treated
19 as compared to your other employees that are not city-
20 funded?  Or are they treated exactly the same way in
21 terms of human resources policies?
22     A.    They come under my authority.
23     Q.    So you treat them exactly how you treat any
24 other of your employees?
25     A.    That's correct.

63

1      Q.    And the city -- does the city ever attempt
2  to give input as to how they're treated in terms of
3  discipline or human resources issues?
4      A.    No, sir.
5      Q.    So do you have any other personal
6  assistants or secretaries other than these two, Smith
7  and Lawson?
8      A.    That's all, sir.
9      Q.    What was Roland White's title during the
10 campaign?
11     A.    He worked on the campaign.  He doesn't work
12 for me.
13     Q.    Yeah.  He was just a committee member?
14     A.    Yeah.
15         MR. ROSEN:  I object to this line of
16 questioning concerning his campaign.  I don't see how
17 it's relevant to any issue in this case.  I have an
18 objection.  I'm not going to give you far afield
19 because it's not relative to the issues in this case.
20         MR. SHOEMAKER:  Jeff, this is a political
21 firing case.  Who was on his committee is relevant.
22 They may have information.
23
24 BY MR. SHOEMAKER:
25     Q.    Who was chairman of the campaign, or was

64

1  there a chairman?
2      A.    There was not a chairman.  I act as my own
3  chairman.
4      Q.    Bowden was the treasurer?
5      A.    That's correct.
6      Q.    Did you all meet from time to time?
7      A.    From time to time, yes.
8      Q.    Were any records kept in the course of
9  those meetings?
10     A.    In my political meeting?
11     Q.    Yes.
12     A.    Not that I know of.
13     Q.    Did you ever notice anybody taking notes?
14     A.    No, not in my political meeting.
15     Q.    Did you ever have political meetings at the
16 office?
17     A.    I have them at my house.  When I had my
18 committee meeting, it was at my house.
19     Q.    You never had them at the office?
20     A.    No.  Not that I can remember.
21         MR. ROSEN:  Okay.  All right.  Before we
22 start, I sent you a letter previously concerning lines
23 of questioning which I will not allow you to ask him
24 about.
25         MR. SHOEMAKER:  Let's go ahead and --

65

1          MR. ROSEN:  So I just want to make clear
2  that if you're going to ask any of the areas in which I
3  said we're not going to answer, keep that at the end,
4  because I will direct him not to answer.
5          MR. SHOEMAKER:  Let's call the Judge now
6  and tell them we have an issue we're going to want to
7  take up, because we may not be able to get them on the
8  phone now.
9          MR. ROSEN:  I would file a protective order
10 so my option is to discontinue the deposition.  So why
11 don't you hold that until the end because I'm going to
12 end the deposition and file for a protective order.
13 Okay?  So why don't you just hold that until the end.
14         MR. SHOEMAKER:  I want the record to be
15 clear about what --
16         MR. ROSEN:  Let's offer my letter in
17 evidence.  You want to offer my letter in evidence?
18         MR. SHOEMAKER:  I'm not disputing getting
19 the letter.  Okay?
20         MR. ROSEN:  Okay.  I just want --
21         MR. SHOEMAKER:  But the -- let's see if
22 this will help.
23         Yeah.  I don't see any problem with
24 entering this as an exhibit.  We'll make this
25 Plaintiff's Exhibit 2.

17 (Pages 62 to 65)

66

1        (Plaintiff's Exhibit No. 2 was marked
2     for identification.)
3
4        MR. SHOEMAKER:  This is a document that Mr.
5  Rosen sent me on September 28th, and in it he says he
6  will not allow questions regarding certain of the
7  sheriff's practices as alleged in paragraph 15 of the
8  complaint.  Apparently, that also goes to whether or
9  not meetings were held in his office -- in the
10  sheriff's office, although I don't know that that was
11  an allegation in paragraph 15.  So by agreement, this
12  is an exhibit now to Sheriff Roberts' deposition.
13       And Mr. Rosen has also said that it's his
14  intent to exercise his options under Rule 30 and
15  discontinue the deposition and file a pleading on this
16  issue, and he's got that right under Rule 30 and so I
17  don't have a problem with it.  Obviously, I object.  I
18  think these questions are relevant and I will file
19  opposition papers to whatever his motion is.
20       MR. ROSEN:  Okay.  I just wanted to get
21  that clarified.  Why don't you ask the other questions.
22  Then at the end you can ask -- if you want to ask them,
23  if you need to, we can have the Judge decide if that's
24  an appropriate area of inquiry because my -- an
25  appropriate area of inquiry.

67

1        MR. SHOEMAKER:  All right.
2
3  BY MR. SHOEMAKER:
4     Q.    All right.  You've just answered my
5  question about whether or not you ever had any
6  political meetings in your office, and you said no.
7     A.    I just want to verify that i'm -- i don't
8  recall having any -- any political meetings in there.
9  I meet with staff and everybody all the time, so what I
10  do know is when I had a meeting having anything to do,
11  that I believe was done at my home or someone else's
12  home.
13     Q.    All right.  Did you ever have any meetings
14  in the sheriff's office, the publicly provided
15  sheriff's office, to plan political events?
16       MR. ROSEN:  Okay.
17       MR. SHOEMAKER:  I know.  My intent, you
18  said ask the questions so I'm --
19       MR. ROSEN:  I was going to say, do it at
20  the end because -- I said do it at the end because I'm
21  going to direct him not to answer.
22       MR. SHOEMAKER:  That's fine.  It wasn't my
23  intent to get him to answer.  You just said --
24       MR. ROSEN:  Okay.
25       MR. SHOEMAKER:  We'll wait to the end.

68

1        MR. ROSEN:  Why not do it at the end
2  because my option is to terminate the deposition at
3  that point under the rules.  So that's what I would
4  intend to do.  So why not do it at the end.
5        MR. SHOEMAKER:  That's fair enough.
6        MR. ROSEN:  So you get most of your
7  deposition done before I terminate it.
8        MR. SHOEMAKER:  All right, Jeff.  I want to
9  ask him -- I don't really think this is related to your
10  problem.  I want to ask him if there are any records
11  related to planning, discussing, or taking any action
12  regarding his political campaign.
13       MR. ROSEN:  Well, the same thing.  Can we
14  just do that at the end?  Can't you move on to the
15  other stuff?
16       MR. SHOEMAKER:  Fair enough, but just so
17  I'm understanding, that is -- what I just asked is
18  among the category of questions that you would
19  discontinue the deposition over, direct him not to
20  answer and discontinue the deposition?
21       MR. ROSEN:  Correct, yes.
22
23  BY MR. SHOEMAKER:
24     Q.    All right.  As far as you know, Sheriff,
25  have you produced all the personnel records of Bobby

69

1  Bland?
2     A.    As far as I know, sir.
3     Q.    And as far as you know, have you produced
4  all the personnel records of Danny Carter?
5     A.    Yes, sir.
6     Q.    As far as you know, have you produced all
7  the personnel files of Danny Dixon?
8     A.    Yes, sir.
9     Q.    And same question with respect to McCoy.
10     A.    Yes, sir.
11     Q.    Same question with respect to Sandhofer.
12     A.    Yes, sir.
13     Q.    Same question with respect to Woodward.
14     A.    Yes, sir.
15     Q.    Who did you have gather those documents?  I
16  don't expect you to do it personally.  Did somebody
17  else gather that stuff?
18     A.    Colonel Bowden, Karen Bowden.
19     Q.    All right.  Did she gather all the
20  documents that we requested or did you delegate it to
21  different people?
22     A.    No, just her.  She was responsible for
23  getting all the documents.
24     Q.    All right.  Okay.  Now, in the fall of 2009
25  you never wrote any e-mails which mentioned Bobby

70

1 Bland?
2   A.   No, sir.
3   Q.   And in the fall of 2009 -- let me change my
4 question to late summer and fall of 2009. From
5 August 1 through the end of 2009, you never wrote any
6 e-mails mentioning Bobby Bland?
7   A.   No, sir.
8   Q.   You never wrote any other document
9 mentioning Bobby Bland?
10   A.   No, sir.
11   Q.   Between August 1 of 2009 and the end of
12 December of 2009, you never authored any e-mails
13 mentioning Danny Carter?
14   A.   No, sir.
15   Q.   And you never authored any documents
16 mentioning Danny Carter?
17   A.   Do the time period again.
18   Q.   August 1, 2009, to the end of December,
19 2009.
20   A.   Only the letter that he won't be
21 reappointed.
22   Q.   All right.  And --
23   A.   And that's for all of them.
24   Q.   For all of them.  All right.
25      So we have an understanding that you wrote

71

1 a letter informing each of the six plaintiffs that they
2 would not be reappointed. The questions I'm asking now
3 have to do with any other document, correspondence, or
4 e-mail mentioning any of the plaintiffs from August 1,
5 2009, to the end of December, 2009. You've told me
6 that you authored no documents other than the one I
7 just identified mentioning Bobby Bland.
8   A.   That's correct, sir.
9   Q.   And you've informed me from August 1, 2009,
10 to the end of December, 2009, you have authored no
11 documents other than the one we just identified
12 mentioning Danny Carter?
13   A.   To the best of my knowledge, that's
14 correct.
15   Q.   Same question with respect to David Dixon.
16 From August 1, 2009, to the end of December, 2009, did
17 you author any documents other than the termination --
18 or the failure to re -- the option not to reappoint
19 letter, did you author any documents mentioning Danny
20 Dixon?
21   A.   To the best of my knowledge, yes, sir.
22   Q.   From August, 2009, to the end of December,
23 2009, other than the document regarding
24 nonreappointment, did you author any documents or
25 e-mails mentioning Robert Wayne McCoy?

72

1   A.   That's the best of my knowledge, no.
2   Q.   Best of your knowledge, no?
3   A.   No.
4   Q.   From August 1, 2009, through the end of
5 December, 2009, did you author any documents mentioning
6 John Sandhofer other than the letter regarding his
7 reappointment?
8   A.   To the best of my knowledge.
9   Q.   To the best of your knowledge, no?
10   A.   Uh-huh.
11   Q.   Lastly, with regard to Debra Woodward, from
12 August 1, 2009, to the end of December, 2009, did you
13 author any documents other than the appointment letter
14 mentioning Debra Woodward?
15   A.   To the best of my knowledge, no.
16      MR. ROSEN:  The letter, you mean not
17 reappointing?
18      MR. SHOEMAKER:  The letter not reappointing
19 her, correct.
20
21 BY MR. SHOEMAKER:
22   Q.   Are you aware of any documents being
23 written between August 1, 2009, authored by others that
24 mention any of the plaintiffs in this case?
25   A.   No, sir.  Not to the best of my knowledge.

73

1 No.
2   Q.   Okay.  And in December of 2009, you
3 declined to reappoint the plaintiffs in this case and
4 you apparently also declined to reappoint some others.
5 I know -- who are the others that you declined to
6 reappoint in December of 2009, to the best of your
7 recollection?
8   A.   One was Sammy Mitchell.  I think Deputy
9 Wheeler.  Deputy Davis.  And another female.  I just
10 can't remember her name right now.
11   Q.   How about Ken Darling?
12   A.   And Ken Darling.
13   Q.   The other female wasn't Pikett, or Piatt,
14 Pikett, the lady we subpoenaed?
15   A.   No, sir.
16   Q.   Why did you decide not to reappoint
17 Wiggins?
18   A.   I'm sorry?
19   Q.   Why did you decide not to reappoint
20 Wiggins?
21   A.   Deputy Wiggins had missed enormous amount
22 of work time and it was determined that she was not --
23 would not be a good deputy to continue on with in the
24 next term.
25   Q.   Is that Tameka Wiggins?

74

1      A.    I believe so.
2      Q.    Who brought her deficiencies with respect
3  to work time to your attention?
4      A.    That was Major Richardson.
5      Q.    Were there any other reasons you failed to
6  reappoint Wiggins?
7      A.    And according to her work area and working
8  and not -- the lack of ability to get to work.  That
9  was it.
10     Q.    Why did you not reappoint Sammy Mitchell?
11     A.    Sammy Mitchell was a duty lieutenant, and
12  he had had numerous problems in the training area and
13  also running his shift.  We found that his shift was
14  lacking the supervision that was necessary so found it
15  necessary not to reappoint him.
16     Q.    You remember how close to retirement he
17  was?
18     A.    No, sir.
19     Q.    Was he -- he was a 20-plus-year employee,
20  wasn't he?
21     A.    No, sir.
22     Q.    He wasn't?
23     A.    I do know that, that he was not, because I
24  hired him.
25     Q.    When did you hire him?  Do you remember?

