IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

-------------------------------------
BOBBY BLAND, DANIEL RAY CARTER, JR.,
DAVID W. DIXON, ROBERT W. McCOY,
JOHN C. SANDHOFER, and
DEBRA H. WOODWARD,

        Plaintiffs,             CASE NO.
                              4:11-CV-45
v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

        Defendant.
-------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF KAREN BOWDEN,
TAKEN ON BEHALF OF THE PLAINTIFFS

Virginia Beach, Virginia

October 4, 2011

Appearances:

        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
        By: JAMES H. SHOEMAKER, JR., ESQUIRE
            Counsel for the Plaintiffs

        PENDER & COWARD
        By: JEFF W. ROSEN, ESQUIRE
            Counsel for the Defendant

Exhibit 2

**2**

```
 1              I N D E X
 2
   DEPONENT        EXAMINATION BY        PAGE
 3
   KAREN BOWDEN    Mr. Shoemaker          3
 4
 5
 6
 7              EXHIBITS
 8
   NO.  DESCRIPTION                    PAGE
 9
   None
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1           Deposition upon oral examination of KAREN
 2  BOWDEN, taken on behalf of the Plaintiffs before
 3  Juanita Harris Schar, RMR, CCR, CRR, a Notary Public
 4  for the Commonwealth of Virginia at large, commencing
 5  at 2:56 p.m. on October 4, 2011, at the law offices of
 6  Pender & Coward, 222 Central Park Avenue, Suite 400,
 7  Virginia Beach, Virginia; and this in accordance with
 8  the Federal Rules of Civil Procedure.
 9           - - - - -
10           KAREN BOWDEN, was sworn and deposed on
11  behalf of the Plaintiffs as follows:
12
13           EXAMINATION
14  BY MR. SHOEMAKER:
15      Q.   Ma'am, could you state your full name for
16  the record, please?
17      A.   Yes. Karen E. Bowden.
18      Q.   All right. And, ma'am, could you give us
19  your home address, please?
20      A.   Yes. 309 Dunn Circle, City of Hampton,
21  Virginia, 23666.
22      Q.   Ma'am, my name is Jamie Shoemaker. I'm an
23  attorney. I represent the plaintiffs Bobby Bland,
24  Debbie Woodward, John Sandhofer, Wayne McCoy, David
25  Dixon, and Danny Carter in a suit that's been filed in
```

**4**

```
 1  the United States District Court for the Eastern
 2  District of Virginia against Sheriff Roberts, alleging
 3  violations of their First Amendment rights.
 4           The testimony you're about to give today is
 5  a deposition. It is sworn testimony and it bears the
 6  same weight and dignity as if we were in a mahogany-
 7  walled courtroom in downtown Norfolk. So it's
 8  important that we build as clear a record as possible.
 9  To that end, I'm going to ask you to wait until I
10  complete my questions before you begin speaking.
11           Now, sometimes, as I've shown this
12  afternoon, I can be an offender of this. I'll start
13  speaking before you finish. Sometimes the witness will
14  start speaking before I finish. When that happens, she
15  can't take that down. So it's important that we both
16  wait until each other are finished before we begin
17  speaking.
18           To that same end, you can't -- you've got
19  to verbalize your answer. You can't say "uh-huh" and
20  "uh-uh." You can't shake your head because she can't
21  take that down either. So you have to verbalize your
22  answer.
23           Are you under any conditions here today
24  that would affect your ability to understand my
25  questions and to answer them fully and truthfully?
```

**5**

```
 1      A.   No.
 2      Q.   Okay. Ma'am, how long have you been
 3  employed by the Hampton sheriff's office?
 4      A.   27 years.
 5      Q.   And how long have you held the rank of,
 6  say, lieutenant or above? When were you promoted?
 7  Were you ever a lieutenant?
 8      A.   Yes.
 9      Q.   When was that?
10      A.   I'm not sure of the year.
11      Q.   Well, let me ask it a different way. How
12  long have you been a colonel?
13      A.   Since 1998.
14      Q.   And as a colonel, have you always been the
15  second-highest-ranking officer within the sheriff's
16  department?
17      A.   As the colonel?
18      Q.   Yes.
19      A.   Yes.
20      Q.   And what are your duties as the colonel in
21  the sheriff's department?
22      A.   Responsible for the overall operation of
23  the sheriff's office.
24      Q.   So, basically, your duties encompass
25  everything the sheriff is statutorily charged to do?
```

6

1      MR. ROSEN: Well, object to the form of the
2  question.
3
4  BY MR. SHOEMAKER:
5      Q.   I'll withdraw it and ask it a different
6  way. Is there any aspect of the sheriff's office you
7  don't have anything to do with?
8      A.   I'm not sure if I understand that.
9      Q.   Well, I guess it's a -- not an artfully
10 worded question, I suppose.
11         Basically, do you assist the sheriff in
12 running the department in all its phases; human
13 resources, corrections, civil process, courtroom
14 security?
15     A.   Yes.
16     Q.   Okay. And you can't think of an element or
17 phase of the sheriff's office that you have nothing to
18 do with?
19         MR. ROSEN: I object to the form of the
20 question. You can answer it if you can.
21     A.   No.
22
23 BY MR. SHOEMAKER:
24     Q.   All right. Ma'am, do you communicate with
25 your fellow senior officers by e-mail?

7

1      A.   Yes.
2      Q.   And do you do that from a desktop in the
3  office?
4      A.   Yes.
5      Q.   Do you ever do that from home?
6      A.   No.
7      Q.   Do you have a computer at home?
8      A.   Yes.
9      Q.   Do you ever use your computer at home in
10 assisting Sheriff Roberts with his campaign activities?
11     A.   Yes.
12     Q.   You assisted Sheriff Roberts with his 2009
13 campaign; is that correct?
14     A.   Yes.
15     Q.   And did you assist him with his 2005
16 campaign?
17     A.   Yes.
18     Q.   And how about his 2001 campaign?
19     A.   Yes.
20     Q.   What kind of communications do you write
21 from your home computer?
22         MR. ROSEN: Object as to relevance. Go
23 ahead and answer it if you can.
24     A.   Restate that, please.
25

8

1  BY MR. SHOEMAKER:
2      Q.   You said from time to time you use your
3  home computer to write e-mails regarding Sheriff
4  Roberts' campaign activities. Give me some examples of
5  how you might do that.
6          MR. ROSEN: Again -- you can answer.
7  Again, I object. I object to relevance. Go ahead and
8  answer the question.
9      A.   Just campaign reports.
10         MR. SHOEMAKER: You know what we just
11 forgot to do? We've got to -- do we have a -- can we
12 have a stipulation about these questions I wanted to
13 ask on the paragraph 15?
14         MR. ROSEN: Yes. Yes. Go off the record
15 for a second.
16
17         (Discussion off the record.)
18
19         MR. SHOEMAKER: We're going to go back on
20 the record. I'm going to recite the stipulation and,
21 Jeff, correct me if I'm wrong.
22         During Sheriff Roberts' deposition it had
23 been my intent to ask the sheriff questions related to
24 our allegations in paragraph 15 of the complaint. Jeff
25 chose to exercise his right to terminate the deposition

9

1  or not allow questions on those subjects, pending his
2  right to bring the issue before the Court and have the
3  Court determine whether or not those questions were
4  appropriate for a deposition.
5          Did I state that correctly?
6          MR. ROSEN: That's fine. That's accurate.
7          MR. SHOEMAKER: We have stipulated we will
8  put the issue before the Court and depending on which
9  way the Court rules, we may or may not continue Sheriff
10 Roberts' deposition.
11         MR. ROSEN: On those limited issues.
12         MR. SHOEMAKER: Right.
13
14 BY MR. SHOEMAKER:
15     Q.   Okay. Going back to you, Colonel Bowden, I
16 was asking you, could you give me examples of the types
17 of e-mails you might send from your home computer in
18 support of Sheriff Roberts' campaign.
19     A.   I would like to correct that. They are not
20 correspondence. I've done campaign reports on my home
21 computer.
22     Q.   All right. And do you e-mail those
23 somewhere?
24     A.   No.
25     Q.   Do you ever send any e-mails from your home

3  (Pages 6 to 9)

10

1  computer related to Sheriff Roberts' campaigns?
2      A.   No.
3      Q.   You've never done that?
4      A.   No.
5      Q.   Ma'am, I'm probably going to subpoena your
6  computer.  You've never done that?
7      A.   No.
8      Q.   Okay.  Have you ever sent any e-mails
9  related to Sheriff Roberts' campaign from your office
10 computer?
11     A.   No.
12          MR. ROSEN:  Again, I object to this line of
13 questioning as to relevance.  Go ahead.
14
15 BY MR. SHOEMAKER:
16     Q.   The answer is no?
17     A.   No.
18     Q.   You've never done that?
19     A.   No.
20     Q.   Have you ever received any e-mails from
21 anyone on your office computer related to Sheriff
22 Roberts' reelection campaigns?
23     A.   Not to my knowledge.
24     Q.   Ma'am, I'm going to show you a document
25 that's previously been marked Plaintiff's Exhibit 1.

