IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION


----------------------------------------
BOBBY BLAND, DANIEL RAY CARTER, JR.,
DAVID W. DIXON, ROBERT W. McCOY,
JOHN C. SANDHOFER, and
DEBRA H. WOODWARD,

                    Plaintiffs,                    CASE NO.
                                                   4:11-CV-45
v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

                    Defendant.
----------------------------------------


DEPOSITION UPON ORAL EXAMINATION
OF ROBERT T. McGEE,
TAKEN ON BEHALF OF THE PLAINTIFFS


Virginia Beach, Virginia

October 11, 2011


Appearances:

        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
        By: JAMES H. SHOEMAKER, JR., ESQUIRE
            Counsel for the Plaintiffs

        PENDER & COWARD
        By:  JEFF W. ROSEN, ESQUIRE
            Counsel for the Defendant

Exhibit 16

**2**

INDEX

| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| ROBERT T. McGEE | Mr. Shoemaker | 3,87 |
| | Mr. Rosen | 81 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 15 | 6/8/11 memo to Sheriff B.J. Roberts from April L. Borrero; ROBERTS 026-027 | |

**3**

1  Deposition upon oral examination of ROBERT
2  T. McGEE, taken on behalf of the Plaintiffs before
3  Juanita Harris Schar, RMR, CCR, CRR, a Notary Public
4  for the Commonwealth of Virginia at large, commencing
5  at 10:20 a.m., on October 11, 2011, at the law offices
6  of Pender & Coward, 222 Central Park Avenue, Suite 400,
7  Virginia Beach, Virginia; and this in accordance with
8  the Federal Rules of Civil Procedure.
9       - - - - -
10       ROBERT T. McGEE, was sworn and deposed on
11  behalf of the Plaintiffs as follows:
12
13       EXAMINATION
14  BY MR. SHOEMAKER:
15  Q.   Captain, good morning.  My name is Jamie
16  Shoemaker.  What we're about to do here today is I'm
17  about to take your deposition.  Have you ever given a
18  deposition before?
19  A.   No, I have not.
20  Q.   A deposition is sworn testimony and it
21  bears the same weight and dignity as if we were in a
22  mahogany-walled courtroom downtown, so it's important
23  that we build as clear a record as possible.  To that
24  end, I'm going to ask you to wait until I get through
25  asking my question before you begin speaking and I'll

**4**

1  try to remember to do the same thing, to wait until
2  you're finished speaking before I ask my next question.
3  The reason for that is we're bound at some point in
4  this deposition to talk over top of each other and that
5  causes the record to get jumbled up.  She can't take
6  that down.  So we both have to wait until the other is
7  finished.
8       Also, you have to verbalize your answers.
9  You can't say "uh-huh" and "uh-uh" and you can't nod
10  your head because she can't take that down.  So you
11  have to remember to verbalize your responses.
12       Are you under any conditions or medications
13  here today that would affect your ability to understand
14  my questions and to answer them fully?
15  A.   No.
16  Q.   Okay.  I represent the plaintiffs, Bobby
17  Bland, Debra Woodward, Robert McCoy, John Sandhofer,
18  David Dixon, and Danny Carter, who have filed a lawsuit
19  in United States District Court against Sheriff B.J.
20  Roberts for various First Amendment violations.  That's
21  what we're here on today.
22       Could you state your full name for the
23  record, please?
24  A.   Robert Timothy McGee.
25  Q.   And, Captain McGee, would you give us your

**5**

1  home address, please?
2  A.   75 Charles Parish Drive, Poquoson,
3  Virginia, 23662.
4  Q.   Okay.  And, Captain McGee, how long have
5  you been employed by the Hampton sheriff's office?
6  A.   It will be 20 years December 1st.
7  Q.   And how long have you held the rank of
8  captain?
9  A.   Approximately four to five years.
10  Q.   And prior to that what was your rank?
11  A.   Lieutenant.
12  Q.   And approximately how long were you a
13  lieutenant?
14  A.   Probably about the same, four to
15  five years.
16  Q.   And how do your duties now as a captain
17  differ from your duties you held as a lieutenant?
18  A.   My duties now is the training supervisor,
19  commander of training and professional standards.
20  Q.   All right.
21  A.   My job responsibilities as lieutenant was
22  supervisor of courts and transportation, and prior to
23  that I was a lieutenant in charge of the records
24  division, and prior to that I was a lieutenant in
25  charge as a shift commander.  At the jail.

2  (Pages 2 to 5)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

6

1    Q.    Could you describe for me the duties that
2    you currently hold as captain?
3    A.    Right now, I'm the training supervisor,
4    responsible for overseeing all the training division
5    for the whole department.
6    Q.    And do you have any duties in addition to
7    that?
8    A.    Just the professional standards portion of
9    it.
10   Q.    All right.  And did you hold the same
11   duties in 2009?
12   A.    No, I did not.
13   Q.    What duties did you hold in 2009?
14   A.    In 2009 I was the commander of the court
15   services division.
16   Q.    And were you a captain or a lieutenant at
17   that point?
18   A.    I was captain.
19   Q.    And when did you make the switch from court
20   services to training?
21   A.    I want to say it was October 12th of 2010.
22   Q.    Unless I indicate otherwise here today, my
23   questions refer to the time period of 2009.  Now, I
24   might ask a question where I will broaden that expanse
25   or limit it somewhat, but generally speaking, if I

7

1    don't state what time period I'm referring to, I'm
2    referring to 2009.
3    How often back in 2009 and prior did the
4    sheriff hold staff meetings?
5    A.    What type of staff meeting?
6    Q.    Senior staff.
7    A.    He has a staff meeting for senior staff on
8    Tuesday afternoons.
9    Q.    Every week?
10   A.    Every week unless they are cancelled or
11   postponed or rescheduled.
12   Q.    And does Colonel Bowden keep minutes or
13   notes of those staff meetings?
14   A.    I believe she does.
15   Q.    Have you ever seen a -- apparently, I think
16   she keeps a notebook of staff meetings?
17   A.    I never seen a notebook.
18   Q.    How do -- what do you see her do?  Do you
19   ever see her take notes at these meetings?
20   A.    Everyone comes to the meeting with their
21   notes and we discuss everyone's notes and current
22   events for each division, and she comes with her notes.
23   I don't know what kind of notes as far as her records,
24   what she keeps.
25   Q.    What do members of the senior staff do with

8

1    these notes when the meetings are concluded?
2    A.    We just brief the sheriff and sometimes
3    people have written notes, sometimes people just bring
4    a general briefing to the sheriff of what's going on in
5    their division.
6    Q.    Do you keep notes of your staff meetings?
7    A.    I keep notes as to what I talk about and
8    the important events that someone else would brief me
9    about that I would need to refer to at a later time.
10   Q.    And you keep a file of these notes?
11   A.    They're in a notebook like a composition
12   notebook.
13   Q.    Is it the type of composition notebook
14   where you can take paper in and out, or is it one of
15   those composition notebooks where you can't take paper
16   out?
17   A.    It's a spiral.
18   Q.    It's a spiral so you would have to tear the
19   sheet out?
20   A.    Yes, sir.
21   Q.    How far back do you have notes?
22   A.    I would have to check on that.  I -- I keep
23   the spiral notebook, and when it fills up I put another
24   one in there.  It goes with me to the staff meeting.
25   Q.    And you save the old spiral notebook?

9

1    A.    I -- I may have one year prior because it
2    takes awhile to fill up that spiral notebook.
3    Q.    Do the other members of senior staff keep
4    spiral notebooks as well?
5    A.    I don't know what they do.
6    Q.    Back in 2009 did you use e-mail very -- by
7    the way, when I say "senior staff" -- and we were just
8    discussing the senior staff meetings -- who would
9    participate in these meetings?
10   A.    Usually captains and above unless there was
11   a special meeting involving someone else.
12   Q.    Back in 2009 did you use e-mail within the
13   office?
14   A.    Yes.
15   Q.    And did you have your own e-mail account so
16   that when you'd send an e-mail or you received an
17   e-mail it was either to or from Captain McGee?
18   A.    Yes.  It was registered to me.
19   Q.    And did you have your own designated laptop
20   or, rather, desktop computer?
21   A.    Yes.
22   Q.    And would you typically -- back in 2009 was
23   it your custom -- would you typically send e-mails
24   every day?
25   MR. ROSEN:  Object to the form of the

3  (Pages 6 to 9)

10

1  question.
2      You can answer it.
3      A.   I would receive e-mails.  If I needed to
4  correspond with other people, I would send e-mails.
5
6  BY MR. SHOEMAKER:
7      Q.   Okay.  Did you review any e-mails in
8  preparation for your deposition today?
9      A.   Just an e-mail on the time that I was
10  supposed to be here and the meeting.
11      Q.   And what meeting?  This deposition?
12      A.   This deposition meeting.
13      Q.   What else did you do, if anything, to
14  prepare for the deposition here today?
15      A.   We had a meeting, let me see, it was last
16  week or the week before, with Mr. Rosen to tell us what
17  a deposition is about and what to expect.
18      Q.   Okay.  I don't need --
19      MR. ROSEN:  He doesn't want to know what I
20  told you.
21
22  BY MR. SHOEMAKER:
23      Q.   I don't want to know the content of what
24  Mr. Rosen said to you or what you said to Mr. Rosen in
25  that meeting.

11

1      Did you review any documents to prepare for
2  this deposition?
3      A.   I reviewed an eval, I believe.
4      Q.   An eval?  Do you remember who the eval was
5  of?
6      A.   Deputy Sandhofer.
7      Q.   All right.  Why did you review that eval?
8      A.   There was a question in reference to
9  performance.
10      Q.   Did Deputy Sandhofer work for you in 2009?
11      A.   Yes, he did.
12      Q.   Did Debbie Woodward work for you in 2009?
13      A.   No, she did not.
14      Q.   Did Bobby Bland work for you in 2009?
15      A.   No, he did not.
16      Q.   Did Wayne McCoy work for you in 2009?
17      A.   No, he did not.
18      Q.   Did David Dixon work for you in 2009?
19      MR. ROSEN:  I object to the form of the
20  question.  They don't work for him.
21      You can answer if you can.
22
23  BY MR. SHOEMAKER:
24      Q.   Did they fall under your area of
25  supervision in 2009?

12

1      A.   At what part of 2009?
2      Q.   Now, we're talking about Dixon now?
3      A.   Dixon.
4      Q.   At any part of 2009 did Dixon fall under
5  your supervision?
6      A.   It may have been January.
7      Q.   Early in 2009?
8      A.   Maybe January of 2009, and that was
9  probably the entire time.
10      Q.   And then he was transferred to -- under
11  someone else's supervision?
12      A.   Yes, sir.
13      Q.   How about Danny Carter?  Did he work for
14  you at any point in 2009?
15      A.   No, sir.
16      Q.   Did you review any other documents in
17  preparing for today's deposition?
18      A.   No, sir.
19      Q.   All right.  I'm going to ask you about the
20  duties of deputies within the Hampton sheriff's office.
21  And what I'm talking about the duties of deputies or
22  asking you questions about deputies' responsibilities,
23  I'm referring to deputies within the Hampton sheriff's
24  office and only the Hampton sheriff's office.  Okay?
25      A.   Yes, sir.

