IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

------------------------------------
BOBBY BLAND, DANIEL RAY CARTER, JR.,
DAVID W. DIXON, ROBERT W. McCOY,
JOHN C. SANDHOFER, and
DEBRA H. WOODWARD,

        Plaintiffs,           CASE NO.
                           4:11-CV-45

v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

        Defendant.
------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF KENNETH P. RICHARDSON,
TAKEN ON BEHALF OF THE PLAINTIFFS


Virginia Beach, Virginia

October 12, 2011


Appearances:

        PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
        By: JAMES H. SHOEMAKER, JR., ESQUIRE
           Counsel for the Plaintiffs

        PENDER & COWARD
        By:  JEFFREY A. HUNN, ESQUIRE
           Counsel for the Defendant

Exhibit 19

**2**

INDEX

DEPONENT            EXAMINATION BY        PAGE

KENNETH P. RICHARDSON  Mr. Shoemaker        3


EXHIBITS

NO.  DESCRIPTION                 PAGE

None

**3**

1    Deposition upon oral examination of KENNETH
2  P. RICHARDSON, taken on behalf of the Plaintiffs before
3  Juanita Harris Schar, RMR, CCR, CRR, a Notary Public
4  for the Commonwealth of Virginia at large, commencing
5  at 1:50 p.m., on October 12, 2011, at the law offices
6  of Pender & Coward, 222 Central Park Avenue, Suite 400,
7  Virginia Beach, Virginia; and this in accordance with
8  the Federal Rules of Civil Procedure.
9         - - - - -
10    KENNETH P. RICHARDSON, was sworn and
11  deposed on behalf of the Plaintiffs as follows:
12
13         EXAMINATION
14  BY MR. SHOEMAKER:
15    Q.    Sir, my name is Jamie Shoemaker. I'm an
16  attorney.  I represent six plaintiffs in the Eastern
17  District of Virginia who filed a lawsuit against
18  Sheriff B. J. Roberts.  Have you ever given a
19  deposition before?
20    A.    Yes.
21    Q.    Okay.  So you know that deposition
22  testimony is as formal and bears the same weight and
23  dignity as if we were in some mahogany-walled courtroom
24  downtown, and as a result it's important that we build
25  as clear a record as possible.  To that end, I'm going

**4**

1  to ask that you wait until I get through asking my
2  questions before you begin to speak, and I'll try to
3  remember to wait until you're through with your answer
4  before I begin to ask the next question.
5         Sometimes people are in a rush to say what
6  they have to say and they'll begin speaking before the
7  other is finished.  When that happens in a deposition,
8  she can't take that down so we have to kind of make a
9  conscious effort to slow it down and make sure each of
10  us are through speaking before the other one starts.
11         In addition, you've got to verbalize your
12  answers.  You can't say "uh-uh" and "uh-huh" and you
13  can't shake your head because she can't take that down.
14  So you have to verbalize and express your answers in a
15  way that she can take down.
16         Are you under any conditions or medications
17  here today that would affect your ability to understand
18  my questions and to answer them fully and truthfully?
19    A.    No.
20    Q.    Would you state your full name for the
21  record, please.
22    A.    Kenneth Paul Richardson.
23    Q.    What is your home address, Major
24  Richardson?
25    A.    8711 Orcutt, O-R-C-U-T-T, Avenue, Hampton,

**5**

1  Virginia, 23666.
2    Q.    You're currently employed as a major within
3  the Hampton sheriff's office?
4    A.    Yes, sir.
5    Q.    You don't have any other type of
6  employment, do you?
7    A.    No, no.
8    Q.    How long have you been a major within the
9  Hampton sheriff's office?
10    A.    About two years.
11    Q.    And prior to that you were a captain?
12    A.    Yes.
13    Q.    And do you know roughly how long you served
14  as a captain?
15    A.    About six years.
16    Q.    And prior to that were you a lieutenant?
17    A.    Yes.
18    Q.    And prior to that a sergeant?
19    A.    Yes.
20    Q.    Okay.  How many total years do you have
21  with the Hampton sheriff's office?
22    A.    I started employment in 1994.  October.
23    Q.    All right.  What did you do prior to that?
24    A.    Worked for the Virginia Department of
25  Corrections.

6

1    Q.    How long were you with the Virginia
2  Department of Corrections?
3    A.    About a year.
4    Q.    And prior to that am I back near school yet
5  or am I still a ways off?
6    A.    Worked for the Virginia Department of
7  Transportation.
8    Q.    How long were you with them?
9    A.    About a year.
10   Q.    Am I getting close to school yet?
11   A.    No.
12   Q.    When did you graduate from high school?
13   A.    1980.
14   Q.    Where did you go to high school?
15   A.    Warwick.
16   Q.    And did you have any formal education after
17  high school?
18   A.    Some college.
19   Q.    Does the sheriff regularly have senior
20  staff meetings at the office?
21   A.    Yes.
22   Q.    And who attends senior staff meetings?
23   A.    Sheriff, colonel, majors, captains,
24  lieutenants.
25   Q.    Lieutenants do attend?

7

1    A.    Sometimes.
2    Q.    I think one lieutenant may have said they
3  attend them and one lieutenant said they never attended
4  them.  Do lieutenants attend on an as-needed basis?
5    A.    Special -- special occasions.
6    Q.    But captains always attend?
7    A.    For the most part, yes.
8    Q.    And generally majors always attend?
9    A.    Yes.
10   Q.    How often are these meetings held?
11   A.    How often?
12   Q.    How often, yeah.  Do they occur with any
13  regularity?
14   A.    Normally, on Tuesdays.
15   Q.    And are they scheduled to last a particular
16  amount of time, or do they just last as long as they
17  need to last?
18   A.    Last as long as they need to last.
19   Q.    Does anyone take notes or minutes of these
20  meetings?
21   A.    I think the staff all might write down
22  notes.
23   Q.    Is anyone charged with keeping formal
24  minutes of these meetings?
25   A.    No.

8

1    Q.    Have you ever noticed Colonel Bowden
2  keeping notes or minutes of these meetings?
3    A.    I'm not sure.
4    Q.    Do you know if Colonel Bowden keeps a set
5  of notebooks memorializing what is said and done in
6  senior staff meetings?
7    A.    I'm not sure.
8    Q.    Do you use e-mail?
9    A.    Yes.
10   Q.    And you have your own e-mail account with
11  you as an addressee and you as a potential sender?
12   A.    Yes.
13   Q.    Did you have an e-mail account back in
14  2009?
15   A.    I'm not sure.
16   Q.    Roughly, how long have you all used e-mail
17  over there?
18   A.    I'm not sure.
19   Q.    Is it more than five years?
20   A.    Yes.
21   Q.    Unless I indicate otherwise in my question,
22  when I ask you questions today I'm referring to a
23  period -- the period of time of 2009.  Unless I
24  indicate otherwise in my questioning.  Okay?
25   A.    Sure.

9

1    Q.    Now, lots of my questions won't be related
2  to time so we don't need to worry about it.
3         Did you take the basic jailer's class when
4  you were first hired in the Hampton sheriff's office?
5    A.    Yes.
6    Q.    And does that -- do you ever have to go
7  back for refreshers in the basic jailer's class?
8    A.    In service, yes.
9    Q.    How often do you have to do that?
10   A.    Every two years.
11   Q.    Do deputies have to go back with the same
12  frequency or do they go back more often or less often?
13   A.    Same frequency.
14   Q.    And when you go back every two years, how
15  long is that course?
16   A.    A week.
17   Q.    And is that at the -- that's at the Hampton
18  Roads Criminal Justice Training Academy?
19   A.    Yes, sir.
20   Q.    Have you ever attended basic law
21  enforcement -- the basic law enforcement class?
22   A.    No.
23   Q.    What is a master deputy?
24   A.    Best that I can recall is the individual
25  has been there at least three years, that shoots I

ADAMS HARRIS REPORTING, INC.
(757)631-0458

**10**

1  think an 80, 80 percentile on the range, no major
2  disciplinary violations and no automobile accidents.
3  Q.  Is that all?
4  A.  That I can remember.
5  Q.  Do they have to have a certain level of
6  evaluation before they are made a master deputy?
7  A.  I'm not sure about the specifics.
8  Q.  Do you remember there being a board they
9  have to go in front of to become a master deputy or a
10  test they have to take?
11  A.  I'm not sure.
12  Q.  Do you have any idea what percentage of
13  your uniformed deputies are master deputies?
14  A.  No, I don't.
15  Q.  Do master deputies hold any sort of unique
16  power or authority?
17  A.  No.
18  Q.  Who was responsible for hiring in the
19  Hampton sheriff's office in 2009?
20  A.  Can you explain?
21  Q.  Was there a person within the Hampton
22  sheriff's office who had primary responsibility for
23  hiring new deputies in 2009?
24  A.  Are you talking about the board or the
25  final decision?

**11**

1  Q.  Okay.  Fair enough.  What -- let me -- I'll
2  withdraw this.  I'll come back to this.
3  What do your duties include?
4  A.  I'm director of corrections.  I'm in charge
5  of the main jail, the annex, and intake, making sure
6  that inmates are treated fair, and the deputies are
7  performing their job correctly.
8  Q.  Is that the job you held in 2009?
9  A.  2009, I could have been the captain,
10  commander of corrections then.
11  Q.  Do you remember when you were promoted to
12  major?
13  A.  No, sir.
14  Q.  Sheriff Roberts went through an election
15  back in fall of 2009.  Do you remember that?
16  A.  Yes.
17  Q.  Were you a captain then or a major then?
18  A.  I think I was a captain.
19  Q.  All right.  And did your duties differ from
20  the duties you have today?
21  A.  My duties increased today.  Based on my --
22  based on my rank and my position.
23  Q.  How so?  How did your duties change when
24  you went from captain to major?
25  A.  Just responsible for more things.

**12**

1  Q.  More things outside of the corrections
2  arena?
3  A.  No.  Within corrections.
4  Q.  When you were a captain was there a
5  corrections major that you worked for?
6  A.  I reported at that time to Lieutenant
7  Colonel Adams.
8  Q.  All right.  He left in early 2009.  Right?
9  A.  I'm not sure of the time frame, but that's
10  who I reported to.
11  Q.  When he left did you assume his duties?
12  A.  Yes, sir.
13  Q.  Then the rank came later?
14  A.  Yes, sir.
15  Q.  Now, you mentioned the phrase "hiring
16  boards."  What is a hiring board within the Hampton
17  sheriff's office?
18  A.  Just a panel of members who just interview
19  potential new applicants.
20  Q.  And are there permanent members of the
21  hiring board, or is it a committee that's formed on an
22  as-needed basis?
23  A.  It's not a permanent board.  It's just --
24  they just select individuals who can come sit on the
25  board.

