UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

---

BOBBY BLAND, DANIEL RAY CARTER, JR., DAVID W. DIXON, ROBERT W. McCOY, JOHN C. SANDHOFER and DEBRA H. WOODWARD,

Plaintiffs,

v 4:11cv45

B. J. ROBERTS, individually, and in his official capacity as Sheriff of the City of Hampton, Virginia,

Defendant.

---

DEPOSITION UPON ORAL EXAMINATION OF

BOBBY BLAND

Taken on behalf of the Defendant

Newport News, Virginia

August 22, 2011

-----oOo-----

INGRAM REPORTING
2520 Queens Elm Place
Virginia Beach, Virginia 23454
(757) 481-0935

Exhibit 23



APPEARANCES: James A. Shoemaker, Jr.
Patten, Wornom, Hatten & Diamonstein, L.C.
12350 Jefferson Avenue, Ste. 300
Newport News, Virginia 23602
Attorneys for the Plaintiffs

Jeff W. Rosen
Pender and Coward
222 Central Park Avenue, Suite 400
Virginia Beach, Virginia 23462
Attorneys for the Defendant

-----oOo-----

REPORTED BY: Marjorie F. Ingram

INDEX

| WITNESS | PAGE |
|---|---|
| BOBBY BLAND | |
| Examination by Mr. Rosen | 4, 85 |
| Examination by Mr. Shoemaker | 82 |

Deposition of BOBBY BLAND, taken before Marjorie F. Ingram, Court Reporter, a Notary Public for the State of Virginia at Large, by Notice of counsel as to the time and place, at the offices of Patten, Wornom, Hatten and Diamonstein, L.C., 12350 Jefferson Avenue, Newport News, Virginia, at 9:00 a.m., August 22, 2011, to be used in the trial of the above-entitled cause.

-----oOo-----

BOBBY BLAND, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROSEN:
Q. Good morning, Mr. Bland.
A. Good morning.
Q. My name is Jeff Rosen, and I represent Sheriff Roberts in the lawsuit that you filed against him. We're here today to take your deposition. Do you know -- do you know

what a deposition is?
A. Yes, sir.
Q. Okay. It's a chance for me to ask you questions about what you know about the case and obviously, since you're a plaintiff, it's going to take a little time to find out what you know and what the basis of your allegations are.
If there's any question that I ask you that you don't understand, let me know and I'll be glad to rephrase it. Otherwise, I'll assume you understand my question and will rely on your answers. Do you understand?
A. Yes, sir, I do understand.
Q. Also, this is being taken down by a court reporter, and you must answer verbally. A nod or the shake of the head does not show up in the transcript?
A. Correct. I understand.
MR. SHOEMAKER: And keep your voice up, too, so we can all hear.
THE WITNESS: Okay.

BY MR. ROSEN:
Q. Please state your full name and address.

Page 6

A. Bobby Ray Bland. The address is 20 Kettering Lane, Hampton, Virginia. Zip code is 23666.
Q. And what's your date of birth?
A. My date of birth is June 22, 1950.
Q. Okay. And you married, sir?
A. Yes, I am.
Q. What's your wife's name?
A. My wife's name is Eva. E-V-A.
Q. Uh-huh. Any children?
A. Yes. I have a daughter, Chandra (sic).
Q. And how old is Chandra.
A. Chandra is 32.
Q. Uh-huh. Okay. And just give me briefly your educational background, if you would for me.
A. I'm sorry?
Q. Educational background.
A. Graduated from high school in 1968, Horton High School in Pittsboro, North Carolina. I attended Kittrell Junior College, which is located in Kittrell, North Carolina. Transferred from the junior college from North Carolina to North Carolina Century University in

Page 7

Durham, North Carolina, and that was in 1970 that I went to Durham.
Q. Did you graduate?
A. No, I didn't.
Q. Okay. So you have a -- an associates degree?
A. Associates degree.
Q. Associates degree. In what field?
A. Business.
Q. Just general business?
A. Yes.
Q. Okay. All right. And what year did you -- well, did you go continuously from high school to junior college to North Carolina Century?
A. North Carolina Central.
Q. Central. Did you go continuously?
A. Yes.
Q. All right. And so when was the -- when did you leave North Carolina Central?
A. I left in the summer of '72.
Q. Okay. And why did you not complete your education there?
A. The reason I didn't complete it is -- and I always wanted to join the Air Force,

Page 8

and I had an opportunity to do that. So I joined the Air Force.
Q. In 1972?
A. I joined the Air Force in 1974.
Q. Okay.
A. I worked a couple of years. I was a short of funds, I think, during that time frame is one of the reasons I did not finish, so I worked during that time frame. And then I joined the Air Force after that.
Q. Okay. So you worked from '70 --'72 to '74?
A. Seventy-two to '74.
Q. And where did you work?
A. I worked at the Population Center in Chapel Hill, North Carolina.
Q. What is that?
A. What is the Population Center?
Q. Yes.
A. The Population Center is a -- it's a world population. They -- I was -- I -- I -- I worked at the Population Center, but it had nothing to do with the population center. I was running copies for the Population Center.
Q. You mean photocopying?

Page 9

A. Yeah. Photocopying.
Q. Making photo copy -- copies?
A. Correct.
Q. Okay.
A. But the Population Center was -- it took into account all the population of the -- of the world.
Q. Is that an international organization?
A. Yes, sir.
Q. Okay. All right. So you were making photocopies?
A. Correct.
Q. Did you work in the mail room?
A. Correct.
Q. Did you work for actually the Population Center or for a subcontractor?
A. It was basically for a subcontractor.
Q. Subcontractor?
A. Of the Population Center.
Q. And what's the name of that company?
A. It was Frank, gosh. It was for the Population Center. Let me rephrase. It was the

Population Center that I worked for.
Q. Uh-huh.
A. And I worked for Frank Greeman (sic), I think, is what his name. He worked also for the Population Center.
Q. That was your supervisor.
A. That was my supervisor, correct.
Q. All righty. And how -- and --
A. I'm sorry.
Q. -- and you worked there for two years?
A. Yes, sir.
Q. All right. Then you say you joined the Air Force?
A. Yes, sir.
Q. All right. And what rank did you go in?
A. What rank did I go in?
Q. Yes. Were you enlisted?
A. Yes, sir.
Q. Enlisted. Okay. And what was your -- how long were you in the Air Force?
A. Twenty-four years.
Q. So did you retire from --
A. Yes, I did.

Q. Okay. Retired from the Air Force.
And what rank did you end up retiring at?
A. Master Sergeant, which is an E-7.
Q. And what was -- just describe your career for me in the Air Force.
A. The career in the Air Force was accounting and finance career field.
Q. Accounting and finance?
A. Finance career field, correct. There are different subject matter areas in -- in the Air Force. My first job was a pay clerk. That was taking care of the accounts of the members.
Q. Paying accounts?
A. Paying accounts --
Q. Uh-huh.
A. -- of members, correct.
Q. Okay. And then were you promoted in that position?
A. And then subsequently, you do other jobs in the -- in the Air Force. You go up from pay accounts. You might work travel accounts. You would also work accounts payables. Another SMA would be commercial services. Another

account would be material section. Another would be the commissary section. Another SMA and further, as long as you are up, go up to supervisory level, so my last position was the superintendent, Superintendent of Finance. And that -- that was at Pope Air Force Base.
Q. That was your last position?
A. That was my last position, yes.
Q. And how much did you earn as a Superintendent of Finance at Pope Air Force Base?
A. As an E-7 back in -- at the end of my career which was 1998, it would have been approximately 45 plus.
Q. You mean pay you more than 45 or plus benefits. What do you mean?
A. Well, benefits was -- it was -- it was probably more. I don't know the exact amount, but it was probably $45,000 upward, between 45 and 50,000.
Q. Okay. All right. And did you retire when you left the military?
A. Yes.
Q. So you are drawing your military retirement?

A. Correct.
Q. As of that time?
A. Correct.
Q. About how much do you draw in military retirement?
A. Retirement pay right -- right now is approximately about 23,000 a year.
Q. And you drew that the entire time you were employed by the Newport News Sheriff's Department? Hampton. Sorry. Hampton Sheriff's Department. Okay. Strike me down now.
MR. SHOEMAKER: Tell you're from the Beach.
MR. ROSEN: Strike me down now, right. Sorry, Sheriff. I got your name here. I don't have the Sheriff's Department. Write that down right now.