75

1      A.    Probably in -- somewhere in '95, '94.  I'm
2  not sure of the dates.
3      Q.    All right.  Davis, that was a female?
4      A.    Sergeant.  A male.
5      Q.    All right.  You don't remember the first
6  name?
7      A.    No.
8      Q.    Why did you not reappoint Sergeant Davis?
9      A.    Sergeant Davis, same thing, had supervision
10  problems.  Had problems, I believe, coming to work.  I
11  think that was part of it.  And also I think following
12  direction.  I believe that's one of the things where I
13  found it necessary not to reappoint him for my next
14  term.
15     Q.    Who brought to you the information
16  regarding Sergeant Davis that caused you not to
17  reappoint him?
18     A.    That would be Major Richardson.
19     Q.    I don't think I asked that question about
20  Mitchell.  Did someone come to you about Mitchell or
21  did you come to that on your own?
22     A.    That would be Major Richardson and along
23  with Colonel Bowden, but basically Major Richardson.
24     Q.    Why does this fall under Major Richardson's
25  purview?

76

1      A.    He supervised them.  That was his area,
2  corrections, and all of them were in corrections.
3      Q.    How about Ken Darling?  Why did you not
4  reappoint Ken Darling?
5      A.    Didn't reappoint Mr. Darling, we were in a
6  situation where we needed to have deputies supervising
7  and made a determination, and he indicated that he
8  didn't want to be the supervisor, so we were -- we had
9  to have more deputies working and we replaced him with
10  a lieutenant that was already in place.  So we
11  determined that we needed to have his position done by
12  a deputized deputy.
13     Q.    So the employees that you did not reappoint
14  upon your reelection in November of 2009 were Tameka
15  Wiggins?
16     A.    Uh-huh.
17     Q.    Sammy Mitchell?
18     A.    (Moved head up and down.)
19     Q.    Ken Darling, William Wheeler, and somebody
20  -- Sergeant Davis?
21     A.    Sergeant Davis.
22     Q.    Was there anyone else?
23     A.    I think we are missing one.  I just can't
24  think of the name.
25     MR. ROSEN:  Counsel, all the records have

77

1  been produced, the personnel records.  So you know you
2  have them.  Do you want me to pull them out?
3     MR. SHOEMAKER:  No.
4     MR. ROSEN:  I mean, we've produced all the
5  records for all the nonreappointed deputies.
6     MR. SHOEMAKER:  All right.
7
8  BY MR. SHOEMAKER:
9      Q.    Shifting gears, what was Debra Davis' job
10  in your office when she was employed by you?
11     A.    She was director of administration.
12     Q.    How long did she hold that position?
13     A.    I believe six, six years, seven years.  I'm
14  not sure.
15     MR. ROSEN:  I'm sorry.  I just have an
16  objection for the record.  Your last question you asked
17  about who was not reappointed.  You didn't mention your
18  other -- your clients as well.  You meant to include
19  your clients as well?
20     MR. SHOEMAKER:  No, I'm coming back to
21  that.
22     MR. ROSEN:  You said, the deputies you
23  didn't reappoint.  You listed the six, excluding your
24  clients.
25     MR. SHOEMAKER:  I think I said other than

20  (Pages 74 to 77)

78

1    my clients.
2         MR. ROSEN: I don't think you did. If you
3    did, I stand corrected.
4         MR. SHOEMAKER: I think I did.
5         MR. ROSEN: I don't want the record to
6    reflect that only six were not reappointed when there
7    were 12 not reappointed. Sorry.
8         MR. SHOEMAKER: All right.
9         MR. ROSEN: Sorry to interrupt you.
10        MR. SHOEMAKER: No problem.
11
12   BY MR. SHOEMAKER:
13        Q.    When did Debra Davis leave your employ?
14        A.    I believe it was 2008.
15        Q.    Was it toward the end of 2008?
16        A.    I -- I'm -- best I can give you is 2008
17   somewhere.
18        Q.    Did she tell you why she left?
19        A.    Yes. She -- she said she wanted to -- I'd
20   have to get her resignation form, but she -- when she
21   came in to talk to me about it that she was leaving,
22   she decided she did not want to work there. And she
23   had some other stuff that -- other things she wanted to
24   do.
25        Q.    All right. Who worked for her at the time

79

1    of her termination? At the time she left.
2         MR. ROSEN: I object to the form of the
3    question. You mean who worked under her?
4         MR. SHOEMAKER: Yeah. Who did she
5    supervise as of the time she left?
6         A.    Mr. Bland. Mrs. Bland. Unnoppet. There's
7    one other person, but I can't think of their name.
8         Q.    Did Debbie Woodward work for her for
9    awhile?
10        A.    For awhile, yes.
11        Q.    When did Debbie Woodward stop working for
12   her? If you know.
13        A.    It's been awhile, Counselor. Probably
14   about maybe '05, '04. I'm just not sure, but it's
15   awhile. It was...
16        Q.    Was there a director of administration when
17   Debra Davis assumed this role, or was it a new
18   position?
19        A.    Fairly -- fairly new position, I believe.
20   Yeah.
21        Q.    In fact, didn't she come in and fill this
22   position where no one had held this position before?
23        A.    Yes. To make it simple, yes.
24        Q.    Did she work for you in some other capacity
25   prior to that, or did you bring her in to be the

80

1    director of administration?
2         A.    She came in as -- to assist me with the
3    financing, getting our -- some policies in order, and
4    then later on as we went along, the gentleman that she
5    was working with left and she took on his
6    responsibility. And then I restructured and made her
7    director of administration.
8         Q.    Okay. Who was the gentleman that left?
9         A.    His last name was Hag -- Hagwood
10   (phonetic), I believe.
11        Q.    And do you know what his title was before
12   he left?
13        A.    He did our finance for us. Budget and
14   finance.
15        Q.    How many years was he with you?
16        A.    Oh. I'd say about two years. About two
17   years.
18        Q.    How did you -- how did Debra Davis come to
19   work for you? Did you recruit her?
20        A.    Yes. She was a friend that worked at HU,
21   Hampton University, and I needed -- I needed some more
22   help in there, and she came in and helped with policies
23   and helped Mr. Hagwood.
24        Q.    All right. Did you give Debra Davis hiring
25   authority? Did she hire her own people after she came

81

1    in?
2         A.    For the most part, yes. She recommended
3    them to me, but for the most part she had her staff.
4         Q.    All right. And did she also actually
5    create positions in the administration department?
6         A.    I don't remember her creating a position.
7         Q.    When did you learn that she was going to
8    take a role in Jim Adams' campaign?
9         A.    When?
10        Q.    Yeah.
11        A.    When he filed and I believe we -- when we
12   filed, that's when I -- when he had her listed as the
13   treasurer.
14        Q.    Okay. Do you remember when he filed?
15        A.    No. I do not.
16        Q.    Do you remember how you learned that he
17   filed?
18        A.    I'm not sure. I can't remember if it was
19   just when we saw -- I saw the filings for the sheriff's
20   office, for the sheriff's race, or not. I just don't.
21        Q.    When you learned that he filed, did you
22   already have opposition? Did Cooper already announce
23   his intention to run for the job?
24        A.    I don't recall. I just don't know the...
25        Q.    At some point Cooper announces he's going

ADAMS HARRIS REPORTING, INC.
(757)631-0458

82

1  to challenge you in the primary, right?
2      A.    Yes.
3      Q.    Do you remember when that primary was in
4  2009? Was it in June?
5      A.    No, he didn't -- I had no opposition in the
6  primary.
7      Q.    You had no opposition in the primary at
8  all?
9      A.    That's right.
10     Q.    So he ran in the general?
11     A.    The general.
12     Q.    Did he run in a primary in 2005?
13     A.    Yes.
14     Q.    And in 2005 you won that primary.
15     A.    That's correct.
16     Q.    And you faced a fellow named Amos in the
17 election?
18     A.    No.  I had no opposition in the general
19 election.
20     Q.    When did Amos run against you?
21     A.    2001.
22     Q.    Were any -- did any members of your staff
23 or former members of your staff take a role in Cooper's
24 campaign?
25     A.    I don't -- I don't know that.  No.

83

1      Q.    Did any other members of your staff or
2  former members of your staff other than Davis take a
3  role in Adams' campaign?
4      A.    I don't -- I don't know that.
5      MR. ROSEN:  Can we take a break?
6      MR. SHOEMAKER:  Yeah, sure.
7
8          (Recess)
9
10 BY MR. SHOEMAKER:
11     Q.    We're going back on the record.
12         Do you remember there being a time in the
13 -- some time in the earlier part of 2009 where
14 controversy arose over a -- you know who George Perkins
15 is?  He was a lieutenant of yours?
16     A.    Yes.
17     Q.    Do you remember there being a controversy
18 about Perkins taking around petitions for you and him
19 not being a resident of Hampton?
20     A.    No.  I -- I never heard of a controversy
21 about it.
22     Q.    Are you aware that the petitions that
23 candidates have to get to place themselves on the
24 ballot have to be taken around by city residents in the
25 case of the sheriff's election?

84

1      A.    I believe that's the case.
2      Q.    And you don't remember any controversy
3  regarding Perkins in that regard?
4      A.    No, sir.
5      Q.    I'm going to go over a few records with
6  you.
7          The first one is Debbie Woodward's January,
8  2009, performance evaluation.  And I'll call this
9  Plaintiff's Exhibit 3.
10
11         (Plaintiff's Exhibit No. 3 was marked
12     for identification.)
13
14 BY MR. SHOEMAKER:
15     Q.    Just take a minute to look at that.
16         What is this document, Sheriff?
17     A.    It's a Civilian/Administrative Performance
18 Evaluation Form.
19     Q.    And it's an evaluation of Debbie Woodward,
20 is that correct?
21     A.    That's correct.
22     Q.    And it was issued to her on January 19,
23 2009?
24     A.    That's correct, sir.
25     Q.    Okay.  It appears it was signed by Major

85

1  Wells-Major on January 27, 2009; is that correct?
2      A.    That's correct.
3      Q.    Okay.  And it reflects that Debbie's
4  performance for this evaluation period was outstanding.
5  Is that correct?
6      MR. ROSEN:  I object to the form of the
7  question.  It reflects various things.
8      MR. SHOEMAKER:  Page 55.
9      MR. ROSEN:  I object to the form of the
10 question, mischaracterizes the exhibit.  You can
11 answer.
12
13 BY MR. SHOEMAKER:
14     Q.    You see the category that says Overall
15 Performance Rating?
16     A.    That's correct.
17     Q.    You see the box marked Outstanding Xed?
18     A.    Yes, sir.
19     Q.    And as far as you know, sitting here, this
20 is -- this accurately reflects Debbie Woodward's
21 performance evaluation?
22     A.    As far as I know, yes.
23     Q.    I will show you a document I will label
24 Plaintiff's 4.
25

86

1           (Plaintiff's Exhibit No. 4 was marked
2    for identification.)
3
4    BY MR. SHOEMAKER:
5        Q.    If you'll take a moment to look at this.
6           Does this appear to be Debbie Woodward's
7    January 17, 2008, performance evaluation?
8        A.    Yes, it does.
9        Q.    She was -- her name was Jones prior to some
10   point, I think, in late '08, when her name became
11   Woodward; is that correct?
12       A.    Yes.
13       Q.    I'm sorry, sir?
14       A.    Yes, sir.
15       Q.    Okay.  And this performance evaluation was
16   signed by Major Wells-Major on January 18, 2008; is
17   that correct?
18       A.    That's correct.
19       Q.    And it reflects an overall performance
20   rating of outstanding; is that correct?
21       A.    That's correct.
22       Q.    I'm going to show you a document that I'm
23   going to have labeled Plaintiff's 5.
24
25

87

1           (Plaintiff's Exhibit No. 5 was marked
2    for identification.)
3
4    BY MR. SHOEMAKER:
5        Q.    Would you take a moment to take a look at
6    this document, sir.
7        A.    Okay.
8        Q.    Is this a performance evaluation for Danny
9    Carter?
10       A.    Yes, it is.
11       Q.    And it appears to be signed by Danny Carter
12   on December -- December 31, 2008; is that correct?
13       A.    That's correct.
14       Q.    Now, do you know whose signature that is as
15   the reviewer signature?
16       A.    I can't tell you, sir.  I'm trying to
17   figure that out myself.
18       Q.    Is there an L.C. somebody there?
19       A.    I don't know.
20       Q.    It looks like a Sergeant Harris' signature,
21   supervisor's signature?
22       A.    This signature here, sir?
23       Q.    No.  The one across.  The other one on the
24   right margin.  No, right there on that same page.
25   Right side.