11

1       If you wouldn't mind taking a look at that.
2  I apologize, but the pages after page one are all
3  numbered 11.  I want you to flip into it about one,
4  two, three, four -- four pages into it.
5       First of all, take a minute to review the
6  document, especially to review the requests for
7  production from this point to the end of the document.
8          MR. ROSEN:  The only caveat on this is we
9  may have filed an objection to this request.  So I
10 don't know if we did or not.  We probably did, I
11 suspect, so we -- I don't know if we resolved those
12 objections, so if there's an objection, I stand on the
13 objection.
14         MR. SHOEMAKER:  Okay.
15         MR. ROSEN:  Is your question with respect
16 to number three?
17
18 BY MR. SHOEMAKER:
19     Q.   Yes.  Have you ever seen this document
20 before?
21     A.   Yes.
22     Q.   When was the first time you saw it?
23     A.   An actual date?
24     Q.   Well, roughly.  Was it more than three
25 weeks ago, more than a month ago?

12

1      A.   About a month ago.
2      Q.   Did you perform a search of e-mails in
3  conjunction with your -- Sheriff Roberts testified that
4  he put you in charge of gathering documents.  Is that
5  correct?
6      A.   Yes.
7      Q.   Did you perform any e-mail searches when
8  you were gathering documents?
9      A.   Yes.
10     Q.   What e-mail searches did you perform?  What
11 systems did you check?
12     A.   I called over to the city and advised them
13 about the pending lawsuit and that I would need
14 documents -- I would need anything on the plaintiffs.
15 Because their accounts had been closed.  That's the
16 search that I did, conducted.
17     Q.   Did you ask the city -- does the city
18 control your e-mail servers?
19     A.   Yes.
20     Q.   Did you ask them for any e-mails?
21     A.   I did.
22     Q.   Do you remember what e-mails you asked them
23 for?
24     A.   I asked for all their e-mails from the --
25 from the plaintiffs.

13

1      Q.   From the plaintiffs?
2      A.   Yes.
3      Q.   Did you ask for any e-mails from the
4  sheriff?
5      A.   No.
6      Q.   Did you ask for any e-mails from anyone
7  else other than the plaintiffs?
8      A.   No.
9      Q.   So the City of Hampton maintains the server
10 that runs the sheriff's -- the e-mail within the
11 sheriff's department?
12     A.   That's correct.  Yes.
13     Q.   Do you know who at the city is responsible
14 for maintaining that server?
15     A.   The actual person?
16     Q.   Yes, ma'am.
17     A.   No.  No.
18     Q.   Do you know what -- is it the IT
19 department?
20     A.   It is the IT department.
21     Q.   Do you happen to know who runs the IT
22 department?
23     A.   Yes.
24     Q.   Who is that?
25     A.   Jim Conway.

14

1    Q.    Conway?
2    A.    Conway.
3    Q.    That's C-O-N-W-A-Y?
4    A.    Yes.
5    Q.    Would you have sent any e-mails to the
6  sheriff, from you to Sheriff Roberts, in the fall of
7  2009 about anything?
8    A.    No.
9    Q.    None?
10   A.    No.
11   Q.    You never use e-mail?
12   A.    Yes.
13   Q.    But you don't, apparently, communicate with
14  the sheriff with e-mail?
15   A.    Occasionally.
16   Q.    How is it -- you appear to be pretty
17  confident you didn't send any e-mails to the sheriff in
18  fall of 2009.
19        MR. ROSEN:  Okay.  I object to the form of
20  the question.  You can answer it.
21
22  BY MR. SHOEMAKER:
23   Q.    You seem to be fairly confident you didn't
24  send any e-mails to the sheriff in the fall of 2009.
25  Is that correct, you're confident you did not send any

15

1  e-mails to the sheriff in the fall of 2009?
2    A.    Regarding?
3    Q.    Regarding anything.
4    A.    I probably did send some e-mails regarding
5  the operation of the -- of the office.
6    Q.    Okay.  Back in the fall of '09 how often in
7  a typical week would you e-mail the sheriff?
8    A.    Not often.
9    Q.    Does that mean less than six times a week?
10   A.    Yes.
11   Q.    Is it less than three times a week?
12   A.    I don't have a number.  If there was, you
13  know, some business, some office business that I needed
14  to e-mail or something come in that he needs, I'll
15  e-mail it.  Maybe something from the Department of
16  Corrections or something from the comp board.
17   Q.    All right.  Would you ever e-mail the
18  sheriff about campaign election issues?
19   A.    No.
20   Q.    And that question -- with that question, I
21  mean would you ever e-mail him about campaign election
22  issues either from your home computer or from the
23  office computer.
24   A.    Office computer, no.  Home, I don't believe
25  so.

16

1    Q.    Back in the fall of 2009 would you have
2  e-mailed anyone else other than the sheriff about the
3  sheriff's campaign issues?
4    A.    From my home computer?
5    Q.    From either one.
6    A.    Office computer, no.  Home, no.
7    Q.    So you wouldn't send -- are there any other
8  computers you would use?
9    A.    I don't have any other computers.
10   Q.    You don't have any other computers?
11   A.    No.
12   Q.    So the only two computers you have access
13  to or that you used back in the fall of 2009 would have
14  been your home computer and your office computer?
15   A.    Yes.
16   Q.    By office computer, I mean the sheriff's
17  office computer.
18   A.    Yes.
19        MR. ROSEN:  You mean her computer in the
20  sheriff's office, is what you mean.
21        MR. SHOEMAKER:  Right.  Right.  Sorry.
22
23  BY MR. SHOEMAKER:
24   Q.    I mean your work computer in the sheriff's
25  office.

17

1    A.    Yes.
2    Q.    So back in the fall of 2009 you wouldn't
3  have e-mailed anybody about campaign issues at all?
4    A.    No.
5    Q.    Do you recall receiving any e-mails in the
6  fall of 2009 from anyone about the campaign?
7    A.    I don't recall.
8    Q.    Ma'am, I'm going to ask you a couple of
9  questions about the training that deputies go through.
10  Deputies in the Hampton sheriff's department attend
11  something called the basic jailer's course at the
12  Hampton Roads Regional Justice Training Academy; is
13  that correct?
14   A.    Yes.
15   Q.    They do not attend the basic law
16  enforcement officer's course at the Hampton Roads
17  Regional Justice Training Academy, do they?
18   A.    No.
19   Q.    The curriculum for the basic jailer's class
20  is approximately twice as long as the basic law
21  enforcement class; is that correct?
22   A.    Repeat that.  I'm sorry.
23        MR. ROSEN:  You have it reversed.
24
25

5  (Pages 14 to 17)

**18**

BY MR. SHOEMAKER:

1  Q.   I'm sorry.  Is the curriculum for the basic
2  law enforcement officer's class approximately twice as
3  long as the basic jailer's class?
4  A.   Yes.
5  Q.   Okay.  Ma'am, are you aware of any
6  sheriff's office employees ever having been disciplined
7  for using curse words when addressing another employee
8  of the department?
9  A.   Don't remember.
10  Q.   I'm going to ask you a hypothetical
11  question.  Are you familiar with the department's
12  disciplinary policies?
13  A.   Yes.
14  MR. ROSEN:  That's not hypothetical.
15
16
BY MR. SHOEMAKER:
17  Q.   That's not hypothetical.  You are familiar
18  with the department's disciplinary policies.  Is that
19  correct?
20  A.   Yes.
21  Q.   Is it fair to say that the sheriff's office
22  in Hampton employs gradations of discipline when
23  dealing with employees?  And by that I mean a first
24  offense may get a warning, a second offense may get

**19**

1  something more severe.  And I realize that's a very
2  general question, but do you understand what I mean by
3  gradations of discipline?
4  A.   Yes.
5  Q.   Okay.  So does the sheriff's office employ
6  gradations of discipline when dealing with its
7  employees?
8  MR. ROSEN:  Object to the form of the
9  question.  You can answer it.
10  A.   Based on the nature of the offense.
11
12  BY MR. SHOEMAKER:
13  Q.   Okay.  So by that answer you mean an
14  offense might warrant a verbal counseling, a second
15  offense might warrant something more severe.  Is that
16  fair?
17  A.   Yes.
18  Q.   I'm going to ask you a hypothetical.  If a
19  sheriff's department employee on the job told another
20  employee, quote -- and I apologize for the phrase, but,
21  quote, "Fuck you," end quote, what kind of discipline
22  would be meted out to that offending employee?
23  MR. ROSEN:  Objection, calls for
24  speculation.  You can answer if you can.
25  A.   We take an oath, and the oath is to be