13

1      Q.   The deputies when in the Hampton sheriff's
2  office typically attended a course at the Hampton Roads
3  -- Hampton Roads Criminal Justice Training Academy?  Is
4  that the name of the school?
5      A.   They -- it's the Hampton Roads Criminal
6  Justice Training Academy now.
7      Q.   Okay.
8      A.   They changed the name.
9      Q.   How long ago did they change the name?
10      A.   They changed the name when they moved from
11  Christopher Newport University some years ago to the
12  new location where they're at.
13      Q.   Was that prior to 2009?
14      A.   Yes.
15      Q.   The Hampton deputies take the basic
16  jailer's and court services course; is that correct?
17      A.   Yes, sir.
18      Q.   They do not take the basic law enforcement
19  course; is that correct?
20      A.   Yes, sir.
21      Q.   It's correct that they do not take it?
22      A.   They do not take it.
23      Q.   Do you remember there coming a time back a
24  few years ago when the sheriff was seeking the
25  accreditation of CALEA?

4 (Pages 10 to 13)

**14**

1    A.    Yes, sir.
2    Q.    And CALEA is a national law enforcement
3  accreditation agency?  Is that correct?
4    A.    Yes, sir.
5    Q.    Do you remember there having to be a --
6  either a policy issued or policy change in regard to
7  the Hampton deputies' arrest powers in order to satisfy
8  CALEA?
9    A.    I remember an issue on that, yes, I do.
10    Q.    What do you remember about that issue?
11    A.    That word was getting around that the
12  sheriff was taking away the arrest powers of the
13  deputies, which was not the case.
14    Q.    Do you remember that prior to the CALEA
15  accreditation Hampton sheriff's deputies were allowed
16  to work -- sign up with the Hampton Police Department
17  to work events out in the community?
18    A.    Yes, sir.
19    Q.    That changed, didn't it?
20    A.    It changed for a time frame.
21    Q.    When did it change?
22    A.    It changed while we were making
23  determinations as to the standard in reference to law
24  enforcement, how that fell in the category of law
25  enforcement versus what we do.

**15**

1    Q.    And did the sheriff issue a memo or a
2  policy restricting deputies' arrest powers around that
3  time frame when that issue came up?
4          MR. ROSEN:  Object to the form of the
5  question.
6          You can answer it if you can.
7    A.    I don't remember seeing a memo.
8
9  BY MR. SHOEMAKER:
10    Q.    How about a policy?
11    A.    I don't remember seeing a policy.
12    Q.    Do you remember seeing any document
13  addressing that subject?
14    A.    No, I don't.
15    Q.    The DCJS, or DCCJS, do you know what that
16  is?
17    A.    DCJS.
18    Q.    Okay.  Do they have a regulation saying
19  that in order to have general exercise -- exercise
20  general arrest powers that deputies should be graduates
21  of the basic law enforcement course?
22    A.    No, they don't.  That -- no.
23    Q.    You're not aware of that?  So if the
24  sheriff testified to the contrary, he'd be mistaken?
25    A.    I'm not aware of a standard from DCJS

**16**

1  saying that in order to make an arrest, you have to be
2  basic law enforcement trained.
3    Q.    Okay.  Well, let me ask the question
4  differently.  Are you aware of a standard from DCJS
5  that to make -- for a deputy to make an arrest not
6  incidental to the deputy's duties as a jailer or a
7  court services officer, that he has to be a graduate of
8  basic law enforcement?
9          MR. ROSEN:  Object to the extent it calls
10  for an expert opinion.
11          You can answer it if you can.
12    A.    I'm not aware of a standard.
13
14  BY MR. SHOEMAKER:
15    Q.    There came a time, I think you've already
16  said, when the Hampton sheriff's office discontinued
17  its practice of allowing deputies to sign up with the
18  Hampton Police Department for outside duty.  When I say
19  outside duty, I mean duty outside the Hampton sheriff's
20  office responsibilities.  Is that correct?
21          MR. ROSEN:  Object, mischaracterizes the
22  testimony.
23          You can answer it if you can.
24    A.    There was a time frame for a short period
25  of time.  I'm not aware of the dates.  I can't remember

**17**

1  the dates or the length of time that that was in
2  effect.
3
4  BY MR. SHOEMAKER:
5    Q.    Did that policy come into effect in order
6  to satisfy CALEA?
7    A.    The policy or the directive came into
8  effect while we were trying to determine how we satisfy
9  the law enforcement standards within the City of
10  Hampton.
11    Q.    And how long was it in effect?
12    A.    I do not remember how long it was in
13  effect.
14    Q.    So Hampton deputies now can go sign up with
15  the Hampton sheriff's office to work events outside of
16  the Hampton sheriff's purview?
17    A.    Yes.
18    Q.    And how long have they been able to do
19  that, looking back from today?
20    A.    For a number of years.
21          MR. ROSEN:  I object to the form of the
22  question as to relevance.
23
24  BY MR. SHOEMAKER:
25    Q.    What is a master deputy?

5 (Pages 14 to 17)

18

1    A.    Master deputy is a deputy who's been given
2   a career development position within the sheriff's
3   office.
4    Q.    Before I get into this, you used the phrase
5   "directive." Are you aware of a -- you obviously have
6   talked about the period where Hampton deputies were not
7   allowed to sign up with the Hampton Police Department
8   to work activities outside the purview of the Hampton
9   sheriff's office. You used the phrase "directive."
10  Are you aware of any directives in that regard?
11   A.    I'm not in that -- that may be a misspoken
12  on my behalf. It was -- it was either verbally told to
13  us or some other means of getting the information
14  disseminated. I do not remember exactly what it was.
15   Q.    How do you become a master deputy?
16   A.    You have to go through an application
17  process. You have to meet the criteria set by the
18  state in order to apply. If you meet that criteria,
19  you have to go before the master deputy board and be
20  approved by the board to become a master deputy.
21   Q.    Do you have any idea what percentage of the
22  Hampton deputies have attained the designation of
23  master deputy?
24   A.    Over what period of time?
25   Q.    Well, if you -- as of -- as of December,

19

1   2009, do you have any idea what percentage of the
2   deputies would have been master deputies?
3    A.    A very small percentage. We may have had
4   four or five possibly.
5    Q.    Okay. Is it fair to say that achieving
6   master deputy status is a difficult thing to do?
7    A.    Can you define what you mean by difficult?
8   It's just a process.
9    Q.    Okay. Well, why is it only four out of 100
10  whatever, 130, 140 deputies were master deputies?
11   A.    Master deputies are granted by the state
12  compensation board based on the size of the agency.
13  You're allotted so many different -- so many slots for
14  master deputies, and as the budget became constricted,
15  the board no longer funded the master deputy program.
16  So if a deputy was a master deputy and they parted with
17  the sheriff's office, or were -- resigned or for
18  whatever reason no longer became a master deputy, then
19  that position was terminated. Until we got down to the
20  numbers that we have now.
21   Q.    Are background checks done for all deputies
22  before they're hired?
23   A.    Yes.
24   Q.    Has there ever been a situation where after
25  hiring a deputy you realized there was something in

20

1   their background that would disqualify them or might
2   possibly disqualify them from being a deputy?
3    A.    Possibility, but I'm not involved in the
4   background checks.
5    Q.    Are you aware of any of those situations?
6    A.    No.
7    Q.    I want to talk about the discipline within
8   the Hampton sheriff's office and history of discipline
9   with the Hampton sheriff's office. I'm going to show
10  you a document that I'm going to have labeled
11  Plaintiff's 15.
12
13       (Plaintiff's Exhibit No. 15 was marked
14       for identification.)
15
16  BY MR. SHOEMAKER:
17   Q.    If you can take a moment and review this
18  document, Captain.
19       Captain, what is a disciplinary board?
20   A.    That is a board that a deputy may face when
21  there was an action of negligence or something like
22  that as recommended by the commander or the director of
23  the division that that deputy works for.
24   Q.    How many disciplinary boards have you sat
25  on before?

21

1    A.    Exact numbers, I don't know. I did sit on
2   several.
3    Q.    I guess the boards convene on an as-needed
4   basis?
5    A.    Yes, sir.
6    Q.    I'd like for you to remember for me every
7   instance you can remember, and right now I just want
8   you to identify the deputies on whose disciplinary
9   boards you sat. Every one that you can remember
10  sitting here, looking back from today. I'm not talking
11  about just 2009 but looking back from today.
12       MR. ROSEN: Object as to relevance.
13       You can answer it.
14   A.    I am horrible with names.
15       MR. ROSEN: It was asked to the best of
16  your recollection. If you can't remember, you can't
17  remember. Tell him the best you can.
18   A.    I can't remember. It's been probably over
19  a year since I've sat on a board.
20
21  BY MR. SHOEMAKER:
22   Q.    You can't remember a single deputy you've
23  ever sat on a board for?
24   A.    Michael Johnson.
25   Q.    Any others?

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

**22**

1    A.    To say definitely, no.
2    Q.    Well, all right.  Do you remember there
3   being a disciplinary board regarding someone named
4   Pershard?
5    A.    Pershard?
6         MR. ROSEN:  Can you spell that?
7         MR. SHOEMAKER:  I think P-E-R -- P-E-R-S-H-
8   A-R-D.
9    A.    Is that the first name or last name?
10
11  BY MR. SHOEMAKER:
12   Q.    That's the last name.
13   A.    I can't remember exactly.
14   Q.    Do you remember generally anything about
15  Pershard?
16   A.    I remember a Pershard.  I do not remember a
17  disciplinary board.
18   Q.    Do you remember a disciplinary board for an
19  employee -- and these might be employees, civilian
20  employees, might be deputies.  Do you remember a
21  civilian disciplinary board for an employee named Hill?
22  For not reporting or not securing an inmate and then
23  not reporting it.
24   A.    I remember the incident.  I don't remember
25  whether or not he went to a board or not.