**13**

1  Q.  And who does the selecting?  Do you know?
2  A.  I'm not sure.
3  Q.  Have you ever served on a hiring board?
4  A.  Yes.
5  Q.  The hiring board does what with respect to
6  the applicants?  What do they do?
7  A.  Just interview the applicants.
8  Q.  Do they review the applicant's paperwork?
9  A.  Yes.
10  Q.  So if an -- so the applicant -- if the
11  applicant submits an application and they submit a
12  resumé, the hiring board will review those documents?
13  A.  I'm not sure about the resumé, but the
14  application package, yes.
15  Q.  And then once they do that, they interview
16  the applicants?  Does the hiring board interview all
17  the applicants?
18  A.  Yes, that I know of.  Yes.  Everybody comes
19  before us.
20  Q.  So the hiring board does not weed out
21  people they think are just not qualified for an
22  interview?  Or do they?
23  A.  I don't understand your question.
24  Q.  Well, I'm trying to get an idea of the
25  scope of the tasks performed by the hiring board.  And

14

```
1    so my general understanding right now talking to you is
2    that you will get -- the hiring board gets the
3    applications that people have submitted for a
4    particular position.  And now what I'm asking is, does
5    the hiring board interview all of the applicants or do
6    they screen out some because they aren't -- they are
7    less qualified or unqualified for the job?
8         MR. HUNN:  Objection, form.
9         You can answer.
10
11   BY MR. SHOEMAKER:
12   Q.   You can answer.
13   A.   Okay.  All I -- as a hiring board, the
14   members that sit on the board, we just take the
15   application packages that we have and sit down and have
16   a one-on-one with the potential new applicant.  That's
17   all we do.
18   Q.   So you're not aware of any screening-out
19   process?
20   A.   No.
21   Q.   All right.  And then once the interviews
22   are held, what does the hiring board do then?
23   A.   We come to a general decision.  If we think
24   the applicant is a good applicant, we will make a
25   recommendation to pass them on to the -- my supervisor.
```

15

```
1    Q.   And so, basically, is it the hiring board's
2    mission to decide whether or not the person is a
3    reasonable candidate or qualified candidate for the job
4    or not?
5    A.   Just look -- make a recommendation based on
6    what we see and what we hear.
7    Q.   What exactly are you recommending when you
8    forward this recommendation on, that the person be
9    hired or that the person just be considered for hiring?
10   A.   Considered for employment.
11   Q.   Then the sheriff makes the ultimate
12   decision?
13   A.   Yes, sir.
14   Q.   And does the sheriff interview candidates
15   as well?
16   A.   I think he does, yes.
17   Q.   Does anyone else interview the candidates
18   other than the hiring board?
19   A.   From the hiring board it goes to the
20   colonel and then, again, I think to the sheriff.
21   Q.   All right.  And how many hiring boards can
22   you remember having sat on?
23   A.   Several.
24   Q.   Did you sit on any hiring boards in 2009?
25   I know that's tough.
```

16

```
1    A.   I couldn't tell you.  I don't know.
2    Q.   Did you sit on any hiring boards about the
3    time of the last election?
4    A.   I really couldn't tell you.  I don't know.
5    Q.   Have you sat on more than ten hiring
6    boards, do you think?
7    A.   Yes, sir.
8    Q.   And the hiring board, does it -- does it
9    issue a report when it's done with its interviews?
10   Does the hiring board create a document of any kind?
11   A.   Just if -- I just need some help with this
12   question.  Are you trying to -- can you just ask the
13   question over again, please?
14   Q.   Does the hiring board create a document of
15   any kind memorializing their work or memorializing
16   their recommendation?
17   A.   Oh, well, it's part of the package.  After
18   every applicant comes through, we will recommend or not
19   recommend.
20   Q.   Okay.  And, typically, who were the
21   component members of a hiring board?  Could it be a
22   rank-and-file deputy or -- could a rank-and-file deputy
23   be on the hiring board?
24   A.   We've used sergeants, lieutenants,
25   captains, and majors.
```

17

```
1    Q.   But you don't remember rank-and-file
2    deputies ever being on a hiring board?
3    A.   I don't recall.
4    Q.   How are jobs announced?  I mean, when
5    there's a vacancy that comes open, how are they
6    advertised or announced?
7    A.   They're posted.
8    Q.   Where are they posted?
9    A.   In the break rooms.
10   Q.   Are they posted anywhere else?
11   A.   I think human resources.
12   Q.   Are they advertised anywhere like the Daily
13   Press or Virginian-Pilot or on line?
14   A.   I'm not sure.
15   Q.   Have you sat on more than five hiring
16   boards in the last three years?
17   A.   Yes.
18   Q.   Have you sat on more than ten hiring boards
19   in the last three years?
20   A.   Not sure.
21   Q.   Does a major have to be on all hiring
22   boards?
23   A.   No.
24        I'm going to switch gears here and I'm
25   going to ask you questions about the Hampton sheriff's
```

5 (Pages 14 to 17)

18

```
1    office disciplinary process and history of discipline
2    within the Hampton sheriff's office.
3            There is apparently such a proceeding as a
4    disciplinary board. Have you heard that phrase before?
5    A.    Yes.
6    Q.    Have you ever sat on the disciplinary
7    board?
8    A.    No.
9    Q.    Do majors ever sit on disciplinary boards?
10   A.    I'm not sure.
11   Q.    Can you -- I'd like for you to recall as
12   best you can any disciplinary boards that were convened
13   or were held for anyone that you supervised.
14   A.    I'm sorry. Can you repeat that?
15   Q.    I want you to identify for me anybody you
16   have supervised within the Hampton sheriff's office who
17   has been brought before a disciplinary board.
18   A.    I'm sure they are, but I just can't recall
19   any names right now.
20   Q.    You can't recall any?
21   A.    At this time, no.
22   Q.    Can you remember any disciplinary boards
23   for the accidental discharge of firearms?
24   A.    No.
25   Q.    Can you remember any accidental discharges
```

19

```
1    of firearms ever having occurred?
2    A.    Yes.
3    Q.    What do you remember -- what accidental
4    discharges of firearms do you remember having ever
5    occurred?
6    A.    I just remember who was involved.
7    Q.    Who was involved?
8    A.    I think it was Lieutenant Mitchell.
9    Q.    And was he involved in more than one
10   accidental discharge of a firearm?
11   A.    Yes.
12   Q.    Do you remember when the first accidental
13   discharge occurred?
14   A.    No.
15   Q.    Was it after the year 2000?
16   A.    I don't -- I don't know.
17   Q.    Do you remember what job you were in when
18   that first accidental discharge occurred?
19   A.    I think I was the captain. I was in
20   command of security.
21   Q.    And so we began this by you've been a major
22   since roughly early 2010; is that right?
23   A.    Yes, sir.
24   Q.    And you were a captain for about four years
25   prior to that?
```

20

```
1    A.    Four or five years, yes, sir.
2    Q.    So did this first event take place probably
3    -- do you have a better recollection now about whether
4    or not this first accidental discharge took place after
5    the year 2000?
6    A.    Yes, sir.
7    Q.    Okay. So it sounds like it may have taken
8    place around 2004?
9    A.    Yes. Could have been.
10   Q.    Do you remember where this accidental
11   discharge occurred?
12   A.    I think it was at the range.
13   Q.    My understanding is that there were two.
14   The first one was at the range, and the second one was
15   in the armory. Does that sound right?
16   A.    Yes, sir.
17   Q.    When the first one occurred was Lieutenant
18   Mitchell a lieutenant then or was he a sergeant then?
19   A.    I'm not sure.
20   Q.    And when this accidental discharge occurred
21   did he accidentally shoot himself in the hand?
22   A.    I think so.
23   Q.    And when this occurred he was -- was he
24   director of firearms training?
25   A.    No.
```

21

```
1    Q.    What was his -- what was his role? Why was
2    he at the range that day, if you know?
3    A.    I think he was a range officer. Or range
4    instructor.
5    Q.    Would lieutenants normally serve as a range
6    officer or a range instructor?
7            MR. HUNN: Objection, form.
8
9    BY MR. SHOEMAKER:
10   Q.    Go ahead and answer, if you can.
11   A.    I'm not sure 'cause that falls under
12   training.
13   Q.    Do you ever remember a lieutenant serving
14   as a range officer or a firearms instructor?
15   A.    I'm not sure. I know we have a captain
16   that does it.
17   Q.    Do you know if there was a disciplinary
18   board associated with that first accidental discharge?
19   A.    I'm not sure.
20   Q.    Now, when did the second accidental
21   discharge involving Lieutenant Mitchell take place?
22   A.    I don't recall.
23   Q.    Do you know where it occurred?
24   A.    I think it was in the armory.
25   Q.    And, apparently, on that occasion he
```

6 (Pages 18 to 21)

22

1    accidently shot himself in the hand as well?
2        A.    I'm not sure where he got shot.
3        Q.    Did he get shot, do you know, on that
4    second occasion?
5        A.    I don't know if a round went off or if he
6    got shot. I don't know.
7        Q.    Are you aware of any other accidental
8    discharges of firearms within the Hampton sheriff's
9    office or by anyone who is employed by the Hampton
10   sheriff's office?
11       A.    Not that I can recall.
12       Q.    Are you aware of any incidents where a
13   member of the Hampton sheriff's office misplaced their
14   weapon?
15       A.    Yes.
16       Q.    Who do you remember misplacing their
17   weapon?
18       A.    Sergeant Ford.
19       Q.    Do you ever remember any other employees of
20   the Hampton sheriff's office ever misplacing their
21   weapon, other than Sergeant Ford?
22       A.    Not that I can recall.
23       Q.    Tell me about the Ford incident.
24       A.    I think all I can recall is the weapon was
25   left unsecured in a vehicle, and -- and the officer

23

1    from HPD somehow knew about it, found out, and notified
2    my captain. I was on vacation at the time. I don't
3    know all of the fine points of the issue.
4        Q.    Who was your captain that was notified?
5        A.    Captain Glover.
6        Q.    Is Captain Glover still with the office?
7        A.    Yes.
8        Q.    Did Sergeant Ford receive any discipline as
9    a result of that incident?
10       A.    I don't know 'cause he worked in courts. I
11   believe he was terminated.
12       Q.    And I can't remember whether you said or
13   not. Are you aware of any other employees of the
14   Hampton sheriff's office ever misplacing or losing
15   track of their firearm?
16       A.    I don't recall any.
17       Q.    Are you aware of any other members of the
18   Hampton sheriff's office ever misplacing or losing any
19   equipment that was owned by the sheriff's office?
20       A.    No, sir.
21       Q.    Are you aware of any Hampton sheriff's
22   office employees who have been disciplined as a result
23   of the early or improper release of prisoners?
24       A.    Yes.
25       Q.    What deputies are you aware of or employees

24

1    are you aware of who have been disciplined as a result
2    of an improper or early release of a prisoner?
3        A.    Lieutenant Lewis.
4        Q.    Anyone else?
5        A.    I'm sure there are others. I just don't
6    recall any more.
7        Q.    This is the only one you recall?
8        A.    Yes.
9        Q.    Do you remember when this occurred?
10       A.    No.
11       Q.    Do you remember what rank you were when it
12   occurred?
13       A.    No, I don't.
14       Q.    Do you remember what rank he was when it
15   occurred?
16       A.    No, I'm not sure.
17       Q.    What do you remember about the incident?
18       A.    I think as a supervisor, he's responsible
19   to ensure that he reviewed the file before -- before an
20   inmate is released.
21       Q.    Did this happen more than five years ago?
22       A.    I'm not sure.
23       Q.    It didn't happen more than ten years ago,
24   did it?
25       A.    No, I don't think so.