BY MR. ROSEN:
Q. You have been drawing that retirement throughout the time you were working for the Sheriff's Department?
A. Since I retired from the Air Force, yes, sir.
Q. All righty.

Page 14

All right. And is your wife employed as well?
A. Currently?
Q. Yes.
A. No, she's not.
Q. Okay. Was she employed?
A. Yes, she was.
Q. Where -- where did she work?
A. Originally, she worked at the City of Hampton.
Q. Uh-huh.
A And then subsequently, she moved over to the Hampton Sheriff's Department as the Human Resource person.
Q. And so she worked at the Hampton Sheriff's Department as the Human Resource person. That's what I thought. Okay. And when did she leave the Hampton Sheriff's Department?
A. About June of 2009, I think, was the date approximately.
Q. And why did she leave the Hampton Sheriff's Department?
A. I'm not quite sure. You will probably have to, you know, get with her. I think it was a disagreement. She was not

Page 15

demoted, but another person was put over her --
Q. Uh-huh. Okay.
A. -- is why she probably left.
Q. All right. And who was that?
A. Tammy Underpet (sic).
Q. How do you spell that? Do you know?
A. No, sir. I -- I don't know the correct spelling of Underpet.
Q. Okay. Are you claiming that the fact that your wife had someone put in as a supervisory position over her is retaliation in this case?
A. I would say she resigned from her position because of that situation.
Q. Are you claiming that --that was retaliation as a result of you being -- not rehired by the Sheriff's Department?
A. No, sir. I'm not talking -- claiming any retaliation purpose. I'm just stating the fact that she was -- she was -- she resigned her position because of a situation that happened at the Sheriff's Department.
Q. Okay. How long was she in Human Resources? Was she the Human Resources Director

Page 16

at the Hampton Sheriff Department?
A. She was the, yes, sir, she was the Director of Human Resources.
Q. How long did she hold that position?
A. A couple of years. Two or three years, if I can remember correctly, sir.
Q. So did she continue on as Human Resource Director after you were not rehired?
A. She resigned her position before I was not reappointed.
Q. Okay.
A. She was -- she left in June of 2009, I think, and I left in December of 2009.
Q. Did you suspect that you would not be reappointed after the election?
A. It was a -- sir, it was a total shock that I was not reappointed. I feel that I should -- I was shocked that I was not appointed back in my position.
Q. Okay. Now, I wanted to get -- I'll get to that. So was the Sheriff's Department the first civilian job you had after retiring from the military?
A. The first civilian job I had was

Page 17

with Thomas Nelson Community College.
Q. And what position did you obtain with them?
A. I was accounts payable or accounting technician was the proper job. Accounting technician for Thomas Nelson.
Q. And -- and what time frame did you work there?
A. That would have been from -- it was in 2000. I'm sorry, 1998 to 2000. Probably I went in about October, November, time frame of '98, and I left there probably November of 2000.
Q. And why did you leave?
A. For higher salary.
Q. Okay. What were you earning when you left Thomas Nelson?
A. It was probably about 20,000, approximately.
Q. And -- and where did you -- leave or where did you go after that?
A. I'm sorry, sir?
Q. Where did you go to after that for employment?
A. I went to Hampton Sheriff's Department after that.

Page 18

Q. How did you obtain a job with the Hampton Sheriff's Department?
A. I had a call from one of the former co-workers at Thomas Nelson, indicating that there was a need for a person with accounting background for the canteen office at the Sheriff's Department, and she wanted to know was I interested in that position, and I told her I would be interested in that position.
Q. Do you remember who that was?
A. I can't recall her name right now, sir.
Q. Okay. And so -- and after that -- to follow up with that, did you contact someone at the Sheriff's Department?
A. Yes, sir.
Q. Who did you contact?
A. I was interviewed or contacted by Ms. Debra Davis.
Q. Did you know Ms. Davis before going to work for the Sheriff's Department?
A. No, sir.
Q. Was your wife working for the City of Hampton at the time?
A. At that time, yes, sir. She was.

Page 19

Q. She was. Okay. And so did you -- did you fill -- fill out an application with the Sheriff's Department?
A. Yes, sir. I believe I filled out an application.
Q. Okay. Did you know anyone at the Sheriff's Department before applying for a job there?
A. No, sir. I did not know anyone.
Q. Who was the sheriff at the time?
A. Sheriff Roberts was the sheriff.
Q. Okay. What was Ms. Davis' position with the Sheriff's Department at the time?
A. She was Director of Administration.
Q. And so -- and -- and -- is she the one that hired you or did you interview with Sheriff Roberts as well?
A. I interviewed with Ms. Debra Davis.
Q. And she hired you?
A. Yes, sir, with the approval of Sheriff Roberts.
Q. Did you meet Sheriff Roberts before you were hired?
A. I met Sheriff Roberts at one of his staff meetings.

Page 20

Q. You mean after you were hired?
A. After I was hired, right.
Q. Okay. All right. And Debra Davis, she hired you. Was she your boss at the Sheriff's Department?
A. Correct, sir. She was my boss.
Q. And how long was she your boss?
A. From 2000 till -- from 2000 to the time I left. I'm sorry. From the time she left.
Q. Okay. All right. And so when you were hired at the Sheriff's Department, what position did you originally have?
A. I was the canteen officer at that time.
Q. Were you a sworn deputy?
A. Yes, sir. I took an oath.
Q. Did you --
A. As a civilian.
Q. As a civilian. You were a civilian. So you were a civilian. You were not a sworn deputy?
A. Correct. Well, I was a civilian.
Q. Okay. Were you ever a sworn deputy?

Page 21

A. I went down to the courthouse to swear -- to be sworn in.
Q. I understand you took an oath for the job, but were you ever -- were you ever a sheriff's deputy? A deputy at the Sheriff's Department?
A. No, sir.
Q. You never were for the entire --
A. No, sir.
Q. -- employment history there. Okay. So you began as a canteen officer, you said?
A. Yes, sir.
Q. And so did you keep track of the inmate canteen? That would be your job?
A. I kept account of the canteen -- the inmate accounts.
Q. All right. Did you also do the purchasing for the canteen?
A. No, sir. That was subcontracted out.
Q. Okay.
A. I would take the sheets up for the inmates' reports for whatever they wanted during that week. I would -- I think at that time that

Page 22

we first started, it was an input of all the items that the canteen wanted to order for that week, we put it in the computer. Subsequently, there was a machine you just put the -- the form in the -- into the machine. It would automatically, you know, register what the inmate wanted Tuesday for that week.
Q. Okay.
And how long did you hold that position?
A. For approximately four years.
Q. And -- and after that four years, did your position change at all?
A. Yes, sir.
Q. To what?
A. Finance officer.
Q. Okay. Was that a promotion?
A. Yes, sir.
Q. Okay. All right. Do you know what your starting salary was in charge of the canteen -- inmate canteen, what your starting salary was?
A. I can't recall right at this time what the exact figure was, sir.
Q. Okay. Do you have a ball park?

Page 23

A. Ball-park figure probably was about 26,700, I imagine, something like.
Q. And when you were promoted to finance officer, then what was your salary?
A. Subsequently, it went up to probably about to 30. Somewhere in that range.
Q. Okay. And as finance officer, what were your responsibilities?
A. Basically, I assisted with the budget. I also did purchase orders. I did requisitions, material receipts. Other tasks included keeping in contact with fixed assets.
Q. What does that mean?
A. Well, all the equipment that was in the office, I would keep a list of all the equipment that came into the office.
Q. The inventory?
A. Inventory, yes, sir.
Q. Uh-huh.
A. Then also I kept the travel cards in a locked box. I would be responsible for the travel cards.
Q. Okay.
A. I paid the bills, accounts payable type situation for the Sheriff's Department.

Page 24

Also, I did work-force related work for the finance -- finance -- for the Sheriff's Department, I'm sorry.
As far as the inmates that were on -- on work -- on work release, I would take care of their checks. And if they had debts to be paid or -- I would send those out to the courts. If they owed the courts funds, I would send that out. The balance of the money would go back into their accounts.
Q. Uh-huh.
A. So that was another task that I had.
Q. Okay. Anything else?
A. I'm sure there are some more tasks that I did. Any special projects that came up. For instance, there was one instance where the antenna on the roof was -- when the wind blew, it rained. It rained, it would kind of make it -- the computers wouldn't work correctly, so that there was one project that we got underground cable, so I assisted in that project.
Q. Uh-huh. And how long were you a finance officer?