88

1        A.    Sergeant Harris.
2        Q.    All right.  That was Carter's supervisor?
3        A.    Yes.
4        Q.    Both Carter's signature and Harris'
5    signatures are December 31, 2008.  The reviewer's
6    signature appears to be dated 31 January, 2009?  Is
7    that correct?
8        A.    I read it as to be 2008.
9        Q.    That wouldn't make any sense, though, would
10   it?  Looks like the year changed and he forgot and put
11   '08 instead of a 9?
12           MR. ROSEN:  Object to the form of the
13   question.
14       A.    (Indicating).
15
16   BY MR. SHOEMAKER:
17       Q.    Do you think this was signed by that
18   reviewer in January of 2009 or 2008?
19           MR. ROSEN:  Objection, lack of foundation.
20   You can answer it.
21       A.    I have no knowledge of when it was signed.
22
23   BY MR. SHOEMAKER:
24       Q.    Okay.  But you'd agree it appears to be
25   signed by Carter on December 31, 2008, and by Harris on

89

1    December 31, 2008?
2        A.    Yes.
3        Q.    And on the front page it says it's -- the
4    evaluation date is December 31, 2008; is that correct?
5        A.    That's correct.
6        Q.    And the overall performance rating on page
7    Carter 100, the overall performance rating is above
8    average?
9        A.    That's correct, sir.
10       Q.    The next document I'm going to show you I
11   will have labeled Plaintiff's 6.
12
13          (Plaintiff's Exhibit No. 6 was marked
14   for identification.)
15
16   BY MR. SHOEMAKER:
17       Q.    If you'll take a moment to take a look at
18   this.  Does this appear to be an employee performance
19   evaluation of Danny Carter?
20       A.    Yes, sir.
21       Q.    And if you'll look at the last page which
22   is Bates labeled Carter 105, it appears to be signed by
23   Carter on December 18, 2007?
24       A.    That's correct, sir.
25       Q.    And it appears to be signed by a Sergeant

23  (Pages 86 to 89)

90

1   Peek on December 18, 2007?
2       A.   That's correct.
3       Q.   And signed by Lieutenant Lewis on
4   December 30, 2007?
5       A.   That's correct.
6       Q.   And it reflects an overall performance
7   rating of above average?
8       A.   That's correct.
9       Q.   All right.  I will show you a document I'm
10  going to have marked Plaintiff's 7.
11
12          (Plaintiff's Exhibit No. 7 was marked
13      for identification.)
14
15  BY MR. SHOEMAKER:
16      Q.   Just take a moment to take a look at
17  Plaintiff's 7.
18      A.   (Indicating).
19      Q.   Is this a performance evaluation issued for
20  David Dixon on -- for an evaluation date of
21  December 22, 2008?
22      A.   That's correct.
23      Q.   That's correct?
24      A.   Uh-huh.
25      Q.   And if you'll go to the last page, the

91

1   signatures, it appears to be signed by Dixon on
2   January 5, 2009?  Is that correct?
3       A.   Yes.
4       Q.   And it appears to be signed by Sergeant
5   Perkins on January 5, 2009?
6       A.   That's correct.
7       Q.   And it appears to be signed by -- do you
8   know whose signature that is?
9       A.   I believe that would be Robert McGee.
10      Q.   Okay.  And that signature is dated
11  January 6, 2009; is that correct?
12      A.   That's right.
13      Q.   And this reflects that Deputy Dixon got a
14  performance evaluation on the dates we just indicated
15  of outstanding; is that correct?
16      A.   That's correct.
17      Q.   Now, I'm going to ask you a couple of
18  questions and then I'm going to continue with these
19  documents, but this document, is it a form that you all
20  have been using for awhile?  The Employee Performance
21  Evaluation/Counseling Form.
22      A.   I believe so, sir.
23      Q.   Okay.  And the document is intended to do
24  what, Sheriff?
25      A.   To -- as it said, to evaluate the

92

1   employee's performance and determine how he or she is
2   doing in the course of their work.
3       Q.   Is the document also intended to point out
4   their weaknesses?
5       A.   That's correct.
6       Q.   All right.  I'm going to show you a
7   document I'm going to have labeled Plaintiff's 8.
8
9          (Plaintiff's Exhibit No. 8 was marked
10      for identification.)
11
12  BY MR. SHOEMAKER:
13      Q.   If you'll take a moment and take a look at
14  this document.
15          Is this David Dixon's performance
16  evaluation issued for an evaluation date of January 14,
17  2008?
18      A.   Yes, sir.
19      Q.   And if you'll turn to the last page, it
20  appears to be signed by Dixon on January 17, 2008?  Is
21  that correct?
22      A.   I'm not able to tell you who signed that.
23      Q.   All right.  There's a date there
24  January 17, 2008?
25      A.   Yes, it is.

93

1       Q.   It looks like Major Wells-Major signed this
2   document on January 17, 2008, as well; is that correct?
3       A.   That's correct.
4       Q.   And it looks like it's probably signed by
5   Jim Adams on January 28, 2008?
6       A.   I think so, uh-huh.  Yes, sir.
7       Q.   And in this evaluation it reflects an
8   overall performance rating of above average; is that
9   correct?
10      A.   That's correct, sir.
11      Q.   Sir, I'm going to show you a document that
12  I'm going to have labeled Plaintiff's 9.
13
14          (Plaintiff's Exhibit No. 9 was marked
15      for identification.)
16
17  BY MR. SHOEMAKER:
18      Q.   Take a moment to review this document.
19          Is this Bobby Bland's performance
20  evaluation for an evaluation date of January 15, 2008?
21      A.   That's correct, sir.
22      Q.   And if you'll flip to the back page, it
23  appears to be signed over the caption Employee
24  Signature with a date of January 15, 2008?
25      A.   That's correct.

24  (Pages 90 to 93)

94

1  Q.  And do you recognize that as Bobby Bland's
2  signature, or do you know?
3  A.  It looks like it.
4  Q.  All right.  And it appears to be signed by
5  Debra Davis with a date of January 15, 2008?
6  A.  That's correct.
7  Q.  And it reflects an overall performance
8  rating of above average; is that correct?
9  A.  That's correct, sir.
10  Q.  I will hand you a document I'm going to
11  have labeled Plaintiff's 10.
12
13       (Plaintiff's Exhibit No. 10 was marked
14       for identification.)
15
16  BY MR. SHOEMAKER:
17  Q.  Do you know if you had a performance
18  evaluation for Bobby Bland for 2009?
19  A.  I wouldn't know, sir.
20  Q.  Well, I'm not going to ask you any
21  questions about Plaintiff's 10.  It's an old one, 2005.
22       People generally got evaluations every
23  year, right?
24  A.  I believe so, yes, sir.
25  Q.  The evaluation process, it seems to be --

95

1  seems to conclude at the end of the calendar year and
2  that's when evaluations are issued?
3  A.  Yes, sir.
4  Q.  I will show you a document I'm going to
5  have labeled Plaintiff's Exhibit 11.
6
7       (Plaintiff's Exhibit No. 11 was marked
8       for identification.)
9
10  BY MR. SHOEMAKER:
11  Q.  Is this document an employee performance
12  evaluation for a Robert W. McCoy?
13  A.  It is, sir.
14  Q.  And he goes by Wayne; is that right?  Do
15  you know?
16  A.  I just know him as Rob McCoy.
17  Q.  All right.  If you'll flip to the last
18  page, under the -- over the caption Employee Signature
19  there appears to be a signature and a date of
20  December 31, 2008.  You see that?
21  A.  Yes, sir.
22  Q.  And it appears to be signed by his
23  supervisor on December 31.  It says December 31, 2009.
24  Do you see that?
25  A.  Yes, sir.

96

1  Q.  Do you know who that supervisor is?
2  A.  I'm thinking it's Sergeant Glover.
3  Q.  Okay.  Do you have any idea whether he
4  signed that in December of 2009 or December, 2008?
5  A.  I can only go by what the date is here,
6  sir.
7  Q.  All right.  Over the Reviewer's Signature
8  caption, there's that signature we saw before.  That's
9  not Harris' signature, is it?
10  A.  No, sir.  Not that -- I don't think it is.
11  Q.  Can you tell, is it -- is the first L, is
12  that lieutenant?  Can you tell that?
13  A.  I -- Counselor, I'm trying to work with you
14  on that.  I just don't know what that is.
15  Q.  Okay.  Fair enough.  That signature over
16  Reviewer's Signature appears to be dated December 31,
17  2008; is that correct?
18  A.  That's correct.
19  Q.  And this performance evaluation reflects an
20  overall performance rating of above average; is that
21  correct?
22  A.  That's correct.
23  Q.  Sir, I'm going to show you a document I'm
24  going to have labeled Plaintiff's 12.
25

97

1       (Plaintiff's Exhibit No. 12 was marked
2       for identification.)
3
4  BY MR. SHOEMAKER:
5  Q.  Would you take a minute to review this
6  document.
7       is this an employee performance evaluation
8  for Robert W. McCoy for an evaluation date of
9  December 31, 2007?
10  A.  That's correct.
11  Q.  And if you'll flip to the last page, this
12  appears to be signed by the employee on December 31,
13  2007?  Is that correct?
14  A.  Yes, that's correct, sir.
15  Q.  And it appears to be signed by his
16  supervisor on December 31, 2007; is that correct?
17  A.  That's correct.
18  Q.  And it appears to be signed by the reviewer
19  on December 31, 2007; is that correct?
20  A.  That's correct.
21  Q.  And it reflects an overall performance
22  rating of above average; is that correct?
23  A.  That's right.
24  Q.  Sir, I'm going to show you a document I'm
25  going to have labeled Plaintiff's 13.

25 (Pages 94 to 97)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

98

1    (Plaintiff's Exhibit No. 13 was marked
2    for identification.)
3
4    BY MR. SHOEMAKER:
5    Q.   Take a moment to review this document.
6         Sir, is this an employee performance
7    evaluation for John Sandhofer?
8    A.   It is, sir.
9    Q.   And this performance evaluation bears an
10   evaluation date of February 4, 2009; is that correct?
11   A.   Yes.
12   Q.   And if you will go to the last page of
13   Plaintiff's 13, this document appears to be signed by
14   the employee on February 4, 2009; is that correct?
15   A.   Yes.
16   Q.   And it appears to be signed by his
17   supervisor Glover on February 4, 2009?  Is that
18   correct?
19   A.   Yes.
20   Q.   And it appears to be signed by the reviewer
21   on February 4, 2009; is that correct?
22   A.   That's correct.
23   Q.   And it bears an overall performance rating
24   of above average; is that correct?
25   A.   Yes.

99

1    Q.   All right.  Sir, I'm going to show you a
2    document that I'm going to have labeled Plaintiff's 14.
3
4    (Plaintiff's Exhibit No. 14 was marked
5    for identification.)
6
7    BY MR. SHOEMAKER:
8    Q.   If you'll take a moment to review this
9    document.
10        Does this appear to be an employee
11   performance evaluation for John Sandhofer?
12   A.   Yes, it is.
13   Q.   And the evaluation date for this
14   performance evaluation is November 4, 2008; is that
15   correct?
16   A.   That's correct.
17   Q.   And if you'll flip to the last page, it's
18   signed by the employee on November 4, 2008; is that
19   correct?
20   A.   Yes, sir.
21   Q.   And it's signed by Sandhofer's supervisor
22   on November 4, 2008; is that correct?
23   A.   That's correct.
24   Q.   And it's signed by Sandhofer's reviewer on
25   November 14, 2008; is that correct?