**20**

1  professional at all times.  And in that oath, in that
2  Code, it deals with abusive, vulgar language.  That is
3  not tolerated.
4
BY MR. SHOEMAKER:
5
6  Q.   Okay.  So what would happen to an offending
7  employee in that circumstance?
8  A.   There could be some discipline.
9  Q.   What kind of discipline?
10  A.   Anything from a warning to a termination.
11  Q.   What sort of circumstances would militate
12  in favor of a warning as opposed to a termination?
13  MR. ROSEN:  Objection, calls for
14  speculation.  You can answer.
15  A.   Repeat that, please.
16
17  BY MR. SHOEMAKER:
18  Q.   I'm going to ask you about what sort of
19  circumstances might militate in favor of a lighter
20  punishment as opposed to a heavier punishment.
21  MR. ROSEN:  What do you mean by militate?
22  I don't understand.
23
24  BY MR. SHOEMAKER:
25  Q.   I mean that might tend to cause you to mete

**21**

1  out a lighter punishment rather than a heavier
2  punishment.  So with respect to circumstances that
3  might cause the department to mete out a lighter
4  punishment, would a first offense cause the department
5  to potentially mete out a lighter punishment?
6  MR. ROSEN:  Same objection.  You can
7  answer.
8  A.   Not necessarily.
9
10  BY MR. SHOEMAKER:
11  Q.   Okay.  Well, what sort of factors would
12  come into play?
13  A.   Again, it goes back to the Code, and the
14  Code states that we're professionals and we are to
15  carry ourselves in a professional manner at all times.
16  To include our language, down to our dress.
17  Q.   Okay.  If an employee used the type of
18  language I just referenced, is it possible that
19  employee might just get a verbal counseling?
20  A.   Are we...?
21  Q.   Talking about on the job.  One employee
22  tells another employee: F--- you.
23  MR. ROSEN:  In some circumstances is it
24  possible?
25  THE DEPONENT:  Yes.

22

BY MR. SHOEMAKER:
2  Q.   What sort of circumstances would you
3  consider in meting out just a verbal counseling for
4  that sort of statement?
5            MR. ROSEN:  Same objection.  You can answer
6  it.
7  A.   The vulgar language...
8       I lost the question.
9

10  BY MR. SHOEMAKER:
11  Q.   I had asked you whether or not it might be
12  possible for the department to mete out, say, a verbal
13  counseling punishment for this phrase, and I asked you
14  what circumstances might cause the department to mete
15  out that lighter form of punishment.
16  A.   I can't think of a circumstance.
17  Q.   But you think some circumstances might
18  exist to warrant that?
19  A.   No.
20  Q.   I'm sorry?
21  A.   No.
22  Q.   You can't think of any circumstances that
23  would --
24  A.   No.
25  Q.   -- support just a verbal?

23

1  A.   No.
2  Q.   Okay.  So you think an employee would
3  receive at least some sort of formal discipline?
4  A.   Yes.
5  Q.   What would those disciplines range between?
6            MR. ROSEN:  Objection, asked and answered.
7  You can tell him again.
8            MR. SHOEMAKER:  You know, you're right.
9  I'll withdraw the question.
10
11  BY MR. SHOEMAKER:
12  Q.   Have you ever known any employees of the
13  Hampton sheriff's office to be disciplined for any
14  infractions involving dishonesty?
15  A.   Yes.
16  Q.   Tell me about what you can remember in that
17  regard.
18  A.   Falsifying reports.
19  Q.   Who did that?
20  A.   Perchard (phonetic).
21  Q.   Perchard?
22  A.   Perchard.
23  Q.   Is that a last name?
24  A.   That's the last name.  I was trying to
25  think of the first name, but I can't.  Don't remember.

24

1            MR. ROSEN:  All you can do is answer what
2  you remember.
3
4  BY MR. SHOEMAKER:
5  Q.   Can you remember any other employee of the
6  sheriff's office being disciplined for some sort of
7  breach of integrity or some sort of dishonesty?
8            MR. ROSEN:  That's a different thing.  You
9  added breach of integrity and dishonesty.
10            MR. SHOEMAKER:  I'll leave it dishonesty
11  right now.
12            MR. ROSEN:  Okay.
13  A.   Yes, but I don't remember...
14            MR. ROSEN:  All of his questions are to the
15  best of your recollection.  So it's okay.  If you can't
16  remember, you can't remember.  It's to the best of your
17  recollection.
18  A.   I don't remember the name.
19
20  BY MR. SHOEMAKER:
21  Q.   Was it a man or woman?
22  A.   A man.
23  Q.   How long ago was it?
24            MR. ROSEN:  If you can remember.
25  A.   I don't remember.

25

1  BY MR. SHOEMAKER:
2  Q.   Was it within five years?
3  A.   No.
4  Q.   Was it within ten years?
5  A.   Within ten.
6  Q.   Within ten?
7  A.   Within ten.
8  Q.   Do you remember what the infraction was?
9  A.   Again, it was falsifying documentation.
10  Q.   Can you remember any other incidents where
11  an employee was disciplined for some level of
12  dishonesty?
13       While you're thinking, let's go off the
14  record for a second.
15
16       (Discussion off the record.)
17
18  BY MR. SHOEMAKER:
19  Q.   Back on the record.
20  A.   I don't remember names.
21  Q.   Do you remember another incident where you
22  just can't remember the name?
23  A.   And I'm not certain of the incident.
24  Q.   How long ago was this incident you're
25  thinking about?

7  (Pages 22 to 25)

26

```
1     A.    Maybe 2001.
2     Q.    What type of incident was it?
3     A.    Not securing an inmate.
4     Q.    Well, did he lie about it or...?
5           Was this a dishonesty thing or just some
6  other event?
7     A.    He didn't report it.
8     Q.    Do you remember who this was?
9     A.    I think the last name was Hill.
10    Q.    This was a female?
11    A.    A male.
12    Q.    And you're speaking of the didn't report
13 not securing the inmate?
14    A.    That's correct.
15    Q.    Okay.  Are there any other incidents of
16 dishonesty that you can remember?
17    A.    I can't remember.  I can't remember.
18    Q.    Okay.  Now, this Perchard, how long ago was
19 that?
20    A.    I'm not certain of the actual year.
21    Q.    Was it within the past five years?
22    A.    Within the past ten maybe.
23    Q.    Okay.  And what happened to Perchard?
24    A.    He was terminated.
25    Q.    And how about the second event, falsifying
```

27

```
1  documentation?  Do you know what happened to that
2  person?
3     A.    Yes.
4     Q.    What happened?
5     A.    Terminated.
6     Q.    And how about the person that didn't report
7  not securing the inmate?
8     A.    Terminated.
9     Q.    Can you remember any employees being
10 disciplined for acting inappropriately towards
11 prisoners?
12    A.    Yes.
13    Q.    Who can you remember being accused of doing
14 that?
15    A.    It was a female.  I don't remember her last
16 name.
17    Q.    Do you remember what she did?
18    A.    Yes.
19    Q.    What did she do?
20    A.    She gave the inmate a wedding ring, a ring.
21    Q.    A ring.
22    A.    A ring.
23    Q.    Was it a wedding ring?
24    A.    Yes.
25    Q.    Did they have a relationship?
```

28

```
1     A.    Yes.
2     Q.    What happened to her?
3     A.    She was terminated.
4     Q.    Any other incidents of employees acting
5  inappropriately towards prisoners?  You remember any
6  incidents of any sheriff's office employees being
7  verbally abusive to prisoners?
8     A.    I don't recall any.
9     Q.    Do you recall any sheriff's office
10 employees being disciplined for being insubordinate?
11    A.    I don't recall all the disciplinary
12 actions.
13    Q.    I understand.  I'm just asking what you do
14 recall.
15    A.    I don't recall.  I don't recall any
16 insubordination.
17    Q.    Do you recall any employees of the
18 sheriff's office getting DUIs?
19    A.    Yes.
20    Q.    Who do you recall getting a DUI?
21    A.    His name was Harry.
22          MR. ROSEN:  You have to speak up so she can
23 hear you.
24    A.    I think the first name was Harry.
25
```

29

```
1  BY MR. SHOEMAKER:
2     Q.    How long ago was this?
3     A.    Maybe '95, '94, '95.
4     Q.    Do you remember any other DUIs other than
5  that?
6     A.    I don't recall any.
7     Q.    That one you recalled, was he operating a
8  sheriff's office vehicle when it occurred or a
9  privately owned vehicle?
10    A.    Private.
11    Q.    Do you recall any serious traffic
12 infractions committed by any sheriff's office employees
13 while driving the sheriff's office vehicle?
14    A.    I don't recall any.  I don't remember.
15    Q.    Do you recall any sheriff's department
16 employees losing a weapon?
17    A.    Yes.
18    Q.    Who do you recall having lost a weapon?
19    A.    Gray.
20    Q.    Gray?
21    A.    Gray.  Last name Gray.
22    Q.    How long ago was that?
23    A.    Again, I don't remember the year, the
24 actual year that that occurred.
25    Q.    Was it more than five years ago?
```