**23**

1    Q.    What do you remember about that incident?
2    A.    Just what you said, that there was an
3   incident.  Do you have the first name so I can make
4   sure?
5    Q.    No, I don't.  Uh-uh.
6    A.    It was a Hill that had an incident for
7   transporting an inmate without restraints.
8    Q.    Do you remember if that person Hill had
9   ever had any prior discipline of any kind?
10   A.    I would say yes.
11   Q.    Do you remember roughly when this
12  discipline was?
13   A.    No, I do not.
14   Q.    Do you remember Lieutenant Harry Lewis
15  facing a disciplinary board?
16   A.    Not definitely, no.
17   Q.    What about generally or indefinitely?  Can
18  you remember anything about Lieutenant Harry Lewis
19  being disciplined for something?
20   A.    I don't remember.
21   Q.    You don't remember anything?
22   A.    Not --
23   Q.    As far as you know, he was never
24  disciplined?
25   A.    I would have to refer back to some

**24**

1   paperwork.  I mean, there was a lot of disciplinary
2   boards that I sat on.  If I sat on that one, I could
3   recall the incident, but I...
4    Q.    I'm not just asking you about -- I'm not
5   asking you about right now boards you sat on.  I'm
6   asking for discipline that you're aware of.
7    A.    I do not remember Lieutenant Lewis being
8   disciplined.
9    Q.    All right.  Do you remember a sergeant
10  Theodore Ford being disciplined for anything?
11   A.    Yes.
12   Q.    What do you remember about that?
13   A.    Sergeant Ford was disciplined for an
14  incident that happened where he participated in an
15  event and left his weapon on the seat of a vehicle, on
16  the back seat.
17   Q.    Prior to his discipline for that
18  infraction, had he ever been disciplined for anything
19  before that you're aware of?
20         MR. ROSEN:  Objection, lack of foundation.
21         You can answer if you can.
22   A.    I don't remember him being in front of the
23  board for anything else.
24
25

**25**

1   BY MR. SHOEMAKER:
2    Q.    Do you remember him being disciplined for
3   anything else?
4    A.    No, I do not.
5    Q.    Do you remember there coming a time of an
6   incident apparently when a Deputy Mitchell discharged
7   his weapon accidently and I think shot himself in the
8   hand?
9    A.    Yes.
10   Q.    I think there was an incident on a firing
11  range where that occurred.  Is that correct?
12   A.    Yes.
13   Q.    And then there was a second incident in one
14  of the court buildings where that occurred with Deputy
15  Mitchell.  Is that correct?
16   A.    No, it's not.  It was not in the court
17  building.
18   Q.    Where was the second discharge?
19   A.    The second discharge was in the weapons
20  armory.
21   Q.    All right.  And on the second occasion did
22  he hit himself in the hand?
23   A.    Yes.
24   Q.    Was he disciplined at all for either of
25  those two events?

7  (Pages 22 to 25)

26

1    A.    Yes.  He was suspended as a firearms
2    instructor for a year.  I believe it was a year.
3    Q.    Was he -- he was a lieutenant at some
4    point, right?
5    A.    Yes, sir.
6    Q.    Was he a lieutenant when either of those
7    events occurred?
8    A.    I remember him being a lieutenant on the
9    second incident.  The first one, I don't remember
10   whether he was or he wasn't.
11   Q.    Do you remember when these events occurred?
12   A.    Not exactly by date, no.
13   Q.    Were they within the past five years from
14   today?
15   A.    Probably so, yes.
16   Q.    Did you sit on the disciplinary board
17   related to either of those two incidents?
18   A.    No, I did not.
19   Q.    Were there disciplinary boards for that, or
20   do you know?
21   A.    I don't remember if it was handled formally
22   or informally.
23   Q.    Can you remember any other accidental
24   discharges of weapons?
25   A.    One.

27

1    Q.    And who was involved in that?
2    A.    Sergeant Johnson.  William Johnson.
3    Sergeant William Johnson.
4    Q.    So William Johnson and Sammy Mitchell are
5    the only two accidental discharges of weapons that you
6    can remember?
7    A.    That's the only two I remember.
8    Q.    When an accidental discharge of a weapon
9    occurs, is a report to be made to some state authority?
10   A.    The -- to a state authority?
11   Q.    Or to any authority.
12        MR. ROSEN:  Objection to relevance.
13        You can answer it.
14   A.    The incident with William Johnson was
15   investigated by the police division because it happened
16   off duty at his residence.
17
18   BY MR. SHOEMAKER:
19   Q.    How did the sheriff's department learn
20   about the incident?
21   A.    He called us.
22   Q.    Did he shoot himself accidently?
23   A.    No, it was just an accidental discharge in
24   his home.
25   Q.    All right.  Was he disciplined for that at

28

1    all?
2    A.    I do not remember.
3    Q.    Was there any report made as a result of
4    Mitchell's accidental discharges?
5    A.    He wrote incident reports.
6    Q.    Did any -- did either of those discharges
7    have to be reported outside the sheriff's office for
8    any reason?
9    A.    I do not think they're required to be
10   reported, and I can't remember for the second incident
11   how that one was handled.  I think that the first
12   incident was handled by HPD as well.  Hampton Police
13   Division.
14   Q.    When you say "handled," do you mean
15   investigated?
16   A.    Yes.  And I do not know if they did a
17   formal investigation because it was considered
18   accidental.
19   Q.    Other than Sergeant Ford, are you aware of
20   any employee of the Hampton sheriff's office ever
21   misplacing a weapon?
22   A.    I am aware of two weapons, possibly three
23   that were lost.
24   Q.    Do you know who the employees were who were
25   responsible for those weapons?

29

1    A.    I'm pretty sure that one of them was Danny
2    Carter, one of them was James Jones, and I'm not
3    familiar with the third one.  I just remember that
4    there was an incident.
5    Q.    Well, if an employee lost a weapon, would
6    they be disciplined for that?
7    A.    It depends on how the weapons were lost.
8    Deputy Jones' weapon was stolen.  If I remember
9    correctly, Deputy Carter's weapon came up missing and
10   was found on the interstate by a state trooper.  That's
11   all I can remember about those.
12        MR. ROSEN:  What deputy was that, did you
13   say?
14        THE DEPONENT:  I want to say that was
15   Deputy Carter.
16
17   BY MR. SHOEMAKER:
18   Q.    Would he have been written up for that?
19   A.    I -- I don't remember.  It depends on his
20   report, how -- whether it was negligence, whether it
21   was stolen, how it was reported.  I don't remember
22   exactly what happened --
23   Q.    Did you say --
24   A.    -- about the incident.
25   Q.    -- there was a third weapon being lost that

8  (Pages 26 to 29)

30

1  you can't remember, sitting here?
2      A.   All weapons have been recovered except for
3  the one from James Jones.
4      One, apparently, at some point in time, if
5  I remember correctly, turned up in a pawn shop. I
6  don't remember who that weapon belonged to or how it
7  got there.
8      Q.   Can you remember any incidents where an
9  employee of the Hampton sheriff's office lost equipment
10  other than weapons?
11      Equipment owned by the Hampton sheriff's
12  office or owned by the state. Or the city.
13      A.   No, just one -- on a couple of occasions a
14  deputy has lost a canister, two-ounce canister of Mace.
15      Q.   You can't remember any incidents where
16  deputies have lost ammunition or...?
17      A.   No ammunition or anything like that, no,
18  sir.
19      Q.   How about do you all have bulletproof
20  vests?
21      A.   Some do, some don't.
22      Q.   And you can't remember any incidents where
23  any equipment like that has ever been lost?
24      MR. ROSEN:  Objection, asked and answered.
25      THE DEPONENT:  I'm sorry.  What did you

31

1  say?
2      MR. ROSEN:  I said it was asked and
3  answered already.
4      You can answer him again.
5      A.   No, I do not.
6
7  BY MR. SHOEMAKER:
8      Q.   All right. Can you think of any serious
9  infractions of Hampton sheriff's office policy that
10  have occurred while you were -- you've been a captain?
11  By a deputy.
12      MR. ROSEN:  Object to the form of the
13  question.  Overbroad, undefined.
14      You can answer if you can.
15      A.   You would have to define serious
16  infractions.
17
18  BY MR. SHOEMAKER:
19      Q.   Well, I want to use your definition of
20  serious.
21      A.   Yes.
22      Q.   What's the first incident you remember?
23      A.   Deputy Hill.
24      Q.   This is the same Hill we were discussing a
25  minute ago?

32

1      A.   Yes.
2      Q.   Do you remember any other incidents?
3      A.   I remember several incidents where inmates
4  were wrongfully released due to negligence.
5      Q.   What deputies do you remember being
6  responsible or at least partially responsible for
7  wrongful release of inmates due to negligence?
8      A.   I don't want to call someone's name in
9  error.
10      Q.   I want you to name the name if you think
11  they may have been involved.
12      A.   Ron Rose.
13      Q.   Anyone else?
14      A.   I need a minute to think.
15      John Eaton maybe.
16      Q.   Anyone else?
17      A.   That's all I can put a name on right now.
18  Without referral.
19      Q.   Any other types of serious infractions that
20  you can recall, sitting here?
21      A.   The incident with Sergeant Ford.
22      Q.   Any others?
23      A.   That's all I can think of now.
24      Q.   Can you remember any incidents where an
25  employee of the Hampton sheriff's office has received a

33

1  DUI or DWI charge?
2      A.   I'm not aware of that, no.
3      Q.   Can you think of any incidents, are you
4  aware of any incidents where an employee of the Hampton
5  sheriff's office has been charged with reckless
6  driving?
7      A.   I'm not aware of any incidents for that
8  either.
9      Q.   Are you aware of any incidents where a
10  Hampton sheriff's office employee was involved in a
11  traffic accident in a public vehicle where there were
12  injuries?
13      A.   Department vehicle, yes.
14      Q.   Tell me what you remember about that.
15      A.   Deputy Eley (phonetic) is a civil officer,
16  serving civil process. She was rear-ended by an
17  individual in the Buckroe area somewhere in the
18  neighborhood of First Street and Pembroke Avenue. She
19  was injured and taken to the hospital for treatment.
20      Q.   Do you remember any others?
21      A.   Serious injuries, that's the most serious
22  injury that I remember.
23      I remember William Johnson had an accident
24  on his way to work one time where he had ran into
25  someone and it was determined that he had an underlying

9  (Pages 30 to 33)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

34

1  condition.
2     Q.    Any other accidents where there were
3  injuries?
4     A.    I can't remember any other accidents that
5  had injuries.
6     Q.    Can you remember any vehicle accidents in
7  sheriff's office vehicles where there was vehicle
8  damage but there were no injuries?
9     A.    There's a lot of vehicles that are damaged
10 due to negligence.
11    Q.    Can you remember any deputies who have been
12 guilty of causing damage to a sheriff's vehicle because
13 of negligence more than once?
14        MR. ROSEN:  Object to the form of the
15 question.
16        You can answer it.
17    A.    I do not know the results.  They have a
18 vehicle accident review board.  I don't sit on the
19 board, so I could not determine whether it was
20 negligence based on what they found during the accident
21 review board.
22
23 BY MR. SHOEMAKER:
24    Q.    Are you aware of any deputies already
25 having been disciplined for a vehicle accident where

35

1  there was damage to a vehicle?
2     A.    Yes.
3     Q.    Who are you aware of having been
4  disciplined for that?
5     A.    Deputy Eley.
6     Q.    I thought you said she was rear-ended.
7     A.    I'm sorry.  This is Deputy Elcy.  That is
8  the wrong deputy.  I need to correct that.
9     Q.    Okay.  Who was it?
10    A.    It was Deputy Cherry.
11    Q.    Any other deputies who were disciplined
12 because of vehicle damage?  That you're aware of.
13    A.    Not that I'm aware of.
14    Q.    What happened in Deputy Cherry's case?
15    A.    She had an accident and apparently the dis
16 -- the accident review board found that it was
17 negligence and she was disciplined where she had to
18 assist with payment for the damage.  A portion.  I do
19 not know what the percentage or the -- her portion was.
20    Q.    Had she ever been disciplined for anything
21 prior to this incident?  Do you know?
22    A.    I do not think so.
23    Q.    Are you aware of any other deputies who
24 were disciplined because of damage to a vehicle?
25    A.    Other than what you've told me about.