25

1        Q.    Was anyone else disciplined as a result of
2    that incident?
3        A.    I'm not sure.
4        Q.    Do you remember a Deputy Rose being
5    disciplined as a result of an early release of a
6    prisoner?
7        A.    Sergeant Rose?
8        A.    Sergeant Rose, yeah. Being disciplined as
9    a result of the early release of a prisoner.
10       A.    Okay. Yes, sir.
11       Q.    What do you remember about that incident?
12       A.    I don't.
13       Q.    You just remember that it happened?
14       A.    Yeah, I do.
15       Q.    Sitting here, you don't remember any other
16   incidents regarding the early release of a prisoner?
17       A.    Specific names, no, but I'm sure it's
18   happened.
19       Q.    Do you remember there being an occasion
20   when a Deputy Kemper went before a disciplinary board
21   for a reason?
22       A.    Kemper. Are we talking about for the same
23   issue?
24       Q.    No, I'm not sure what the issue was with
25   Deputy Kemper. Do you remember Deputy Kemper ever

7  (Pages 22 to 25)

26

```
1    Q.   going before a disciplinary board?
2    A.   I don't recall.
3    Q.   Do you ever remember him receiving any
4  discipline or suspension for a disciplinary infraction?
5    A.   Yeah.  I'm sure it initiated some type of
6  documentation.  I don't know if it was a progressive or
7  counseling or what.
8    Q.   You remember Deputy Kemper being involved
9  in some sort of infraction that resulted in discipline;
10  is that correct?
11    A.   Yes.
12    Q.   And you remember him being suspended?
13    A.   I don't recall that.
14    Q.   But you remember some sort of discipline
15  being meted out to him?
16    A.   Yes, sir.
17    Q.   Is that all you remember about the incident
18  regarding Deputy Kemper?
19    A.   Yes.
20    Q.   Just that it occurred and there was some
21  discipline?
22    A.   Uh-huh.
23    Q.   Do you remember the nature of the incident
24  at all?
25    A.   I'm sorry.
```

27

```
1    Q.   Did it involve dishonesty?
2    A.   I don't believe that -- I'm not sure.
3    Q.   Do you remember a disciplinary incident or
4  an occasion when Sergeant Cherry went before a
5  disciplinary board?
6    A.   I don't recall.  I -- I think she did get a
7  violation, but I don't recall the nature of what it
8  was.
9    Q.   Do you recall how long ago it was?
10    A.   No, I don't.
11    Q.   Do you recall whether or not she was
12  suspended for that?
13    A.   I don't recall.
14    Q.   Do you recall Deputy Boswell going before a
15  disciplinary board?
16    A.   I don't.
17    Q.   Do you know Kemper's first name?
18    A.   No, I don't.
19    Q.   Do you know Cherry's first name?
20    A.   No, I don't.
21    Q.   Do you know Boswell's first name?
22    A.   We have two.
23    Q.   What are the first names of those two
24  Boswells?
25    A.   One is Mark and one is Chris.
```

28

```
1    Q.   You're not aware of either of them ever
2  having gone before a disciplinary board?
3    A.   I'm not sure.  I know they've been
4  disciplined, but --
5    Q.   When you say, "I'm not sure," you mean, I
6  have no mem -- I have no knowledge of that, sitting
7  here?
8    A.   I just don't recall.
9    Q.   Okay.  Do you remember a Deputy Rogers ever
10  going before a disciplinary board?
11    A.   We've had male and female.
12    Q.   You've got a male Rogers and a female
13  Rogers?
14    A.   We did have a male.  He left.  We have a
15  female Rogers.
16    Q.   Do you remember either of them ever going
17  before a disciplinary board?
18    A.   I don't believe so.
19    Q.   Do you remember their first names?
20    A.   No.
21    Q.   You don't remember either of them being
22  suspended for some sort of disciplinary infraction?
23    A.   Not to my knowledge.
24    Q.   Do you remember Sergeant Thomas Hartman
25  being -- going before a disciplinary board for an
```

29

```
1  improper release?
2    A.   I remember Sergeant Hartman.  I don't
3  recall him going before a board for a release.
4    Q.   Do you recall Sergeant Hartman being
5  disciplined for anything?
6    A.   I don't recall at this time.
7    Q.   You have no memory of anything about that?
8    A.   No.
9    Q.   Do you recall a Deputy Wiggins going before
10  a disciplinary board for an improper release?
11    A.   Yes.
12    Q.   Do you remember Wiggins' first name?
13    A.   No, I don't.
14    Q.   What do you remember about that incident?
15    A.   I think it occurred at intake 'cause -- I
16  believe he called me.  And they had to go out and look
17  for the inmate.
18    Q.   Did that occur in 2008?
19    A.   I'm not sure of the time frame.
20    Q.   Do you remember what happened to Wiggins as
21  a result of that incident?
22    A.   Probably went before a disciplinary board.
23    Q.   But you don't remember sitting here what
24  happened as a result of it?
25    A.   No.
```

8 (Pages 26 to 29)

30

```
1     Q.    Do you remember a Lieutenant Harding ever
2   being disciplined for anything?
3     A.    Harding?
4     Q.    Lieutenant Harding.
5     A.    No.
6     Q.    There is a Lieutenant Harding, correct?
7     A.    Yeah, correct.
8     Q.    Do you remember a Deputy Coronado ever
9   being disciplined for anything?
10     A.    No, he went to the board, I think relating
11   to the Ford issue.
12     Q.    Do you remember whether or not he was
13   disciplined as a result of it?
14     A.    I think he was terminated, also.
15     Q.    He was terminated?
16     A.    (Moved head up and down).
17     Q.    All right. The Ford issue, that occurred
18   -- you think that occurred in 2010?
19     A.    Could have been. Yeah.
20     Q.    Do you remember a Wendell Barnwell ever
21   being -- going before a disciplinary board for
22   anything?
23     A.    I think so, yes.
24     Q.    What did he go before a disciplinary board
25   for?
```

31

```
1     A.    I think he was involved with the weapon.
2     Q.    With the Ford incident?
3     A.    Yes, sir.
4     Q.    Did you have -- did you have any role in
5   investigating that incident or determining what
6   discipline should be awarded as a result of that
7   incident?
8     A.    No, sir.
9     Q.    Do you remember a deputy named Michael
10   Johnson ever being disciplined for anything?
11     A.    Yes, but I don't recall the issue.
12     Q.    Do you recall how long ago it was?
13     A.    No, I don't.
14     Q.    Do you recall whether or not he was
15   terminated for the incident?
16     A.    I don't know.
17     Q.    Do you recall a Deputy Margaret Evans ever
18   being disciplined for anything?
19     A.    Yes.
20     Q.    What do you recall Deputy Margaret Evans
21   ever being disciplined for?
22     A.    I don't recall the specifics, but I think
23   she went before a board, also.
24     Q.    Do you remember it having something to do
25   with her being insubordinate to a Sergeant Snelling or
```

32

```
1   Captain McGee?
2     A.    I don't recall the nature of it.
3     Q.    Who reports to you? Who are your direct
4   reports?
5           MR. HUNN: Object to the form of the
6   question. Are we talking about now or 2009? I'm
7   sorry.
8           MR. SHOEMAKER: Good point.
9   BY MR. SHOEMAKER:
10     Q.    2009. Who reported to you in 2009?
11     A.    Lieutenants. Shift commanders.
12     Q.    All the shift commanders?
13     A.    The four shift commanders and the jail,
14   I've got.
15     Q.    Does Snelling still work for the Hampton
16   sheriff's office?
17     A.    Just retired yesterday.
18     Q.    Just retired yesterday.
19           Was he a lieutenant or a sergeant?
20     A.    Sergeant.
21     Q.    Does my mentioning Snelling's name or
22   McGee's name spark your memory at all as to a
23   disciplinary board that Margaret Evans was brought
24   before?
```

33

```
1     A.    No.
2     Q.    With respect to Evans, you remember her
3   being disciplined for something but you don't know
4   anything more than that? You don't remember anything
5   more than that?
6     A.    That's correct.
7     Q.    You remember a Deputy Eley being brought
8   before a disciplinary board for any infraction?
9     A.    No.
10     Q.    You do not?
11     A.    I do not.
12     Q.    Do you remember a Lieutenant John Eaton
13   ever being brought before a disciplinary board for
14   anything?
15     A.    I don't recall. I don't think so.
16     Q.    Do you remember a Deputy James Jones losing
17   his weapon or having his weapon stolen?
18     A.    Yes.
19     Q.    What do you remember about that incident?
20     A.    He said somebody broke into his -- his
21   personal truck. I do believe that's what he said. And
22   he called -- he called the local police.
23     Q.    I gather if somebody steals a weapon then
24   he probably wasn't disciplined?
25     A.    I'm not sure because I honestly don't
```