Page 25

A. Till about five years. Four or five years.
Q. And then did your job change again after that?
A. Did the job change after that?
Q. Yes.
A. After that, I was not reappointed.
Q. Oh, okay. So that was the last job you held?
A. Yes.
Q. Okay. All right. Okay. All right. And while you worked for the Sheriff's Department, were you ever counseled or disciplined for poor job performance?
A. No, sir. I was never counseled for poor job.
Q. Were you ever disciplined?
A. No, sir.
Q. Okay. Did you -- were you ever -- did you ever -- were you ever suspended while you were at the Sheriff's Department?
A. Was I ever suspended? I can recall, no, sir. I was never suspended.
Q. All righty. Now, I think you said that you were surprised when you were not

Page 26

reappointed. Why do you believe you were not reappointed by the sheriff -- by Sheriff Roberts after the election in 2009?

A. Because I had -- I have always done an outstanding job with all the jobs that I came in contact with, so I had no reason to believe that I would not be appointed again because I had done all my EPRs suggested. I had above average performances. And I was never disciplined as you-- as I can recall. And so I -- I -- it was my understanding that I was doing a wonderful job there.

Q. So why do you believe you were not -- why were you not reappointed?

A. Why was I not reappointed? I often wonder why I was not reappointed. It was probably because in opposition that he maybe thought I was, you know, going to oppose him in some way is the only reason I can imagine that I was not reappointed.

Q. All right. So let me explore that. What do you mean by that? You said you were going to oppose him in some way. What do you mean by that?

A. Well, maybe he thought I was going

Page 27

to go with the opposition. Not vote for him or vote for the opposition.

Q. And why would you say that? What makes you say that?

A. Well, probably because my supervisor, Ms. Davis, was probably working for the opposition, and in some way, I don't know what way, maybe I got connected there and --

Q. Okay. Well, were -- were you working for McAdams' (sic) campaign to run for sheriff in 2009?

A. I'm sorry?

Q. Were you working for McAdams' campaign in 2009 with --

A. Jim Adams?

Q. Jim Adams. Was Adams -- strike that.

Was Adams running against the sheriff in 2009?

A. Yes, he was.

Q. Okay. Were a supporter of Adams?

A. I wasn't support of anyone at that time, sir.

Q. Okay. Well, I'm trying to find out. You say you thought that the sheriff may

Page 28

have thought that you were supporting his opposition. Why would he think that?

A. He had probably connected me by working -- by my being with Ms. Davis and Ms. Davis working for Sheriff Adams, that's the only reason I -- I can surmise that he would do that.

Q. Okay. So you think it's just because you worked for Ms. Davis? Okay.

A. (Witness nodded) Because I had no other -- no other connection.

Q. All right. Did you -- did you actively support Adams' candidacy for sheriff?

A. No, sir.

Q. Did you contribute any money to his campaign?

A. No, sir.

Q. Did you go to any campaign functions for him?

A. No, sir.

Q. Did you post any postings on the internet supporting him?

A. No, sir.

Q. Did you say anything derogatory about Sheriff Roberts during the -- before the campaign or during the campaign?

Page 29

A. No, sir.

Q. When did Ms. Davis leave the Sheriff's Department?

A. Gosh, I'm not sure when Ms Davis left. I really can't say. I mean, I know she left, but I don't know the exact time when she left.

Q. Well, how far, in fact, was it -- did Ms -- Ms -- Ms. Davis become the campaign manager for Adams?

A. Yes, sir. I believe she became the campaign manager for Adams.

Q. So she was Sheriff Roberts' opposition's campaign manager?

A. I'm sorry?

Q. She became his campaign manager, Adams' campaign manager?

A. She became his campaign manager or, yes, sir, treasurer or something.

Q. Treasurer. Okay. And were you -- did you provide any information about the operation of the Sheriff's Department under Sheriff Roberts to Ms. Davis after she became the treasurer for Mr. -- Mr. Adams?

A. No, sir.

Q. Did you give her any information about salaries or sheriffs' salaries about -- from the Sheriff's Department?
A. No, sir.
Q. Did you keep in contact with her after she left the Sheriff's Department?
A. I would call her from time to time because we were good friends. So she would call to see how I was doing. Yeah, just a friendly conversation but nothing businesslike.
Q. All right. So you were -- you were close friends?
A. Oh, I'm still close friends with Ms. Davis.
Q. Okay. All right.
Well, now, you understand when you began working for Sheriff Roberts that you served at his pleasure? Did you understand that?
A. Yes, sir. I did understand that.
Q. And so he could terminate you for any reason except when that was illegal?
MR. SHOEMAKER: Object to the form of the question. Go ahead and answer it to the best of your ability.

BY MR. ROSEN:
Q. Do you understand that?
A. I understand that Sheriff Roberts has the authority to hire and fire individuals, but with my situation, but with cause. I had no reason to be dismissed as I could -- as I see it. I mean, he had the authority, but just because you have the authority doesn't -- you know, in my estimation, I have to have a cause. It was a wrongful dismissal in my estimation that I was let go.
Q. So you believe Sheriff Roberts has to have cause before he could dismiss you from the Sheriff's Department. That's your -- that's your belief?
A. I --I believe that he would have to have good cause to let me go, yes, sir. And there was no cause to let me go.
Q. And why did you say that? Were you bound by a grievance procedure at the Sheriff's Department?
A. No, sir. I was not bound by any grievance.
Q. Were you bound by the City of

Hampton's grievance procedure?
A. No. I wasn't bound by the City of Hampton.
Q. Did your wife tell you that he -- that Sheriff Roberts had to have good cause to fire you?
A. No, sir.
Q. I'm just trying to find out what would make you think that he had to have good cause to fire you?
A. I didn't say he had to have a cause. I say he did not have cause to fire me. I mean, he had the authority. But the fact that I was fired, you know, I don't know the reason behind that. I did not have an opportunity to talk with Sheriff Roberts before I left to give him information as to sit down man-to-man and talk --
Q. Uh-huh.
A. -- okay, sir, if I did something wrong, good, I would gladly go. But if I'm, you know, but if I didn't do anything, you know, why would I be let go. Only because you had that authority to let me go and you, you know, you used that authority.

Q. I understand.
A. You know.
Q. I understand. My question is though, do you understand what "at will" employment means?
A. At will?
Q. Yes.
A. He has -- to me, it means that he has an authority, yes.
Q. He has authority -- he can hire you or fire you for any reason except for one that's against the law.
MR. SHOEMAKER: Object to the form of the question.
MR. ROSEN: Do you understand that?
MR. SHOEMAKER: Object to the form of the question.

BY MR. ROSEN:
Q. Do you understand that?
A. I understand that I was let go without a cause.
Q. Okay. I understand. But do you understand that's his right to do that?
A. I understand that's his right to do

it, correct.
Q. Okay. So I'm trying to find out if that's his right to do it, what is your complaint? I don't understand why you're upset.
A. My complaint is my First Amendment rights were violated. It was a wrong -- wrongful dismissal.
Q. Okay. All right. Okay. At -- what First Amendment rights were violated?
A. My rights to due process. I did not have a chance to explain to him when I got let go that, sir. Whatever my reasons were, I did not have a chance to -- just freedom of speech.
Q. Okay. That's what I want to ask. What speech did you make that caused you to be fired?
A. What freedom?
Q. What speech? What --
A. Oh, what speech?
Q. -- what did you do? What do -- what did you do?
A. I didn't do anything, sir.
Q. Okay. All right. Because you allege that Sheriff Roberts violated your First

Amendment rights to free speech by firing you. You understand that?
A. I understand. What I said is that Sheriff Roberts fired me without cause or reasonable cause. And he -- and I do understand that he has that authority to hire and fire at will, but I also understand that a person in his authority have to look at, okay, if I did something wrong, yes, you can get fired. But if I didn't do anything, why am I going to get fired?
Q. You don't have to -- you don't have to do anything wrong for him to be able to fire you at "at will" employment if you serve at the pleasure of a constitutional officer. Do you understand that or you don't think that's fair?
MR. SHOEMAKER: Objection to the form of the question. Go ahead and answer it to the best of your ability.
A. I understand his ability, sir.