100

1    A.   That's correct.
2    Q.   And this evaluation of John Sandhofer bears
3    an above-average overall performance rating; is that
4    correct?
5    A.   That's correct.
6    Q.   Okay.  Does your office do mid-term
7    evaluations?
8    A.   Not that I know -- not that I can remember,
9    sir.
10        MR. SHOEMAKER:  All right.  This would be a
11   good breaking point for lunch.  Why don't we come back
12   at 1:00.
13        MR. ROSEN:  Okay.
14
15        (Recess)
16
17   BY MR. SHOEMAKER:
18   Q.   We're back on the record after lunch,
19   Sheriff.
20   A.   Okay.
21   Q.   Lieutenant John Eaton, do you remember him?
22   A.   Yes.
23   Q.   He left your office when?
24   A.   I think in -- I think '5.
25   Q.   Okay.  Did he leave at the end of your

101

1    cycle that ended at the '05 election point, in
2    November, '05, election point?
3    A.   No, sir.  He left after the primary, so I
4    guess in May.  June.
5    Q.   And why did he leave?
6    A.   I at-willed him.
7    Q.   You fired him?
8    A.   At-willed.
9    Q.   You let him go?
10   A.   That's correct.
11   Q.   Why did you do that?
12   A.   I let him go because of his performance,
13   really, but he began to -- in a period of time while
14   he was working created a situation where he threatened
15   a work stoppage.
16   Q.   He had threatened a work stoppage?
17   A.   Yes.
18   Q.   Tell me about that.
19   A.   If I can remember correctly all the little
20   details in there, but the major thing was that he
21   determined that because he didn't get some car --
22   cartridge for -- cartridge for machines or whatever.
23   Q.   Okay.
24   A.   Printing, whatever, and he went to the
25   magistrates and said that he was going to -- because he

26 (Pages 98 to 101)

102

1  didn't have that, he would probably have -- he was
2  going to have a work stoppage.
3       So after that, Colonel Bowden wrote him up
4  and dealt with it on that period, but as we went along,
5  I determined that when -- after the campaign, but
6  really the campaign didn't have anything to do with it.
7  During that period of time I thought it would be
8  necessary to not appoint him.
9       Q.   What month was the primary election held in
10  '05?  Do you remember?
11      A.   I believe it was in June, I believe.  I'm
12  not sure.
13      Q.   Do you remember what month he was
14  terminated?
15      A.   I don't know.
16      Q.   Now, do you know his mother?
17      A.   Yes, very well.
18      Q.   How do you know her?
19      A.   Knew her well before I became sheriff, and
20  knew her husband much better and I know the husband's
21  sister.
22      Q.   Did you grow up with them or how did you --
23      A.   No, they're much older.  They're much older
24  people.  No.
25      Q.   You knew them socially?

103

1       A.   Yes.
2       Q.   And how did you know them socially?
3       A.   His father, I knew him through his -- his
4  aunt.  And I had known them before I became sheriff, as
5  I said.  And his father passed some time in there, and
6  I lost a little bit of contact with the mother and that
7  family.  But that was, I guess about seven -- about
8  eight or nine years ago the father passed.
9       Q.   How did you know the aunt?
10      A.   She worked on campus and she was very
11  prominent in -- as I was growing up as a young man.
12  And I knew her daughter.  Her daughter worked on
13  campus, also.
14      Q.   What was her name?
15      A.   The aunt?
16      Q.   Yeah.
17      A.   Dawson.
18      Q.   Do you remember the first name?
19      A.   Martha Dawson.
20      Q.   All right.  Did you ever become aware that
21  John Eaton's mother had a Cooper sign in her yard?
22      A.   I never knew that until you deposed your
23  clients at Mr. Rosen's -- at your office.  I'm sorry.
24      Q.   Yeah.  Right.
25       Did there come a time either in August of

104

1  2009 or September of 2009 when you learned that a
2  couple of deputies were on Jim Adams' Facebook page?
3       A.   Yes, sir.
4       Q.   Tell me how you learned about that.
5       A.   The only -- the only one that came to mind
6  is -- was Carter, I believe.  And I'm not sure how I
7  got the information that it was on -- it was on
8  Facebook.
9       Q.   Do you remember where you were when you
10  learned about it?
11      A.   No.  That's a good little time ago.  I
12  don't quite remember where it was.
13      Q.   Okay.  Were you at work?  Do you know that?
14      A.   Probably at work.
15      Q.   And someone told you about this?
16      A.   Yeah.
17      Q.   Do you remember, was it an officer who told
18  you about it?
19      A.   I said I don't know.  I don't recall how I
20  got the information.
21      Q.   But my question, though, is -- I'm just
22  trying to, you know, get more information about what
23  your memory precisely is.  Do you know if the person
24  who told you was one of your senior officers?
25      A.   No.  I do know it was just in general and

105

1  what I -- if I remember right -- and I don't remember
2  how I got the information.  That's number one, but the
3  -- it was just talk and I -- I never saw it, so I don't
4  know when it was.
5       Q.   Did any of your senior officers ever look
6  at it?
7       A.   I don't know that to be -- I don't know.
8       Q.   So your testimony is you never looked at
9  Jim Adams' Facebook page?
10      A.   No, I have not.
11      Q.   And you don't know of any of your senior
12  officers who looked at Jim Adams' Facebook page?
13      A.   I don't know.  No one has told me that
14  they've seen it, that they looked at it.  That I can
15  remember.  I just know that I didn't.
16      Q.   Did there ever come a time when you learned
17  that Robert McCoy, Wayne McCoy, was on Jim Adams'
18  Facebook page?
19      A.   Only until late after -- I think it was
20  after the election.
21      Q.   But you're not sure about that?
22      A.   No, but I believe it was after the
23  election.  But I'm not sure.
24      Q.   Did you ever learn that Tameka Wiggins was
25  on his Facebook page?

106

1    A.    No, I didn't know that until the
2  depositions.
3    Q.    Are you aware of any other of your
4  employees being on Jim Adams' Facebook page prior to
5  November -- prior to the election in November of 2009?
6    A.    No, I don't.
7    Q.    Have you ever been on Facebook?
8    A.    Pardon me?
9    Q.    Have you ever been on Facebook?
10   A.    No, I have not.
11   Q.    No one in your office maintains a Facebook
12  presence for the Hampton sheriff's office on Facebook?
13   A.    No, not for the Hampton sheriff's office,
14  that I know of.
15   Q.    And you never had any discussions with any
16  of your senior officers about any of your employees
17  being on Jim Adams' Facebook page?
18        MR. ROSEN:  Object to the form of the
19  question.  You can answer it.
20   A.    I -- I don't recall how I knew that -- who
21  told me the facts of being -- them -- anyone being on
22  the Facebook.  All I know is that I did know that
23  Carter had -- and one of the reasons I knew, because he
24  told me.
25

107

1  BY MR. SHOEMAKER:
2    Q.    All right.  Did you have any discussions
3  with any of your senior officers about the fact that
4  Carter was on that Facebook page?
5    A.    I could have.  I just don't recall.
6    Q.    How did that -- how did that make you feel
7  when you learned that Carter was on Jim Adams' Facebook
8  page?
9    A.    Didn't make me feel any way, one way or the
10  other.  I had no feeling about it one way or the other.
11   Q.    Did you ever mention the fact that an
12  employee was on Jim Adams' Facebook page in a meeting
13  with other employees?
14   A.    No, I did not.
15   Q.    You never mentioned that?
16   A.    Not that I can remember.
17   Q.    Is it possible you did, but you just don't
18  remember sitting here today that --
19   A.    I don't believe that --
20   Q.    Hold on a second, Sheriff.  It's kind of
21  important for us to wait so that the record is clear.
22   A.    I'm sorry.
23   Q.    Is it possible you mentioned the fact that
24  one of your employees was on Jim Adams' Facebook page
25  in a meeting with other employees?

108

1    A.    I don't recall saying that.
2    Q.    Is it possible that you did that, you just
3  don't recall it, sitting here today?
4    A.    I don't recall it, Counselor.
5    Q.    Are you saying that it's not possible that
6  you did it, or are you saying it's possible you did it,
7  you just don't recall it?
8        MR. ROSEN:  Object to the form of the
9  question, calls for speculation.  You can answer it.
10   A.    I guess it's possible that I could have,
11  but I don't recall ever doing that.
12
13  BY MR. SHOEMAKER:
14   Q.    All right.  In paragraph 22 of the
15  complaint --
16        MR. ROSEN:  Can I get a copy?
17        MR. SHOEMAKER:  Sure.
18
19  BY MR. SHOEMAKER:
20   Q.    Sheriff, I'm going to ask you a question
21  about paragraph 22 of the complaint.  Counsel is going
22  to show you this.  Why don't you read this paragraph
23  and I'm going to ask you a question.
24   A.    Yes, sir.  I've read it.
25   Q.    Okay.

109

1    A.    Just that?
2    Q.    Yes, sir.  I'm just going to ask you a
3  question right now about 22.  Yeah, 22.  Some of it
4  does, I think, go to the top of the next page.
5    A.    Okay.
6    Q.    Did you ever give your employees a talk --
7  my first question is did you ever give your employees a
8  talk where you used the phrases "long train" and "short
9  train"?
10   A.    Yes, sir, I did say that.
11   Q.    Tell me what you told your employees on
12  that occasion.
13   A.    I -- in a meeting I said that I'm -- I have
14  a long training -- train, meaning that I got a lot of
15  supporters.  You ought to consider -- you ought to
16  consider this train because the other -- don't get on
17  -- don't get on a short train because it really don't
18  have a lot of supporters.  That's what I meant and
19  that's what I said.
20   Q.    Did you use the phrase "the man I fed for
21  16 years"?
22   A.    I don't talk like that, Counselor.  No.
23   Q.    Did you say that, "I'm going to have this
24  job as long as I want it"?
25   A.    No, sir.

28  (Pages 106 to 109)

110

1    Q.    Did you say anything like that?

2    A.    I don't recall, but I didn't say I'm going

3    -- I never would say I would have a job as long as I

4    want it.

5    Q.    On this occasion did you mention to the

6    employees that you were speaking to that another of

7    your employees had appeared on Jim Adams' Facebook

8    page?

9    A.    No, sir.

10   Q.    Did you say this sentence, quote: "This is

11   a bad economy and people are knocking down my door for

12   these jobs," end quote?

13   A.    I don't recall saying that.

14   Q.    Did you say anything like that?

15   A.    I don't recall saying anything like that.

16   Q.    Is it possible that you said something like

17   that, you just don't recall it, sitting here today?

18   A.    Could have, but I don't believe that's the

19   way I talk.

20   Q.    Sheriff, everybody is human.  Were you a

21   little upset when you were speaking to your employees

22   on this occasion?

23         MR. ROSEN:  Object to the form of the

24   question.  You can answer it.

25   A.    No, sir.  When I speak to my staff, I don't

111

1    -- I don't become upset.

2

3    BY MR. SHOEMAKER:

4    Q.    Did you ever tell any of your employees

5    that you were going to exercise your right as an

6    at-will employer to end their employment if they were

7    not going to be loyal to you?

8    A.    No, that's not true.

9    Q.    Did you ever say anything --

10   A.    No.

11   Q.    -- like that --

12   A.    No.  No, sir.

13   Q.    -- to your employees?

14   A.    No, sir.

15         MR. ROSEN:  Wait for the question.

16         THE DEPONENT:  I'm sorry.

17         MR. ROSEN:  I understand.  It's human

18   nature to anticipate.

19

20   BY MR. SHOEMAKER:

21   Q.    Did you believe you had the right to end

22   your employees' employment if they are not politically

23   loyal to you?  And I'm speaking of rank-and-file

24   employees.

25         MR. ROSEN:  Object to the extent it calls

112

1    for a legal conclusion.  You can answer the question.

2    A.    Can you repeat it again, Counselor?

3

4    BY MR. SHOEMAKER:

5    Q.    Do you believe you have the right to end

6    one of your employee's employment -- and I'm talking

7    about rank-and-file employees, nonsupervisory rank-and-

8    file employees -- because they are not politically

9    loyal to you?