8 (Pages 26 to 29)

30

1    A.    It was more than five.
2    Q.    Was it less than ten?
3    A.    I'm not sure.
4    Q.    Okay.  Do you remember what happened to
5    Gray as a result of that?
6          MR. ROSEN:  You mean disciplinary action?
7          MR. SHOEMAKER:  Yeah.
8    A.    No, I don't.
9
10   BY MR. SHOEMAKER:
11   Q.    Do you think his name was spelled G-R-A-Y?
12   A.    It was a female.
13   Q.    Female.  Do you think it was G-R-A-Y or
14   G-R-E-Y?
15   A.    A-Y.
16   Q.    All right.  Do you recall a Sergeant Ford
17   losing a weapon?
18   A.    It wasn't lost.
19   Q.    What happened to it?
20   A.    It was left in a vehicle.
21   Q.    Okay.  And what happened to him as a result
22   of that?
23   A.    Termination.
24   Q.    Can you think of any other events regarding
25   leaving a weapon in a vehicle or misplacing a weapon or

31

1    losing a weapon?
2    A.    No.
3    Q.    Can you think of any disciplinary actions
4    involving the loss of any equipment or sheriff's office
5    property?
6    A.    I don't recall any.
7    Q.    You have a grievance board at the sheriff's
8    department, right?
9    A.    Yes.
10   Q.    And what is the function of the grievance
11   board?
12   A.    To hear disciplinary matters.
13   Q.    And how often does the grievance board
14   convene?
15   A.    When there's a disciplinary issue.
16   Q.    Who sits on the grievance board?
17   A.    Accreditation manager.  A lieutenant, a
18   sergeant.  And a person from the administration --
19   Q.    Who's the --
20   A.    -- office.
21         I'm sorry.  From human resources.
22   Q.    Who's the accreditation manager?
23   A.    Lieutenant Harper.
24   Q.    And does Lieutenant Harper maintain the
25   records of all the grievance proceedings?

32

1    A.    No.
2    Q.    Who does that?
3    A.    Human resources.
4    Q.    With the City of Hampton or the sheriff's
5    office?
6    A.    Within the sheriff's office.
7    Q.    And who runs human resources?
8    A.    The director of administration, Captain
9    Unnoppet.
10   Q.    Captain Unnoppet.  Okay.
11         Can you recall the last grievance committee
12   that sat?
13   A.    Yes.
14   Q.    And what was that about?  What was the
15   subject of the grievance?
16   A.    Property that had not been -- inmate
17   property that had not been inventoried.
18   Q.    And who was the accused party in that
19   instance?
20   A.    That name slips my memory.
21   Q.    How long ago was this?
22   A.    A month.
23   Q.    Was it a man or a woman?
24   A.    A man.
25   Q.    Was it a deputy or a sergeant or

33

1    lieutenant?
2    A.    It was a deputy.
3    Q.    And do you remember, were they white or
4    black?
5          MR. ROSEN:  Objection as to relevance.  You
6    can answer it if you know.
7    A.    Black.
8
9    BY MR. SHOEMAKER:
10   Q.    And what was the person accused of?
11   A.    Not inventorying an inmate's property.
12   Q.    And was there some inmate property missing?
13   A.    It was not inventoried -- it wasn't
14   missing.  It was not on the -- on the inventory
15   property sheet.  And when the inmate was being
16   released, the jacket -- and I don't remember the full
17   details.  The releasing officer, in returning the
18   inmate's property, realized that it was a jacket in his
19   property that was not on the sheet.  Not on the
20   inventory sheet.
21   Q.    What happened to that person as a result of
22   that?
23   A.    There was a review of policy, of that
24   policy, and retraining.
25   Q.    What do the levels -- what are the levels

9 (Pages 30 to 33)

34

1  of discipline that might result from a type of
2  infraction?  I'm just going to take, you know, a
3  generic infraction.  What are the ranges of discipline?
4  I understand termination is one end of the range.
5  Verbal counseling may be at the other.  Can you tell me
6  from lightest punishment to most severe punishment what
7  the types of punishment are that are given out as a
8  result of infractions within the Hampton sheriff's
9  office?
10      A.    Verbal.
11      Q.    Okay.
12      A.    A suspension.
13      Q.    Is there maybe a written between verbal and
14  suspension?
15      A.    A written.  There could be a written.
16      Q.    What else?
17      A.    Demotion.
18      Q.    Anything else?
19      A.    And termination.
20      Q.    It sounded like retraining is one?
21      A.    Yes.  And training.
22      Q.    All right.  Can you remember any accidental
23  discharges of weapons that resulted in discipline?
24           MR. ROSEN:  Accidental discharges of
25  weapons?

35

1           MR. SHOEMAKER:  That resulted in
2  discipline.
3      A.    I don't recall any.
4
5  BY MR. SHOEMAKER:
6      Q.    All right.  Do you recall Sammy Mitchell
7  accidently discharging his weapon?
8      A.    Yes.
9      Q.    And, in fact, he did that twice?  Shot
10  himself in the hand twice?
11           MR. ROSEN:  Is that --
12      A.    I don't recall shooting himself in the hand
13  twice.
14
15  BY MR. SHOEMAKER:
16      Q.    Did he do it once?
17      A.    Yes.
18      Q.    Do you recall a second accidental discharge
19  regarding Mitchell?
20      A.    Yes.
21      Q.    Was he disciplined for either of those?
22      A.    I'm not sure.
23      Q.    Can you remember any deputies being
24  disciplined for improperly releasing an inmate?
25      A.    Yes.

36

1      Q.    Who can you remember being disciplined for
2  improperly releasing an inmate?
3      A.    Rose.  Lewis.
4      Q.    What's Lewis' first name?
5      A.    Harry.
6      Q.    Anyone else?
7      A.    Yes, there's been several, but I don't
8  remember all their names.
9      Q.    Would an early release of an inmate usually
10  result in a grievance hearing?
11      A.    Not necessarily.
12      Q.    Would it frequently result in a grievance
13  hearing?
14           MR. ROSEN:  Objection to the form of the
15  question.  You can answer if you can.
16      A.    Are you referring to the number of
17  grievances based on releases?
18
19  BY MR. SHOEMAKER:
20      Q.    I just want to know typically if there's an
21  early release, is it the type of infraction that
22  typically results in a grievance hearing?
23           MR. ROSEN:  Object to the form of the
24  question.  You can answer it.
25

37

1  BY MR. SHOEMAKER:
2      Q.    Does it happen half the time, most of the
3  time?  Does it happen just a small percentage of the
4  time?
5           MR. ROSEN:  If you can answer it.
6      A.    I'm not certain of the frequency, how
7  often.
8
9  BY MR. SHOEMAKER:
10      Q.    Okay.  I'm going to ask you a question I
11  asked before.  I'm sorry.  I'm asking because I forgot
12  the answer, or even if I got an answer.  Approximately
13  how many grievances are there a year?
14      A.    Grievance?
15      Q.    Yeah, grievance hearings.
16      A.    A grievance hearing?
17      Q.    I'm sorry.  Grievance panels.  The
18  grievances are reviewed by the panel you named earlier,
19  right?
20      A.    Disciplinary panel.
21      Q.    All right.  Disciplinary panel.  How many
22  disciplinary panels are there a year?  I'm sorry.
23  Approximately.
24      A.    Maybe six or seven.
25      Q.    And those records are kept by the human

10  (Pages 34 to 37)

38

1    resources office?
2        A.    Correct.
3        Q.    I'm just -- ma'am, I have no problem with
4    your taking all the time you need to answer questions,
5    but I just want to let the record reflect -- because I
6    have a certain limit of time that I'm allowed to have
7    with you and I'm concerned that I may have to go over
8    that time, I just want the record to reflect we began
9    your deposition at about 2:40 and it's now about five
10   minutes of 4:00.  And we're going kind of slow here,
11   and I don't -- I don't know whether I'm going to be
12   able to finish today.  But again, you have a right to
13   take whatever time you need to answer the question.
14           MR. ROSEN:  You're doing fine.  I mean,
15   just for the record, you're asking her, you know, every
16   grievance termination from the beginning of her time
17   with the sheriff's department.  You are asking her a
18   memory test, and so she's just trying to remember
19   details and answer your question fully.  There's
20   nothing wrong with that.
21           MR. SHOEMAKER:  Well, I agree she can take
22   whatever time she needs, but I may be entitled to some
23   dispensation because I think in this -- all this time
24   we've been here, I probably have three pages of
25   testimony.