36

1     A.    I'm not aware.  I do not remember anyone
2  else being disciplined.  I'm not saying that it did not
3  happen.
4     Q.    Do you remember any deputies ever being
5  disciplined for being insubordinate?
6     A.    Yes.
7     Q.    Who do you remember?  What deputies do you
8  remember being disciplined for being insubordinate?
9     A.    Margaret Evans.
10    Q.    These questions are all about, you know,
11 what you remember ever happening, not just limited to
12 2009.
13    A.    (Moved head up and down).
14        MR. ROSEN:  Object to the form of the
15 question.
16        You can answer if you can.
17
18 BY MR. SHOEMAKER:
19    Q.    What do you remember about Margaret Evans
20 being disciplined?
21    A.    She was working in our intake division.
22 She had an incident with the supervisor of civil
23 process.
24    Q.    Who was that supervisor?
25    A.    John Snelling.

37

1     Q.    Was he a lieutenant?
2     A.    He's a sergeant.
3     Q.    All right.  And what was she alleged to
4  have done?
5     A.    She was disrespectful to the sergeant and
6  to me.
7     Q.    What sort of discipline did she receive?
8     A.    She got a written counseling.
9     Q.    Do you remember when this occurred?
10    A.    The exact date, no, I do not.
11    Q.    Do you know what year?
12    A.    It may have been 2007.
13    Q.    When she was disciplined for this act of
14 insubordination, had she ever been disciplined for
15 anything before that you're aware of?
16    A.    I can't testify to that.  She was not in my
17 division.
18    Q.    Are you aware of any other deputies or
19 employees of the Hampton sheriff's office ever being
20 disciplined for insubordination of any kind?
21        MR. ROSEN:  Objection to the form.
22        You can answer it.
23    A.    I don't remember.
24
25

10  (Pages 34 to 37)

38

1    BY MR. SHOEMAKER:
2        Q.    You don't remember any?
3        A.    Any others.
4        Q.    Do you remember any deputies or employees
5    of the Hampton sheriff's office ever having been
6    disciplined for being abusive toward prisoners?
7        A.    No, I do not.
8        Q.    Do you remember any incidents of Hampton
9    sheriff's office deputies or employees being
10   disciplined for having inappropriate relationships with
11   prisoners?
12       A.    I don't remember anything specifically in
13   that.
14       Q.    Do you remember anything generally in that
15   regard?
16       A.    Disciplined, I do not remember anyone being
17   disciplined for any of those charges.
18       Q.    Do you remember any Hampton sheriff's
19   office deputy or employee being accused of having an
20   inappropriate relationship with a prisoner?  But not
21   being disciplined.
22       A.    Your definition of inappropriate?
23       Q.    I want you to use your definition of
24   inappropriate.
25       A.    I remember one incident where someone

39

1    visited an inmate in another facility.
2        Q.    A Hampton sheriff's office employee visited
3    an inmate in another facility?
4        A.    Yes.
5        Q.    It was a facility not under the purview of
6    the Hampton sheriff's office?
7        A.    Yes.
8        Q.    And what employee was that?
9        A.    I do not remember the name, and that's why
10   I was reluctant to say, I remember something about an
11   incident where -- and someone visited an inmate in
12   another detention facility.  And that's all I can
13   remember.
14       Q.    Was there an issue of that visit being
15   romantic or sexual?
16       A.    I don't remember.  Not to my knowledge, no.
17       Q.    Are you aware of any employees of the
18   Hampton sheriff's office or any deputies within the
19   Hampton sheriff's office ever being alleged to have
20   engaged in some conduct involving dishonesty?
21       A.    Yes.
22       Q.    What employees do you remember being
23   involved in incidents related to dishonesty?
24       A.    Michael Johnson.
25       Q.    Any others?

40

1        A.    There was someone with him.  I can't
2    remember the name of the deputy that came with him to a
3    disciplinary board.
4        Q.    Any other incidents?
5        A.    That's the only one I remember.
6        Q.    And what did Mike -- what was Michael
7    Johnson accused of doing?
8        A.    He was -- there was an incident at intake
9    where it was stated in his hearing that the major had
10   reported to intake at a specific time, which he did
11   not.  And he was aware of the incident.  And it was
12   proven that that was not true.
13       Q.    So he was innocent of the allegation?
14       A.    No, he was guilty.
15       Q.    Oh.  He was guilty of the allegation.
16   Okay.  And again, his infraction was what now?
17       A.    There was an incident, but surrounding the
18   incident there was a statement that he made in
19   reference to the major reporting to intake, which was
20   not true.
21       Q.    So he alleged in a statement that a major
22   had reported to intake and that fact was not true?
23       A.    Yes.
24       Q.    And what happened to him because of this
25   infraction?

41

1        A.    The board recommended termination.
2        Q.    And was he terminated --
3        A.    Yes.
4        Q.    -- as a result of this infraction?
5        A.    Yes.
6        Q.    And you don't remember who else was
7    involved in this?
8        A.    No, I do not.
9        Q.    Do you know of any employees in the Hampton
10   sheriff's office who are related to Sheriff B. J.
11   Roberts?
12            MR. ROSEN:  Objection as to relevance.
13            Answer it.
14
15   BY MR. SHOEMAKER:
16       Q.    By related, I mean a familial relationship
17   of some sort.
18       A.    Yes.
19       Q.    Who are they?
20       A.    Wendell Barnwell.
21       Q.    Are there any others?
22       A.    That's the only one I know of.
23       Q.    And Wendell Barnwell is his nephew?
24       A.    Yes.
25       Q.    Are you aware of Wendell Barnwell ever

11  (Pages 38 to 41)

42

1    having been disciplined for anything?
2         A.    He was involved in the incident with
3    Sergeant Ford. I think he was disciplined somewhat. I
4    don't remember what his discipline was.
5         Q.    Who else other than Barnwell was involved
6    in that incident, if anyone?
7         A.    Cayetano Coronado.
8         Q.    Coronado, Deputy Coronado?
9         A.    Yes.
10        Q.    Do you remember Coronado's first name?
11        A.    Cayetano.
12        Q.    Fayetano?
13        A.    Cayetano. C-A-Y-E-T-A-N-O.
14        Q.    Cayetano. Was Cayetano disciplined as
15   well?
16        A.    Yes.
17        Q.    And that incident, Sergeant Ford had
18   apparently left his weapon in the back seat of a
19   sheriff's vehicle?
20        A.    Yes.
21        Q.    And then what, Barnwell and Coronado
22   transported a prisoner in that vehicle?
23        A.    Barnwell --
24             MR. ROSEN:  Objection to the form of the
25   question.

43

1             You can answer it.
2         A.    Barnwell transported a prisoner.
3
4    BY MR. SHOEMAKER:
5         Q.    What did Coronado do?
6         A.    Coronado delivered the vehicle to Barnwell.
7         Q.    And so Sergeant Ford was guilty of leaving
8    the weapon in the back seat, Coronado was guilty of not
9    checking the vehicle, and Barnwell was guilty of not
10   checking the vehicle?
11            MR. ROSEN:  Object to the form of the
12   question. It's not a criminal charge.
13            You can answer.
14        A.    That's the basis of the incident, yes.
15
16   BY MR. SHOEMAKER:
17        Q.    All right. And so Coronado was
18   disciplined, Ford was disciplined, and Barnwell was
19   disciplined?
20        A.    Yes.
21        Q.    Does the sheriff's office have a discipline
22   policy?
23        A.    Yes.
24        Q.    And what do you -- what do you remember --
25   what does the discipline policy say, as best you can

44

1    remember?
2         A.    It gives explanation of the procedures for
3    disciplinary action.
4         Q.    Okay.
5         A.    And the appeal process and things of that
6    nature.
7         Q.    Does the policy generally call for applying
8    gradations of discipline based on the infraction?
9             MR. ROSEN:  Object to the form of the
10   question.
11            You can answer it.
12        A.    There's a progressive disciplinary action
13   that an immediate supervisor can take. More serious
14   infractions are referred to the director of the
15   division for recommendations on disciplinary action.
16
17   BY MR. SHOEMAKER:
18        Q.    All right. And is it generally the policy
19   of the Hampton sheriff's office that lapses in
20   performance or infractions of policy should be
21   documented so that the employee can learn from them?
22        A.    Yes.
23        Q.    Did you attend a staff meeting in either
24   November or December of 2009, the subject of which was
25   which deputies should not be or which employees should

45

1    not be reappointed?
2         A.    No.
3         Q.    Did you attend any meeting in November or
4    December of 2009 at which -- with senior staff at which
5    the subject was which employees or deputies should not
6    be reappointed?
7         A.    No.
8         Q.    Did you attend any senior staff meeting at
9    all, put aside -- in 2009 did you attend any senior
10   staff meeting at all, the subject of which was whether
11   or not certain deputies or employees should not be
12   reappointed?
13        A.    No.
14        Q.    Did you believe in 2009 that Deputy David
15   Dixon should not be reappointed, or did you simply not
16   have an opinion on the matter?
17        A.    No opinion.
18        Q.    Did you believe in 2009 that Deputy Robert
19   W. McCoy should not be reappointed, or did you simply
20   have no opinion on the matter?
21        A.    No opinion.
22        Q.    Did you believe in 2009 that Deputy John C.
23   Sandhofer should not be reappointed, or did you simply
24   have no opinion on the matter?
25        A.    No opinion.