ADAMS HARRIS REPORTING, INC.
(757)631-0458

34

1  remember.
2      Q.   Well, in that case, you remember somebody
3  breaking into a truck and taking a weapon.  Are they
4  allowed to leave their weapons in their personal locked
5  vehicles?
6      A.   If it's secured.
7      Q.   So the answer is yes, they are?
8      A.   Yes.
9      Q.   As long as it's locked?
10      A.   Yes.
11      Q.   Do you remember what happened in that
12  incident?  Did that -- was that weapon ever used in a
13  crime or...?
14      A.   I don't think so.
15      Q.   Was it ever recovered; do you know?
16      A.   I don't think so.
17      Q.   Now, my understanding is the Hampton
18  sheriff's office uses a -- employs a progressive
19  discipline policy.  Is that correct?
20      A.   Yes.
21      Q.   And could you describe for me what is meant
22  by progressive discipline?
23      A.   It's just -- it's already -- a preprinted
24  form that deals with minor policy violations.  And it's
25  a tracking mechanism.  And once -- once you write the

35

1  policy violation, you sit down with the employee, he
2  gets a copy, and then the rest of it is forwarded to
3  human resources.
4      Q.   Do you remember a Deputy Pershard ever
5  being disciplined for anything?
6      A.   I'm not sure.
7      Q.   Do you remember -- do you remember a Deputy
8  Pershard at all?
9      A.   Vaguely.
10      Q.   Do you ever remember him being disciplined
11  for falsifying a report?
12      A.   I don't remember the circumstances of it.
13      Q.   Do you remember a Deputy Hill ever being
14  disciplined for apparently leaving a door open or
15  leaving an area of the jail unsecured?
16      A.   Hill.  No.  I think we've had several
17  Hills, but I still don't recall this issue.
18      Q.   Do you ever remember a deputy ever being
19  disciplined for using inappropriate language at work?
20      A.   Inappropriate language.  Can you -- I mean,
21  can you explain further what you're trying to say or
22  ask?
23      Q.   Well, have you -- do you ever remember a
24  deputy ever being disciplined for using the F word at
25  work?

36

1      A.   No.
2      Q.   Do you ever remember any deputy ever being
3  disciplined for an act involving dishonesty?
4      A.   I don't think we've had an issue like that
5  come up.
6      Q.   You don't remember that ever happening?
7      A.   No.
8      Q.   You don't remember a deputy ever having
9  been disciplined for making a false report of any kind?
10      A.   I think, yes.
11      Q.   What do you remember about that?
12      A.   I think when we did an interview with a
13  deputy, he gave some information that was -- that I
14  guess -- I think it proved to be incorrect.
15      Q.   Who was that deputy?
16      A.   I don't recall his name.  He didn't stay
17  with us long.
18      Q.   Was he fired as a result of that incident?
19      A.   I don't know if he was fired or if he
20  resigned.
21      Q.   Do you ever remember any other deputies
22  ever being disciplined for making a false statement of
23  any kind?
24      A.   Yes.  It was a female on the range.
25      Q.   Okay.  And what did she say that was false?

37

1      A.   Her score.
2      Q.   And who was she?  Do you remember?
3      A.   I think her name was Deputy Everett.  I
4  think that's it.  I'm not sure.
5      Q.   How long ago did this occur?  Do you
6  remember?
7      A.   Maybe 2007 or '8.  Something like that.
8      Q.   And what discipline did she receive as a
9  result of that incident?
10      A.   I don't know if she was fired or if she
11  resigned.
12      Q.   But she ended up leaving?
13      A.   Yes.
14      Q.   Did she leave because of that incident; do
15  you know?
16      A.   I'm not sure.
17      Q.   Do you remember any other incidents where
18  deputies or any employee of the Hampton sheriff's
19  office have been accused of making a false statement of
20  any kind?
21      A.   I don't recall.
22      Q.   Can you remember any incidents where a
23  deputy or any employee of the Hampton sheriff's office
24  has been accused of mishandling or misappropriating
25  funds?

10   (Pages 34 to 37)

38

```
1        A.    I don't recall.
2        Q.    Can you think or remember of any incident
3   where a deputy within the Hampton sheriff's office or
4   any other employee within the Hampton sheriff's office
5   has been accused of misappropriating or mishandling any
6   property at all?
7        A.    I don't recall.
8        Q.    Do you remember an incident where a deputy
9   was accused of taking an inmate's property?
10       A.    (Indicating.)
11       Q.    Specifically a coat.  Do you remember any
12  incident like that?
13       A.    No, I don't.
14       Q.    As head of the correctional staff, if one
15  of your correctional officers was accused of taking an
16  inmate's property, that's something that would stand
17  out in your mind, isn't it?
18       A.    Sure.
19       Q.    And sitting here, you're not aware of any
20  incidents where that issue has ever even been raised?
21       A.    I don't -- I don't recall it.
22       Q.    Do you think it has been raised, you just
23  don't recall it sitting here today, or do you have no
24  memory of that ever having occurred?
25            MR. HUNN:  Objection, form, asked and
```

39

```
1   answered.
2
3   BY MR. SHOEMAKER:
4        Q.    Please answer the question
5            MR. HUNN:  Again.
6
7   BY MR. SHOEMAKER:
8        Q.    Please answer the question.
9        A.    Can you repeat it?
10       Q.    Do you remember having -- do you have any
11  memory of any accusation ever occurring where one of
12  your correctional officers was accused of taking an
13  inmate's property?
14            MR. HUNN:  Objection, same question.  Form.
15            MR. SHOEMAKER:  Read back my question prior
16  to that one.
17
18            (The reporter read the record.)
19
20  BY MR. SHOEMAKER:
21       Q.    And the answer to that is what?
22            MR. HUNN:  Objection, asked and answered.
23
24  BY MR. SHOEMAKER:
25       Q.    The answer is what?
```

40

```
1            MR. HUNN:  You can -- when I object, you
2   can still answer unless I instruct you not to.
3        A.    Okay.  It could have happened.  I just
4   don't recall it right now.
5
6   BY MR. SHOEMAKER:
7        Q.    All right.  Do you remember any Hampton
8   sheriff's office deputies or any employees of the
9   Hampton sheriff's office ever having been charged with
10  DUI or DWI?
11       A.    We had one.
12       Q.    And who was that?
13       A.    I think it was Deputy Foggie.
14       Q.    How do you spell that last name?
15       A.    F-O-G-G-I-E.
16       Q.    Do you remember how long ago that was?
17       A.    Maybe about three or four years ago.
18       Q.    And what happened to him?  Do you know?
19       A.    Terminated.
20       Q.    Because of the DUI?
21       A.    I guess.  I don't know.
22       Q.    Do you remember any other incidents where
23  employees of the Hampton sheriff's office or any
24  deputies within the Hampton sheriff's office have been
25  charged with DUI or DWI?
```

41

```
1        A.    I don't recall any others.
2        Q.    Do you recall any incidents where employees
3   of the Hampton sheriff's office have ever been charged
4   with reckless driving while driving a sheriff's office
5   vehicle?
6        A.    No.
7        Q.    Can you recall any incidents where
8   employees of the Hampton sheriff's office or deputies
9   within the Hampton sheriff's office have been charged
10  with any major traffic infraction while driving a
11  sheriff's office vehicle?
12            MR. HUNN:  Objection, form.
13       A.    No.  Not that I can recall.
14
15  BY MR. SHOEMAKER:
16       Q.    Can you recall any incidents where an
17  employee of the Hampton sheriff's office has been
18  involved in a collision driving a Hampton sheriff's
19  office vehicle that resulted in injuries to anyone?
20       A.    No.  I cannot recall.
21       Q.    Do you remember Deputy Cherry?  Do you
22  remember Deputy Cherry's first name?
23       A.    No, I don't.
24       Q.    Do you remember Deputy Cherry being
25  involved in a car accident?
```

11 (Pages 38 to 41)

42

1    A.   Yeah.  Yeah.  I think over at the bank.
2    Q.   What do you remember about that accident?
3    A.   Nothing.  I mean, I went over there along
4  with probably somebody who took pictures.  And that was
5  it.  I'm not her immediate supervisor.
6    Q.   Okay.  But why did you go over there?
7    A.   I guess 'cause they -- she called me or
8  somebody called me so I went over there.
9    Q.   And how long ago was this?
10    A.   About maybe two -- two years.  Something
11  like that.
12    Q.   Was she disciplined for that accident?  Do
13  you know?
14    A.   I'm not sure.
15    Q.   And was somebody injured in that accident?
16    A.   I don't think so.
17    Q.   Do you remember her being made to assist in
18  the repayment or compensation for property damage as a
19  result of that accident?
20    A.   I wouldn't know.
21    Q.   Was she one of -- was she in your
22  department or was she in another department?
23    A.   She was in another department.
24    Q.   Why would somebody call you as a result of
25  an event like that, simply because you're fairly high

43

1  ranking within the department?
2    A.   I guess.
3        MR. HUNN:  Objection, calls for
4  speculation.
5
6  BY MR. SHOEMAKER:
7    Q.   Is that the answer?
8    A.   I don't know.  I'm a major.  I get calls
9  all the time.
10    Q.   Between September 1st, 2009, and the end of
11  2009 did anyone seek your opinion or your assessment as
12  to whether or not Bobby Bland should be reappointed in
13  the Hampton sheriff's office?
14    A.   No.
15    Q.   Between September 1, 2009, and the end of
16  2009 -- well, let me go back to Bobby Bland.  At any
17  time in 2009 did anyone seek your opinion or your input
18  or assessment as to whether or not Bobby Bland should
19  be reappointed in the Hampton sheriff's office?
20    A.   No.
21    Q.   At any time in 2009 did anyone seek your
22  input or assessment as to whether or not Danny Carter
23  should be reappointed to his position within the
24  Hampton sheriff's office?
25    A.   Yes.