BY MR. ROSEN:
Q. Okay. So my question is now you allege in the lawsuit that your First Amendment rights were violated, your freedom of speech.

What speech did you make, what did you do that caused Sheriff Roberts to fire you?
MR. SHOEMAKER: Object to the form of the question. The question mischaracterizes the allegations in the lawsuit. Go ahead and answer to the best of your ability.
A. Okay.

BY MR. ROSEN:
Q. Tell me.
A. I was not given an opportunity to come before him.
Q. Okay. All right. Did you make any speech opposing his candidacy for sheriff to anyone?
A. No, sir. I did not make any speech. Excuse me. When you say, "any speech".
Q. Any.
A. Can you explain that to me, sir?
Q. Sure. Did you say anything expressing your rights -- expressing your views, your political views, either for or against him or Mr. Adams during the election that you believe that Sheriff Roberts used to fire you?

A. Of course, there were -- there was always would be talk, you know, between co-workers, okay. And -- but it was never -- but it was never said, you know, who I would, you know, who I would vote for during that time frame.
Q. So you didn't tell anyone?
A. So I would just tell -- well, I would -- I would talk to my co-worker, maybe one that I trusted, and say, okay, you know, I don't know whether this is going to be a good time to make a change or whatever the case might be, but, you know, I would talk to my co-worker and say that but not, you know.
Q. What does that mean? I don't understand what that means.
A. You don't understand what what means?
Q. I don't know what you just said, no. Okay. Let me ask you this. Who other co-workers did you talk to about your political views as to whether Sheriff Roberts should remain sheriff?
A. My would talk to my closest co-worker who would be Debbie -- Debbie Woodard

Page 38

-- Woodward.
Q. All right.
A. Yeah. She was next door to me, yes. We would always talk.
Q. All right. And so you would talk to her about whether Sheriff Roberts should stay sheriff or not?
A. We would always talk of, you know, if he was doing a good job, he would stay. If he's not doing a good job, maybe he should go, or something like that.
Q. Well, you don't believe that she reported that back to Sheriff Roberts, do you?
A. I have no knowledge of that, sir.
Q. Okay. Did you talk to anyone else besides Debbie Woodward -- Woodard about that?
A. No. She would be the only -- probably the only one I would talk with.
Q. Okay. Did you ever talk with any of the sheriffs in administration about your political views?
A. No. I would never talk to anyone else about my political views.
Q. Because why? Because it --
A. It would get out.

Page 39

Q. It would get out, and you would be fired?
A. Correct.
Q. So you were secretive about your views; is that right?
A. I wouldn't talk to anyone else in -- in the office about my political-- you know, who I vote for or not.
Q. Well, did you believe Sheriff Roberts wasn't doing a good job as sheriff in 2009?
A. I believe Sheriff Roberts was doing an outstanding job. He's always done a good job in my view.
Q. So what was your -- what was the reason for your comments to Ms. Woodard -- Woodard that this may not be a good time?
A. Well, you know, sometimes you can -- you can have as -- as time goes on, you can have different views about a person. They might not be doing something that you would think they should be doing or not listening to someone, and that might sway you one way or the other.
Q. That's what I'm trying find to out. Did you believe that about Sheriff Roberts in

Page 40

2009?
A. I believe that as time goes on, attitudes change.
Q. Okay. Tell me what you mean by that. I'm trying to find out what you were saying.
A. Attitudes change. What I'm trying to say is you can have, you know, not your way is the best way all the time, but somebody else has an opinion also, and you should take that into consideration is what I mean.
Q. So did you believe Sheriff Roberts was not doing that in 2009?
A. In 2009, I believe that we did not have enough communication back and forth between the whole office is what I believe.
Q. Okay.
A. And sometimes you have to, you know, get stuff out in the open like, each shift or initially, I think early on, he would get the group together and, you know, go over ideas. But toward the end, I -- I don't think there were that many discussions going on.
Q. Okay. Were you supporting Mr. Adams in his candidacy for sheriff?

Page 41

A. No, sir.
Q. Okay. Did you ever discuss election with Sheriff Roberts or hear him say anything about the election before -- in 2009 leading up to it?
A. There was no discussion, sir.
Q. And did you ever attend any meetings with -- where the sheriff was present and said anything about supporting his candidacy for sheriff?
A. Yes. I attended some meetings because the sheriff would get the group together and indicate that, you know, the election is coming and, you know, I'm the best person for this position. And so yes, in that regards, yes.
Q. Did you say anything else about that other than he was the best person for the position?
A. Oh, yes. He -- he indicated that probably I'm the best person and something to the effect that I can be sheriff as long as I want to be sheriff.
Q. Okay. Did he require the employees to -- to support his candidacy?

Page 42

A. Excuse me?
Q. Did they require -- did he require the employees to help him get elected -- reelected?
A. I'm -- I'm sure when he got everybody together, that was his focus was to get everybody to jump on his band wagon because he wanted to be, you know, reappointed. He wanted to be reelected to sheriff. So he was just making sure everybody was on the same page that, okay, I'm the best person, I'm the best candidate.
Q. Well, other than saying that, did he ask you to vote for him?
A. Well, he said he was the best candidate then. You know, you have to just read between the lines that, I'm the best candidate here, so.
Q. Well, did he require that you contribute money to his campaign?
A. I'm sure I contributed money to his campaign in the form of ticket sales, yes.
Q. You say you are sure you did?
A. I did contribute to his campaign.
Q. How much did you contribute?

Page 43

A. Whatever tickets were. Usually, we got them in blocks. I think it was five, I think there were about ten, about $50 for each campaign.
Q. You mean raffle tickets?
A. Yes, sir.
Q. Okay. Were they required that you buy raffle tickets?
A. Yes, sir.
Q. Why do you say that? Did they say you have -- had to buy him?
A. The official that gave us the tickets indicated that you sell them or either you purchase them.
Q. Who -- who -- who -- who did that to you? Who - who told you that?
A. That was the last couple -- person that gave me tickets were at that time was Captain Richardson, who would hand them out to me.
Q. And did you buy $50 worth of tickets in 2009?
A. Yes, I did, sir.
Q. Did you have -- did you buy them in cash or check?

Page 44

A. I bought them in checks.
Q. Did you have a canceled check showing that -- proving that you purchased them?
A. I'm sure if I don't have it, the bank has it. I don't remember. I don't think I have it. I'm sure there's a copy of it.
Q. Okay. If you find it, would you please provide it?
MR. SHOEMAKER: Okay.
MR. ROSEN: Okay.
I did want to put on the record before we began that we agreed that since you have not responded to discovery, that if anything -- any documents are subsequently produced that if I have a question about it, we can keep -- we can reopen the depositions to get -- question witnesses about those responses.
MR. SHOEMAKER: All right. No problem with that. I just wanted to note that you haven't responded to discovery either.
MR. ROSEN: I have sent it to you.
MR. SHOEMAKER: What Thursday? I was -- I was in North Carolina on

Page 45

Thursday.
MR. ROSEN: Well, I have it, but I'm -- but you will have it in advance of your depositions.
MR. SHOEMAKER: Okay. I've got no objection.
MR. ROSEN: Okay. All righty. Okay. Okay. For that, and if there's any other responses to interrogatories that I find out about also, I would like to have the opportunity to follow up if I need to.
MR. SHOEMAKER: No problem.

BY MR. ROSEN:
Q. Okay. All right. And so do I understand that you bought $50 worth of tickets every year -- every -- every election?
A. Yes. I believe I purchased tickets every year that -- that -- they were given to me.
Q. Okay. All right. Could you have said you don't want -- you couldn't do it this year? Could you have done that or not?
A. No. I never said I couldn't do it.
Q. Okay. All right. Did anyone tell

you that you had to buy the tickets as a condition of your continued employment with the Sheriff's Department?

A. No, sir.

Q. Okay. Okay. Now, did you read the lawsuit that you filed in this suit? Did you read the lawsuit?

A. Yes, sir.

Q. Okay. As you promoted the allegations in the lawsuit?

A. Yes, sir.

Q. I'm going to ask you about that.

All right. It says in paragraph 15, Over his lengthy tenure sheriff, Roberts has repeatedly used the power and resources of the office for reelection efforts. And then it says in Subparagraph A, he has used sheriff -- sheriff's office employees, including low-level non-supervisory employees to plan, manage, staff and carry out political activities and events while on paid status?