10         MR. ROSEN:  I object to the form of the

11   question.  I'm not sure I understand what that means,

12   but you can answer it if you can.

13   A.    I believe all my employees are at-will

14   employees.

15

16   BY MR. SHOEMAKER:

17   Q.    So you believe that you have the right to

18   terminate them for any reason, including political

19   opposition to you?

20   A.    No.

21   Q.    You don't believe that?

22   A.    No, I don't believe that I have the right

23   to -- I know I have the right to terminate their

24   employment for at will, but I'd have to have a cause

25   for at will.

113

1    Q.    Okay.  But in any event, it's your

2    understanding that you don't have the right to end a

3    nonsupervisory employee's employment at will for

4    political opposition to you?

5         MR. ROSEN:  Okay.  I object to the form to

6    the extent it calls for a legal conclusion or

7    interpretation of law.

8         You can answer it if you can.

9    A.    The answer to that would be no.

10

11   BY MR. SHOEMAKER:

12   Q.    Okay.  So you don't believe you have that

13   right?

14   A.    Right.

15   Q.    Do you know if Captain Richardson, who I

16   think is now a major --

17   A.    That's correct.

18   Q.    Major Richardson, do you know if Major

19   Richardson ever told any of your employees when he was

20   selling or handing out tickets to your golf event,

21   something to the effect of, quote, "You either sell the

22   tickets or you buy them," end quote?

23   A.    I have never heard anybody say that.

24   Q.    Have you -- do you know whether or not he

25   or any of your senior officers ever told your employees

29 (Pages 110 to 113)

114

1  anything like that?
2     A.    No, I don't.
3     Q.    Who do you -- who did you place in charge
4  of promoting ticket sales to your golf event in 2009?
5     A.    I don't know if I placed anyone in charge
6  of it.  Richardson had tickets.  I don't know if any
7  other persons got tickets.
8     Q.    Do you put anyone in charge of putting that
9  event on?
10    A.    Captain Unnoppet and before that -- oh, who
11 did it?  Every -- we -- I mean it was a collective
12 thing, Counselor, where almost everybody worked on to
13 put it on.
14    Q.    Did any of your senior officers ever come
15 to you and tell you which employees were supporting you
16 and which were not?
17    A.    No, sir.
18    Q.    Now, did there come a time in either late
19 August of 2009 or early September, 2009, when you
20 learned about a cookout that was attended by Jim Adams,
21 Danny Carter, John Sandhofer, Robert McCoy, and --
22 Robert McCoy?
23    A.    I knew -- I knew about the birthday party,
24 but I didn't know who had come.  I knew Adams was
25 there.

115

1     Q.    How did you learn that Adams was there?
2     A.    I'm -- you know, I don't know anyone in
3  particular that said that -- who was there.  I never
4  really asked who was there, but I believe -- I don't
5  know if Colonel Bowden told me or not.  I think it
6  might have been Colonel Bowden.
7     Q.    Do you recall ever looking at a computer
8  screen with pictures of that event on it?
9     A.    No, sir.
10    Q.    Did any of your senior officers report to
11 you that they had seen pictures of people who attended
12 that event?
13    A.    No, sir.
14    Q.    Do you know how Colonel Bowden learned
15 about the event?
16    A.    No, I don't.  She would have to tell you.
17    Q.    Were you ever present when any of your
18 senior officers spoke to any of your employees about
19 your strengths as sheriff?
20    A.    Was I present when that happened?
21    Q.    Yes.
22    A.    No, sir.
23    Q.    After this occasion where you mentioned the
24 long train and short train, I asked you about paragraph
25 22 before.  You made that talk to different groups of

116

1  your employees, didn't you?  That talk wasn't just
2  given on one occasion, it was given to each shift, was
3  it not?
4     A.    That's correct, sir.
5     Q.    After you spoke to Danny Carter's shift,
6  did you and Danny Carter have a conversation?
7     A.    Yes, we did.
8     Q.    Tell me about that conversation.
9     A.    While I was speaking to the shift, and he
10 seemed agitated and I thought he had become -- looked
11 pretty angry in the meeting, and I knew that was
12 unusual.  So as I was walking out, he was walking out,
13 and I asked him as he walked out, I said:  Danny, is
14 there something you want to talk to me about?  And we
15 walked -- he said:  Yes, if you don't mind.
16       And I walked out with him, and he started
17 -- he started the conversation about his wife.  He got
18 upset that -- the fact that we disciplined her.  I'm
19 not even sure if they were married at the time, but
20 yes, they -- they probably was.  He got upset because
21 we had to discipline her because she left -- as control
22 operator, she left the sally port gates open and also
23 the door to the jail.  He said that the disciplinary
24 board did not give -- get enough information and he
25 became -- raised his voice and got loud.  He said I

117

1  didn't know all the information.
2        So I had to ask him to calm down and let's
3  talk about it.  And he was -- still got a little upset
4  about it, but I explained to him that his wife was a
5  deputy and we have the -- they didn't come as a pair.
6  What we did to his wife as a deputy had nothing to do
7  with him.  And he -- he -- he didn't like that.  And he
8  said that we didn't know enough about it.
9        Well, I don't know if he really -- did he
10 realize that I was the one, in my tour, I walked
11 through the sally port, I walked through the -- my jail
12 door.  I don't think he realized it, and I told him I'd
13 found the security breach.  No one else had to tell me
14 that it happened.  I found it in my tour.  And I knew
15 who was the operator of the console.
16       And he calmed down after that and he was
17 still agitated.  And after that, I told him, now, that
18 was -- we were finished.  And he went on.
19       And that was the extent of our -- my
20 conversation with Danny Carter.
21    Q.    Okay.  Have you told me all the important
22 elements of that conversation with Danny Carter?
23    A.    Sir, I told you the whole conversation.
24    Q.    So that included all the important elements
25 of that conversation; is that correct?

30  (Pages 114 to 117)

---

118

1    A.    Yes, sir.
2    Q.    Okay.  Were there any other conversations
3  you had with Danny Carter that you can remember in fall
4  of 2009 other than that one?
5    A.    That was the only one.
6    Q.    Did you or any of your senior officers ever
7  tell any of your employees that supporting you for
8  sheriff could either help them or hurt them, it's up to
9  them?
10    MR. ROSEN:  Objection, asked and answered.
11  Go ahead.
12    A.    No.
13
14  BY MR. SHOEMAKER:
15    Q.    On that occasion that we were just talking
16  about where the long train, short train was mentioned,
17  did you say anything like that, quote, "Be sure you are
18  supporting the right person," end quote?
19    A.    No, sir.
20    Q.    Well, why was it you were telling them they
21  shouldn't get on, quote, "short train," end quote?
22    A.    I explained what I meant by that.
23    Q.    What did you mean by that?
24    A.    The short train on the -- with small
25  support.  Long train, I had -- we had a lot of

---

119

1  supporters, as always.  And I ended with that, didn't
2  elaborate on it whatsoever.  And in those meetings,
3  Counselor, we don't spend a lot of time on that stuff.
4  We really get into what's going on at the jail and
5  what's going on in the organization.
6    Q.    How often do you go to shift change
7  meetings?
8    A.    For sure, when I'm asking for support.  I
9  can go anytime.  I make my tours of the jail.  It's no
10  schedule for it.
11    Q.    But it's fair to say you don't go that
12  often, isn't it?
13    A.    No, I don't have a shift change meeting,
14  no, not that often.
15    Q.    The date of this meeting, was it the last
16  day in August of 2009?
17    A.    I don't know the date, sir.
18    Q.    A minute ago I was asking you about whether
19  it was okay for you -- whether it was lawful for you to
20  fire a rank-and-file employee for either supporting
21  your opposition or failing to support you, and you
22  said -- and correct me if I'm wrong, but you told me
23  that no, that was not -- that was not lawful.  Is that
24  correct?
25    A.    That's --

---

120

1    MR. ROSEN:  Objection to the form of the
2  question to the extent it calls for a legal conclusion
3  or mischaracterizes testimony.
4    You can answer.
5    A.    It's my belief that I cannot dismiss a
6  person for political reasons.
7
8  BY MR. SHOEMAKER:
9    Q.    Okay.  Why did you fire Debbie Woodward?
10    A.    I didn't reappoint Debra.
11    Q.    Why did you not reappoint Debbie Woodward?
12    A.    I didn't reappoint Ms. Woodward because she
13  was -- she was placed in a deputy's position.  She was
14  a civilian in a deputy's position.  She was in
15  training.  We had already -- we knew that we were going
16  to have to -- our number of deputies were being reduced
17  because our inmates were being -- were reduced, being
18  that we had so many in the regional jail.
19    Ms. Woodward was a super -- she worked in
20  that position in training.  And we truly wanted someone
21  in there to -- that could train and that was a deputy.
22  I had asked her from time to time did she want to be a
23  deputy.  She told me no.  And I believed her
24  supervisors had asked her did she want to become a
25  deputy.  So we evaluated, and all our civilian

---

121

1  positions, made determinations that we needed to put
2  deputies in those positions because we needed to be
3  able to systematically -- if we need a deputy to go on
4  the floor, we would have someone available, someone to
5  -- especially being that she was just a clerk in the
6  training office, we needed a deputy.
7    Q.    Did anyone ever say to her:  Hey, Debbie,
8  you've either got to become a deputy or we're not going
9  to reappoint you?
10    A.    I don't know that to be the case.
11    Q.    You mentioned that the number of deputy
12  positions was going down?
13    A.    Counselor, when the -- they determine your
14  staffing, you get three to one, three -- you get one to
15  three deputies to population.  Population had been
16  declining for a number of years.  In the past two years
17  we've lost three and then five positions, I think it's
18  a total of eight positions, deputy positions through
19  the comp board, and so we had to make a determination
20  what could we do to bring in more deputies.  We had so
21  many people that were working for us that were admin
22  that had full deputy positions.  So we made a
23  determination almost across the board that we were
24  going to use those positions for deputies.  Actually --
25    Q.    Who made that determination?

31 (Pages 118 to 121)

122

1    A.    I made the last one.  I took
2  recommendations from the -- we had been talking about
3  this for quite a long time.
4    Q.    So who took Debbie Woodward's position?
5    A.    Deputy Youngblood.  She's a full training
6  officer and did the same work that a deputy did, but
7  she goes out and trained, also.  And she has the
8  ability to go back into the jail and work.
9    Q.    What does she do when she goes back in the
10  jail?
11    A.    She -- if need be, she becomes a regular
12  deputy, supervising inmates, and if necessary,
13  transport inmates.
14    Q.    Other than Deputy Youngblood having the
15  ability to work in the jail, was there any difference
16  in the job that Deputy Youngblood took from Debbie
17  Woodward?  In other words, the functions she took from
18  Debbie Woodward were the exact, same functions Debbie
19  Woodward was performing?
20    A.    No.
21    MR. ROSEN:  Objection to the form of the
22  question.  Mischaracterizes the testimony.
23    You can answer it.
24    A.    Ms. Woodward was a clerk.  She scheduled,
25  from what she got from the training academy, the people

123

1  to go to the academy and for our in service.  Deputy
2  Youngblood does that and also becomes -- she's what is
3  already a training officer.  And at the same time she
4  schedules and also trains.
5
6  BY MR. SHOEMAKER:
7    Q.    When was Deputy Youngblood moved into that
8  position?  Do you know?
9    A.    I don't know the date, but right after I
10  didn't reappoint -- I believe right after I didn't
11  reappoint Ms. Woodward.
12    Q.    So are all your -- do all your civilian
13  employees count against your deputy allotment?
14    A.    Not all, but the majority of them.  She was
15  one that did.
16    Q.    Uh-huh.  Were there any -- did Bobby Bland
17  count against your deputy allotment?
18    A.    Yes, sir.
19    Q.    Who else counted against your deputy
20  allotment?
21    A.    Mr. Darling.
22    Q.    He was uniformed when he left, wasn't he?
23    A.    No, sir.
24    Q.    Anyone else?
25    A.    Mr. Darling, Ms. Woodward, and Bobby Bland.