39

1           MR. ROSEN:  You're doing perfectly fine.
2    Keep on doing what you're doing.
3           I mean, ask something else then.  Ask
4    something that doesn't require her to go through her,
5    you know, 25 years at the sheriff's department.
6
7    BY MR. SHOEMAKER:
8        Q.    Can you remember anyone else, any other
9    incidents, regarding accidental discharges of weapons
10   other than with -- other than Mitchell?
11       A.    I don't recall.
12       Q.    Do accidental discharges of weapons have to
13   be reported in any special way?
14       A.    Yes.
15       Q.    How are they reported specially?
16       A.    They have to be reported to the Department
17   of Corrections.
18       Q.    Okay.  And who's responsible for giving
19   that report?
20       A.    I am.
21       Q.    Do you have a file of accidental discharges
22   of weapons?
23       A.    Yes.
24       Q.    Roughly how many -- do you know roughly how
25   many incidents are in that file?

40

1        A.    No.
2        Q.    Is it more than three?
3        A.    I'm not sure, sir.
4        Q.    Is it a thick file or a thin file?
5        A.    Thin file.
6        Q.    But sitting here today, the only person you
7    can remember within the sheriff's office ever having an
8    accidental discharge is Sammy Mitchell?
9           MR. ROSEN:  Object to the form of the
10   question.  You can answer if you can.
11
12   BY MR. SHOEMAKER:
13       Q.    Sammy Mitchell is the only person you can
14   ever remember -- that you can remember --
15       A.    That I can remember.
16       Q.    Off the top of your head sitting here
17   today, Sammy Mitchell is the only person you can
18   remember in the sheriff's office ever having an
19   accidental discharge of a weapon?
20       A.    That I can remember, yes.
21       Q.    Fair enough.  You think there may be others
22   but you can't remember, sitting here today?
23       A.    Correct.
24       Q.    Okay.  Can you remember any firings within
25   the sheriff's department that were made for cause other

41

1    than the ones you've told me about here a moment ago?
2    Having primarily to do with the dishonesty question.
3           MR. ROSEN:  Object to the form of the
4    question.  You can answer it if you can.
5        A.    Repeat the question again, please.
6
7    BY MR. SHOEMAKER:
8        Q.    Can you remember any other firings of
9    sheriff's office personnel for cause?  And I'll take
10   Mr. Rosen's advice here and I'm going to limit this
11   question to within the past five years.  Any other
12   firings for cause within the Hampton sheriff's office
13   within the past five years?  And I'll say other than
14   the ones you've told me about, other than the ones
15   you've told me about already.
16       A.    For cause.
17       Q.    Uh-huh.
18           MR. ROSEN:  I object to the form of the
19   question to the extent that it requires cause.  You can
20   answer it.
21       A.    Yes.
22
23   BY MR. SHOEMAKER:
24       Q.    Okay.  What other firings for cause can you
25   remember?

11 (Pages 38 to 41)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

42

1    A.    Not reporting to duty.
2    Q.    Not reporting to duty?
3    A.    Uh-huh.
4    Q.    And who was that?
5    A.    I'm not sure of that person's name.  And
6  then we had another one for not completing the academy.
7  Within the last five years.
8    Q.    You think there have only been two
9  terminations for cause within the last five years?
10    A.    It's probably some more, but I just can't
11  remember their names.
12    Q.    Ma'am, who was most involved other than the
13  sheriff with getting the sheriff's office ACA
14  accreditation and the CALEA accreditation?  Other than
15  the sheriff, who worked on that the most?
16    A.    The accreditation manager.
17    Q.    Who was that?
18    A.    Harper.  Lieutenant Harper.
19    Q.    Is that a lady?
20    A.    Yes, it is.
21    Q.    What's her first name?
22    A.    Virginia.
23    Q.    How long has she been with the sheriff's
24  office?
25    A.    About 12 years.

43

1    Q.    Okay.  Do you remember there coming a time
2  when it was learned that Danny Carter was on Facebook
3  supporting Jim Adams?
4        MR. ROSEN:  I object to the form of the
5  question.  You can answer it if you can.
6    A.    Yes.
7
8  BY MR. SHOEMAKER:
9    Q.    And when do you remember learning about
10  that?
11    A.    I don't remember when, the exact time.
12    Q.    Does it refresh your recollection, did that
13  happen in late August, early September, 2009?
14    A.    I'm not sure what time frame.
15    Q.    Okay.  But some time in fall 2009?
16        MR. ROSEN:  Well, I object to the form of
17  the question.  If she doesn't know, she says she can't
18  remember so...
19
20  BY MR. SHOEMAKER:
21    Q.    Do you think it was some time in the fall
22  of 2009?
23    A.    Yes.
24    Q.    Do you think it was some time prior to the
25  election day in November, 2009?

44

1    A.    Yes.
2    Q.    How did you learn about it?
3    A.    I think another officer informed me or told
4  me about it.
5    Q.    Was that Major Richardson?
6    A.    No.
7    Q.    Who was it?
8    A.    Major Wells-Major.
9    Q.    And do you know how she learned about it?
10    A.    No, I don't.
11    Q.    And what did you do when you learned about
12  it?
13    A.    I may have told the sheriff.
14    Q.    Did you -- did you also learn that Wayne
15  McCoy was on Jim Adams' Facebook page about the same
16  time?
17    A.    Yes.
18    Q.    Is it possible you told the sheriff about
19  that as well?
20        MR. ROSEN:  Objection, calls for
21  speculation.  You can answer if you can.
22
23  BY MR. SHOEMAKER:
24    Q.    Did you tell the sheriff about that as
25  well?

45

1    A.    Maybe, yes.
2    Q.    How did the sheriff react to that?
3    A.    There was no reaction.
4    Q.    Did he respond to you at all when you told
5  him that these two men were on Facebook supporting his
6  opponent?
7        MR. ROSEN:  Object to the form of the
8  question.  That's not what she said.  But you can
9  answer it.
10
11  BY MR. SHOEMAKER:
12    Q.    Did he respond at all when you told him
13  what you told him about the Facebook issue?
14    A.    I don't re -- I don't believe he did.
15    Q.    Did you -- did there come a time when you
16  learned any other department office employees or
17  sheriff office employees were on Jim Adams' Facebook
18  page?
19    A.    No.
20    Q.    Did you pull up Jim Adams' Facebook page
21  when Wells-Major told you about this?
22    A.    No.
23    Q.    Did Wells-Major pull it up?
24    A.    I don't believe she did.
25    Q.    Did you ever look at Jim Adams' Facebook

ADAMS HARRIS REPORTING, INC.
(757)631-0458

46

1  page on your computer?
2      A.   On my home computer.
3      Q.   On your home computer?
4      A.   Yes.
5      Q.   And when did you look at his Facebook page
6  on your home computer?
7          MR. ROSEN: I object to relevance.  You can
8  go ahead and answer.
9      A.   I don't remember every time I looked it up.
10
11 BY MR. SHOEMAKER:
12     Q.   Okay.
13     A.   I did look at it.
14     Q.   You were involved in helping the sheriff
15 get reelected in the fall of 2009, correct?
16     A.   Yes.
17     Q.   And so it's only natural that you'd be
18 keeping tabs of the opponent.  Is that also correct?
19         MR. ROSEN: Object to the form of the
20 question.
21     A.   Not keeping tabs, but I did look at the
22 Facebook, look at his Facebook.
23
24 BY MR. SHOEMAKER:
25     Q.   Okay.  Did there come a time when you

47

1  learned of a cookout in late August of 2009 that was
2  attended by Danny Carter, John Sandhofer, and Wayne
3  McCoy?  And Jim Adams.
4      A.   Of a cookout?
5      Q.   Right.  Or a party.
6      A.   A party, yes.
7      Q.   And what did you learn in that regard?
8      A.   That the party had occurred.  It was a
9  birthday party.  And that Adams had attended, but it
10 was not the person that informed me, which was Larkins,
11 that it was not -- Adams was not her guest.
12     Q.   Okay.  Did you ever see Facebook pictures
13 of the people at that party?
14     A.   No.
15     Q.   Did you ever have any conversations with
16 Major Wells-Major about that party and who attended?
17     A.   No.
18     Q.   Did you ever have any conversations with
19 Major Richardson about who attended that party?
20     A.   No.  I don't think so.
21     Q.   Did you ever become aware that pictures of
22 that cookout were on -- on either Danny Carter's or Jim
23 Adams' Facebook page?
24     A.   No.
25         MR. SHOEMAKER: Jeff, I would ask her the

48

1  same line of questions about our allegations in
2  paragraph 15 of the complaint about campaign activities
3  on, you know, public time in public places and
4  involvement of sheriff's office employees.  My
5  understanding is that you would exercise your right to
6  terminate the deposition and seek a Court's ruling
7  before allowing your witnesses to answer this question.
8          MR. ROSEN: Correct.
9          MR. SHOEMAKER: All right.  So we have a
10 stipulation that rather than going through that
11 rigamarole of me asking a bunch of questions you ask
12 her not to answer, we are going to place this issue
13 before the Court and get a Court's ruling on whether or
14 not this line of questioning is appropriate.
15         MR. ROSEN: That's fine with me.
16         MR. SHOEMAKER: All right.
17
18 BY MR. SHOEMAKER:
19     Q.   Did you attend any debates in the fall of
20 2009 between the sheriff candidates?
21     A.   Yes.
22     Q.   Do you recall seeing John Sandhofer at any
23 of those debates?
24     A.   Yes.
25     Q.   Do you recall ever seeing him attend those