12 (Pages 42 to 45)

46

1    Q.    Did you believe in 2009 that Debra Woodward
2    should not be reappointed, or did you simply have no
3    opinion on the matter?
4    A.    No opinion.
5    Q.    Did you believe in 2009 that Deputy Daniel
6    Carter should not be reappointed, or did you simply
7    have no opinion on the matter?
8    A.    No opinion.
9    Q.    Did you believe in 2009 that Bobby Bland
10   should not be reappointed, or did you simply have no
11   opinion on the matter?
12   A.    No opinion.
13   Q.    Major Wells-Major's first name is Belinda,
14   right?
15   A.    Yes, sir.
16   Q.    Does she go by Belinda?  To people who -- I
17   mean is she on a first-name basis with you or with any
18   of the senior people in the office?
19   A.    She's on the major level with me.
20   Q.    All right.  All right.  Have you ever heard
21   either the sheriff, Colonel Bowden -- withdraw that.
22         Have you ever heard any senior officer
23   within the Hampton sheriff's office say anything like,
24   quote, "If you don't support the sheriff, you're going
25   to be out of here," end quote?

47

1    A.    No.
2    Q.    Have you ever heard any senior officer
3    within the Hampton sheriff's office say anything like,
4    quote, "If you don't support the sheriff, you're not
5    going anywhere," end quote?
6    A.    No.
7    Q.    Have you ever heard any senior officer --
8    and by senior officer, I mean anyone at the rank of
9    lieutenant or above.  Okay?
10   A.    (Moved head up and down).
11   Q.    And with that caveat, does your answer
12   change at all on the previous two questions I just
13   asked?
14   A.    No.
15   Q.    Have you ever heard any senior officer
16   within the Hampton sheriff's office ever say anything
17   like, quote, "Supporting the sheriff could help you or
18   hurt you, it's up to you," end quote?
19   A.    No.
20   Q.    Have you ever heard any senior officer
21   within the Hampton sheriff's office say anything like
22   that, quote, "Supporting the sheriff could help you or
23   hurt you," end quote?
24   A.    Could you repeat that?
25   Q.    Quote, "Supporting the sheriff could help

48

1    you or hurt you," end quote.
2    A.    No.
3    Q.    Have you ever heard any senior officer
4    within the Hampton sheriff's office say, quote,
5    "Supporting the sheriff could help you," end quote, or
6    anything like that?
7    A.    No.
8    Q.    Have you ever heard any senior officer
9    within the Hampton sheriff's office say anything like
10   that, quote, "Be sure you are supporting the right
11   person," end quote?
12   A.    No.
13   Q.    Have you ever heard any senior officer
14   within the Hampton sheriff's office say anything like
15   that, quote, "It is in your best interest to support
16   the sheriff," end quote?
17   A.    No.
18   Q.    Have you ever made a statement like that?
19   A.    Not that I remember.
20   Q.    Is it possible that you made such a
21   statement, you simply don't remember it, sitting here?
22         MR. ROSEN:  Objection, calls for
23   speculation.
24         You can answer it.
25   A.    Possibility.  I don't remember.

49

1    BY MR. SHOEMAKER:
2    Q.    But it's possible?
3    A.    Anything is possible.
4    Q.    Well, it's not possible that you killed
5    somebody in 2009, is it?
6    A.    No, sir.
7    Q.    It's not possible that you robbed a bank in
8    2009, is it?
9    A.    No.
10   Q.    Do you remember there being a shift change
11   meeting in 2009 at which the sheriff -- and I believe
12   the shift change meeting would have occurred either in
13   August or September of 2009, and the sheriff attended
14   and spoke?
15   A.    Were you referring to the meeting being
16   held...?
17   Q.    Well, let me start with any shift change
18   meeting.
19   A.    August I remember a meeting in the court
20   services division that the sheriff attended.
21   Q.    In that meeting did the sheriff say
22   anything like that, quote, "I am going to have this job
23   as long as I want it," end quote?
24   A.    I don't remember that statement.
25   Q.    Do you remember any statement like that?

13  (Pages 46 to 49)

50

1    A.    No.
2    Q.    Do you remember the sheriff saying, quote,
3  "My train is the long train," end quote, or making any
4  statement like that?
5    A.    No, sir.
6    Q.    Do you remember the sheriff saying, quote,
7  "I will be sheriff until I don't want to be sheriff,"
8  end quote, or any statement like that?
9    A.    No.
10    Q.    Do you remember the sheriff mentioning
11  getting on the, quote, "short train," end quote? And
12  I'll tell you the sheriff testified the other day that
13  he talked about the long train and short train.
14          MR. ROSEN:  Objection to the form of the
15  question.  That's an improper question.
16          You can answer it if you can.
17    A.    I don't remember those statements.  I
18  remember the meeting.
19
20  BY MR. SHOEMAKER:
21    Q.    You do remember the meeting?
22    A.    I remember the meeting.
23    Q.    And you remember the sheriff speaking?
24    A.    I remember the sheriff speaking.
25    Q.    And what did the sheriff say?

51

1    A.    Without exact words, it was an appeal for
2  the deputies there, appealing for their support.
3    Q.    Did the sheriff mention he had learned
4  about certain deputies being on Facebook for Jim Adams?
5    A.    I don't remember that statement about any
6  Facebook.  At that meeting?
7    Q.    Right.
8    A.    No.
9    Q.    Do you remember the sheriff ever mentioning
10  that he had learned that certain deputies were on
11  Facebook supporting Jim Adams?
12    A.    No.
13    Q.    You're under oath here today.
14    A.    I know.
15          MR. ROSEN:  Objection, that's improper.
16  You don't have to remind him he's under oath.
17          Ignore that.
18          MR. SHOEMAKER:  I have every right to
19  remind him he's under oath.
20
21  BY MR. SHOEMAKER:
22    Q.    You understand you're under oath here
23  today?
24    A.    Yes.
25    Q.    And you understand that any materially

52

1  false statement would be perjury?
2          MR. ROSEN:  Objection, argumentative.  You
3  don't have to threaten with perjury now, Mr. Shoemaker.
4  That's improper in a deposition, okay?
5          MR. SHOEMAKER:  I'm not threatening him.
6          MR. ROSEN:  Yes, you are.  Yes, you are.
7  Hold on a second.  Hold on a second.  Let's take a
8  break.
9
10          (Recess)
11
12  BY MR. SHOEMAKER:
13    Q.    Back on the record.
14          You understand you're still under oath,
15  right, Captain?
16    A.    Yes, sir.
17    Q.    How long did the sheriff speak in this
18  meeting where he gave this appeal in support of his
19  campaign?  How long did he speak?
20    A.    Just a few minutes.
21    Q.    Do you remember Colonel Bowden speaking
22  after the sheriff spoke?
23    A.    I don't remember seeing Colonel Bowden
24  there.
25    Q.    Do you remember Major Richardson being

53

1  there?
2    A.    No.
3    Q.    Did you only attend one such meeting where
4  the sheriff spoke an appeal?
5    A.    Just one.
6    Q.    Was it a shift change meeting?
7    A.    It was a staff meeting for the court
8  services staff, and the sheriff spoke after the meeting
9  was over.  Or at the beginning.  I can't remember which
10  one.
11    Q.    Were members of the operations department
12  also there?
13    A.    I remember that the -- my staff was there.
14  I can't remember exactly who from the other division
15  was there.  It's -- it's possible that they were there.
16  I don't remember them being there.
17    Q.    Do you remember Danny Carter being there?
18    A.    Danny Carter was not in courts division.
19  He would have no reason to be there.
20    Q.    Do you remember if Ken Darling was there?
21    A.    Ken Darling.
22          Ken Darling.  Where did he work at?
23    Q.    I think he was in the admin. support at the
24  time, or operations at the time.
25    A.    I don't -- I don't remember seeing his

54

1   face.  He could have been there.  I'm not sure.
2        Q.    Do you remember appeals being made by the
3   sheriff or any other members of his senior staff,
4   appeals or requests from the sheriff or any other
5   members of his senior staff, lieutenant or above, in
6   2009 for political support for his campaign effort?
7        A.    He appealed for support at the meeting to
8   staff.
9        Q.    Okay.
10       A.    Now, what type of -- are you talking
11  about...?
12       Q.    Well, let me back up.  I'll ask it in a
13  more detailed way.  Do you ever remember Major
14  Richardson ever speaking to any deputies either as a
15  group or one on one where he said:  Hey, I need you to
16  do something for the sheriff, in support of his
17  campaign?
18            Not exactly those words but words like that
19  where he was asking for support from employees with the
20  sheriff's office.
21       A.    I don't remember him coming to the division
22  that I was in, asking for people to support.
23       Q.    Okay.  I'm not -- my question is not
24  restricted, though, coming to your division.  Do you
25  remember him doing that at all?

55

1            MR. ROSEN:  Object to the form of the
2   question.
3            You can answer it if you can.
4        A.    What type of support are you -- just...?
5
6   BY MR. SHOEMAKER:
7        Q.    Any sort of support -- any sort of support
8   in aid of the sheriff's reelection effort in 2009.  Or
9   prior to 2009.
10       A.    I think he -- he -- he would have tickets.
11       Q.    To the golf event?
12       A.    Yes.
13       Q.    To the golf tournament?
14       A.    Yes.
15       Q.    And the sheriff held a golf tournament
16  every year in support of his political reelection,
17  correct?
18       A.    Yes.
19       Q.    That was held every year irrespective of
20  whether the sheriff was in a campaign that year,
21  correct?
22       A.    Yes.
23       Q.    As far as you know, the proceeds of that
24  golf tournament would go to support his reelection
25  effort, correct?

56

1            MR. ROSEN:  Objection to the form of the
2   question.
3
4   BY MR. SHOEMAKER:
5        Q.    Do you know whether or not the proceeds
6   from the golf tournament were to go to support his
7   reelection effort?  Is that your understanding?
8        A.    Yes.
9        Q.    And you have seen Major Richardson come
10  around selling tickets to the event?
11           MR. ROSEN:  Object to the form of the
12  question.
13           If you can answer, answer it.
14       A.    I don't think he was selling the tickets.
15
16  BY MR. SHOEMAKER:
17       Q.    He was seeking deputies to sell tickets?
18       A.    He was seeking support of selling the
19  tickets if they wanted to.
20       Q.    And what would he say?  What would he say
21  to the deputies?
22       A.    Do you want to sell some barbecue tickets
23  to support the sheriff?
24       Q.    When you say "barbecue," the barbecue was
25  held in conjunction with the golf tournament?

57

1        A.    Yes.
2        Q.    Or was that a separate event?
3        A.    It's the same.
4        Q.    Did any deputies ever complain to you about
5   this?
6            MR. ROSEN:  Objection to relevance.
7            You can answer if you can.
8        A.    They -- they may have.  I'm not going to
9   say that it was a complaint, because they accepted
10  tickets.
11
12  BY MR. SHOEMAKER:
13       Q.    Did any deputies complain to you that they
14  felt coerced or they felt pressured to accept the
15  tickets and to sell them?
16           MR. ROSEN:  Objection, hearsay.
17           You can answer it.
18       A.    I don't remember them saying that they were
19  coerced into selling tickets.
20
21  BY MR. SHOEMAKER:
22       Q.    Do you remember them saying anything like
23  that?
24       A.    I remember them asked about if they wanted
25  to sell tickets.