44

1    Q.   Who sought that input?
2    A.   I talked to my immediate supervisor and the
3  sheriff.
4    Q.   And who was your immediate supervisor?
5    A.   Colonel Bowden.
6    Q.   And when did she talk to you about that?
7    A.   Well, not specifically him.  We just were
8  dealing with issues in corrections.
9    Q.   Okay.  And on what occasion were you
10  dealing with this issue?
11    A.   I think basically as the term was -- end of
12  the term was coming up.
13    Q.   And where were you when this input was
14  solicited?
15    A.   Probably in the conference room.
16    Q.   And you gave your input there sitting in
17  that meeting?
18    A.   Yes, 'cause I get my information from the
19  lieutenants if we are having any issues with staff.
20    Q.   And what lieutenant reported to you that
21  there was an issue with Danny Carter?
22    A.   I don't recall.
23    Q.   So what did you say to them about Danny
24  Carter?
25    A.   Well, I didn't single him out.  I just

45

1  asked are we having any disciplinary problems that we
2  need to be made aware of.
3    Q.   So you didn't mention Danny Carter's name
4  in that meeting?
5        MR. HUNN:  Objection, form.
6        MR. SHOEMAKER:  Wait a minute.  Don't coach
7  the witness.
8        MR. HUNN:  Objection, form, meeting.  Okay?
9  You're confusing the questions.
10        MR. SHOEMAKER:  You've got your objection.
11        MR. HUNN:  Sure.  I'm not trying to be
12  difficult.
13
14  BY MR. SHOEMAKER:
15    Q.   Did you mention Danny Carter's name in that
16  meeting?
17        MR. HUNN:  Objection, form.  What meeting?
18  You are now talking about two meetings?
19
20  BY MR. SHOEMAKER:
21    Q.   You raised it.  You said it was probably in
22  a staff meeting where you gave input.  Right?
23        Let me start over.
24        MR. HUNN:  Sure.
25

12 (Pages 42 to 45)



46

1    BY MR. SHOEMAKER:
2        Q.    Did you ever give anyone any input or any
3    assessment as to whether or not Danny Carter should be
4    reappointed to his position within the Hampton
5    sheriff's office?
6        A.    When I get information, I relay that -- I
7    relay that information to my supervisors if we are
8    having some personnel problems.
9        Q.    That doesn't answer my question at all.
10   Did you ever give anyone any input or assessment as to
11   whether or not Danny Carter should be reappointed to
12   his position within the Hampton sheriff's office?
13       A.    I don't -- I don't -- if I understand you
14   correctly -- can -- all I'm saying -- can you just
15   repeat the question?
16       Q.    Did you give anyone any input, any
17   recommendation, any opinion, as to whether or not Danny
18   Carter should be reappointed to his position within the
19   Hampton sheriff's office any time in late 2009?
20           MR. HUNN:  Objection, form.  You may
21   answer.
22       A.    Okay.  All I'm saying is I give my
23   supervisor information if I'm having any issues with my
24   staff.
25

47

1    BY MR. SHOEMAKER:
2        Q.    So the answer is you don't remember giving
3    any input about Danny Carter?
4           MR. HUNN:  Objection, form.  Argumentative
5    and mischaracterizes what he just told you.
6           MR. SHOEMAKER:  Well, I want to know.  I
7    want to know --
8           MR. HUNN:  It's that easy and simple.
9           MR. SHOEMAKER:  First of all, I want a yes
10   or no answer to a simple question.
11
12   BY MR. SHOEMAKER:
13       Q.    Did you ever give any of your superiors any
14   input, any recommendation, or any opinion as to whether
15   or not Danny Carter should be reappointed to his
16   position within the Hampton sheriff's office?
17           MR. HUNN:  Objection.
18           MR. SHOEMAKER:  I understand your
19   objection.
20           MR. HUNN:  Form, asked and answered.
21           THE DEPONENT:  I can answer?
22           MR. HUNN:  Yes, go ahead.
23
24   BY MR. SHOEMAKER:
25       Q.    Yes.

48

1        A.    I don't make -- I let my supervisor know if
2    I'm having any staffing personnel issues.
3        Q.    Okay.  And you don't remember, sitting
4    here, letting your supervisor know about any personnel
5    staffing issues specifically with respect to Danny
6    Carter, do you?
7           MR. HUNN:  Objection, form.  Sitting here?
8        A.    I dealt with my staff.  That's what I let
9    my supervisors know, when I was having problems with
10   any of my staff.
11
12   BY MR. SHOEMAKER:
13       Q.    Did you let any of your supervisors know
14   that you were having a problem with Danny Carter?
15       A.    Specifically him, no.  I don't recall at
16   this time.
17       Q.    Did you give any input to any of your
18   supervisors, any input or opinion or recommendation, at
19   any time in 2009 as to whether or not David Dixon
20   should be reappointed to his position within the
21   Hampton sheriff's office?
22           MR. HUNN:  Objection, form.
23       A.    I'm trying to think if Mr. Dixon was in
24   corrections at that time.
25

49

1    BY MR. SHOEMAKER:
2        Q.    I think he was.
3        A.    Okay.
4        Q.    But --
5        A.    If he was, if I was having staffing
6    problems or concerns or issues with a deputy, I just
7    relayed it to my supervisor.
8        Q.    But you don't recall giving any input to
9    any of your superiors, any input or opinions or
10   recommendations to your superiors in late 2009 about
11   whether or not David Dixon should be reappointed to his
12   position within the Hampton sheriff's office?
13           MR. HUNN:  Objection, form.
14
15   BY MR. SHOEMAKER:
16       Q.    You have to answer.
17       A.    Again, I just let my supervisor know if I'm
18   having any issues with any of my personnel.
19       Q.    Okay.  And you do not remember -- sitting
20   here, you don't remember right now, talking to me,
21   giving your supervisors any input or recommendation in
22   late 2009 about whether or not David Dixon should be
23   reappointed to his position?
24           MR. HUNN:  Objection, form.
25       A.    I let my supervisors know if I was having

13 (Pages 46 to 49)

50

```
1    any staffing problems with any of my people.
2
3         BY MR. SHOEMAKER:
4         Q.    Okay.  And sitting here, you do not
5    remember giving your supervisors any input or opinion
6    about whether or not David Dixon should be reappointed
7    to his position?
8              MR. HUNN:  Objection, form.
9         A.    Again, sir --
10
11        BY MR. SHOEMAKER:
12        Q.    You don't remember, right?
13             MR. HUNN:  Objection, form, argumentative,
14   asked and answered.
15             MR. SHOEMAKER:  It has not been answered.
16
17        BY MR. SHOEMAKER:
18        Q.    You have to answer.
19        A.    I've given you my best answer, sir.
20        Q.    The best answer is you don't remember or
21   you didn't?
22             MR. HUNN:  I mean, I will object as
23   argumentative and asked and answered.
24             MR. SHOEMAKER:  What was the answer to that
25   question?
```

51

```
1              MR. HUNN:  I'm not going to give the
2    deposition here today, but if you're going to sit here
3    and ask the same question three and four times and
4    raise your voice at the witness, we're going to step
5    out and take a break.  We'll come back.
6              MR. SHOEMAKER:  I'm not raising my voice.
7              MR. HUNN:  I felt like you were.
8              MR. SHOEMAKER:  I'm not raising my voice.
9    I'll get quieter, okay?  I don't want to hurt anybody's
10   feelings.
11             THE DEPONENT:  Can I stop and go to the
12   bathroom for a few minutes?
13             MR. SHOEMAKER:  Sure, but I do not want you
14   to talk to counsel.
15             MR. HUNN:  I can talk to him about anything
16   I want to talk to him about but not the question.
17             MR. SHOEMAKER:  There's a question on the
18   table.
19             MR. HUNN:  Answer the question before you
20   go to the bathroom, if you can.
21        A.    Again, any staffing issues that I was
22   having with the people under me, I let my supervisor
23   know that I was having some problems with them.
24
25
```

52

```
1         BY MR. SHOEMAKER:
2         Q.    Okay.  But right now, right now, Major,
3    it's fair, isn't it --
4              MR. HUNN:  Time out.  Do you want to take a
5    bathroom break?
6              You want him to answer the question.
7              MR. SHOEMAKER:  He has not given an answer.
8              MR. HUNN:  Do you want to take a bathroom
9    break?
10             THE DEPONENT:  Yes, sir.
11             MR. HUNN:  You're free to have a bathroom
12   break.  I will sit here so I will not be accused of
13   tampering with any witnesses.
14
15             (Recess)
16
17        BY MR. SHOEMAKER:
18        Q.    We're back on the record.
19        Major, was there any time in late 2009,
20   second half of 2009, either at a senior staff meeting
21   or at any other time, when you gave your superiors, any
22   of your superiors, or any one of them, any
23   recommendation, opinion, or input as to whether or not
24   Deputy David Dixon should be reappointed to his
25   position within the Hampton sheriff's office?
```

53

```
1              MR. HUNN:  Objection, form.
2         A.    Again, any staffing problems that I had,
3    that's what I brought to my supervisors.
4
5         BY MR. SHOEMAKER:
6         Q.    Did you bring staffing problems to the
7    attention of your supervisors with respect to David
8    Dixon?
9         A.    He could have been involved with that one,
10   yes.
11        Q.    He could have been, but --
12        A.    Could have been.
13        Q.    -- you can't remember for sure, sitting
14   here?
15        A.    No.
16        Q.    Okay.  In the second half of 2009 either at
17   a senior staff meeting or on any other occasion, do you
18   ever remember giving any of your senior officers any
19   recommendation or input as to whether Robert McCoy,
20   Deputy Robert McCoy, should be reappointed to his
21   position within the Hampton sheriff's office?
22        A.    Again, if we were having discipline
23   problems, that's what I brought up to my supervisor.
24        Q.    But you don't have any specific
25   recollection of giving a recommendation regarding
```

14  (Pages 50 to 53)

54

1    Robert McCoy either in the second half of 2009 or at a
2    senior staff meeting?
3        A.    If I was having problems, I'm sure I
4    brought it up to my supervisors.
5        Q.    But you don't remember specifically doing
6    that, sitting here?
7        A.    He could have been.
8        Q.    He could have been, but you're not sure?
9        A.    Yeah.
10       Q.    Is that right?
11       A.    'Cause I -- again, I was having problems
12   with several officers.
13       Q.    Okay.
14       A.    And I'm pretty sure...
15       Q.    You're pretty sure what?
16       A.    Can I finish my question?
17       Q.    You mean your answer?
18       A.    My answer.
19       Q.    Okay.
20       A.    If I was having -- again, if I was having
21   problems -- because there were several guys that
22   weren't reappointed -- I just bring the information on
23   to my supervisor.
24       Q.    And you would have gotten this information
25   from one of your lieutenants?

55

1        A.    Lieutenants and my interaction with my
2    staff.
3        Q.    Who were your lieutenants in December -- in
4    November and December of 2009?
5        A.    Lieutenant Mitchell was one. Lieutenant
6    Cooke. Lieutenant Lewis. And I don't recall who the
7    fourth one was.
8        Q.    So your lieutenants were Mitchell, Cooke,
9    and Lewis, and you don't remember who the fourth one
10   was?
11       A.    Dean was the fourth one.
12       Q.    Do you remember hearing about an incident
13   between David Dixon and Frances Pope at the polls in
14   November of 2009?
15       A.    No.
16       Q.    Have you ever solicited any sheriff's
17   office employees or deputies for support for the
18   sheriff's reelection efforts?
19       A.    No.
20       Q.    Have you ever asked Hampton sheriff's
21   office deputies or employees to sell tickets to a golf
22   tournament for the sheriff?
23       A.    Yes.
24       Q.    And how often have you done that?
25       A.    Probably once a year.