Do you know anything about that?

A. Yes, sir. That happened.

Q. Okay. Well, tell me -- tell me what you know about that.

A. Well, probably during every election, he would get the staff together, and, you know, get volunteers to help support his campaign.

Q. Okay.

A. And I know during the -- during the -- his golf tournament time -- fund raising time, he would -- there would be tents set up out there, and he would have inmates stay and set the tents up.

Q. Uh-huh. You say they were volunteers. Were the employees volunteers who worked on his campaign?

A. The employees could volunteer to work on his campaign.

Q. Okay. Did you ever volunteer to work on his campaign?

A. Oh, yes, sir. I worked on his campaign. I would go out and hand out flyers, you know, to different people in the neighborhood.

Q. Did you do that voluntarily?

A. Oh, yeah, did that voluntarily.

Q. So knowing you were never told it was mandatory or you wouldn't be -- your

employment would not continue if you didn't do it, were you?

A. Oh no. I willingly did that.

Q. Okay. All right.

A. I had no problem with that.

Q. Did you work on his campaign in 2009?

A. No, sir. I did not work on his campaign in 2009.

Q. Why not?

A. I just didn't work on his campaign.

Q. All right.

A. I didn't go out to hand out flyers, I think -- I think the night of the election, I did go out and help set up his equipment. I was called by Captain Wells-Major to set up the computer, the laptop to help show results that -- that were coming in. So that -- that, I think, was the only thing that I did for that campaign.

Q. Was that -- was that as a volunteer? Was that as part of your job at the Sheriff's Department?

A. No. That was not part of my job.

Q. Okay, okay.

A. I just volunteered to do that.

Q. All right. Okay. But as far as you know, all the Sheriff's Department employees that worked on the campaign did so voluntarily?

A. I don't know what all the other volunteers -- I know I did it voluntarily. I don't know about all the other people, but I didn't do -- like I said, for the last campaign, I didn't go around dropping off flyers or, you know, putting placards in people's yards, I didn't do that.

Q. And why -- had you done it in all the previous campaigns?

A. I had done it previous times. I was committed on some of the other days doing other things. That was another reason I didn't do it.

Q. Okay. You say, and it's alleged, that he has used office material, equipment, property, meeting space for his own political purposes. Do you know anything about that?

A. Well, I'm sure if there was office equipment around that he wanted to use, it was utilized. So at that time, yes.

Q. Well, do you -- do you have any

specific knowledge of what equipment was utilized for political purposes?
A. Well, I'm sure papers, business papers -- well, not business papers, but computers, printed-out information. So I'm sure that was used.
Q. What was -- was office equipment used to produce political material?
A. I don't know what the office material was used, you know, I wasn't -- I'm just saying, any office material that was available would have been used for his reelection campaign.
Q. Do you have any knowledge that it was?
A. Well, there was always flyers going around saying when a meeting was going to be held. So yes, I do have knowledge of that. We would meet in the rooms and discuss, you know, future events, so yes.
Q. You mean political meetings?
A. It would be a meeting, you know, to get a campaign --
Q. Campaign meeting?
A. -- yes, sir.

Q. So you would get a notice about that?
A. Yes, sir.
Q. Okay. But it wasn't mandatory that all the employees attend?
A. No. It wasn't mandatory that all attend.
Q. So it was just whoever wanted --
A. Whoever wanted to volunteer to come.
Q. Let me ask you, did all of the members of the Sheriff's Department, all the deputies and civilians participate in Sheriff Roberts' campaign?
A. I'm not aware of that, whether or not all of them participated or not, no, sir.
Q. Do you know people who did not participate in his campaign?
A. I don't know by name, no, sir.
Q. Excuse me.
A. I don't know by name whether they, you know, did not participate. I don't know who did not participate.
Q. Do you know what percentage did?
A. It's probably a small percentage.

Probably about ten to 15 percent that participated.
Q. So ten to 15 percent --
A. That would be an approximate guess, yes, sir.
Q. -- of the Sheriff's Department employees participated in the -- the political campaign.
A. That would help out with his campaign.
Q. Okay.
A. It might have been more than that. So I was -- I'm guessing at this time. Say approximately ten to 15 percent.
Q. Okay.
A. It could have been more.
Q. All right. And it's alleged in paragraph 15D that the sheriff had coerced employees to sell tickets and to buy tickets to campaign fund raising events.
Were you ever coerced to sell tickets or buy tickets?
A. I was not coerced. I was asked to either buy them or -- or you know --
Q. Sell them?

A. -- or sell them, correct.
Q. Okay. Were you being -- would you say you thought you were coerced?
A. I kind of thought, you know, I needed to do this, so I went ahead and did it.
Q. Okay. Do you know if everyone at the Sheriff's Department did that?
A. I have no knowledge of that, no, sir.
Q. Do you know if some people did not do it?
A. I'm not aware of it, sir.
Q. Okay. It's alleged in paragraph 18 that after Adams resigned and announced his opposition to Roberts, Roberts was informed by senior officers and his own investigation that the plaintiffs had declined to support his reelection efforts and were actively supporting Adams. That's not true with you, is it?
A. No, sir. Not true with me.
Q. Okay. You had not --
A. I had no knowledge of, you know, of other people supporting Adams or not. It wasn't in my best interest, so I didn't -- I had no knowledge of that.

Q. And you had declined. You had not declined to support Sheriff Roberts' reelection efforts?
A. In my -- nobody knew who I was going to vote for, sir.
Q. Okay. That was -- that was my --
MR. SHOEMAKER: Listen. I want you to listen to these questions.

BY MR. ROSEN:
Q. Okay. And you were not actively supporting Adams, were you?
A. No, sir. Not at the time I was not.
Q. Okay. All righty. Who asked you to join this lawsuit?
A. Who asked me to join the lawsuit?
Q. Yes.
A. It was all the ones that got not reappointed. We all got together and was talking, and we just decided to get together and do this.
Q. Whose idea was it?
A. It was -- I don't know whether it was any one particular person's idea or whether

or not it was just a group effort, you know, we got together. We would just have lunch and say, okay, this is wrong, and we need to do something. So we just all decided just to go ahead and do it.
Q. Did you talk to Mr. Adams about filing this lawsuit?
A. No, sir.
Q. Okay. Would this -- this lawsuit could be used as a political tool for Adams -- for Adams in his subsequent reelection campaign, can't it?
A. Say that again now.
Q. Yeah. This lawsuit can be used as a tool or used by Adams in his future campaign against Sheriff Roberts, couldn't it?
MR. SHOEMAKER: Object to the form of the question. Go ahead and answer it to the best of your ability.
A. I don't know if it can be used against him or not.

BY MR. ROSEN:
Q. You don't know if it can be used against him or not?

A. I mean --
Q. You can't look at him. He's not going to help you. You get to answer the question.
A. Can you repeat the question?
Q. Yes. Do you know or are -- are you aware that this lawsuit can be used by Mr. Adams in his future election efforts against -- to unseat Sheriff Roberts?
A. I'm sure probably if it gets out in the media or something, it can be used against him, yes.
Q. Well, it's out. It's in the public. You filed it in public. You're aware of that, aren't you?
A. Yes, sir.
Q. Okay. Have you talked to Mr. Adams about your role if he wins as the -- as the next election that you want to work for him?
A. No, sir. I have not.
Q. Have the other deputies told him that?
A. I have no idea.
Q. Okay. Are you supporting Mr. Adams' future election campaign?