124

1  And all those positions are held by deputies now.
2    Q.    Is there a document somewhere that says
3  they're occupying a deputy's position?
4    A.    Yes, sir.
5    Q.    And what is that document called?
6    A.    I don't know the name of it right offhand,
7  but we can -- we can give it to you.
8    MR. ROSEN:  Just answer his question if you
9  know.
10    A.    Yeah.  I'm -- I would have to just say
11  where the -- the individual in this -- in this space,
12  it would denote he's a deputy.  I believe that's the
13  way it is.
14
15  BY MR. SHOEMAKER:
16    Q.    It would denote --
17    A.    That they were a deputy.
18    Q.    So what would this document have on it?
19    A.    What the employee's --
20    Q.    Name?
21    A.    Name and rank and where they -- where they
22  went to work, I believe.  That's my guess that it would
23  be that.
24    Lieutenant Giddings (phonetic) -- I'll wait
25  till you ask me a question.

125

1  BY MR. SHOEMAKER:
2    Q.    Why did you let Bobby Bland go?
3    A.    Basically, the same reason.
4    Q.    Did you give him the opportunity to become
5  a deputy?
6    A.    No, sir.
7    Q.    Why not?
8    A.    Because in evaluating Mr. Bland, we didn't
9  -- I didn't think -- I was not going to reappoint him
10  to be a deputy even if he had wanted to.
11    Q.    Well, why?
12    A.    When Ms. Davis was the supervisor, she
13  continually said she had problems with him doing his
14  work and when we moved he became -- he was a canteen
15  officer.  And he went to -- he became a -- in charge of
16  procurement and finances.  Some of the finances.  He --
17  she had -- she thought he didn't do some of the things
18  he needed to do.  And because we were in this heavily
19  trying to make a difference in having deputies in the
20  positions, I did not reappoint him.  Because of those
21  reasons.  That I wanted -- I needed to have a deputy in
22  that -- in his position.
23    Q.    Do you know how long Deputy Youngblood has
24  been with you?
25    A.    I would think about ten years.  Eight or

32 (Pages 122 to 125)

126

1  ten years.
2      Q.    Who replaced Bobby Bland?
3      A.    Mrs. Davis. Ms. Davis. She went to the
4  academy and she came in. She was...
5      Q.    Does she work back in the jail sometimes?
6      A.    She is trained to do that. Now, whether
7  she's been back there, I can't tell you.
8      Q.    Okay. Why did you fire -- why did you not
9  reappoint David Dixon?
10     A.    David Dixon? David Dixon was not
11  reappointed because he insulted a fellow employee when
12  he came out of the election booth. And --
13     Q.    What --
14           MR. ROSEN: Let him finish his answer.
15
16  BY MR. SHOEMAKER:
17     Q.    Yeah, go ahead.
18     A.    And, also, during the period of time Dixon
19  continually wanted to move to different places in the
20  facility and I knew -- I didn't think that -- when I
21  got ready to reappoint -- reappoint him, do the
22  reappointments, I thought it was in -- out of poor
23  taste for him to use the words he used to Mrs. Poe.
24     Q.    What did he say to Mrs. Poe?
25     A.    He used the word -- and I won't say it, but

127

1  I -- it was my understanding he used the word f---ing.
2  You can take this f---ing s---, stuff, and throw it in
3  the trash can.
4      Q.    By that stuff, he's referring to your
5  campaign literature?
6      A.    That's correct.
7      Q.    You never interviewed Dixon to get his side
8  of it, did you?
9      A.    No, I did not, sir.
10     Q.    And none of your senior officers ever
11  interviewed Dixon to get his side?
12     A.    I don't know if they did or not. I made
13  that decision.
14     Q.    How much does it cost to send somebody
15  through basic jailer school?
16     A.    Counselor, I really don't know. We -- it's
17  not an individual thing. We pay accordingly. For
18  example, if you have 100 deputies, you pay that -- you
19  pay an amount every year for that.
20     Q.    Okay.
21     A.    And then we can send 40 if need be.
22     Q.    Do you know how much it is for 100
23  deputies?
24     A.    I don't know. I'd have to find out.
25     Q.    Is it more than $20,000?

128

1      A.    I don't know.
2      Q.    What document would say -- who would know
3  how much that costs?
4      A.    We'd have that, the charge from the
5  academy.
6      Q.    When you say, "we," who in your office
7  knows most about that?
8      A.    Colonel Bowden.
9      Q.    Have you told me all the reasons you
10  decided not to reappoint David Dixon?
11     A.    I did, sir.
12     Q.    Why did you choose not to reappoint John
13  Sandhofer?
14     A.    John, I didn't reappoint John Sandhofer
15  because I didn't think he integrated that well with the
16  -- with my other -- with my staff. That was just my --
17  on me. And I didn't think that he would -- I didn't
18  want to continue his employment or reappoint him.
19     Q.    Have you told me all the reasons that you
20  decided not to reappoint John Sandhofer?
21     A.    Yes, sir.
22     Q.    And John Sandhofer has a bachelor's degree
23  from James Madison University. Do you have any idea
24  how many of your rank-and-file deputies have bachelor's
25  degrees, you know, from solid colleges?

129

1      A.    Quite a number. Quite a number.
2      Q.    Do you have any idea of the percentage?
3      A.    No, I don't, but quite a number of them
4  have college degrees.
5      Q.    Were you aware that I think he also has a
6  master's from William and Mary?
7      A.    No, sir. I wouldn't -- I didn't know he
8  had a master's from anywhere.
9      Q.    All right. Why did you terminate Danny
10  Carter? Why did you choose not to reappoint Danny
11  Carter?
12     A.    Because of the conversation, the
13  conversation we had after the meeting. I had to make a
14  determination if -- could I keep both of them, the wife
15  and him. And I thought he -- that was the first time
16  any deputy had raised the level of our conversation the
17  way he did, and I just didn't feel that it would be to
18  my best interests and my office's best interests to
19  keep him or keep both of them. I didn't believe that
20  he could separate himself from his wife while they were
21  working.
22     Q.    Okay. Have you told me all the reasons you
23  chose not to reappoint Danny Carter?
24     A.    Yes, sir.
25     Q.    Why did you choose not to reappoint Wayne

33 (Pages 126 to 129)

**130**

1  McCoy?

2      A.    Wayne, Deputy McCoy, formerly Deputy McCoy,

3  we had had -- he had had a lot -- not a lot. He had

4  had some difficulties in almost every area we had

5  worked. We worked in.

6          And so arguments, heated arguments with

7  deputies when he was in civil. We switched him up and

8  brought him back to corrections. I just felt that at

9  that particular time that it would be better for us to

10  sever ties with Wayne and move forward on some of the

11  things we wanted to accomplish.

12      Q.    He had, I think, 20 years of service with

13  you and you chose not to reappoint him; is that

14  correct?

15      A.    I don't know the years that he had, but it

16  might be to that effect.

17      Q.    At 25 years if you are of sufficient age,

18  you can get full retirement from your office; is that

19  correct?

20      A.    25 years and 50.

21      Q.    25 years of service and at least 50 years

22  of age?

23      A.    That's correct.

24      Q.    Are there any documents in your office that

25  explain the retirement benefit?

**131**

1      A.    Not necessarily. That is a function of the

2  city. You can go there. It will say retirement office

3  and they --

4      Q.    I'm sorry. Go ahead.

5      A.    They, because we -- in that respect we are

6  just like city employees because we come under the VSRA

7  and the city puts my staff and any other constitutional

8  staff in within that. So we get the same retirement as

9  the city employees.

10      Q.    And that's VRS?

11      A.    VRS.

12      Q.    But you're not aware of any documents in

13  your possession that explain the retirement benefit?

14      A.    No. Because we -- because of that fact.

15  If you wanted to know anything about --

16      Q.    It sounds like all the payroll and benefits

17  are run out of the city.

18      A.    Yes. We are a conduit and give them the

19  information.

20      Q.    Who at the city is the person with

21  information about, for instance, the deputies'

22  retirement benefit?

23      A.    They changed, constantly changed who that

24  was and I don't know the new person.

25      Q.    Do you know who runs your payroll with the

**132**

1  city?

2      A.    That comes in finance, but I know -- I know

3  his first name, Carl, runs the finance so it comes in

4  through that office.

5      Q.    All right. And what city office is this?

6      A.    Finance office.

7      Q.    Finance. Okay. What about administration

8  of like vacation? Does the city run that, too, or you

9  do?

10      A.    No, we run that.

11      Q.    Does the city administer the health

12  benefits as well?

13      A.    Yes.

14      Q.    Is that the finance office as well?

15      A.    I believe so, yes.

16      Q.    How long does an employee have to be with

17  you before they're entitled to full health benefits?

18  Do you know?

19      A.    No, I don't know, but I think there's a

20  window when you first are hired and I think it's about

21  90 days. I'm thinking it's about 90 days.

22      Q.    I'm going to take a break, take about five,

23  ten minutes and then I may have a few more, or I may

24  not.

25          MR. ROSEN: Sure. Okay.

**133**

1          (Recess)

2

3  BY MR. SHOEMAKER:

4      Q.    I've got a few more questions.

5      A.    Okay.

6      Q.    Sheriff, did you ever meet John Sandhofer's

7  girlfriend?

8      A.    I don't recall ever meeting her. I might

9  have, but I just don't recall it.

10      Q.    Would you know her to see her?

11      A.    No, sir.

12      Q.    You've never seen his girlfriend before?

13      A.    You asked me would I know her if I saw her.

14      Q.    Right.

15      A.    No, sir.

16      Q.    Do you ever recall seeing him with a girl

17  in fall 2009?

18      A.    I -- he -- I think -- I think I remember

19  seeing him with a female. I...

20      Q.    Do you remember seeing him with a female at

21  some campaign events?

22      A.    For -- if you can help me. Which one?

23      Q.    During the campaign season of 2009. There

24  were about three or so debates you had with Jim Adams

25  and Cooper. Is that right?

---

134

1    A.    Maybe the first one he could have been, but
2  Cooper wasn't in the debate.
3    Q.    All right.  Do you think you remember
4  seeing Sandhofer there with a woman that day?
5    A.    He might have.  There was a lot of people
6  there so...
7        MR. ROSEN:  He's just asking what you
8  remember.
9    A.    I just don't recall ever meeting his
10 girlfriend.
11
12 BY MR. SHOEMAKER:
13   Q.    Do you recall ever seeing Sandhofer in a
14 car with a Jim Adams' bumper sticker on it?
15   A.    No, sir.
16   Q.    Do you remember Martha Mugler coming to you
17 back in 2005, saying that McCoy would not sign your
18 petition for sheriff during that year?
19   A.    I -- I don't recall her ever saying that,
20 sir.
21   Q.    Do you ever recall telling anyone during
22 that year, 2005, that:  I should have fired McCoy when
23 I fired Eaton?
24   A.    No, sir.
25   Q.    Do you remember Deputy Woodward ever

---

135

1  protesting about the fact that people who did not live
2  in Hampton were circulating your petitions?
3    A.    No, sir.
4    Q.    This ratio issue that you talked about a
5  few minutes ago, the ratio of deputies to inmate
6  population, who would -- who was working with you on
7  balancing that ratio and dealing with that issue, if
8  anyone?
9    A.    Counselor, no one has to work with me to
10 balance it.  That comes from the compensation board.
11   Q.    Okay.  But you obviously -- you say you
12 chose not to reappoint Bland and Woodward because of
13 this issue.  Correct?
14   A.    Partly, yes.
15   Q.    And were you working with anyone in making
16 that determination to not reappoint the two people in
17 the fall of 2009?
18   A.    The colonel, Colonel Bowden, and I think
19 Wells-Major and I believe Major Richardson, we
20 continually talked about it.  It's not just in this --
21 in 2009.  We've talked about this from -- since 2005
22 and '6.
23   Q.    You don't recall Danny Carter doing any
24 campaign work for you during the 2009 campaign, do you?
25   A.    No, I don't recall him -- I wouldn't -- I

---

136

1  don't know.  No.  I don't recall him doing anything.
2    Q.    You recall Robert McCoy doing any kind of
3  campaign work for you in 2009?
4    A.    No, I don't.
5    Q.    Do you recall David Dixon doing any kind of
6  campaign work for you in 2009?
7    A.    No, sir.
8    Q.    Do you recall John Sandhofer doing any kind
9  of campaign work for you in 2009?
10   A.    Not that I -- no.
11   Q.    Do you recall Bobby Bland doing any kind of
12 campaign work for you in 2009?
13   A.    No, sir.  I don't recall.
14   Q.    Do you recall Debbie Woodward doing any
15 kind of campaign work for you in 2009?
16   A.    No, sir.
17   Q.    Now, in past years McCoy had done some
18 campaign work for you, had he not?
19   A.    I would not have known that either.
20   Q.    You don't remember McCoy going to events
21 for you or putting out signs or handing out literature?
22   A.    No, sir.
23   Q.    Do you recall Danny Carter putting out
24 signs for you before 2009?
25   A.    I never knew that.