49

1  debates with a female in his company?
2      A.   No.
3      Q.   Did you -- have you ever met -- did you
4  ever meet the girl John Sandhofer was living with in
5  the fall of 2009?
6      A.   No.
7      Q.   Have you ever met anyone named Jennifer
8  Strube (phonetic)?
9      A.   No.
10     Q.   Who is Frances Pope?
11     A.   She works at the Hampton sheriff's office.
12     Q.   And how long had she been employed by the
13 Hampton sheriff's office?
14     A.   Maybe less than five years.  Three years.
15     Q.   And is she a deputy?
16     A.   Yes, she is.
17     Q.   Has she ever been disciplined for anything?
18     A.   No.
19         MR. ROSEN: Objection to relevance.  You
20 can answer.
21     A.   No.
22
23 BY MR. SHOEMAKER:
24     Q.   In the fall of 2009 some sheriff's office
25 employees got involved in the sheriff's campaign; is

13  (Pages 46 to 49)

50

1      that correct?
2          A.      Yes.
3          Q.      And by get involved, some of them handed
4      out literature; is that correct?
5          A.      Yes.
6          Q.      Some of them helped put up yard signs; is
7      that correct?
8          A.      Yes.
9          Q.      Some of them went to the fundraising event,
10     the golf tournament; is that correct?
11         A.      Yes.
12         Q.      Some of them sold tickets for the golf
13     tournament; is that correct?
14         A.      Yes.
15         Q.      Now, in 2009 you never saw Danny Carter
16     taking an active participatory role in Sheriff Roberts'
17     reelection campaign, did you?
18         A.      Not to my knowledge, no.
19         Q.      And in 2009 you never saw John Sandhofer
20     take an active participatory role in Sheriff Roberts'
21     campaign, did you?
22         A.      Not to my knowledge.
23         Q.      And in 2009 you never saw David Dixon take
24     an active participatory role in Sheriff Roberts
25     reelection campaign, did you?

51

1          A.      Not to my knowledge.
2          Q.      And in 2009 you never saw Robert W. McCoy,
3      Wayne McCoy, take an active participatory role in
4      Sheriff Roberts' reelection campaign, did you?
5          A.      Yes.
6          Q.      What did you see him do?
7          A.      Hand out fliers.
8          Q.      Where did you see him do that?
9          A.      Apartment complex on Mercury Boulevard.  I
10     don't remember the name of it.
11         Q.      Are you sure that wasn't 2005?
12         A.      No.
13         Q.      You're not sure?
14         A.      It was not.
15         Q.      Did you see him participate in Sheriff
16     Roberts' reelection campaign in any other way?
17         A.      Not that I remember, no.
18         Q.      Did you see Bobby Bland take any sort of
19     active participatory role in Sheriff Roberts'
20     reelection campaign in 2009?
21         A.      Not to my knowledge.
22         Q.      And you didn't see Debbie Woodward take an
23     active participatory role in Sheriff Roberts'
24     reelection campaign in 2009, did you?
25         A.      Not to my knowledge.

52

1          Q.      Now, in 2005 and earlier you had seen
2      Debbie Woodward take an active participatory role in
3      Sheriff Roberts' reelection campaigns, had you not?
4              MR. ROSEN:  Objection to the form of the
5      question.  You can answer it.
6          A.      I don't recall.
7
8      BY MR. SHOEMAKER:
9          Q.      You don't recall ever seeing Debbie
10     Woodward at the polls in 2005 or earlier?
11         A.      No.  I don't recall.
12         Q.      You don't recall her handing out literature
13     in 2005 or earlier?
14         A.      I don't recall.
15         Q.      Do you recall seeing Wayne McCoy take an
16     active participatory role in Sheriff Roberts'
17     reelection efforts in 2005 and prior campaigns?
18         A.      I don't remember.
19         Q.      Okay.  I will take about a 5-minute break.
20     We've been going almost two hours.
21             MR. ROSEN:  That's fine.  Let's take a
22     break.
23
24         (Recess)
25

53

1      BY MR. SHOEMAKER:
2          Q.      Let's go back on the record.
3              Ma'am, I'd like you -- these are
4      plaintiff's exhibits in front of you.  I'd like you to
5      flip to Plaintiff's Exhibit 3 and Plaintiff's
6      Exhibit 4.  That's 2 right there.  Let's start with 3.
7              Exhibit 3 would appear to be a
8      Civilian/Administrative Performance Evaluation Form for
9      Debbie Woodward.  Would you agree with me on that?
10         A.      Yes.
11         Q.      And the evaluation date here is January 19,
12     2009.  Would you also agree with that?
13         A.      Yes.
14         Q.      And if you flip to the last page, it looks
15     like Debbie signed this thing on January 23, 2009, and
16     Major Wells-Major signed this on January 27, 2009.  And
17     it reflects an overall performance rating of
18     outstanding for Ms. Woodward.  Do you see that?
19         A.      Yes.
20         Q.      Okay.  And then Plaintiff's Exhibit 4 is
21     another evaluation -- I'd like you to take a look at
22     it -- of Debbie Woodward, only it's for the previous
23     year.  The evaluation date is January 17, 2008, where
24     she also received an outstanding performance
25     evaluation.  Do you see that?

ADAMS HARRIS REPORTING, INC.
(757)631-0458

54

1    A.    Yes.
2    Q.    Now, did anybody ever voice to you any
3    complaints about Debbie Woodward's performance?
4    A.    During 2008 and '9?
5    Q.    Well, at any time.
6    A.    No.
7    Q.    Okay. No one ever described Debbie
8    Woodward as incompetent in your presence?
9    A.    I'm not certain.
10   Q.    You don't remember that, sitting here
11   today?
12   A.    No. No.
13   Q.    The answer is no?
14   A.    I don't remember.
15   Q.    Did you ever hear Debra Davis say that she
16   thought Debbie Woodward was incompetent?
17   A.    She made reference to her work. She did.
18   The position that she was in, that she couldn't do the
19   -- do the job. I can't remember if she used
20   "incompetent."
21   Q.    When was that?
22   A.    That was prior to her being moved to the
23   training -- training position, I believe.
24   Q.    All right. Was Debbie Woodward generally
25   regarded as a good, productive employee in '08 and '09?

55

1    A.    I'm not certain. I don't know.
2    Q.    Did Sheriff Roberts ever come to you and
3    seek your input before his decision not to reappoint
4    Debbie Woodward? Seek input about Debbie Woodward
5    before his decision not to reappoint her.
6    A.    It was not just my input.
7    Q.    Whose input did he seek?
8    A.    It was the major's and the captain, I
9    believe was in there.
10   Q.    Which captain?
11   A.    I believe Captain McGee was in the meeting.
12   Q.    When did this meeting take place?
13   A.    It was a staff meeting.
14   Q.    And do you remember when it took place?
15   A.    The actual date and time, no, I don't.
16   Q.    Do you remember roughly when it was?
17   A.    It was some time in late November.
18   Q.    Of 2009?
19   A.    2009.
20   Q.    What were the criteria being employed to
21   determine who would not be reappointed?
22   A.    The discussion was in regards to the
23   overall operation of the office, on the staffing level,
24   the budget restraint shortfalls. Personnel issues.
25   Q.    Was loyalty to the sheriff one of the

56

1    issues that came up in that meeting?
2    A.    No.
3    Q.    What other issues were there?
4    A.    The issues dealt with overall operation of
5    the office, the budget issues, the staffing level, the
6    possibility of the loss of deputies' positions. I
7    think that's it.
8    Q.    But what criteria were employed in the
9    selection of the people who were not reappointed? Was
10   it performance evaluation scores, was it discipline?
11   What was it?
12   A.    We didn't set criteria. We looked at the
13   overall operation of the office.
14   Q.    But when you were discussing people to not
15   reappoint, did you look at their evaluations?
16   A.    Now, the majors, when they dealt with their
17   personnel, they dealt with the issues or concerns that
18   they were having, the disciplinary issues that -- that
19   they were aware of. We didn't bring disciplinary forms
20   to the meeting, if that's what you're asking.
21   Q.    Okay. So what I am inferring from what
22   you're telling me is that the majors selected people
23   they were having discipline problems with for possible
24   not reappointment. Is that fair?
25         MR. ROSEN: I object to the form of the

57

1    question. You can answer that.
2    A.    They've had some issues. They've had some
3    problems, yes.
4
5    BY MR. SHOEMAKER:
6    Q.    Okay. So basically -- all right. These
7    were employees that the majors were having problems
8    with and that's how they got on the table to consider
9    for nonreappointment? Is that correct?
10   A.    Yes.
11   Q.    All right. Most, in fact, probably all, of
12   these six plaintiffs probably worked for a supervisor
13   between the majors and them, at least one, right?
14   Woodward didn't work directly for a major, right?
15   A.    No.
16   Q.    She worked for some other supervisor,
17   correct?
18   A.    That's correct.
19   Q.    Bland didn't work directly for a major. He
20   worked for some other supervisor, correct?
21   A.    Bland worked for Major Wells-Major.
22   Q.    Directly?
23   A.    Yeah.
24   Q.    He didn't have another supervisor?
25   A.    Yes.