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

58

1    Q.   Who do you remember asking this?

2    A.   The major would ask individuals. He would

3  come around when it came that time and ask deputies if

4  they wanted to sell tickets to the barbecue or golf

5  tournament.

6    Q.   I'll come back to this in a minute. Do you

7  remember the major coming around and saying anything

8  else about the sheriff's reelection effort? Other

9  than: Do you want to help sell some tickets?

10    A.   In reference to the barbecue or golf

11  tournament?

12    Q.   In reference to the reelection effort, the

13  reelection campaign at all.

14    A.   I don't -- I don't remember him saying

15  anything specific to that, no.

16    Q.   Do you remember him saying anything

17  generally about that?

18    A.   No. He was -- he was in the corrections

19  division. I don't remember him coming over to the

20  other division seeking that support. Or whatever.

21    Q.   Did you --

22    A.   I'm not saying that it didn't happen. I

23  don't recall him visually or hear him say anything that

24  I can remember.

25    Q.   Okay. Did you think there was anything

59

1  inappropriate about a major within the office coming up

2  to a rank-and-file employee and asking them: Hey, will

3  you sell some tickets for the golf tournament?

4    MR. ROSEN: Objection, irrelevant.

5    You can answer.

6    A.   No.

7

8  BY MR. SHOEMAKER:

9    Q.   Now, you saw him doing this in his uniform?

10    A.   Possibly, yes.

11    Q.   When you saw him doing this, where were

12  you?

13    A.   It -- it just varies on when it was. I

14  could be anywhere in my division. I could have been in

15  my office. I could have been passing by or it could

16  have been brought over to the people that agreed to

17  sell tickets and left.

18    Q.   Do you think you saw him in each of those

19  contexts at some time seeking deputies to sell tickets?

20    MR. ROSEN: Objection to the form of the

21  question. Leading. You can answer.

22    A.   I would say no. They -- they would ask me

23  if I wanted to sell tickets and they would give me some

24  tickets.

25

60

1  BY MR. SHOEMAKER:

2    Q.   Who's "they"?

3    A.   The major.

4    Q.   And he would do this with other deputies,

5  too?

6    A.   As far as I know, yes.

7    Q.   Did you ever see the major ever say

8  anything like, Hey, you really ought to support the

9  sheriff for reelection this fall, to employees?

10    MR. ROSEN: Objection to the form of the

11  question.

12    You can answer it if you can.

13    A.   Specifically, I can't remember him saying

14  that. Everybody in general would support the sheriff.

15

16  BY MR. SHOEMAKER:

17    Q.   Why was that?

18    A.   He's our boss. And we support the sheriff.

19  Just loyalty.

20    Q.   Did anyone ever inquire of you who any of

21  your employees were supporting for sheriff in 2009?

22    A.   Inquire of me of what?

23    Q.   Of whether or not any of my employees

24  were supporting the sheriff for reelection in 2009?

25    MR. ROSEN: Object to the form of the

61

1  question. You mean his subordinates?

2

3  BY MR. SHOEMAKER:

4    Q.   I mean -- yes. Any of your subordinates.

5    A.   Would they inquire to me?

6    Q.   Yes.

7    A.   I'm still not understanding the exact

8  question.

9    Q.   Did anyone ever come to you in 2009 --

10  anyone ever come to you in 2009 and inquire of you

11  whether any of your subordinates -- let me break it

12  down a bit -- whether any of your subordinates were

13  supporting Jim Adams?

14    A.   Okay. I understand. No.

15    Q.   Did anyone ever come to you and inquire of

16  you whether your subordinates were supporting the

17  sheriff for reelection?

18    A.   No.

19    Q.   Did anyone ever come to you and inquire of

20  you whether any one particular of your subordinates

21  were supporting the sheriff for reelection?

22    A.   No.

23    Q.   Has the sheriff made -- ever made any

24  comment to you about his decision not to reappoint

25  Bobby Bland?

ADAMS HARRIS REPORTING, INC.
(757)631-0458

62

1   A.   No.
2   Q.   Has the sheriff ever made any comment to
3   you about his decision to not reappoint Danny Carter?
4   A.   No.
5   Q.   Has the sheriff ever made any comment to
6   you about his decision not to reappoint David Dixon?
7   A.   No.
8   Q.   Has the sheriff ever made any comment to
9   you about his decision not to reappoint Robert McCoy,
10  or Wayne McCoy?
11  A.   No.
12  Q.   Has the sheriff ever made any comment to
13  you about his decision not to reappoint John Sandhofer?
14  A.   No.
15  Q.   Has the sheriff ever made any comment to
16  you about his decision not to reappoint Debbie
17  Woodward?
18  A.   No.
19  Q.   Has Major Richardson ever made any comment
20  to you about the sheriff's decision not to reappoint
21  Bobby Bland?
22  A.   No.
23  Q.   Has Major Richardson ever made any comment
24  to you about the sheriff's decision not to reappoint
25  Danny Carter?

63

1   A.   No.
2   Q.   Has Major Richardson ever made any comment
3   to you about the sheriff's decision not to appoint
4   David Dixon?
5   A.   No.
6   Q.   Has Major Richardson ever made any comment
7   to you about the sheriff's decision not to reappoint
8   Robert Carter -- Robert McCoy?
9   A.   No.
10  Q.   Has Major Richardson ever made any comment
11  to you about the sheriff's decision not to reappoint
12  John Sandhofer?
13  A.   Yes.
14  Q.   What comment has he made to you in that
15  regard?
16  A.   That I need to bring him to his office at
17  the end of the duty day.
18  Q.   Is that all he said?
19  A.   Yes.
20  Q.   What duty day was this?
21  A.   The day that Sandhofer was let go,
22  terminated, or however his letter stated that he is no
23  longer employed.
24  Q.   And did you have any discussions with
25  anyone about the decision to terminate John Sandhofer's

64

1   employment?
2   A.   I tried to inquire to Major Richardson why
3   Sandhofer needed to be reporting to his office.
4   Q.   And what did Major Richardson say to you?
5   A.   Just:  Bring him to the office this
6   afternoon when he's done working.
7   Q.   And that's all that was said between the
8   two of you?
9   A.   Yes.
10  Q.   Were there any subsequent decisions about
11  why John Sandhofer was being terminated?  I mean, were
12  there any subsequent discussions between you and anyone
13  about why John Sandhofer was not being reappointed?
14  A.   Just some of the immediate staff as to why.
15  I didn't know why.
16  Q.   So you're saying people subordinate to you
17  would come and inquire about why John Sandhofer --
18  A.   I discussed it with the supervisors, if
19  they knew why.  I did not know why.
20  Q.   So some supervisors would come and inquire
21  of you, correct?
22  A.   Yes.
23  Q.   And they would inquire as to why John
24  Sandhofer was not being reappointed?  Correct?
25  A.   I didn't have any knowledge of the

65

1   reappointment.  It was just --
2   Q.   I understand.  I'm just asking you about
3   what they were asking you.  I'm trying to break it
4   down.
5   A.   I'm trying to answer the best I can.  When
6   someone is terminated, it's:  Okay, why are you
7   terminated?  The decision for someone to be terminated
8   was not given to me so, naturally, I am curious as to,
9   okay, why is this person no longer working?  What has
10  he done?
11  Q.   Okay.  Let me stop you right there.  Who
12  did you talk to in an effort to satisfy that curiosity?
13  A.   Lieutenant Harding.
14  Q.   Who else did you talk to?
15  A.   It may have been Sergeant Ford.
16  Q.   Who else did you talk to?
17  A.   I believe that was it.
18  Q.   And what did they say to you as a result of
19  your discussion with them?  What did they say to you?
20  A.   They didn't know.
21  Q.   Did you talk to anyone else in an effort to
22  satisfy your curiosity as to why John Sandhofer was
23  being terminated?
24  A.   I talked to John Sandhofer.
25  Q.   Did you think John Sandhofer was a pretty

17 (Pages 62 to 65)

66

1  good deputy?
2      MR. ROSEN: Object to the form of the
3  question.
4      You can answer it.
5      A.   I had no issues with Sandhofer.
6
7  BY MR. SHOEMAKER:
8      Q.   Did you think he was an above-average
9  deputy?
10     A.   I thought --
11     MR. ROSEN: Object to the form of the
12 question.
13     You can answer it.
14     A.   I thought he was -- he was new to our
15 division. He -- I want to say he came over in
16 February. And he was in training for his training
17 period and he did a good job serving papers. That's
18 what he was doing. He was serving civil process. I
19 didn't have any issues with the work that he was doing
20 on a daily basis.
21
22 BY MR. SHOEMAKER:
23     Q.   Did you talk to anyone else who said
24 anything to you about why John Sandhofer was not being
25 reappointed other than Lieutenant Harding, Sergeant

67

1  Ford, and Major Richardson?
2      MR. ROSEN: Objection, asked and answered
3  for three times.
4      Answer it again.
5      And if you answer it in a -- if you ask in
6  a louder voice doesn't mean you get a different answer.
7  Go ahead.
8      MR. SHOEMAKER: I'm not the one raising my
9  voice. The record should reflect the only person that
10 has raised his voice in this deposition is Jeff Rosen.
11 I have never raised my voice.
12     MR. ROSEN: That's not correct.
13     MR. SHOEMAKER: I have a right to explore
14 his memory.
15     MR. ROSEN: If you don't like what the
16 witness says, your voice goes up a notch.
17     MR. SHOEMAKER: Well, I don't think that's
18 true.
19     MR. ROSEN: Okay.
20     A.   I remember speaking to --
21     MR. ROSEN: Well, let's finish before you
22 start answering? Okay?
23     MR. SHOEMAKER: There is a question on the
24 table. What was the question?
25

68

1      (The reporter read the record.)
2
3  BY MR. SHOEMAKER:
4      Q.   Please answer that question to the best of
5  your ability.
6      A.   I remember speaking to Lieutenant Harding
7  and Sergeant Ford. That is the only two that I
8  remember speaking with.
9      Q.   Have you ever seen any documents explaining
10 why John Sandhofer was not reappointed?
11     A.   I seen the document that was handed to him
12 in Major Richardson's office. I did not read it.
13     Q.   Handed to him. You mean handed to John
14 Sandhofer?
15     A.   Yes.
16     Q.   And you never had a discussion with the
17 sheriff about John Sandhofer or any of these other
18 plaintiffs about why they were not reappointed?
19     A.   No.
20     MR. ROSEN: Objection, asked and answered.
21
22 BY MR. SHOEMAKER:
23     Q.   Did any of these other -- I think John
24 Sandhofer -- was he the only one of these plaintiffs
25 that worked under your supervision in late 2009?