56

1        Q.    And how would you go about doing that?
2        A.    Just issue -- we have a roster, and I just
3    give everybody five tickets and just ask them to go
4    ahead and sell the tickets for me.
5        Q.    And where would you do this, at shift
6    change meetings?
7        A.    Like this year we just did everything
8    outside in the parking lot. We were never inside the
9    building.
10       Q.    You never did it inside the building?
11       A.    I said this year.
12       Q.    Okay. What about in 2008?
13       A.    I think in the past, yeah. And I've done
14   it because I was just getting started. And I -- I was
15   responsible for that.
16       Q.    And in past years you've done it at shift
17   change meetings?
18       A.    Could have been. I'm not sure.
19       Q.    In past years you've done it in the
20   buildings?
21       A.    Yes.
22       Q.    And it's your testimony here under oath
23   today that the only times you did it in 2009 was in the
24   parking lot?
25       A.    Yes.

57

1        Q.    Is that parking lot not the sheriff's
2    property?
3        A.    I'm assuming it's city property.
4        Q.    So in 2009 when you did it, you did it in a
5    city parking lot?
6        A.    Are we talking about 2009 or...?
7        Q.    My question right now is about when you
8    solicited employees to sell golf tournament tickets for
9    you, you told me you did it in the parking lot. What
10   parking lot were you doing it in?
11       MR. HUNN: Objection to form,
12   mischaracterizes the testimony regarding soliciting.
13   That's not what he said.
14
15   BY MR. SHOEMAKER:
16       Q.    Okay. When you were asking deputies to
17   take responsibility for selling tickets to the
18   sheriff's golf tournament, you said you were doing that
19   in a parking lot, and I gather you meant the parking
20   lot right outside the sheriff's office? Right outside
21   of the annex or the downtown jail?
22       MR. HUNN: Objection to form.
23
24   BY MR. SHOEMAKER:
25       Q.    Which parking lots were you referring to?

15  (Pages 54 to 57)

58

1      MR. HUNN:  Objection to form.
2
3  BY MR. SHOEMAKER:
4      Q.     You have to answer the question.  Which
5  parking lot?
6      A.     What year are we talking about?
7      Q.     I'm talking about 2009.
8      A.     I might have did it in the building.
9      Q.     So at some point after 2009 you started
10  just doing it outside of the building?
11      A.     Yes, sir.
12      Q.     Did you support the sheriff's campaign for
13  sheriff in any other way other than the support of the
14  golf tournament we just talked about?
15      A.     Literature drop.
16      Q.     And what would be -- what would you do to
17  help him with literature drops?
18      A.     Just pass out his information.  Normally on
19  the weekends.
20      Q.     And where would you pass out his
21  information?
22      A.     It varied.
23      Q.     Give me some examples of where you passed
24  out the information.
25      A.     Different neighborhoods within Hampton.

59

1      Q.     Do you ever remember there being an
2  incident where Debbie Woodward had a problem with the
3  fact that a Lieutenant Perkins or Sergeant Perkins was
4  getting signatures on a petition and Perkins was not a
5  resident of Hampton?  Do you remember anything like
6  that?
7      A.     No.
8      Q.     Do you remember any incident where there
9  was a person who was not a resident of Hampton passing
10  around or getting employees to sign a petition and
11  there being an issue made of that?
12      A.     No.
13      Q.     Other than the literature drops and your
14  work regarding the tickets with the golf tournament,
15  what other ways did you work to support the sheriff's
16  reelection back in 2009?
17      A.     Probably just put up signs.
18      Q.     And where would you put up signs?
19      A.     Wherever people allowed us to put up signs.
20      Q.     Did you ever get deputies to help you put
21  up signs?
22      A.     I'm sure we asked them for their help.
23      Q.     Did you work the polls on election day?
24      A.     You talking about this year?
25      Q.     No, 2009.

60

1      A.     I'm pretty sure I did.
2      Q.     Did you do anything else to help the
3  sheriff's reelection efforts in 2009, other than work
4  the polls, help get out signs, literature drops, and
5  the golf tournament?
6      A.     Probably seek volunteers to come out and
7  help pass out literature at the different locations,
8  polling sites.
9      Q.     And you would seek volunteers from within
10  the Hampton sheriff's office?
11      A.     And outside, outside, too.
12      Q.     Okay.  Did you ever speak to employees in
13  an effort to obtain their support for the sheriff in
14  his reelection efforts in 2009?
15      A.     No.
16      Q.     Were you ever present when any other
17  officers at the rank of lieutenant or above ever spoke
18  to Hampton sheriff's office employees in an effort to
19  get them to vote for B. J. Roberts in 2009?
20      A.     No, I've never heard that.
21      Q.     Did you attend any shift change meetings in
22  2009 at which the sheriff spoke about the election?
23      A.     Probably.
24      Q.     Do you have any recollection, specific
25  recollection of that, sitting here today?

61

1      A.     No.
2      Q.     So sitting here today, you do not remember
3  what the sheriff said to his employees at any shift
4  change meeting about his reelection campaign in 2009?
5      A.     No.
6      Q.     Do you have a general recollection -- it
7  sounds like you have a general recollection of the
8  sheriff speaking to employees during at least one shift
9  change meeting in the fall of 2009, or late summer of
10  2009?
11      A.     No.
12      Q.     You don't even have a general recollection
13  of it?
14      A.     Well, 2009, like 2010, '11, he just goes
15  and just asks for your support.  That's about it.
16      Q.     Do you remember that happening in late
17  summer or fall of 2009?
18      A.     No.
19      Q.     Do you remember the sheriff ever giving a
20  talk in which he was discussing an upcoming campaign
21  and in which he used the phrases "long train" -- quote,
22  "long train," end quote, or, quote, "short train," end
23  quote?
24      A.     This year.
25      Q.     This year he did that?

62

1    A.    Yes, sir.
2    Q.    In 2011?
3    A.    I'm sorry.  Yeah, it was 2009.  You're
4    right.
5    Q.    In 2009?
6    A.    Yeah.
7    Q.    What did he say?
8    A.    Just the way I took it, it was that he was
9    asking for your support, and as far as the train
10   portion, it's kind of cloudy because I never heard it
11   before, but he was just asking for everybody's support.
12   Q.    Well, he talked about employees being able
13   to get on a long train or get on a short train,
14   correct?
15         MR. HUNN:  Objection, form.
16
17   BY MR. SHOEMAKER:
18   Q.    Didn't he mention that in his talk?
19   A.    He mentioned -- all I remember is the train
20   portion.  He went there just asking for support.
21   Q.    Do you remember him saying anything to the
22   effect of:  You can get on the long train or you can
23   get on the short train?
24         Do you remember that?
25   A.    I don't.

63

1    Q.    Have you told me everything you remember
2    about what the sheriff said on that occasion when he
3    talked about the long train and the short train?
4    A.    I have.
5    Q.    Did there come a time when you learned that
6    Deputy Carter and Deputy McCoy were on Jim Adams'
7    campaign Facebook site?
8    A.    Say it again.  I'm sorry.
9    Q.    Did there come a time in 2009 when you
10   learned that Deputies Carter and McCoy were on Jim
11   Adams' campaign Facebook site?
12   A.    Yes, sir.
13   Q.    And how did you learn about that?
14   A.    I think in passing somebody might have told
15   me.
16   Q.    Did the sheriff mention that at the meeting
17   in which he talked about the long train and the short
18   train?
19   A.    I don't believe so.
20   Q.    Who told you about Carter and McCoy being
21   on the campaign Facebook site?
22   A.    I don't know.
23   Q.    You remember where you were when you
24   learned of it?
25   A.    No, I don't.

64

1    Q.    You remember when you learned of it?
2    A.    Could have been end of the year.  I'm not
3    sure.
4    Q.    Did you take a look at Adams' campaign
5    Facebook site to check it out yourself?
6    A.    I think I did.
7    Q.    Did you talk to Colonel Bowden about the
8    fact that McCoy and Carter were on Jim Adams' campaign
9    Facebook site?
10   A.    I don't think so.
11   Q.    Did you talk to Major Wells-Major about the
12   fact that McCoy and Carter were on Adams' campaign
13   Facebook site?
14   A.    I don't think so.
15   Q.    And is it fair to say that you could have
16   learned about this some time in late summer of 2009 or
17   you could have learned about it at the very end of
18   2009?
19         MR. HUNN:  Objection, form.
20   A.    I don't know the time frame.
21         MR. SHOEMAKER:  Okay.  I want to take a
22   short break.
23         MR. HUNN:  Okay.
24
25         (Recess)

65

1    BY MR. SHOEMAKER:
2    Q.    Let's go back on the record.
3          Do you remember having any discussions with
4    any other deputies within the Hampton sheriff's office,
5    including deputies -- I mean is it proper -- withdraw
6    the question.
7          You're a deputy, right?  You're just a
8    deputy who's a major, too?
9    A.    That's correct.
10   Q.    So even somebody who holds rank like a
11   captain or a major is a deputy?
12   A.    That's correct.
13   Q.    All right.  Back to my question.  Do you
14   remember having any discussion with any other deputies,
15   and, of course, I'm including lieutenants, sergeants,
16   captains, majors, and the sheriff himself -- well, the
17   sheriff is not a deputy?
18   A.    That's true.
19   Q.    Do you remember having discussions with any
20   other deputies, including lieutenants, captains,
21   majors, or the colonel, about the fact that Carter and
22   McCoy were on Jim Adams' campaign Facebook site?
23   A.    I don't recall that.
24   Q.    When you went to check Adams' Facebook site
25   yourself, do you remember confirming the fact that

17  (Pages 62 to 65)

66

1   McCoy and Carter were on it for anyone else?
2       A.   No.
3       Q.   It's fair to say, isn't it, that Sheriff
4   Roberts expected his deputies, all of his deputies, to
5   be politically loyal to him?
6           MR. HUNN:  Objection, form.
7       A.   I don't -- I think everybody has their own
8   opinion.
9
10  BY MR. SHOEMAKER:
11      Q.   And so the sheriff did not expect -- so
12  then your answer is the sheriff -- the sheriff did not
13  expect all of his deputies to be politically loyal to
14  him?  Is that correct?
15          MR. HUNN:  I'm sorry.  Objection, form, and
16  speculation that it calls for.
17      A.   I guess he just -- how about just repeating
18  that question so I'm clear in my mind what you're
19  saying?
20
21  BY MR. SHOEMAKER:
22      Q.   Okay.  The sheriff did not expect all of
23  his deputies to be politically loyal to him; isn't that
24  correct?
25          MR. HUNN:  Objection, form.  That's