A. I don't know at this time, sir.
Q. Okay. Have you been to any meetings talking about his future election?
A. No, sir. I have not.
Q. Did you tell me the name of who asked you to join this lawsuit or you said you got together with all of them?
A. We just got together with the group that -- that is on your list there, sir.
Q. Where did -- where did you meet? Where and when?
A. It was maybe -- I don't know. We met at this pizza place off of Mercury. I think Riverdale Shopping Center was a place down there where we met to have lunch.
Q. Who called you to attend the meeting?
A. Debra would call me. Debbie -- Debra -- Debbie Woodard.
Q. She called you. And what did she say?
A. Well, let's have lunch. And then, you know, we'd e-mail and say, okay. Let's, you know, let's have lunch and we'd talk.
Q. Did you know the other -- this is

the one --
A. The ones that's on the list, that's John Dixon. All the ones that are on the list, we would get together.
Q. Okay. Would you get together regularly?
A. No, no.
Q. Okay. Okay. So someone called you. Debra Woodard called you and asked to meet at the pizza place. When was this?
A. Yes.
Q. When was this?
A. I don't recall the exact date that was.
Q. How soon before the lawsuit was filed?
A. I can't recall. I can't recall the date.
Q. Was it months or --
A. I'm sure it was months after that.
Q. One month, two months, three months.
A. I don't recall the date.
Q. Okay. So she called and said, let's get together for pizza. Did she tell you

that everyone else to be there, too?
A. Oh, yeah. We all knew who was going to be there.
Q. How did you know who else was going to be there?
A. Well, she said John's going to be there, Dixon's going to be there, and the other guys on the -- that's on your list there.
Q. Was Adams there, too?
A. At one time, Adams was there, yes.
Q. He came to the meeting also?
A. Yes, at one time.
Q. So he was at the original meeting when you talked about filing the lawsuit, Adams was there?
MR. SHOEMAKER: Object to the form of the question. Go ahead and answer it to be best of your ability.
A. I'm saying he was at one of the meetings, at one of the lunch meetings.

BY MR. ROSEN:
Q. Okay. All right. And how many meetings did you have?
A. Oh, we had lunch maybe a couple of

times.
Q. To discuss this -- this case?
A. We just had lunch just, you know, just to talk, to have lunch, not specifically to discuss the case.
Q. Well, I'm trying to find out when you first met with these people to talk about bringing the lawsuit -- this lawsuit, when was that? We can be here all day. I'm trying to --
A. I understand.
Q. -- get to the heart of it. So -- so just answer my question and no bull.
A. I'm trying to remember.
MR. SHOEMAKER: He is answering your question. He doesn't have a photographic memory.
A. If I can't remember the date, I can't remember the day.

BY MR. ROSEN:
Q. I'm trying to find out the first meeting.
A. It was like months. I just don't remember the date, sir.
Q. Okay. All right. Well -- well, he

said the first -- at the first meeting --
MR. SHOEMAKER: Why don't you take it from the time you were fired? Was it within two months from the time y'all were fired that you got together?
THE WITNESS: It was about two or three months after the firing.

BY MR. ROSEN:
Q. So how many meetings did you have to discuss your intent to file this lawsuit?
A. How many meetings? We -- we had like a couple of meetings after that. It was only a couple of meetings after the first meeting that we decided to go forward with it.
Q. Okay. How many meetings in total did you have to discuss -- had you met with this group, the other plaintiffs before you -- to -- to discuss filing this lawsuit? How many meetings did you have?
A. It was probably about two or three meetings.
Q. Two or three meetings total?
A. Yes, sir.
Q. Okay. Now, is that before you met

with lawyers?
A. Yes, sir.
Q. Okay. All right. So two or three meetings. All right. Okay. Let's go to the first meeting. Okay. The first one. It came about because Debra Woodard called you and said; we're getting together --
A. For lunch.
Q. -- for lunch. Did she tell you else was going to be there?
A. I'm sure she might have said the guys that were on, you know, that was let go was going to be on the list, yes, sir.
Q. Did you say what the purpose of the meeting was?
A. I can't recall that at this time what she said was the purpose. Just let's have lunch, and then things developed after we got there.
Q. Okay. So when you got to there to the pizza place, what was discussed?
A. We were just talking about why we were let go. We didn't realize why, you know, the reason that we were not reappointed. It was just talking in general, generalities of why we

were let go, and I think one thing led to another.
Q. Who -- who led the meeting?
A. I don't think there were a leader per se. It was just a group effort.
Q. Okay. Now, did you say Adams came to one of these meetings?
A. Yes, sir. He was at one of the meetings and had lunch with us.
Q. Okay. What did he have to say?
A. Nothing. He was just there as we were all friends.
Q. Okay. And why was he -- and why was he there to discuss whether you were going to file a lawsuit against his political opponent?
A. No. He was just there as a -- he was there -- we were all there as friends. We were all there just having pizza and then just talking.
Q. Okay.
A. It was nothing about any lawsuit or anything at that point.
Q. All right. All right. Well, did you discuss the lawsuit the first time -- the

first meeting?
A. I -- that -- I don't think the lawsuit came up at the first meeting. I think that was afterwards.
Q. Okay. Tell me about the best recollection what you discussed at the first meeting, okay?
A. It was just the reason we -- we just didn't understand why we got let go. Why we were not reappointed was the thrust of that meeting.
Q. Okay. Did anyone discuss what remedies were available to you?
A. I don't recall that, sir, whether it was discussed.
Q. Okay. And at that first meeting, was it you, Daniel Carter, David Dixon, Robert McCoy, John Sandhofer and Debra Woodard -- Woodward?
A. To the best of my knowledge, yes, sir, that was the ones that were there. There was also a couple more that was on the -- Mitchell was there. I think Sammy Mitchell was there.
Q. Was he -- had he been reappointed

also?
A. Yes, sir. He was one of the ones that was.
Q. All right. Anyone else?
A. I think that's all I can remember that was there at this time.
Q. Okay. And so what was the outcome of the first meeting, if any?
A. I'm sorry?
Q. What was the outcome of the first meeting? Did you decide to meet again?
A. We say we will stay in contact with each other.
Q. Did you decide to call a lawyer?
A. Not then, no.
Q. Did anyone -- when did you decide to call, not being the first meeting you decided to call a lawyer. Anything else discussed at the first meeting that you remember?
A. No. It was basically just, you know, how are you doing, have you found a job yet or things like that.
Q. Okay. And then how soon was the second meeting after that?
A. We would probably meet probably

Page 66

that following month.

Q. Okay. And how did that come about?

A. We just called each other and say let's get together.

Q. Who's initiated the phone call?

A. I'm not sure who initiated the call at that time. We just kept -- we just kept in contact with each other the whole time.

Q. How -- how did do you that? By e-mail?

A. We would keep in contact by e-mail. We would also keep in contact by telephone calls.

Q. Did you have a link on Facebook or individual e-mail?

A. No. We wouldn't have it on Facebook. Basically, it would just be telephone calls and e-mails.

Q. Were you sending group e-mails?

A. I would get probably six or eight of them. So yes, probably group e-mails.

Q. Okay. All right. Are we going to receive those group e-mails?

MR. SHOEMAKER: If they got them, yes. I don't have them right now. If they got him.

Page 67

A. We will give them to you.

MR. ROSEN: I think we need to see those.

BY MR. ROSEN:

Q. All right. So you were e-mailing and speaking on the phone. Would you have conference calls or individual calls?

A. No, just individual calls.

Q. Okay. And how often were you talking to -- to the -- the different plaintiffs?

A. It wouldn't be that often that we would talk. If we wanted to get together, we would to get together, but it wasn't like a, you know, like every week or every month or something like that.

Q. Okay. And when did the idea of filing a lawsuit come up?

A. I'm trying to think. I don't recall when it came up.

Q. Was that yours?

A. I know Debbie called me and said, you know -- Debbie Woodward -- but I don't remember the date, you know.

Page 68

Q. She called you and said what?

A. Well, you know, let's get together and see can we, you know, get a lawsuit against the sheriff on this.

Q. So this was her idea?

A. I'm not sure whether it was her idea or whether it was, you know, a group, you know, idea.

Q. Was she the one who was the finance director for Mr. Adams' campaign?

A. No. That was Debra Davis. This is Debra Woodard.

Q. Debra Woodard. Okay. All right. So she's the one that called you and said let's get together and see if we can get a lawsuit against the sheriff?

A. We -- we talked, yes.

Q. Okay.

A. I would say she would probably get with the group and say, okay, let's go for it. And then we all decided, you know, let's go for it.

Q. All right. Okay. Now, was this after the first -- first meeting, second meeting or third meeting, this telephone conversation?

Page 69

A. It was probably after the second and probably third meeting, you know, we decided to go ahead and do it.

Q. So were you discussing about the lawsuit at the second meeting, discussing the possibility of filing a lawsuit against the sheriff?