---

137

1    Q.    Do you recall Danny Carter assisting you in
2  any way in your reelection efforts prior to 2009?
3    A.    I don't recall Danny Carter ever doing
4  anything for me for the elections.
5    Q.    Do you recall David Dixon ever doing
6  anything for you for elections prior to 2009?
7    A.    The only thing that I know that David Dixon
8  did was played in my tournament.  Played golf.
9    Q.    Do you recall Bobby Bland ever doing
10 anything for your reelection efforts prior to 2009?
11   A.    I recall he and his wife coming to some of
12 the -- one or two of the fundraisers.
13   Q.    Do you recall Debbie Woodward ever doing
14 anything for your reelection efforts prior to 2009?
15   A.    She worked at the golf tournament as
16 registering the golfers.
17   Q.    Do you recall her circulating petitions for
18 you prior to 2009?
19   A.    I didn't know that she did, sir.
20   Q.    Do you recall her putting out signs for you
21 prior to 2009?
22   A.    No, sir.
23   Q.    Do you recall her working the polls for you
24 prior to 2009?
25   A.    Yes, she -- she did.

ADAMS HARRIS REPORTING, INC.
(757)631-0458

138

1    Q.   Can you recall -- I'm going to switch gears
2    back on you.  I was asking you earlier today about
3    discipline issues.  Can you recall ever having had to
4    discipline an employee for using curse words or
5    inappropriate language on the job?
6    A.   Directed to another employee?
7    Q.   Yeah.  Yeah.
8    A.   Not that I can -- not that I can remember
9    right offhand.
10   Q.   How about using curse words directed to any
11   other person?
12   A.   I can't recall.  Not at this moment.
13   Q.   Can you ever remember having to discipline
14   anyone for verbally abusing an inmate, for instance?
15   A.   I would say yes, but I wouldn't be able to
16   pinpoint which one it is.
17   Q.   What kind of punishment would somebody get
18   for verbally abusing an inmate?
19   A.   Depends on the circumstances of what
20   happened and what the investigation turned up.
21   Q.   Well, what if, hypothetically asking this
22   question, a deputy, a rank-and-file deputy yelled at an
23   inmate, quote -- pardon my language, but, quote "Fuck
24   you," end quote?
25   MR. ROSEN:  Objection, calls for

139

1    speculation.  You can answer if you can.
2    A.   I wouldn't know exactly what would happen
3    to them.
4
5    BY MR. SHOEMAKER:
6    Q.   He wouldn't be terminated for that, would
7    he?
8    MR. ROSEN:  Objection, calls for
9    speculation.  You can answer if you can.
10   A.   It all depends on the circumstances.
11
12   BY MR. SHOEMAKER:
13   Q.   Okay.  So, apparently, you can envision
14   some circumstances where he wouldn't be terminated?
15   MR. ROSEN:  Objection, calls for
16   speculation.  You can answer.
17   A.   Yes, I guess I could.
18   MR. SHOEMAKER:  Sheriff, that's all I've
19   got.  Thank you for your time today.
20   THE DEPONENT:  Okay.
21
22   BY MR. ROSEN:
23   Q.   Sheriff, I just have a few follow-up
24   questions.  I just wanted to ask a few follow-up.
25   Counsel asked you about were there any

140

1    written guidelines by DCJS governing the sheriff's
2    department.  Are there any guidelines governing how the
3    jail is run?
4    A.   Yes, sir.  I didn't -- I didn't clarify
5    that.  It's through DCJS, they have minimum standards
6    on a deputy's training.  Also, being a part of
7    Department of -- the DOC, they also come in and give
8    you minimum standards and they come in and survey your
9    jail to make sure you are following minimum standards.
10   Q.   For jails and lockups?
11   A.   Jails and lockups.
12   Q.   All right.  Now, Mr. Shoemaker asked you
13   what is your right under Virginia law to not reappoint
14   employees or terminate employees.  Let me ask you this.
15   What's your understanding of your ability -- what is
16   the relationship between you and your deputies or your
17   employees under Virginia law?
18   A.   That they are at will and work for -- at
19   the pleasure of the sheriff.
20   Q.   Okay.  And you understand that you could
21   take and terminate them for any reason except reasons
22   that violate the law?
23   A.   That's correct.
24   Q.   Okay.  As far as your understanding, is
25   that relationship reflected in your grievance policy?

141

1    A.   Yes.
2    Q.   Now, Mr. Shoemaker asked you about a time
3    when you -- before the election of 2009 when you went
4    to shift meetings to talk to -- talk to your employees.
5    MR. SHOEMAKER:  Okay.  I've got an
6    objection.  What did you say as far as -- did you say
7    before 2009?
8    MR. ROSEN:  Yes, before the election.
9    MR. SHOEMAKER:  Before the election in
10   2009.  Okay.
11
12   BY MR. ROSEN:
13   Q.   Yes.  Do you remember that line of
14   questioning?
15   A.   Yes.
16   Q.   Okay.  And did you appear in various shift
17   meetings to talk to your employees, the deputies, at
18   the sheriff's department?
19   A.   Yes, I did.
20   Q.   What was the purpose of that?
21   A.   To ask for support in my upcoming election,
22   and also I take that opportunity to ask them questions
23   about anything that's going on in the department or in
24   the jail or anything that they wanted -- thought they
25   may need or what would be some of the process that we

142

1    need to change.  So we use it as a full-fledged
2    committee meeting.  We spend very little time on
3    supporting me in my bid for reelection.
4        Q.    What did you say -- strike that.  How many
5    shift meetings did you appear at?
6        A.    I believe three.
7        Q.    Three.  Okay.  And what did you -- just
8    give us the essence of what you said at each of those
9    shift meetings.
10       A.    We would -- we would start out first
11   introducing myself as to what I was doing and why I
12   called them there.  We'd talk about a minute concerning
13   the upcoming elections.  Always reminded them of the
14   election.  And on this particular time we talked about
15   how much support I had had.  That's the usage of the
16   train and all of that.
17       Q.    Uh-huh.
18       A.    Then we get into if anybody has any
19   questions.  Some people would ask me -- ask me, Who can
20   I get in touch with to work for you, to do some stuff
21   on the campaign?  And I would give them the number.
22   And others would say, I'm on board and I'd love to do
23   some work with you.  Some say nothing.  And then that
24   would be it.
25       Then we start talking about the issues of

143

1    the sheriff's office.
2        Q.    Did you ever say at those meetings or
3    threaten the deputies that if they did not support you,
4    they would be terminated?
5        A.    It did not happen and never would do that.
6        Q.    Did you ever say that you don't expect
7    anyone to support Adams in the election?
8        A.    No, I never mentioned Adams' name.
9        Q.    Did you ever address Facebook, seeing any
10   deputies on Facebook?
11       A.    No.
12       Q.    All right.  Anything else at those meetings
13   that you said?
14       A.    No, that's basically it.  It's a shift
15   change, and I don't keep them that long.  We talk for
16   about five minutes to the election and then we go into
17   what we're concerned with at the jail.
18       Q.    Did you ever tell any of the deputies prior
19   to election that their support of you was a
20   precondition to their being reappointed?
21       A.    No, sir.
22       Q.    And did you ever -- and let me ask you
23   this.  Did you know how many of the deputies in your
24   department voted for you?
25       A.    No, not -- not whatsoever.

144

1        Q.    Were there deputies in your department that
2    did not participate in your campaign?
3        MR. SHOEMAKER:  What's the question?
4        MR. ROSEN:  Were there deputies that did
5    not participate in your campaign.
6        MR. SHOEMAKER:  That he knows about them?
7        MR. ROSEN:  Yes.
8        A.    Did I know the number?
9
10   BY MR. ROSEN:
11       Q.    Yes.
12       A.    No.  No.
13       Q.    Did you know who did -- were there deputies
14   that did not buy tickets to your golf tournaments?
15   That were reappointed.
16       A.    I'm sure there was.
17       Q.    Did you even know who had sold tickets to
18   your golf tournaments when making the reappointment
19   decisions?
20       A.    No, sir.
21       Q.    Did you know whether any of the plaintiffs
22   in this case were not supporting you when you made your
23   reappointment decisions?
24       A.    No, sir.
25       Q.    Okay.  Did any of them tell you that they

145

1    were not supporting you?
2        A.    No, sir.
3        Q.    Did any of them buy tickets to your golf
4    tournament that you know?
5        A.    I don't know.  I don't know.  I didn't know
6    if they did or not.
7        Q.    Did you determine who bought tickets to
8    your golf tournament when you were making your
9    reappointment decisions?
10       A.    No, sir.
11       Q.    All right.  Did you know who was -- who had
12   volunteered to work in your campaign when you made your
13   reappointment decisions?
14       A.    No, sir.
15       Q.    Did you know whether the plaintiffs had or
16   had not worked on your campaign when they were -- you
17   made the reappointment decisions?
18       A.    No, I did not know that.
19       Q.    Do you know whether those people had worked
20   in your campaign in the past?
21       A.    Some I do, some I don't.
22       Q.    Now, Mr. Shoemaker asked you the reasons
23   for your decision not to reappoint other, various
24   deputies.  In addition to the reasons you've outlined,
25   did you also consider their discipline records, if any?

37 (Pages 142 to 145)

146

1    A.   I did.
2         MR. SHOEMAKER:  I object to the leading.
3
4  BY MR. ROSEN:
5    Q.   Okay.  What else did you consider in
6  addition to the facts that you said?
7    A.   Well, certainly, the personnel folder and
8  any disciplinary actions through the deputies that were
9  not being reappointed.
10
11 BY MR. ROSEN:
12   Q.   Okay.  In fact, did you reappoint Daniel
13 Carter's wife, reappoint her to continue being a deputy
14 with the sheriff's department after the election of
15 2009?
16   A.   I did, sir.  I did, sir.
17   Q.   With regard to David Dixon, had he held
18 various positions in the department?
19   A.   That's correct, sir.
20   Q.   Did he also -- do you know whether
21 he had any counts or records of violations of protocol?
22 working there?
23        MR. SHOEMAKER:  Object to the leading.
24
25

147

1  BY MR. ROSEN:
2    Q.   Let me ask, what problems did he have?
3    A.   He -- he had come up through the ranks as
4  sergeant and he -- he said he could not handle the work
5  in the jail as a supervisor, so would I -- would I --
6  well, would I demote him, and I -- because he was
7  having problems supervising.  He just couldn't take it.
8  So we did that.
9         Then he went over to -- I believe he went
10 over to civil process.  And then he wanted to -- when
11 we needed another training officer, he asked to be --
12 could he do that.  So I did that for him.
13        And then he worked in there for awhile,
14 then said that he -- he could not handle that.  He was
15 having such pressures in there, in training.  So I
16 said, Okay, David.
17        Then we moved him over to -- back into
18 civil.  Being there, little bit of difficulties.  Then
19 we wanted to do some transfers and make some movement
20 in civil process, so then we moved him into the jail.
21 That's the last point of contact with us.
22   Q.   Did you consider his past employment
23 history when deciding whether or not to reappoint him?
24   A.   I did.
25   Q.   Now, did his use of profanity on election

148

1  day violate the rules of conduct for deputies?
2    A.   I think so, sir.  I just was -- it's
3  unforgiving to publicly say those things to a fellow
4  employee, regardless of whatever you thought.  To use
5  that language to that particular person.  Or any
6  deputy.
7    Q.   And did you also consider his disciplinary
8  record?
9    A.   I did, sir.
10   Q.   Okay.  As far as Robert McCoy, had he been
11 the subject of an excessive force lawsuit?
12   A.   Yes, he had been.
13   Q.   Did you consider that when making the
14 decision whether or not to reappoint him?
15   A.   That weighed a little, small amount.  I
16 looked at that.  I knew about the case.
17   Q.   All right.  Did he have difficulty getting
18 along with other employees?
19   A.   It appeared that he did.
20   Q.   Okay.  Did he also -- do you know whether
21 he had any counts or records of violations of protocol?
22   A.   I don't know that right at this particular
23 moment, sir.
24   Q.   All right.  With regard to Sandhofer, how
25 long was he with the department?