15 (Pages 54 to 57)

58

1    Q.    All right.  Did Dixon have -- did Dixon
2  work directly for a major or did he report to another
3  supervisor?
4    A.    Another supervisor.
5    Q.    Do you remember who he reported to?
6    A.    No.
7    Q.    Sandhofer didn't report directly to a
8  major.  Did he?  He reported to another supervisor,
9  correct?
10    A.    Correct.
11    Q.    And Danny Carter didn't report directly to
12  a major.  He reported to another supervisor, a
13  lower-ranking supervisor, correct?
14    A.    Yes.
15    Q.    In fact, in all these instances where there
16  was another supervisor, it was a lower-ranking
17  supervisor, correct?
18    A.    Yes.
19    Q.    And Robert McCoy didn't report directly to
20  a major.  He reported to another lower-ranking
21  supervisor, correct?
22    A.    Yes.
23    Q.    Major Wells-Major and Major Richardson and
24  Captain McGee, did they assist Sheriff Roberts in his
25  reelection efforts in fall of 2009?

59

1    A.    Yes.
2    Q.    And how did they assist Sheriff Roberts in
3  his reelection efforts in the fall of 2009?
4    A.    Literature drops.  Poll work.  And some
5  other events.  I can't remember it all.
6    Q.    And they all did these things?
7    A.    Yes.  To my knowledge, yes.
8    Q.    Did they also go around selling tickets to
9  the golf tournament?
10    A.    Did they sell tickets?
11    Q.    Did they go around distributing tickets to
12  the employees for the golf tournament?
13    A.    The three?
14    Q.    Yes.
15    A.    No.
16    Q.    They didn't do any of that?
17    A.    The tickets was Major Richardson.
18    Q.    Major Richardson took the tickets around?
19    A.    Major Richardson was responsible for the
20  tickets, yes.
21    Q.    Did the three of them go out to try to
22  recruit sheriff's office employees to assist with the
23  sheriff's reelection campaign in 2009?
24    MR. ROSEN:  Object to the form.  You can
25  answer the question if you can.

60

1  BY MR. SHOEMAKER:
2    Q.    Let me take it bite by bite.  Did Major
3  Wells-Major go around to recruit sheriff's office
4  employees to assist in the 2009 reelection effort?
5    MR. ROSEN:  Objection to the form of the
6  question.  You can answer it.
7    A.    Not to my knowledge.
8
9  BY MR. SHOEMAKER:
10    Q.    Did Major Wells -- did I just say Major
11  Wells-Major?
12    A.    You did.
13    Q.    Did Major Richardson go around to try to
14  get sheriff's office employees involved in the
15  sheriff's 2009 election campaign?
16    A.    Yes.
17    Q.    And what do you remember him doing in that
18  regard?
19    A.    The major helped with the signs.
20    Q.    He helped get employees to help with the
21  signs?
22    A.    Yes.
23    Q.    Did Captain McGee do anything to get the
24  employees to assist in the reelection effort?
25    A.    I don't recall.

61

1    Q.    Did you do anything to get the employees of
2  the sheriff's office to help with the reelection
3  effort?
4    A.    Yes, I called employees to help with the
5  poll.  At the polls.
6    Q.    Okay.  How many employees do you remember
7  calling to help with the polls?
8    A.    I don't remember how many I called.
9    Q.    Do you remember Debbie Woodward telling you
10  she couldn't help with the polls that year?
11    A.    I don't recall calling Debra.
12    Q.    Do you remember John Sandhofer telling you
13  he couldn't help with the polls that year?
14    A.    I don't recall Sandhofer, no.
15    Q.    Do you have any records from that effort of
16  calling employees?  Do you have a call list or notes or
17  anything?
18    A.    Only the list I put together for the
19  attorney.
20    MR. ROSEN:  He's not asking for that.
21    MR. SHOEMAKER:  I might be asking for that.
22  A list of employees you called?
23    MR. ROSEN:  No.
24    THE DEPONENT:  No.
25    MR. ROSEN:  He's asking you -- hold on a

16  (Pages 58 to 61)

62

1    second. Okay.
2          You're asking for a list maintained at the
3    time?
4
5    BY MR. SHOEMAKER:
6    Q.    List or notes that you made at the time you
7    were making these calls to get people to help with the
8    polls. Any list you used or notes you made in that
9    effort. Do you have a file on that?
10   A.    No.
11   Q.    Did you ever have a file on that?
12   A.    I had poll -- yeah, a poll -- poll workers.
13   Q.    And what did you do with that list of poll
14   workers? You had notes on this list?
15   A.    No notes, just names of who was working
16   what polls.
17   Q.    And that's all you had, was a list of
18   names?
19   A.    Yes.
20   Q.    What about when you were making the calls?
21   Did you note on there yes/no, yes/no?
22   A.    I put them in the -- in the -- at the poll
23   they were going to work. They agreed to work.
24   Q.    All right. And how long did you have that
25   list?

63

1    A.    How long did I have it?
2    Q.    Yeah.
3    A.    For election day.
4    Q.    Then you threw it away?
5    A.    Yes.
6    Q.    Did you do anything else to get sheriff's
7    office employees involved in the election effort in
8    2009?
9    A.    No.
10   Q.    Did you attend the golf tournament?
11   A.    Yes.
12   Q.    Did you work the polls yourself?
13   A.    No.
14   Q.    What did you do on election day?
15         MR. ROSEN: Objection to relevance. You
16   can answer.
17   A.    Delivered meals.
18
19   BY MR. SHOEMAKER:
20   Q.    Delivered meals?
21   A.    Uh-huh.
22   Q.    To whom?
23   A.    To the poll workers.
24   Q.    Did you take that day off?
25   A.    Yes.

64

1    Q.    Do you remember roughly how many sheriff's
2    office employees you got to work the polls that day?
3    A.    No, I don't.
4    Q.    How many polls are there? Do you remember?
5    A.    Roughly 26.
6    Q.    And how many employees would you get to
7    work at each polling station?
8    A.    They're not all manned by employees.
9    Q.    Okay. Roughly, how many employees would
10   participate in that effort? Participated in that
11   effort in 2009, to the best of your memory.
12   A.    I don't know how many.
13   Q.    Would you have -- would poll workers work
14   the whole day or would you break them up into shifts?
15   A.    Shifts.
16   Q.    Shifts would be how long?
17   A.    Two hours.
18   Q.    How many poll workers did you typically
19   want at each poll?
20   A.    One each shift.
21   Q.    What percentage of your poll workers would
22   have been sheriff's office employees versus
23   nonsheriff's office employees?
24         MR. ROSEN: In 2009, you're asking?
25         MR. SHOEMAKER: Right, right.

65

1          MR. ROSEN: If you know.
2    A.    I don't know the percentage.
3
4    BY MR. SHOEMAKER:
5    Q.    Are there lists anywhere of who worked the
6    polls that day?
7    A.    Not to my knowledge.
8    Q.    Do you still have some of this stuff on
9    your computer? Is it possible there's still this list
10   on your computer?
11   A.    No, 'cause I -- it was a handwritten list.
12   Q.    How would you inform them of their shift
13   times?
14   A.    When I did the initial call.
15   Q.    How did -- have you told me -- how did
16   Captain McGee -- you said you didn't know whether or
17   not Captain McGee assisted in getting employees to join
18   the reelection effort?
19   A.    That's correct.
20   Q.    Did any other officers above the rank of
21   lieutenant help to recruit employees, help to get
22   employees to join in the reelection effort in 2009?
23   I'll take it -- I'll take it in smaller doses. Do you
24   remember Lieutenant Rich helping to get employees
25   involved in the election in 2009?

ADAMS HARRIS REPORTING, INC.
(757)631-0458

66

1      MR. ROSEN:  Objection to the form of the
2  question.  You can answer if you can.
3      A.    I don't recall.
4
5  BY MR. SHOEMAKER:
6      Q.    Do you remember Lieutenant Harry Lewis
7  helping to get sheriff's office employees involved in
8  helping with the election in 2009?
9      A.    I don't recall.
10     Q.    How about Lieutenant Mitchell?  Do you
11  remember Lieutenant Mitchell getting involved in
12  helping to recruit employees to get involved in the
13  reelection effort in 2009?
14     A.    I don't recall.
15     Q.    Do you remember Lieutenant Crystal Cook
16  helping to get employees of the department involved in
17  the reelection effort in 2009?
18     A.    I don't recall.
19     Q.    Did the sheriff ever ask you whether or not
20  you thought Debbie Woodward was supporting him in 2009?
21     A.    No.
22     Q.    Did the sheriff ever ask you whether you
23  knew or thought that -- if Bobby Bland was supporting
24  the sheriff in 2009?
25     A.    No.