69

1      A.   Yes.
2      Q.   And no one -- no senior officers came to
3  seek your input as to whether or not John Sandhofer
4  should be reappointed in late 2009 or any other time in
5  2009?
6      A.   No.
7      MR. ROSEN: Object to the form of the
8  question.
9      You can answer it.
10
11 BY MR. SHOEMAKER:
12     Q.   The answer is no?
13     A.   No.
14     Q.   Did anyone make any comments to you about
15 why -- did any senior officers within the Hampton
16 sheriff's office ever make any comments to you about
17 why Debra Woodward was not reappointed?
18     A.   No.
19     Q.   Did you ever work with Debra Woodward?
20     A.   I didn't work with her except for in
21 coordination of training. That's the only thing. She
22 was a training coordinator, and she would coordinate
23 the training. If I had questions or concerns in
24 reference to training, I would talk to her about that.
25 But other than that, I did not work with her.

18  (Pages 66 to 69)

70

1      Q.    Did you find her to be competent?
2            MR. ROSEN:  Object to the form of the
3    question.
4            You can answer it.
5      A.    Yes.
6            MR. SHOEMAKER:  I'm going to take a break.
7    I'm going to review my notes.  I'm probably going to
8    have a few more questions, but I don't think there will
9    be that many.
10           I do want the record to reflect, only
11   because I don't have a delivery receipt and mainly,
12   Jeff, I know how I am, I delivered at the beginning of
13   this deposition two letters to you, Jeff.  One has to
14   do with the status of your discovery responses and the
15   other is a second request for production and second set
16   of interrogatories.
17           So I'm going to take a break now.  I'm
18   going to have a few more questions for you, and then
19   we'll come back on the record here in about five or
20   ten minutes.  Okay?
21           THE DEPONENT:  Okay.
22
23           (Recess)
24
25

71

1    BY MR. SHOEMAKER:
2      Q.    Let's go back on the record.
3            Did there ever come a time in 2009 when you
4    learned that Danny Carter was on Jim Adams' Facebook
5    page basically supporting Jim Adams for sheriff?
6      A.    Yes.
7      Q.    How did you learn about that?
8      A.    It was told to me by a -- one of the
9    supervisors in the division.
10     Q.    Do you remember which supervisor in the
11   division told you that?
12     A.    I want to say it was Sergeant Ford.
13     Q.    And did Ford have an opinion about that?
14     A.    Exactly what he said, I don't -- I don't
15   remember exactly what he said, but it could be he was
16   shocked, I guess.
17     Q.    And did you and Sergeant Ford have a
18   discussion about this?
19     A.    Other than him telling me that he was --
20   placed a photo or something on Facebook.  And that he
21   was shocked.  And I was shocked as well.
22     Q.    That Danny Carter had put the photo on
23   Facebook and that Ford --
24     A.    Someone did.  His photo was on there.
25     Q.    And did there come a time when you learned

72

1    that Wayne McCoy was on Jim Adams' Facebook -- campaign
2    Facebook page?
3      A.    Yes.
4      Q.    And when did you learn about that?
5      A.    I believe it was the same time that
6    Carter's...
7      Q.    Did you also learn that from Sergeant Ford?
8      A.    Yes.
9      Q.    Did you have -- ever have any discussions
10   with anyone else about the fact that either Danny
11   Carter or Wayne McCoy were on Jim Adams' campaign
12   Facebook page?
13     A.    I believe it was Lieutenant Harding.
14     Q.    And what conversations -- what did you say
15   to Lieutenant Harding?
16     A.    She was there, I believe, when Sergeant
17   Ford had told me.  We were together.
18     Q.    What did Lieutenant Harding have to say
19   about it?
20     A.    Everyone was basically shocked that they
21   would put a photo up on the website.
22     Q.    Why was everyone shocked about that?
23     A.    Basically, that they appeared not to be
24   supporting the sheriff.
25     Q.    Did you think at the time -- did you know

73

1    at the time whether or not rank-and-file deputies had
2    the right to support the sheriff's opponent?
3            MR. ROSEN:  Object to the form of the
4    question to the extent it calls for a legal conclusion.
5            You can answer that.
6      A.    Can you state that again?
7
8    BY MR. SHOEMAKER:
9      Q.    Did you know at the time or did you think
10   at the time that rank-and-file deputies had the right
11   to support Jim Adams for sheriff?
12     A.    Yes.
13     Q.    Did you think at the time that they had the
14   right to do so publicly?
15     A.    Yes.
16     Q.    Did you have any discussions about this
17   issue with anyone other than Sergeant Ford and
18   Lieutenant Harding?
19     A.    That was it as far as I remember.  Just
20   those two.
21     Q.    Now, did there come a time when you learned
22   that some photos of a cookout or a party had been
23   placed on Facebook and that the photos were of an event
24   that Jim Adams attended?
25     A.    Photos placed on where?  Whose?

19 (Pages 70 to 73)

74

1  Q.   Placed online somewhere.
2  A.   Online?
3  Q.   Yeah.
4  A.   I remember a -- the rumors that there was a
5  picnic. I don't -- I don't remember if I seen photos
6  of it or not.
7  Q.   What do you remember hearing about this
8  picnic?
9  A.   That there was -- it was a shift picnic
10 from the corrections side of the house. And that a lot
11 of the people was there, and I believe that Jim Adams
12 showed up as well.
13 Q.   And this came to light in either late
14 August or September of 2009?
15 A.   I don't remember the exact date.
16 Q.   Some time during the 2009 campaign?
17      MR. ROSEN: Objection.
18      You can answer it.
19 A.   I would say yes.
20
21 BY MR. SHOEMAKER:
22 Q.   And do you remember John Sandhofer being
23 among the employees whose pictures were being shown at
24 that cookout?
25 A.   I don't remember him. I just remember in

75

1  general that there was a cookout with some photos and
2  that Jim Adams appeared.
3  Q.   Did you have any discussions about these
4  photos or this cookout with anyone?
5  A.   I don't remember discussing that, no.
6  Q.   Do you remember hearing anyone else discuss
7  it?
8  A.   I don't remember anyone else saying. That
9  was a correctional function. It didn't involve the
10 courts division.
11 Q.   Did you know in the fall of 2009 whether or
12 not John Sandhofer supported the sheriff or not?
13 A.   I thought that he did.
14 Q.   Did there ever come a time in 2009 when you
15 learned that he did not?
16 A.   No.
17 Q.   Did you serve on any committee whose
18 mission it was to support the sheriff's reelection
19 effort in 2009?
20 A.   On a committee?
21 Q.   Yeah.
22 A.   No.
23 Q.   Did you do any work in support of the
24 sheriff's reelection effort in 2009?
25 A.   Yes.

76

1  Q.   What did you do?
2  A.   I sold golf tournament tickets.
3  Q.   Anything else?
4  A.   I put up signs.
5  Q.   Anything else?
6  A.   And I assisted the polls.
7  Q.   And was there anything else?
8  A.   I attended a -- I don't know what -- it was
9  a -- it was a function for the sheriff. I don't
10 remember what it was called.
11 Q.   Was it at someone's home?
12 A.   Yes.
13 Q.   Was this the one at the mayor's home?
14 A.   Yes.
15 Q.   Did you attend any other events?
16 A.   I attended one or two debates.
17 Q.   Did you attend any other events?
18 A.   Just the golf tournament.
19 Q.   Did you ever see John Sandhofer at either
20 of those debates?
21 A.   I don't remember seeing him there, no.
22 Q.   Do you remember John Sandhofer dating a
23 girl named Jennifer Strube (phonetic) in the fall of
24 2009?
25 A.   No.

77

1  Q.   Do you remember his -- who he was dating at
2  all in the fall of 2009?
3  A.   No.
4  Q.   Do you know if any senior officers within
5  the Hampton sheriff's office made an effort to
6  determine who had attended that cookout we were
7  discussing just a few minutes ago in 2009?
8  A.   I don't have any knowledge of it.
9  Q.   Did anyone ever come to you and ask you
10 what you knew about that cookout?
11 A.   No.
12 Q.   Have you ever spoken to a group of
13 sheriff's office employees in support of the sheriff's
14 reelection efforts?
15 A.   In a group like in a meeting or...?
16 Q.   Yeah. Have you ever spoken to a group of
17 two or more Hampton sheriff's office employees on an
18 occasion, the purpose of which was to speak in support
19 of the sheriff's reelection effort?
20 A.   I would say probably yes.
21 Q.   How many times can you remember doing that?
22 A.   It was -- it had to be random at best.
23 Q.   Would you do this at work?
24 A.   At work, after -- it -- it -- I don't
25 remember the time when it was. I remember speaking,

ADAMS HARRIS REPORTING, INC.
(757)631-0458

78

1  just asking, you know, pretty much during the election
2  campaign, you know, to support the sheriff. And if you
3  can't support the sheriff, then just be neutral.
4      Q.   And you'd do this sometimes at work and
5  sometimes after work?
6          MR. ROSEN: Objection to the form of the
7  question. Mischaracterizes testimony.
8          You can answer.
9      A.   I don't remember exactly when it was. It
10 could be possibly either way, at work or after,
11 depending upon what the circumstance was.
12
13 BY MR. SHOEMAKER:
14     Q.   So that I understand your question -- your
15 answer, your answer is that these talks that we've just
16 discussed could have occurred either at work or after
17 work. Is that fair?
18     A.   That's fair.
19     Q.   Did any of your seniors ever say to you or
20 a group that you were part of within the Hampton
21 sheriff's office, you know: I hope you can support the
22 sheriff but if you can't, you know, I want you to stay
23 neutral?
24     A.   Seniors for me, no.
25     Q.   How about the sheriff himself? Did the

79

1  sheriff -- did you ever hear the sheriff himself say
2  that?
3      A.   He probably said that at the meeting.
4  Something to that effect.
5      Q.   Have you ever spoken to the sheriff about
6  this case outside the presence of Mr. Rosen?
7      A.   No.
8      Q.   Have you ever spoken about this case to any
9  other sheriff's office employee? Other than what
10 you've told me already here today.
11     A.   In reference to questions and...?
12     Q.   About this case at all. Have you spoken
13 with any other employees about this case at all?
14     A.   Just about having to be present for a
15 deposition on this date.
16     Q.   Who have you spoken to about that?
17     A.   My major.
18     Q.   And that is? Is that Major Richardson
19 or --
20     A.   Wells-Major.
21     Q.   All right.
22     A.   And Deputy Youngblood. And Lieutenant
23 Harper.
24     Q.   When did you speak with Deputy Youngblood
25 about this case?