67

1   speculation.
2       A.   I don't know.
3
4   BY MR. SHOEMAKER:
5       Q.   Have any employees of the Hampton sheriff's
6   office told you that they posted a comment on the Daily
7   Press website in response to any of the articles about
8   this case?
9       A.   No, sir, not to my knowledge.
10      Q.   Have you become aware of any deputies
11  within the Hampton sheriff's office who have posted
12  comments on the Daily Press comments site in response
13  to any articles in this case?
14      A.   No.
15      Q.   Have you posted any comments on any Daily
16  Press comment site in response to any article on this
17  case?
18      A.   No.
19      Q.   Have you heard any deputy within the
20  Hampton sheriff's office with the rank of lieutenant or
21  above -- any deputy within the Hampton sheriff's office
22  with the rank of lieutenant or above ever say anything
23  like, quote, "Be sure" -- and my question is about --
24  let me withdraw the question, start over.
25          Have you heard any deputies within the

68

1   Hampton sheriff's office at the rank of lieutenant or
2   above when speaking to other Hampton sheriff's office
3   employees ever say anything like, quote, "Be sure you
4   are supporting the right person," end quote?
5           MR. HUNN:  Objection, form.
6           You can answer it.
7       A.   I have never heard of that.
8
9   BY MR. SHOEMAKER:
10      Q.   You've never heard any person at the rank
11  of lieutenant or above, any deputy of the rank of
12  lieutenant or above, ever say that to other Hampton
13  sheriff's office employees?
14          MR. HUNN:  Objection to form, asked and
15  answered.
16      A.   I never heard that.
17
18  BY MR. SHOEMAKER:
19      Q.   Have you ever heard anything like that?
20          MR. HUNN:  Objection, form, asked and
21  answered.
22      A.   I haven't heard it.
23
24  BY MR. SHOEMAKER:
25      Q.   Have you ever heard a statement similar to

69

1   that?
2           MR. HUNN:  Objection, form.
3       A.   I've never heard that.
4
5   BY MR. SHOEMAKER:
6       Q.   You're not answering my question.  I think
7   your answer is:  I've never heard a statement like
8   that.
9           Is that fair?
10          MR. HUNN:  Objection, form, asked and
11  answered.
12
13  BY MR. SHOEMAKER:
14      Q.   Have you ever heard a statement like,
15  quote, "Be sure you are supporting the right person,"
16  uttered by any deputy within the Hampton sheriff's
17  office when speaking to other employees of the Hampton
18  sheriff's office?
19          MR. HUNN:  Objection, form.
20      A.   I have never heard that.
21
22  BY MR. SHOEMAKER:
23      Q.   Have you ever heard anything like that?
24          MR. HUNN:  Objection, form.
25      A.   I've never heard that.

18  (Pages 66 to 69)

70

```
1    BY MR. SHOEMAKER:
2        Q.    Okay. So you've heard something like it?
3        A.    No, that's not what I said. I said I've
4    never heard that.
5        Q.    Have you ever heard any deputy within the
6    Hampton sheriff's office with the rank of lieutenant or
7    above say, quote, "It is in your best interest to
8    support the sheriff," end quote?
9        A.    I've never heard that.
10       Q.    Have you ever heard a statement similar to
11   that uttered by a lieutenant or above within the
12   Hampton sheriff's office?
13             MR. HUNN: Objection, form.
14       A.    I have never heard that.
15
16   BY MR. SHOEMAKER:
17       Q.    And you're telling me you've never heard
18   that exact statement?
19             MR. HUNN: Objection, form, asked and
20   answered.
21       A.    I've never heard that.
22
23   BY MR. SHOEMAKER:
24       Q.    Have you ever heard a deputy within the
25   Hampton sheriff's office other than the sheriff himself
```

71

```
1    ever encourage other Hampton sheriff's office employees
2    to vote for the sheriff?
3              MR. HUNN: Objection, form.
4        A.    No.
5
6    BY MR. SHOEMAKER:
7        Q.    You've never heard that?
8              MR. HUNN: Objection, form, asked and
9    answered.
10       A.    I've never heard it, no.
11
12   BY MR. SHOEMAKER:
13       Q.    Have you ever heard a deputy within the
14   Hampton sheriff's office at the rank of lieutenant or
15   above ever say to other employees of the Hampton
16   sheriff's office, quote, "Supporting the sheriff could
17   help you or hurt you," end quote?
18       A.    Never heard that.
19       Q.    You ever heard anything like that?
20             MR. HUNN: Objection, form.
21       A.    I've never heard that.
22
23   BY MR. SHOEMAKER:
24       Q.    Have you ever heard Major Wells-Major ever
25   say, quote, "If you don't support the sheriff, you're
```

72

```
1    not going anywhere," end quote?
2        A.    I've never heard that.
3        Q.    Have you ever heard Major Wells-Major ever
4    encourage any other employee of the Hampton sheriff's
5    office to support the sheriff, the sheriff's reelection
6    effort?
7              MR. HUNN: Objection, form.
8        A.    I need some clarity on that one.
9
10   BY MR. SHOEMAKER:
11       Q.    Have you ever heard Major Wells-Major when
12   speaking to any other employee of the Hampton sheriff's
13   office encourage them to support the sheriff's
14   reelection effort?
15             MR. HUNN: Objection, form.
16       A.    No.
17
18   BY MR. SHOEMAKER:
19       Q.    Have you ever heard Major Wells-Major ever
20   encourage another employee of the Hampton sheriff's
21   office to vote for Sheriff B. J. Roberts?
22             MR. HUNN: Objection, form.
23       A.    No.
24
25
```

73

```
1    BY MR. SHOEMAKER:
2        Q.    When -- back to the event where the sheriff
3    mentioned the long train and the short train and was,
4    you know, saying he was up for reelection in November,
5    and the discussion we were talking about before, on
6    that occasion did the sheriff say something like,
7    quote, "This is a bad economy and people are knocking
8    down my door for these jobs," end quote?
9              MR. HUNN: Objection, form, also
10   mischaracterizes previous testimony.
11       A.    I don't remember.
12
13   BY MR. SHOEMAKER:
14       Q.    Did he mention the economy at all?
15       A.    I don't remember.
16       Q.    Do you remember Danny Carter and the
17   sheriff having a conversation after that meeting where
18   the sheriff mentioned the long train and the short
19   train?
20             MR. HUNN: Objection, form.
21             You can answer.
22       A.    I think it was two things you're saying in
23   that. I don't -- you're talking about this train, but
24   they did have a conversation afterwards.
25
```

ADAMS HARRIS REPORTING, INC.
(757)631-0458

74

```
1    BY MR. SHOEMAKER:
2       Q.   Okay.  And were you present for that
3    conversation?
4       A.   Between the sheriff and Danny?
5       Q.   Right.
6       A.   When the sheriff and I left, I think Carter
7    came out and they started talking.  So at that point,
8    because I thought it was a conversation between the
9    two, I stepped off to the side.  So I didn't hear what
10   they were talking about.
11      Q.   So you didn't hear what they said to each
12   other?
13      A.   No.
14      Q.   Were you present for any other conversation
15   where the sheriff and Danny Carter were having an
16   argument with each other?
17           MR. HUNN:  Objection, form.
18      A.   No.  I don't -- that was the only time that
19   I have encountered those two.
20
21   BY MR. SHOEMAKER:
22      Q.   Talking together?
23      A.   Together.
24      Q.   So just so the record is clear, that's the
25   only time that you've encountered those two talking
```

75

```
1    together?  Is that right?
2       A.   Yes, sir.
3       Q.   Was Colonel Bowden present when the sheriff
4    talked to the employees and mentioned the long train
5    and the short train?
6            MR. HUNN:  Objection to form.
7    Mischaracterizes the evidence and testimony from this
8    witness.
9            MR. SHOEMAKER:  I'm not -- I'm not going to
10   jam you up on your objections.  I know you've got an
11   objection.
12           MR. HUNN:  You can still answer.
13           MR. SHOEMAKER:  I don't want coaching --
14   I'm concerned about --
15           MR. HUNN:  It's an objection to form.
16      A.   Me and the sheriff.
17
18   BY MR. SHOEMAKER:
19      Q.   Just you and the sheriff.  Colonel Bowden
20   wasn't there?
21      A.   No.
22      Q.   And Major Wells-Major wasn't there?
23      A.   No, 'cause it was a correctional meeting.
24      Q.   It was a shift change, wasn't it?
25      A.   For corrections.
```

76

```
1       Q.   Right.  Right.
2       A.   Courts, she might have been over there for
3    courts.  This is correction.
4       Q.   Okay.  Do the courts services have shift
5    changes?
6       A.   I don't know.
7       Q.   Well, they only work one shift, don't they?
8    They work during the day when the courts are open?  I
9    guess they're there at night?
10      A.   Sometimes things are going on at night when
11   they have to post a deputy late.
12      Q.   And civil process, do they work one shift?
13      A.   Yes, sir.
14      Q.   I've talked to you about Carter and McCoy
15   being on Jim Adams' Facebook page.  Did you ever hear
16   about David Dixon supporting Jim Adams for sheriff?
17           MR. HUNN:  Objection to form.
18      A.   I never did.
19
20   BY MR. SHOEMAKER:
21      Q.   Did you ever hear about John Sandhofer
22   supporting Jim Adams for sheriff?
23      A.   When?
24      Q.   Any time prior to the election in 2009.
25      A.   No.
```

77

```
1       Q.   Did Captain McGee work for you?  Back in
2    2009.
3       A.   I think he was over in court services.
4       Q.   Have you ever worked on any committee that
5    supported any of the sheriff's reelection efforts?  Not
6    just 2009 but any other reelection effort.
7       A.   What kind of committees?  I'm sorry.
8       Q.   Have you ever served on any committee whose
9    purpose was to support Sheriff Roberts or any aspect of
10   his reelection efforts?
11      A.   Democratic committee, if that's what you're
12   referring to.
13      Q.   Is that the only committee you've served on
14   in support of Sheriff Roberts' reelection efforts?
15      A.   Yes.
16      Q.   Who else served on that committee?  Did you
17   serve on that committee in 2009?
18      A.   Just people within the city.
19      Q.   Were any other members of the sheriff's
20   office serving with you on that committee?
21      A.   On the Democratic committee?
22      Q.   Yeah.
23      A.   I think Colonel Bowden.
24      Q.   Anyone else?
25      A.   Eva Bland was out there.
```