A. Yes, sir. After the second meeting. I'm sure we was probably coming to that conclusion.

Q. Okay. And whose idea was it? Was it -- who raised it?

A. It was a group. It was a group. It was a group effort. It wasn't just like one individual. We all just was talking about, yeah, we ought to just do it. So it wasn't one individual that was coming forward with it.

Q. Did Mr. -- Mr. Adams attend the second meeting or the third meeting?

A. Only the first meeting as I can recall. He wasn't there at the second one.

Q. He attended the first meeting only?

A. Yeah. I said he was at the first meeting.

19 (Pages 70 to 73)

Q. Okay.
A. But it wasn't discussed about the lawsuit at that time during the first meeting.
Q. Okay. Mr. Adams had resigned from the Sheriff's Department, correct?
A. Yeah. I believe he had, sir.
Q. He was not one of the people that was not reappointed?
A. Correct.
Q. So why did he attend the first meeting?
A. We were all friends. We had played on the same softball game --
Q. I understand.
A. -- same softball team. We were all friends. And we just stayed in contact with each other.
Q. Okay. Well, wasn't the purpose of the first meeting to talk about the people that were not reappointed?
A. The first -- the first -- the purpose of it, you know, was just to get together and talk and see how everybody was doing, whether we had already found another job and that was -- that was the gist of the first

meeting to see how everybody was doing. Because we wanted to know -- we were trying to discuss about unemployment, whether we were able to get employment.
Q. Uh-huh.
A. And we were discussing that issue right there.
Q. And did Mr. Adams -- Adams have any suggestions on that?
A. I can't recall. I don't know whether he had any idea or --
Q. Did he tell you that he would like your support for his future campaigns?
A. No, sir. That didn't come up.
Q. Okay. All right. So the -- so the only people that went to the first meeting were all the people who were not reappointed plus Mr. Adams; is that correct?
A. Yes, sir.
Q. And the second meeting you say you started talking about filing this lawsuit?
A. We were saying that we were let go, we probably need to, you know, do something.
Q. And how did you find Mr. Shoemaker?
A. I -- I think Debbie knew him.

Q. Debbie Woodard -- Woodward?
A. Woodward.
Q. And how did you all decide to pay for Mr. Shoemaker?
A. How did we decide to pay for it?
MR. SHOEMAKER: Mr. Shoemaker has it on a contingent basis purely.

BY MR. ROSEN:
Q. Did you -- did the plaintiffs chip in to pay for court costs before the lawsuit was filed?
A. No, sir.
Q. Okay. Did you ever meet with Mr. Shoemaker with Mr. Adams present?
A. Yes, sir. I think we did meet.
Q. With Mr. Adams present?
A. Yes, sir.
Q. When was that?
A. I can't recall the date.
Q. What was discussed?
A. This was during, you know, the lawsuit.
Q. Drafting the lawsuit?
A. This was during the process of the

lawsuit.
Q. Okay. Well, why was Adams there?
A. No. He was part of the -- because he was part of the -- he was part of the, you know, he knew some of the questions that we didn't know.
Q. Like what?
A. Well, you know, things that happened.
Q. So how many times did you meet with your lawyer and Mr. Adams?
A. I can only remember meeting with him only once is all I can recall.
Q. And was that at -- at -- at his office? At Shoemaker's office?
A. Yes, sir.
Q. Okay. Was that before the lawsuit was filed?
A. That was -- I think that was after the lawsuit was filed.
Q. In the lawsuit, it's alleged that Plaintiffs Carter and McCoy were on Jim Adams' campaign Facebook page actively advocating the election of Adams. Did you know that?
A. No, sir, not until I read it in the

lawsuit.
Q. Okay. It says -- alleges in 18B Plaintiffs McCoy and Sandhofer attended a cookout on August 29th, 2009, given by Carter, attended by Adams and that Roberts and certain senior officers concluded it was a campaign event for Adams. Did you attend that cookout?
A. No, sir. I didn't.
Q. Did you know anything about it?
A. Not until I read in the lawsuit.
Q. Okay. And in 18C. It says on November 3rd, 2009, Election Day. Plaintiff Dixon openly announced before a group of voters including persons close to Roberts that Roberts should not be elected and that Adams should be elected the next sheriff of Hampton.
Were you there for that?
A. No, sir.
Q. Did you know anything about that?
A. Not until I read it.
Q. Okay. And in 18D, it says, During the 2009 campaign season late summer and fall of the 2009, each of the plaintiffs affirmatively expressed their support for Adams to several persons, including several of the colleagues

from the sheriff's office. That's not true for you?
A. I only -- I only talked to my co-worker, Ms. Woodward.
Q. So that allegation is not true for you.
Okay. And it says in 18E that each of the plaintiffs refused to provide requested assistance and support for Roberts' reelection efforts.
That's not true either for you?
A. My only connection was that I helped set up the, as I told you before, the equipment, the electronic equipment.
Q. And you also made a contribution -- a 50-dollar contribution to the campaign, right? And you said the other the reason you didn't do anything more because you had your schedule, prior commitments.
A. Yes, sir.
Q. Okay. So as far as you know, none of the senior officers of the Sheriff's Department would have known that whether you were supporting Sheriff Roberts or not before the election --

A. Correct.
Q. -- is that correct? Okay.
Now, you don't have any information that you were not reappointed by Sheriff Roberts to retaliate against you for anything you did or didn't do during the campaign, do you?
A. I don't have any information?
Q. Yes.
A. No, sir, I don't have any information other than the letter that I -- I received.
Q. Oh, the letter? But as far as you're aware, Sheriff Roberts knew nothing about whether you were supporting him or Mr. Adams?
A. As far as --
Q. Through the campaign, right?
A. As far as I'm aware, he didn't know.
Q. So obviously, if he didn't know, he couldn't retaliate against you for not supporting him, could he?
A. If he didn't know, no, sir, he couldn't.
Q. And there's no way for him to know, right?

A. Right. As far as I know. No, sir.
Q. Okay. All right.
All right. Now, do you know other people who were not rehired in addition -- in addition to the six plaintiffs in this lawsuit, other people were not rehired as well?
A. Others were not. I don't remember all their names, sir.
Q. Okay. And do you know whether they were not rehired -- rehired -- do you know the reason they were not rehired?
A. No, sir, I do not.
Q. You don't know the reasons that any of the other plaintiffs in your lawsuit were not rehired, do you?
A. I sure don't. I don't know, sir.
Q. Okay.
Okay. Now, I want to you ask some questions about damages. What day did you leave the Sheriff's Department?
A. My last day at the Sheriff's Department was on the 4th of December.
Q. December 4?
A. 2009.
Q. 2000, okay. And since then, have

you been looking for a job?
A. Oh, yes, sir.
Q. Okay. Have you been able to get one -- find one?
A. No, sir.
Q. Okay. What efforts have you made to look for employment?
A. I have put applications out every week. I've had interviews but no call-backs on the interviews.
Q. Okay. How many interviews have you had?
A. I have had approximately about ten interviews.
Q. And what type of jobs have you been applying for?
A. In the financial realm, accounts payable, financial technicians, accounting technicians types of jobs. It's in the accounting and finance career field.
Q. Okay. And where have you interviewed? Do you know the employers you've interviewed with?
A. Yes, sir. I've interviewed with Thomas Nelson, Christopher Newport University.

ODU, Hampton University and what's the other one? That's a couple of more I can't recall right now, sir.
Q. Do you have a copy of your employment applications?
A. Yes, sir. I do.
Q. Okay. I'll need a copy of that, too.
A. And I'm sorry. William and Mary. I applied for William and Mary.
Q. Uh-huh. Okay.
A. Virginia Tech. Most of the colleges in the -- in the area.
Q. That's where you were employed before?
A. Yes, sir.
Q. Have you -- do you have any jobs that you have applied for and not heard back from yet?
A. Yes, sir.
Q. How many?
A. The last one I just had another interview last Wednesday.
Q. Uh-huh.
A. That was again at Thomas Nelson, so

I'm waiting to hear on that one.
Q. Do you think you may have a good chance of getting a job there?
A. Well, hoping.
Q. Okay. And what is that -- what position is that?
A. Accounting technician -- I'm sorry. Fiscal technician.
Q. What's that? What is that?
A. It's payables and in that realm.
Q. Okay. And do you know what the starting salary is for that position?
A. I think it's a range from 26 to 30, 36, I think.
Q. Okay. Is that benefits as well?
A. Yes, sir.
Q. Do you know -- do you know whether your position has been filled by a sworn deputy?
A. I don't think it's a sworn deputy. It's a civilian -- well, I'm not sure. I'm not sure, sir, whether she's sworn. It might be a sworn position.
MR. ROSEN: Let's take a five-minute break. I think I'm almost done.
MR. SHOEMAKER: Okay.