149

1    A.   I believe roughly a year and a half, maybe.
2    Q.   What was his background?  Where did he come
3  from?
4    A.   He had worked in, I think it's event -- we
5  -- through the -- for a number of years we had events
6  on Friday nights and Saturday nights downtown, and I
7  think he headed up that.
8    Q.   So was this his first law enforcement job
9  with the sheriff's department?
10   A.   Yes.
11   Q.   Did it appear to be a good fit for him with
12 the sheriff's department, in your view?
13   A.   I didn't think it was, as he worked.  In
14 interviewing him getting on, I thought it was.  But
15 then it didn't appear that he liked what he was doing
16 with us.
17   Q.   Did he follow direction well?
18   A.   I wouldn't know, sir.  I wasn't his
19 supervisor.
20   Q.   Did you get input from his supervisor to
21 make the determination whether or not to --
22   A.   They thought that he did not follow all the
23 directions if he thought he needed to do something
24 different.
25   Q.   In his previous job was he the boss?

150

1    A.    Yes.

2    Q.    Did that -- were you aware of whether that

3    was an issue in his ability to follow directions at the

4    sheriff's department?

5    A.    No, I did not know that.

6    Q.    As far as Debra Woodward, what had you been

7    told about her job performance by Debra Davis?

8    A.    I'm sorry, sir.

9    Q.    As far as Debra Woodward, had you -- had

10    you been told anything by Debra Davis concerning Debra

11    Woodward's job performance?

12    A.    Yes, sir.  She -- Debra had been working

13    with -- Debra Woodward had been working with us for a

14    number of years, and I hired her.  It was the first

15    permanent job she had ever held.  She was -- and she

16    was a -- did clerical work for us.  And then we -- we

17    moved her back to human resources, and Debra Davis

18    became the supervisor of that area.  And then we moved

19    her to -- she was the director of human resources.

20    Debra became so frustrated with her, Debra Davis, she

21    came into my office, and I believe Colonel Bowden was

22    in there, and she wanted me to say that I should

23    terminate her.  And I -- and I said, What's the

24    problem?

25    She told me she was incompetent, that she

151

1    could not do this -- do that kind of work.  So I said I

2    would not treat Debra Woodward that way.  I would find

3    something for her.  I wanted to build up the training

4    office so I said I would find something, and I did.  I

5    started that information coming from the academy and

6    that's where she was placed.

7    Q.    Was that a less strenuous job for her?

8    A.    Yes, it was.

9    Q.    As the training coordinator, what, she just

10    kept records of who went to training?

11    A.    Yes.

12    Q.    Is that a glorified clerk position?

13    A.    I don't want to use the word "glorified,"

14    but it's a position we had.

15    Q.    Was that less responsibility than her

16    previous position?

17    A.    Yes.  It was.  Very much so.

18    Q.    Okay.  Was she also disciplined, if you

19    know, for improper records disposal in 2004?

20    A.    Yes.

21    Q.    Now, you were asked about Kenneth Darling

22    as well.  Did he request to have his job changed when

23    he worked for the sheriff's department?

24    A.    No.  When we -- he fell into that civilian

25    situation.  In fact, because we -- I did not reappoint

152

1    him, I replaced him with a lieutenant.  Then she was a

2    sergeant, Sergeant Giddington.  Now she's a lieutenant.

3    I used her for the job he was doing and she continued

4    doing her job.  So I didn't have to use but one deputy.

5    Q.    So you combined the positions?

6    A.    Combined the positions.

7    Q.    Was that supervisor of records and

8    classification?

9    A.    That's correct.  She works under a captain

10    who's responsible for both.

11    Q.    As far as Curtis Davis, the shift sergeant,

12    did he have supervisory issues?

13    A.    Yes.

14    Q.    Did he mistakenly release an inmate from

15    the jail?

16    A.    That's correct.

17    Q.    Did he have various disciplinary actions

18    against him?

19    A.    Yes.

20    Q.    Did the supervisors not recommend

21    reappointment?

22    A.    That's correct.

23    Q.    How about Sammy Mitchell?  Did he have a

24    problem with supervisory skills?

25    A.    Yes.  He was -- Lieutenant Mitchell was --

153

1    had a very hard time controlling his shift, and we --

2    all the -- many of the problems we had as far as

3    disciplinary and control was on his shift.  It was

4    recommended to me not to -- would I not reappoint him.

5    Q.    Did he also have issues at the Greyhound

6    bus station?

7    A.    Yes, I believe that's been a couple of

8    years ago, but before that he -- I believe he carried

9    an inmate to the bus station and left him there.  So we

10    had to deal with that.

11    Q.    Okay.  As far as James Sutherland

12    (phonetic), who was not reappointed the same time, did

13    he have issues, problems while working as a deputy?

14    A.    Yes.  He had a little bit -- had problems

15    understanding what we were trying to accomplish.  And

16    working.  But I believe the biggest one that really

17    made us have to look at it, I think he brought in some

18    shoes for an inmate.  Which was totally against the

19    policies of the -- of the -- of corrections.  That he

20    personally brought them in.  And I -- he was

21    recommended not to be reappointed.

22    Q.    Now, Desiree Weeks, was she another deputy

23    not reappointed?

24    A.    Desiree Weeks.

25    Q.    Okay.  And why was she not reappointed?

39 (Pages 150 to 153)

154

1    A.    That's the one I couldn't think of.
2          Same thing.  Missing time from work,
3    horrendous ability to -- she had been a sergeant and we
4    had to demote her because she could not perform those
5    duties.  Allegations of problems in the jail.  So I did
6    not reappoint her.
7    Q.    Was she romantically involved with an
8    inmate?
9    A.    That was -- we never could lock that in.
10   Someone said that was some of the problems she had in
11   the jail.
12   Q.    That was an allegation?
13   A.    Allegation.
14   Q.    Tameka Wiggins?
15   A.    Tameka Wiggins was -- again, very rarely
16   came to work.  Left the shift really in -- in some
17   binds that we thought it was necessary not to reappoint
18   her.
19   Q.    When you made the decision not to reappoint
20   these deputies, did you ever consider their -- who they
21   were supporting during the election?
22   A.    No, sir; no, sir; no, sir.  Didn't matter.
23   Q.    You were asked by counsel if you knew
24   whether the plaintiffs, the six plaintiffs, worked on
25   your campaign.  Did you keep track of who worked on

155

1    your campaign?
2    A.    I did not, sir.
3    Q.    So is it fair to say you didn't know which
4    of the deputies -- well, which of the deputies worked
5    on your campaign?
6    A.    No, I wouldn't -- I didn't know.
7    Q.    Were you in charge of coordinating that?
8    A.    No, sir.
9    Q.    Who coordinated that?
10   A.    Some of it was done through Richardson,
11   some was done through Colonel Bowden maybe, and then
12   some might have been done through one of my civilian
13   helpers, but -- that did some work for me.
14   Q.    Did deputies volunteer to work on your
15   campaign?
16   A.    That's correct.
17   Q.    Was it a condition of employment?
18   A.    No, sir.
19   Q.    Did all your deputies do it?
20   A.    No, sir; no, sir.
21   Q.    Same question with regard to buying golf
22   tickets or barbecue tickets.  Was that a condition of
23   employment?
24   A.    No, sir.
25   Q.    Did all deputies buy them?

156

1    A.    No, sir.
2    Q.    Did all deputies sell them?
3    A.    No, sir.
4    Q.    Was that a condition of reappointment?
5    A.    No, sir.
6    Q.    Answer if counsel has questions.  That's
7    all I have.
8
9    BY MR. SHOEMAKER:
10   Q.    I just have a few, Sheriff.  So it's your
11   testimony that you consulted Wayne McCoy's supervisor
12   before you made the decision not to reappoint him?
13   A.    He was part of the -- the grouping from the
14   corrections staff.  That's correct.
15   Q.    Okay.  So you consulted his supervisor
16   before you decided not to reappoint him?
17   A.    We sat at a table, and who can we live with
18   in corrections?  And he said:  This is what I want to
19   do.
20   Q.    Okay.  Who was at that table?
21   A.    Probably, if I recall, Richardson, I think
22   Colonel Bowden.  I'm sure Colonel Bowden.  And
23   Wells-Major.
24   Q.    Did they seek input from these -- from the
25   plaintiffs' direct supervisors before they made these

157

1    recommendations?
2    A.    I'm not able -- I don't know that.
3    Q.    And by -- when you say you consulted the
4    supervisors, you're talking about Richardson, Bowden,
5    and Wells-Major.  Are you talking about anybody else?
6    A.    No, sir.
7    Q.    All right.  All right.  I don't have any
8    other questions.
9          MR. ROSEN:  We'll read.
10
11         (Signature not waived.)
12
13         (Whereupon, the deposition was
14   concluded at 2:45 p.m.)
15
16
17
18
19
20
21
22
23
24
25

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

158

```
 1              DEPOSITION ERRATA SHEET
 2
 3   Case Caption:  Bobby Bland, et al. v. B.J. Roberts
 4   Deponent:      B. J. Roberts
 5   Deposition Date:  October 4, 2011
 6
 7       I have read the entire transcript of my deposition
     taken in the captioned matter or the same has been read
     to me.  I request that the following changes be entered
 8   upon the record for the reasons indicated.  I have
     signed my name to the Errata Sheet and the appropriate
 9   Certificate and request both to be attached to the
     original transcript.
10
11   Page/Line Nos.    Correction/Reason
12   _____   _____
13   _____   _____
14   _____   _____
15   _____   _____
16   _____   _____
17   _____   _____
18   _____   _____
19   _____   _____
20   _____   _____
21   _____   _____
22   _____   _____
23   _____   _____
24   Signature:_____  Date: _____
          B. J. Roberts
25
```

159

```
 1            CERTIFICATE OF DEPONENT
 2   COMMONWEALTH OF VIRGINIA
 3   CITY OF _____
 4
 5      Before me, this day, personally appeared B. J.
     Roberts, who, being duly sworn, states that the
 6   foregoing transcript of this deposition, taken in the
     matter, on the date and at the place set out on the
 7   title page hereof, constitutes a true and complete
     transcript of said deposition.
 8
 9
10
11   --------------------------
             B.J. Roberts
12
13
14
15      SUBSCRIBED and SWORN to before me this _____
     day of _____, 2011, in the jurisdiction
16   aforesaid.
17
18
19
20   _____   _____
     My Commission Expires    Notary Public
21
22
23
24
25
```

160

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2       I, Juanita Harris Schar, RMR, CCR, CRR, a
     Notary Public for the Commonwealth of Virginia at
 3   large, of qualification in the Circuit Court of the
     City of Virginia Beach, Virginia, and whose commission
 4   expires April 30, 2014, do hereby certify that the
     within named deponent, B. J. ROBERTS, appeared before
 5   me at Virginia Beach, Virginia, as hereinbefore set
     forth, and after being first duly sworn by me, was
 6   thereupon examined upon his oath by counsel for the
     respective parties; that such examination was recorded
 7   in Stenotype by me and reduced to computer printout
     under my direction; and that the foregoing constitutes
 8   a true, accurate, and complete transcript of such
     examination to the best of my ability.
 9
10       I further certify that I am not related to
     nor otherwise associated with any counsel or party to
11   this proceeding, nor otherwise interested in the event
     thereof.
12       Given under my hand and notarial seal this
13   5th day of October, 2011, at Virginia Beach, Virginia.
14
15
16   -----------------
             Notary Public
17
     Certified Court Reporter No. 0313085
18
19
20
21
22
23
24
25
```

41 (Pages 158 to 160)