67

1      Q.    Did the sheriff ask you any questions about
2  Bobby Bland in terms of -- well, any questions at all
3  about Bobby Bland in the fall of 2009?
4      A.    No.
5      Q.    Did he ask any questions at all about
6  Debbie Woodward in the fall of 2009, that you can
7  recall?
8      A.    Not that I can recall, no.
9      Q.    Did he ask you any questions about David
10  Dixon in fall of 2009 that you can recall?
11     A.    Not that I can recall.
12     Q.    Did he ask you any questions about John
13  Sandhofer in fall of 2009 that you can recall?
14     A.    Not that I can recall.
15     Q.    Did he ask you any questions about Danny
16  Carter in the fall of 2009 that you can recall?
17     A.    Not that I can recall.
18     Q.    Did he ask you any questions about Robert
19  McCoy in the fall of 2009 that you can recall?
20     A.    Not that I can recall.
21     Q.    Did he ever ask you about the political
22  leaning or the political involvement of any of these
23  six employees, Woodward, Bland, Dixon, Sandhofer,
24  Carter, or McCoy, in 2009?
25     A.    No.

68

1      Q.    Did the sheriff charge the senior
2  officers -- and by the senior officers, I'll name them;
3  Major Wells-Major, you yourself, Major Richardson, or
4  Captain McGee -- with going out into the work force and
5  making his positions known with respect to his
6  reelection?
7      A.    No.
8      Q.    And so they never did that.  They never
9  went out and said: Hey, you should vote for the
10  sheriff?
11     A.    No.
12     Q.    They never did that?
13     A.    No.  Not to my knowledge, no.
14     Q.    That never happened?
15     A.    No.
16     Q.    You never did that?
17     A.    No.
18     Q.    Do you remember the sheriff ever standing
19  up in front of employees and saying: Hey, I think you
20  should support me on election day?
21     A.    No.
22     Q.    You don't remember that ever happening?
23     A.    No.
24     Q.    How about ever?  Not just 2009, but 2005,
25  2001.  Do you remember the sheriff ever standing in

69

1  front of Hampton sheriff's office employees and saying
2  -- on work time, at work, saying: Hey, I want your
3  support in this upcoming election?
4      A.    No.
5      Q.    Did you ever hear the sheriff talk about
6  Debra Davis' decision to become the treasurer of Jim
7  Adams' campaign?
8      A.    No.
9      Q.    Never heard him make any comment about that
10  at all?
11     A.    No.
12     Q.    Did you know any sheriff's office employees
13  who supported Ron Cooper in the 2009 campaign?
14     A.    No.  Ron Cooper?
15     Q.    Right.  Right.  Ron Cooper.
16     A.    Curtis Cooper.
17     Q.    I'm sorry.  Curtis Cooper.
18     A.    No.
19     Q.    So you're not aware of any sheriff's office
20  employees who supported Curtis Cooper in the 2009
21  campaign?
22     A.    No.
23     Q.    Are you aware of any Hampton sheriff's
24  office employees who supported Jim Adams in the 2009
25  reelection campaign?

18  (Pages 66 to 69)

70

1    A.    No.
2    Q.    You are not aware of that at all?
3    A.    No.
4    Q.    Did you infer from Danny Carter being on
5  his Facebook page as a supporter that he supported Jim
6  Adams?
7    A.    No.
8    Q.    You did not?
9    A.    No.
10   Q.    Why not?
11   A.    It's just a Facebook.
12   Q.    Did you ever come to learn that Tameka
13 Wiggins was on Jim Adams' Facebook page?
14   A.    No.
15   Q.    And I think you said you never -- you
16 pulled up his Facebook page to look at on your home
17 computer a few times, right?
18   A.    Yes.
19   Q.    Do you have a Facebook page yourself?
20   A.    Yes.
21   Q.    Are you generally aware of the friending
22 concept?
23   A.    A little.
24   Q.    I think there's a button, there's a little
25 icon, that said, These are friends of Jim Adams, or, We

71

1  like this, and people like Carter and McCoy appeared
2  under that.  Is that your recollection of what the page
3  said?
4          MR. ROSEN:  Object to the form of the
5  question.  I think it mischaracterized the evidence.
6  Leading.  You can answer it if you can.
7    A.    If that's how you pull it up, if that's...
8
9  BY MR. SHOEMAKER:
10   Q.    Yeah.  I mean, do you not get the general
11 understanding that when you're looking at a candidate's
12 Facebook page and people are friends of the
13 candidate -- you don't get a general inference that
14 they support that candidate?
15         MR. ROSEN:  Object to the form of the
16 question.  You can answer the question.
17   A.    No.
18
19 BY MR. SHOEMAKER:
20   Q.    Did Sheriff Roberts have a Facebook page
21 for the 2009 election campaign?
22   A.    He had a web page.
23   Q.    Do you know who designed that web page?
24   A.    Yes.
25   Q.    Who?

72

1    A.    Craig Perkins.
2    Q.    Is he an employee of the sheriff's office?
3    A.    Part-time employee.
4    Q.    What does he do for the sheriff's office?
5    A.    He was a student worker.  Various jobs.
6    Q.    It was your testimony that you never saw
7  any pictures from what you called the birthday party
8  that was a cookout on Facebook.
9          MR. ROSEN:  Objection, asked and answered.
10 You can answer it again.
11
12   A.    No.
13 BY MR. SHOEMAKER:
14   Q.    Do you know if Sammy Mitchell attended that
15 cookout?
16   A.    I don't know.
17   Q.    That's all I have, ma'am.  Thank you.
18   A.    Thank you.
19         MR. ROSEN:  We'll read.
20
21         (Signature not waived.)
22
23         (Whereupon, the deposition was
24 concluded at 5:07 p.m.)
25

73

1          DEPOSITION ERRATA SHEET
2
3  Case Caption:   Bobby Bland, et al. v. B.J.
4          Roberts
5  Deponent:   Karen Bowden
6  Deposition Date:  October 4, 2011
7
8     I have read the entire transcript of my deposition
   taken in the captioned matter or the same has been read
   to me.  I request that the following changes be entered
9  upon the record for the reasons indicated.  I have
   signed my name to the Errata Sheet and the appropriate
10 Certificate and request both to be attached to the
   original transcript.
11
   Page/Line Nos.     Correction/Reason
12
   _____    _____
13
   _____    _____
14
   _____    _____
15
   _____    _____
16
   _____    _____
17
   _____    _____
18
   _____    _____
19
   _____    _____
20
   _____    _____
21
   _____    _____
22
   _____    _____
23
   _____    _____
24
   Signature: _____  Date: _____
25      Karen Bowden

19  (Pages 70 to 73)

ADAMS HARRIS REPORTING, INC.
(757)631-0458

74

```
1              CERTIFICATE OF DEPONENT
2    COMMONWEALTH OF VIRGINIA
3    CITY OF _____
4
5
6        Before me, this day, personally appeared Karen
     Bowden, who, being duly sworn, states that the
7    foregoing transcript of this deposition, taken in the
     matter, on the date and at the place set out on the
8    title page hereof, constitutes a true and complete
     transcript of said deposition.
9
10
11
12        ---------------------------
          Karen Bowden
13
14
15
16       SUBSCRIBED and SWORN to before me this _____
     day of _____, 2011, in the jurisdiction
17   aforesaid.
18
19
20
21   _____   _____
     My Commission Expires      Notary Public
22
23
24
25
```

75

```
1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2        I, Juanita Harris Schar, RMR, CCR, CRR, a
     Notary Public for the Commonwealth of Virginia at
3    large, of qualification in the Circuit Court of the
     City of Virginia Beach, Virginia, and whose commission
4    expires April 30, 2014, do hereby certify that the
     within named deponent, KAREN BOWDEN, appeared before me
5    at Virginia Beach, Virginia, as hereinbefore set forth,
     and after being first duly sworn by me, was thereupon
6    examined upon her oath by counsel for the respective
     parties; that such examination was recorded in
7    Stenotype by me and reduced to computer printout under
     my direction; and that the foregoing constitutes a
8    true, accurate, and complete transcript of such
     examination to the best of my ability.
9
10       I further certify that I am not related to
     nor otherwise associated with any counsel or party to
11   this proceeding, nor otherwise interested in the event
     thereof.
12       Given under my hand and notarial seal this
     5th day of October, 2011, at Virginia Beach, Virginia.
13
14
15
16        ----------------
          Notary Public
17
     Certified Court Reporter No. 0313085
18
19
20
21
22
23
24
25
```