80

1      A.   This morning.
2      Q.   And what did you and Deputy Youngblood
3  speak about?
4      A.   That I was not going to be here. I was
5  scheduled to teach CPR and first-aid and I was not
6  going to be here. I had to go to a deposition today.
7      Q.   And that's the extent of your conversation
8  with Deputy Youngblood?
9      A.   Yes.
10     Q.   And I'm sorry. Who else was it you said
11 you talked to?
12     A.   Lieutenant Harper. Same.
13     Q.   The only conversation you had with
14 Lieutenant Harper was about the scheduling of this
15 deposition?
16     A.   Yes.
17     Q.   Do you ever remember hearing about an
18 incident regarding David Dixon at the polls in November
19 of 2009?
20     A.   No.
21     Q.   Did you ever remember hearing about an
22 incident between David Dixon and Frances Pope?
23     A.   I don't remember hearing anything between
24 those two.
25     Q.   I want to ask you a hypothetical question.

81

1  If a sheriff's office employee off duty, away from any
2  location related to work, were to say to another
3  sheriff's office employee who was holding a piece of
4  paper, quote, "You can throw that fucking shit away,"
5  end quote, would the speaker, the sheriff's office
6  employee, be subject to discipline within the Hampton
7  sheriff's office?
8          MR. ROSEN: Objection, calls for
9  speculation. Improper hypothetical. Mischaracterizes
10 the evidence.
11         You can answer.
12     A.   I can't say that they would be subject to
13 discipline or they wouldn't.
14
15 BY MR. SHOEMAKER:
16     Q.   All right. Have you ever heard of a
17 Hampton sheriff's office employee being subjected to
18 discipline arising from an incident like that?
19     A.   I don't remember any incidents like that.
20     Q.   Captain, thank you very much for your time
21 this morning. I appreciate it. That's all I've got.
22
23 BY MR. ROSEN:
24     Q.   I have a few follow-up questions, Captain.
25         You were asked concerning your knowledge of

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

82

1    various employees and I wanted to ask you a couple of
2    things. Do you have any information concerning job
3    performance in the past while working for the Sheriff's
4    Department of Bobby Bland?
5        A.    No.
6        Q.    How about Daniel Ray Carter? Are you aware
7    -- you mentioned an incident in which he left a gun in
8    a vehicle. What do you know about that?
9        A.    That was a gun that belonged to him.
10   Sergeant Ford is the one that left the weapon in the
11   vehicle. Deputy Carter's gun came up missing and was
12   found on the interstate, if that's the right incident.
13       Q.    So he lost his gun?
14       A.    Yes.
15       Q.    Do you know if he was disciplined for that?
16       A.    I don't recall any disciplinary action on
17   that.
18       Q.    Are you aware of any other job performance
19   issues Danny Carter had while employed by the Sheriff's
20   Department?
21       A.    I read this incident here (indicating).
22       Q.    So the one you're referring to is the
23   June 8th, 2005, incident which was marked Plaintiff's
24   No. 15. Was that an incident he was involved in?
25       A.    Yes, I believe he was.

83

1        Q.    Were you aware of that prior to being shown
2    that document by Mr. Shoemaker?
3        A.    I don't remember that incident.
4        Q.    Okay. But you said you're aware of it now?
5        A.    I'm aware of it now, yes.
6        Q.    Any other job performance incidents or
7    performance issues that you're aware of with Danny
8    Carter while he was employed with the Sheriff's
9    Department?
10       A.    Not for Danny Carter, no.
11       Q.    How about David Dixon? What about him?
12       A.    Nothing in reference to Dixon that required
13   any disciplinary action.
14       Q.    But any other issues, performance issues or
15   problems?
16       A.    Performance issues, he had no performance
17   issues. He did a good job while he was working with me
18   in the civil division.
19       Q.    Okay.
20       A.    He was outspoken.
21       Q.    What do you mean by that?
22       A.    He just said what was on his mind. It may
23   be if they was in a -- in the office setting or
24   something like that, he would tell jokes or something
25   like that. And he was outspoken about what he said.

84

1        Q.    Was he ever disciplined for that?
2        A.    No.
3        Q.    Going back to Daniel Ray Carter, does his
4    wife work for the Sheriff's Department, too?
5        A.    Yes, she does.
6        Q.    Was she reappointed after the 2009
7    election?
8        A.    Yes.
9        Q.    Do you know whether her picture was posted
10   on Facebook along with her husband's?
11       A.    I think that she was on there with her
12   husband. Both of them together.
13       Q.    But she was reappointed?
14       A.    She was reappointed.
15       Q.    Is it fair to say you don't know why the
16   sheriff did not reappoint the deputies he did not
17   reappoint in 2009?
18       A.    That's fair.
19       Q.    Going on to Robert McCoy, did you have any
20   performance issues with Robert McCoy?
21       A.    Yes, McCoy had -- he was confrontational
22   and he was written up at least on one occasion, maybe
23   two occasions, when he worked with me in the civil
24   division.
25             Confrontation with other employees, you

85

1    mean?
2        A.    Yes.
3        Q.    Was he difficult to get along with?
4        A.    Yes.
5        Q.    Were there complaints made about him,
6    against him, by people who he served process on, if you
7    know?
8        A.    More -- I would say that could be a fair
9    statement, but it was more so with employees.
10       Q.    Was he a little weird in his demeanor?
11       A.    Depending on what you mean by weird.
12       Q.    Well, you explain his demeanor to me.
13       A.    He -- weird, he's a little -- he's always
14   telling some type of corny jokes and, you know, he --
15   he would be perfectly fine one day and the next day he
16   would come in and he's like on the warpath for no
17   reason.
18       Q.    So mood swings?
19       A.    Mood swings, yes. Very moody person.
20       Q.    Now, as far as any of these employees, were
21   you aware whether any of these plaintiffs, Bland,
22   Carter, Dixon, McCoy, Sandhofer, Woodward, supported
23   Sheriff Roberts during the election?
24       A.    I thought they all did. I didn't know
25   until I -- till I started seeing pictures contrary to

22  (Pages 82 to 85)

86

1    that and I seen the picture of McCoy and the picture of
2    Carter.
3         Q.    Okay.  Well, just because the picture was
4    on the Adams' Facebook page doesn't necessarily mean
5    they didn't support Roberts, does it?
6              MR. SHOEMAKER:  Object to the form of the
7    question.
8
9    BY MR. ROSEN:
10        Q.    Answer it.
11        A.    I guess it doesn't necessarily mean, but it
12   appears that they did.
13        Q.    In fact, you said you went to a meeting at
14   the mayor's house which was a fundraiser for Sheriff
15   Roberts; is that right?
16        A.    Yes.
17        Q.    Was Sandhofer there as well?
18        A.    I don't remember seeing Sandhofer.  He may
19   have been there.  I don't -- I don't remember seeing
20   him.  I didn't pal around with him.
21        Q.    Okay.  Did you ever hear anyone in the
22   Sheriff's Department, in the administrative staff ever
23   tell any of the employees if they did not support
24   Sheriff Roberts, they would be terminated?
25        A.    No.

87

1         Q.    Did you ever hear any one of the senior
2    staff threaten any of the deputies if they did not sell
3    tickets to the barbecue they would not be reappointed?
4         A.    No.
5         Q.    Did you ever hear any threats whatsoever,
6    hear or make any yourself, to any of the sheriff's
7    deputies that if they were not absolutely loyal to the
8    sheriff or support him in his reelection efforts, they
9    would not be reappointed?
10        A.    No.
11        Q.    Answer any of counsel's questions in
12   follow-up.
13
14   BY MR. SHOEMAKER:
15        Q.    Are you certain it was Danny Carter who
16   lost the gun?
17        A.    I am fairly certain.
18        Q.    Why -- why -- if someone leaves a gun on
19   the side of the interstate, why are they not
20   disciplined?
21        A.    If I remember the incident particularly,
22   the gun was reported stolen.  And it was found.  It
23   wasn't left on the side of the interstate.
24        Q.    So Carter reported the gun as being stolen?
25        A.    I think that's the incident, yes.

88

1         Q.    That's all I have.  Thank you.
2              MR. ROSEN:  We'll read.
3
4              (Signature not waived.)
5
6              (Whereupon, the deposition was
7    concluded at 12:26 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

89

1              DEPOSITION ERRATA SHEET
2
3    Case Caption:    Bland, et al. v. Roberts
4    Deponent:        Robert McGee
5    Deposition Date:  October 11, 2011
6
7       I have read the entire transcript of my deposition
     taken in the captioned matter or the same has been read
     to me.  I request that the following changes be entered
8    upon the record for the reasons indicated.  I have
     signed my name to the Errata Sheet and the appropriate
     Certificate and request both to be attached to the
     original transcript.
10
11   Page/Line Nos.      Correction/Reason
12   _____      _____
13   _____      _____
14   _____      _____
15   _____      _____
16   _____      _____
17   _____      _____
18   _____      _____
19   _____      _____
20   _____      _____
21   _____      _____
22   _____      _____
23   _____      _____
24   Signature:_____    Date:_____
          Robert McGee
25

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

90

```
 1          CERTIFICATE OF DEPONENT
 2   COMMONWEALTH OF VIRGINIA
 3   CITY OF _____
 4
 5
 6       Before me, this day, personally appeared Robert
     McGee, who, being duly sworn, states that the foregoing
 7   transcript of this deposition, taken in the matter, on
     the date and at the place set out on the title page
 8   hereof, constitutes a true and complete transcript of
     said deposition.
 9
10
11
12          ---------------------------
              Robert McGee
13
14
15
16       SUBSCRIBED and SWORN to before me this _____
     day of _____, 2011, in the jurisdiction
17   aforesaid.
18
19
20
     _____   _____
21   My Commission Expires     Notary Public
22
23
24
25
```

91

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2        I, Juanita Harris Schar, RMR, CCR, CRR, a
     Notary Public for the Commonwealth of Virginia at large,
 3   of qualification in the Circuit Court of the City of
     Virginia Beach, Virginia, and whose commission expires
 4   April 30, 2014, do hereby certify that the within named
     deponent, ROBERT McGEE, appeared before me at Virginia
 5   Beach, Virginia, as hereinbefore set forth, and after
     being first duly sworn by me, was thereupon examined
 6   upon his  oath by counsel for the respective parties;
     that such examination was recorded in Stenotype by me
 7   and reduced to computer printout under my direction; and
     that the foregoing constitutes a true, accurate, and
 8   complete transcript of such examination to the best of
     my ability.
 9
         I further certify that I am not related to
10   nor otherwise associated with any counsel or party to
     this proceeding, nor otherwise interested in the event
11   thereof.
12       Given under my hand and notarial seal this
     25th day of October, 2011, at Virginia Beach, Virginia.
13
14
15
         -----------------
16          Notary Public
17
     Certified Court Reporter No. 0313085
18
19
20
21
22
23
24
25
```

24  (Pages 90 to 91)