20 (Pages 74 to 77)

78

```
 1    Q.    Eva Bland?
 2    A.    Uh-huh.
 3          MR. HUNN:  Is that a yes?
 4          THE DEPONENT:  Yes.
 5          MR. HUNN:  I'm sorry.
 6
 7  BY MR. SHOEMAKER:
 8    Q.    Anyone else?
 9    A.    That's it.
10    Q.    Did there ever come a time prior to
11  election in 2009 when you learned that Bobby Bland was
12  supporting Jim Adams for sheriff?
13    A.    I never knew that.
14    Q.    Do you remember learning about a cookout
15  that was cohosted by Danny Carter and Ramona Larkin, or
16  Rowena Larkin?
17    A.    Yes.
18    Q.    Okay.  And when did you hear about that?
19    A.    I'm not sure.  It was afterwards.  I think
20  McCoy told me.
21    Q.    It was after the picnic had occurred?
22    A.    Yes, sir.
23    Q.    And did you learn about that in early
24  September of 2009?  Does that sound about right?
25    A.    Could have been.  I mean, the weather was
```

79

```
 1  warm so it could have been.
 2    Q.    All right.  And McCoy told you about the
 3  picnic?
 4    A.    Uh-huh.
 5    Q.    What did he tell you about it?
 6    A.    I don't recall.  He was kind -- just kind
 7  of told me it was -- they were having a cookout and he
 8  just wanted to let me know that -- who came, and that
 9  was about the extent that I can recall right now.
10  'Cause it caught me off guard 'cause, you know, he just
11  saw me and told me.
12    Q.    Did you subsequently learn that there were
13  some pictures posted on line of that cookout?
14          Did you ever learn that there were pictures
15  of people at that cookout either on Facebook or on some
16  other website page?
17    A.    Oh, I never knew that.
18    Q.    Did you ask Ramona Larkin who attended the
19  cookout?
20    A.    No.
21    Q.    Did you ever talk to Ramona Larkin about
22  the cookout at all?
23    A.    I don't believe so, no.
24    Q.    So if she says that she had a conversation
25  with you about that cookout that she cohosted with
```

80

```
 1  Danny Carter, at which Jim Adams attended --
 2    A.    Uh-huh.
 3    Q.    -- and she says that you said to her that
 4  does not, quote, "look good," end quote, is she
 5  definitely wrong about that, or do you just not
 6  remember whether you said that or not?
 7          MR. HUNN:  Objection, form.
 8          Go ahead.  You can answer.
 9    A.    I think she's wrong because I don't recall
10  it.  I don't recall having this conversation with her.
11
12  BY MR. SHOEMAKER:
13    Q.    All right.
14    A.    I only remember it with McCoy.
15    Q.    All right.  Is it possible you told McCoy
16  that it does not, quote, "look good," end quote?
17          MR. HUNN:  Objection, form.
18          You can answer.
19    A.    No, 'cause he approached me.
20
21  BY MR. SHOEMAKER:
22    Q.    Okay.
23    A.    I wouldn't have known about it.  He came to
24  me.
25    Q.    I know, but he approached you and you had a
```

81

```
 1  conversation about it, right?
 2    A.    Right.
 3    Q.    Did he tell you Adams was there?
 4    A.    Yes.
 5    Q.    And what else did he say to you?
 6    A.    It's been so long ago.  It was just a
 7  cookout.  I think it was a shift cookout.  Somebody was
 8  leaving.  And it was a third piece to that, but I don't
 9  recall all -- all that it was about.  And he said they
10  asked him to cook.  I think that's what he was there
11  for.  He had to go home and get a grill.  Next thing I
12  know, Colonel followed him.
13    Q.    Colonel followed who?
14    A.    McCoy.  To the beach.  I think that's where
15  it was at, at the beach.
16    Q.    What do you mean, "Colonel followed him"?
17    A.    Colonel Adams.  He was my colonel.  I still
18  call him Colonel.
19    Q.    All right.  Is it possible you had a
20  conversation with Ramona Larkin and you just don't
21  remember it, sitting here?
22          MR. HUNN:  Objection, form.
23    A.    I don't recall ever having a conversation
24  with her.
25
```

21  (Pages 78 to 81)

82

```
1   BY MR. SHOEMAKER:
2       Q.   Did you learn that she was one of the
3   cohosts of the cookout?
4       A.   I didn't know it then.  I still don't know
5   it now.  'Cause, again, all I remember, it was -- the
6   party was centered around three entities.  I don't
7   remember --
8       Q.   One of which was Ramona Larkin's birthday?
9       A.   Okay.
10      Q.   Does that ring a bell?
11      A.   Could be.  I'm just not sure.  I remember
12  one of the deputies was leaving.
13      Q.   Did you ever learn that Adams was invited
14  to the cookout -- to this cookout by Danny Carter?
15      A.   I -- I don't know the specifics.  I don't
16  have any knowledge of that.
17      Q.   Did you discuss this cookout with anyone
18  else in the Hampton sheriff's office?
19      A.   No.
20      Q.   So if Ramona Larkin were to testify that
21  you told her that she should tell the sheriff that she
22  did not invite Jim Adams to the cookout, then she is
23  either mistaken or lying?  Is that your position?
24           MR. HUNN:  Objection to the form.  Also
25  calls for speculation.
```

83

```
1       A.   I can't speak for her.  I don't recall.
2   All I know is talking to McCoy.
3
4   BY MR. SHOEMAKER:
5       Q.   Do you know why McCoy told you about the
6   cookout?
7       A.   No.  I mean, like I said, I guess I was his
8   supervisor and he just saw me and something -- again,
9   that cookout happened on Saturday.  I guess he just
10  felt he needed to tell somebody.  So he saw me and he
11  told me.
12      Q.   Was McCoy concerned about the fact that Jim
13  Adams was there?
14           MR. HUNN:  Objection, form.
15      A.   I don't know.  I can't answer that.
16           MR. SHOEMAKER:  All right.  Major, I'm
17  going to take a couple of minutes to review my notes,
18  but I'm pretty close to being done.
19
20           (Recess)
21
22  BY MR. SHOEMAKER:
23      Q.   Back on the record.  In December of 2009
24  who else would have attended senior staff meetings?
25      A.   Sheriff, Colonel, maybe Wells-Major,
```

84

```
1   myself, maybe the captains.
2       Q.   And the captains then, McGee was a captain
3   then?
4       A.   I believe so, yes.
5       Q.   Who were the other captains then that you
6   can remember?  Was Glover a captain then?
7       A.   No, he wasn't.
8       Q.   Who -- what other captains -- Rich wasn't a
9   captain, was he?
10      A.   No, Rich wasn't a captain.
11      Q.   McGee was a captain then.  Who else was a
12  captain then?
13      A.   I think that was about it.
14      Q.   So it would have been McGee, you, Colonel
15  Bowden, Major Wells-Major, and the sheriff?
16      A.   Correct.
17      Q.   All right.  That is all I have, Major.  I
18  appreciate your time this afternoon.
19           MR. HUNN:  He'll read and sign.
20
21           (Signature not waived.)
22
23           (Whereupon, the deposition was
24  concluded at 3:46 p.m.)
25
```

85

```
1           DEPOSITION ERRATA SHEET
2
3   Case Caption:   Bland, et al. v. Roberts
    Deponent:       Kenneth Richardson
    Deposition Date: October 12, 2011
4
5       I have read the entire transcript of my deposition
    taken in the captioned matter or the same has been read
6   to me.  I request that the following changes be entered
    upon the record for the reasons indicated.  I have
7   signed my name to the Errata Sheet and the appropriate
    Certificate and request both to be attached to the
8   original transcript.
9   Page/Line Nos.    Correction/Reason
10  _____       _____
11  _____       _____
12  _____       _____
13  _____       _____
14  _____       _____
15  _____       _____
16  _____       _____
17  _____       _____
18  _____       _____
19  _____       _____
20  _____       _____
21  _____       _____
22  _____       _____
23  _____       _____
24  Signature:_____  Date: _____
              Kenneth Richardson
25
```

22  (Pages 82 to 85)

86

```
 1              CERTIFICATE OF DEPONENT
 2    COMMONWEALTH OF VIRGINIA
 3    CITY OF _____
 4
          Before me, this day, personally appeared Kenneth
 5    Richardson, who, being duly sworn, states that the
      foregoing transcript of this deposition, taken in the
 6    matter, on the date and at the place set out on the
      title page hereof, constitutes a true and complete
 7    transcript of said deposition.
 8
 9
10
11              ---------------------------
                Kenneth Richardson
12
13
14
          SUBSCRIBED and SWORN to before me this _____
15    day of _____, 2011, in the jurisdiction
      aforesaid.
16
17
18
19
      _____      _____
20    My Commission Expires     Notary Public
21
22
23
24
25
```

87

```
 1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2         I, Juanita Harris Schar, RMR, CCR, CRR, a
      Notary Public for the Commonwealth of Virginia at large,
 3    of qualification in the Circuit Court of the City of
      Virginia Beach, Virginia, and whose commission expires
 4    April 30, 2014, do hereby certify that the within named
      deponent, KENNETH RICHARDSON, appeared before me at
 5    Virginia Beach, Virginia, as hereinbefore set forth, and
      after being first duly sworn by me, was thereupon
 6    examined upon his oath by counsel for the respective
      parties; that such examination was recorded in Stenotype
 7    by me and reduced to computer printout under my
      direction; and that the foregoing constitutes a true,
 8    accurate, and complete transcript of such examination to
      the best of my ability.
 9
          I further certify that I am not related to
10    nor otherwise associated with any counsel or party to
      this proceeding, nor otherwise interested in the event
11    thereof.
12        Given under my hand and notarial seal this
      25th day of October, 2011, at Virginia Beach, Virginia.
13
14
15
16              Notary Public
17
18    Certified Court Reporter No. 0313085
19
20
21
22
23
24
25
```

JUANITA HARRIS SCHAR
Notary Public
Commonwealth of Virginia
214040
My Commission Expires Apr 30, 2014

23 (Pages 86 to 87)

ADAMS HARRIS REPORTING, INC.
(757)631-0458