MR. ROSEN: Take a break.
(The deposition recessed at 10:25 a.m. At 10:35 a.m., the deposition continued as follows:)

BY MR. ROSEN:
Q. Have you been promised anything by Mr. Adams if you -- you agree to be a plaintiff in this lawsuit?
A. No, sir.
Q. Okay. And you have not -- if I understand you correctly, you have not paid any money to file this lawsuit?
A. Correct, I have not paid any.
Q. Okay. And has Mr. Adams promised you a job if he is elected sheriff in the next election?
A. No. That conversation never came up.
MR. ROSEN: Okay. That's all the questions I have. Thank you, sir. Answer any counsel's questions if he has any.



Page 82

EXAMINATION

BY MR. SHOEMAKER:

Q. Mr. Bland, I've got a couple of questions.

A. Okay.

Q. In the 2009 campaign season, did any of Sheriff Roberts' subordinates, his senior subordinates, any captains or majors or colonels, come to you and ask you whether or not you were supporting the sheriff?

MR. ROSEN: Well, I object to the form of the question to the extent that he's already answered that question. Go ahead.

A. I'm sure some of his senior officials, Captain Wells-Major came and wanted me to help out with the campaign, yes, sir.

BY MR. SHOEMAKER:

Q. And how did you respond to their requests?

A. I told them I had other commitments to do that I couldn't support -- support them at that time.

Page 83

Q. In previous years in '05 and '01, did you -- did you put up yard signs for Sheriff Roberts?

A. Yes, sir. In previous years, I did.

Q. And in previous years, in '05 and '01, did you hand out political flyers for Sheriff Roberts?

A. Yes, sir, I did.

Q. And in previous years, in '05 and or '01 --

MR. ROSEN: Objection. Leading.

MR. SHOEMAKER: There's nothing leading about this.

BY MR. SHOEMAKER:

Q. In previous years in '05 or '01, did you ever work the polls for Sheriff Roberts?

A. Yes. I did work the polls.

Q. Okay. And did you do any of that in 2009?

A. No, sir. I did not.

Q. Did you tell Debra Davis that you supported Jim Adams for sheriff in the 2009 campaign season?

Page 84

MR. ROSEN: Objection. Leading.

A. No, I did not discuss that with Ms Davis.

BY MR. SHOEMAKER:

Q. You told Debra Woodward that?

MR. ROSEN: Objection. Leading.

A. Yes.

BY MR. SHOEMAKER:

Q. Did you ever know any sheriff's office personnel to perform political work for the sheriff while on a paid status?

A. Yes, sir. I remember.

Q. Can you give me some examples of that?

A. There would be, not always, during the campaign, there would be a meeting with people helping out on his campaign and also during the -- during the -- his golf tournament and fund raising tickets, there would be people in the office helping out on his campaign also.

Q. How did you know they were on paid status?

A. Because they were co-workers of

Page 85

mine.

MR. SHOEMAKER: All right. That's all.

THE COURT: Thank you.

MR. ROSEN: Just a follow-up.

EXAMINATION

BY MR ROSEN:

Q. You said you had other commitments, but you were not -- what were those other commitments? Why didn't you do what you had done in previous elections?

A. I had other -- I had another function that I had to, you know, do stuff with -- well, not do stuff but like on Saturday afternoons, I had a mentoring program that I would mentor little kids so that would -- I think I had a one-on-one with kids in my organization. So I had other -- that's what I mean by other commitments.

Q. Okay. So you didn't think anything negative about you not -- you didn't have the time to work on the campaign is why you didn't do it; is that correct?

A. I had other commitments to do. I know the senior officials were asking me, okay can you help out, and I got other commitments to do.

Q. Okay. All right. And you didn't think by not doing that would be any adverse impact on your employment, did you?

A. I didn't -- I didn't really give that a thought to whether it was adverse effect or not. I just came to the conclusion why am I let go. It had to be for a reason, you know, like, did the sheriff find out something about me that I was, you know, supporting Jim Adams or something like that. So, and that was a -- he had no other reasons to let me go other than the fact that he found out I was supporting him.

Q. But you weren't supporting Jim Adams?

A. Well, I supported him in the fact that I thought maybe he would, you know, he -- he - he -- he could make a better candidate than the sheriff was at that time. So I didn't --

Q. I didn't mean to cut you off. You can finish.

A. Okay.

MR. SHOEMAKER: Finish your answer.

BY MR. ROSEN:

Q. You can finish?

A. Yeah, I mean, to me, at that time, he -- he would, you know, make a better candidate than Sheriff Roberts, so in a sense yes, I was supporting him that way.

Q. So you tell me this now after the break you spoke with your attorney.

A. No. I said in other words, yeah.

Q. Okay.

A. I was supporting him in that realm because there was no other -- there was no other explanation that I can think of. The fact that Debra Davis was working on his campaign. And I'm just saying, well, I didn't do anything other than the fact that he connected me with that, thinking that I was going to, you know, support him, so that's the only reason.

Q. Well, you didn't do anything to support Mr. Adams, did you?

A. I didn't do anything to support Mr. Adams, no. Other than the fact that, you know, he was thinking that I was out there, but

I didn't -- I didn't go out campaigning or anything like that.

MR. ROSEN: Okay. I don't have any further questions.

THE WITNESS: Okay. But it was just like.

BY MR. ROSEN:

Q. You can finish.

A. Okay. His impression was that I was supporting him. And I'm saying, yeah, he's, in a sense, you know, I guess if you look back on it, yes, I -- I -- I was -- I was supporting him.

Q. You didn't tell me that originally, did you?

A. Well, I told you.

Q. Okay. All right. Let me ask you this: What evidence do you have that Sheriff Roberts knew you were supporting Mr. Adams' campaign in 2009?

A. The fact that I can just relate it to what I just said before, that he knew Debra Davis, and he was his campaign manager or treasurer, and that linked me -- her to me. And

in his opinion, he probably thought I was -- I was, you know, supporting him.

MR. ROSEN: Okay. All right. I have no further questions.

MR. SHOEMAKER: I have nothing further. You have the right to waive your review of this or to review it before it's finalized. I would advise you to review the transcript before it's finalized, and you can tell the court reporter that.

THE WITNESS: Yes, I would like to review it before it's finalized.

(The deposition concluded at 10:40 a.m.)

-----oOo-----

CERTIFICATE

COMMONWEALTH OF VIRGINIA
CITY OF NEWPORT NEWS, to-wit:

I, Marjorie F. Ingram, Court Reporter, certify that the foregoing deposition of Bobby Bland was duly sworn to before me and taken by me at the time and place and for the purpose in the caption mentioned.

I further state that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

Given under my hand this day of , 2011.

_____________________
Notary Public

Registration Number: 195724
My commission expires 9-30-2014.

INGRAM REPORTING
2520 Queens Elm Place
Virginia Beach, Virginia 23454

September 6, 2011

Bobby Bland
%James H. Shoemaker, Jr.
12350 Jefferson Avenue, Ste. 300
Newport News, Virginia 23602

Dear Mr. Bland,

Your deposition taken on August 22, 2011, in the matter of Bobby Bland, et al v B. J. Roberts,et al is enclosed for your review and signature. Please sign the deposition on Page 92 where it says deponent. Do not write in the transcript. There is an errata sheet attached for any corrections you may wish to make. Please return to me the original signature page and errata sheet so that I may forward them to counsel.

According to the Rules of Court, you have 30 days to attend to this matter.

Sincerely,

MARJORIE F. INGRAM
Court Reporter

I, Bobby Bland, have read the foregoing deposition this ______day of ____________, 2011; and the same is true and correct to the best of my knowledge.

_____________________
DEPONENT

CITY OF
STATE OF

I hereby certify that Bobby Bland appeared before me this ___________day of ___________, 2011, and affixed his/her signature to the foregoing deposition.

_____________________
Notary Public

My commission expires:

ERRATA SHEET

| PAGE | LINE | CHANGE TO READ |
| --- | --- | --- |