IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

---------------------------------------

BOBBY BLAND, DANIEL RAY CARTER, JR.,
DAVID W. DIXON, ROBERT W. McCOY,
JOHN C. SANDHOFER, and
DEBRA H. WOODWARD,

        Plaintiffs,              CASE NO.
                                       4:11-CV-45

v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

        Defendant.
---------------------------------------

DEPOSITION UPON ORAL EXAMINATION
OF HARRY LEWIS, JR.,
TAKEN ON BEHALF OF THE PLAINTIFFS

Virginia Beach, Virginia

October 12, 2011

Appearances:

    PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
    By: JAMES H. SHOEMAKER, JR., ESQUIRE
       Counsel for the Plaintiffs

    PENDER & COWARD
    By:  JEFFREY A. HUNN, ESQUIRE
       Counsel for the Defendant

Exhibit 25

INDEX

DEPONENT        EXAMINATION BY        PAGE

HARRY LEWIS, JR.     Mr. Shoemaker        3

EXHIBITS

NO. DESCRIPTION                PAGE
None

---

Deposition upon oral examination of HARRY
LEWIS, JR., taken on behalf of the Plaintiffs before
Juanita Harris Schar, RMR, CCR, CRR, a Notary Public
for the Commonwealth of Virginia at large, commencing
at 11:10 a.m. on October 12, 2011, at the law offices
of Pender & Coward, 222 Central Park Avenue, Suite 400,
Virginia Beach, Virginia; and this in accordance with
the Federal Rules of Civil Procedure.
- - - - -

HARRY LEWIS, JR., was sworn and deposed on
behalf of the Plaintiffs as follows:

EXAMINATION
BY MR. SHOEMAKER:

Q.    Sir, my name is James Shoemaker, and I am
an attorney. I represent six people, Bobby Bland,
Debbie Woodward, Wayne McCoy, John Sandhofer, David
Dixon, Danny Carter -- and that might be all of them;
I think that is all of them -- in a matter that is
pending in the United States District Court for the
Eastern District of Virginia. Have you ever given a
deposition before?

A.    No, sir.

Q.    Okay. Well, a deposition is sworn
testimony, and it bears the same weight and dignity as

---

if we were sitting in a courtroom downtown, so it's
important that you and I build as clear a record as
possible. And all she can do is take down what we say,
so it's important for you to wait until I'm through
asking my question before you begin to speak, and it's
also important for me to wait until you're through with
your answer before I begin to speak. If we start
talking over top of each other, she can't take that
down.

The other thing you have to remember is
you've got to verbalize your answers. You can't say
"uh-huh" and "uh-uh" and you can't shake your head
because she can't take those down as responses.

Are you under any conditions or medications
here today that would affect your ability to understand
my questions and to answer them fully?

A.    No, sir.

Q.    Okay. Could you state your full name for
the record, please?

A.    My full name is Harry Lewis. Harry James
Lewis, Jr.

Q.    All right. And what is your home address?

A.    My home address?

Q.    Right.

A.    26 Clayton Drive, Hampton, Virginia.

---

Q.    All right. And how long have you been with
the sheriff's office?

A.    I've been with the sheriff's office
13 years.

Q.    And how long have you been a lieutenant?

A.    Been a lieutenant -- wow. I think five,
six years.

Q.    And prior to that were you a sergeant?

A.    Yes.

Q.    And then you came on to the department as a
deputy?

A.    Yes.

Q.    What are your duties currently?

A.    My duty, currently I'm a shift commander.

Q.    How long have you been a shift commander?

A.    Like I told you, five to six years.

Q.    So you've been a shift commander the entire
time you've been a lieutenant so far?

A.    Yes.

Q.    If I ask a question today that doesn't
reference a specific time, I'm talking about the year
2009. Okay?

A.    Uh-huh. Okay.

Q.    Many of my questions will reference a
specific time, but if I fail to do that, then I'm

**6**

1    talking about the year 2009.
2         As lieutenant, did you attend -- have you
3    ever attended, as lieutenant, on a regular basis senior
4    staff meetings?
5         MR. HUNN:  Objection, form.  Definition of
6    senior staff meeting?
7
8    BY MR. SHOEMAKER:
9    Q.    Do you know what a senior staff meeting is?
10   A.    No.
11   Q.    On a regular basis have you ever -- have
12   you ever attended a weekly meeting with all the
13   captains, majors, Colonel Bowden, and the sheriff on a
14   weekly basis?
15   A.    No.
16   Q.    Do you use e-mail within the office?
17   A.    Yes.
18   Q.    And you have an e-mail account within the
19   office that identifies you as the sender and you as a
20   receiver of e-mail?
21   A.    Yes.
22   Q.    And have you had an e-mail account the
23   entire time you've been a lieutenant?
24   A.    Yes.
25   Q.    How often in 2009 were you using e-mail?

**7**

1    A.    That's a question -- I mean, the city sends
2    you stuff all the time so...
3         I -- I mean every day I work, I look at the
4    e-mail.
5    Q.    Back in 2009 was it typical for you to send
6    an e-mail on a daily basis, at least one?
7    A.    No.  It depends on if I need to respond by
8    e-mail or I need to make a phone call.
9    Q.    So you weren't a frequent e-mail user back
10   in 2009?  Is that fair?
11        MR. HUNN:  Objection, form.
12   A.    Just whatever you see the -- if you need to
13   use it or not.
14
15   BY MR. SHOEMAKER:
16   Q.    Okay.  Well, do you remember back then how
17   often you'd receive e-mails during the week?  Was it
18   more than five times a week?
19   A.    Yeah.  I mean, every day I come back to
20   work, I got e-mail.  Like I said, e-mails from the
21   city.  City-wide and...
22   Q.    And every day when you went to work back in
23   2009 would you typically be responding to those
24   e-mails?
25   A.    No, not every e-mail you respond to.

**8**

1    Q.    I know, but every day would you send at
2    least one response to an e-mail?
3    A.    No.
4    Q.    You wouldn't.  Okay.
5         Did you attend the basic jailer's class at
6    the Hampton Roads Criminal Justice Training Academy
7    when you were hired by the sheriff's office?
8    A.    Yes.
9    Q.    Have you ever attended the basic law
10   enforcement class at the academy?
11   A.    No.
12   Q.    Did you play any role in assisting an
13   evaluation team from the American Correction
14   Association when they were evaluating the Hampton
15   sheriff's office for their accreditation about nine
16   years ago?  Do you remember anything about that?
17   A.    I don't understand your question.
18   Q.    Do you know what the American Correction
19   Association is?
20   A.    ACA?
21   Q.    Yeah.
22   A.    Yes.
23   Q.    Do you remember when the sheriff's office
24   got accredited by the ACA?
25   A.    No, I don't know what year it was.

**9**

1    Q.    You don't remember -- did you play any role
2    in assisting the sheriff's office in getting that
3    accreditation?
4    A.    What do you mean by playing any role?
5    Q.    Did you get documents together for the
6    association?  Did you -- were you interviewed by any of
7    the association's investigators who came to the
8    sheriff's office?
9    A.    No, I wasn't interviewed by any of the
10   investigators.
11   Q.    How about when CALEA accredited the office
12   more recently?  I think that was about three years ago
13   or maybe about 2006.
14   A.    What?  The what?
15   Q.    Did you play any role in that accreditation
16   process?
17   A.    As far as what?  What you mean?
18   Q.    Were you interviewed by any of the
19   evaluators that came to look at the sheriff's office
20   records or look at their processes?
21   A.    No.
22   Q.    Did you gather records together for anybody
23   from CALEA?
24   A.    No.
25   Q.    Do deputies -- rank-and-file deputies

3 (Pages 6 to 9)

10

1    within the office, not sergeants, not lieutenants, but
2    line rank-and-file deputies, do they have job
3    descriptions?
4        A.    What is a rank-and-file?
5        Q.    Somebody who does not hold rank. Somebody
6    who is a deputy but is not a sergeant or lieutenant.
7        A.    Do they have a job description?
8        Q.    Yes.
9        A.    Yes.
10       Q.    And do they have job descriptions for the
11   correctional officer deputies in the Hampton city jail?
12       A.    They got a description for deputies.
13       Q.    Does it distinguish between correctional
14   officers and court services officers, if you know? Or
15   do you know?
16       A.    What do you mean by do they distinguish?
17       Q.    Well, I've seen a job description for court
18   services officers. I have not seen one for
19   correctional officers. Do you know if there's one for
20   correctional officers?
21       A.    I'm not sure.
22       Q.    How about for civil service deputies? Do
23   you know if there's a separate job description for
24   civil service or civil process deputies?
25       A.    No. I'm not sure.

11

1        Q.    Which shift do you currently command?
2        A.    Night shift. B shift.
3        Q.    And how long have you commanded night
4    shift?
5        A.    I've commanded B shift for approximately
6    four years.
7        Q.    And do you typically work in the annex or
8    do you typically work at the central jail in downtown?
9        A.    I'm in charge of three buildings.
10       Q.    When you're on night shift, what -- do you
11   go around between the three buildings?
12       A.    Yes.
13       Q.    What's the third building? The sheriff's
14   office downtown, the annex. What's the third one?
15       A.    The third one is adult intake.
16       Q.    Where is that located?
17       A.    Right there at the courthouse. Back of the
18   courthouse.
19       Q.    It's separate from the jail structure?
20       A.    Uh-huh. Yes.
21       Q.    And how many deputies are on your -- were
22   on your night shift in 2009?
23       A.    I can't remember 2009 how many deputies I
24   had.
25       Q.    How many do you have now?

12

1        A.    Right now I have 18.
2        Q.    Has the number changed in a significant way
3    since 2009?
4            MR. HUNN:  Objection, form.
5        A.    I don't even know.
6
7    BY MR. SHOEMAKER:
8        Q.    Have you ever supervised Bobby Bland?
9        A.    No.
10       Q.    Do you know who Bobby Bland is?
11       A.    Yes.
12       Q.    Have you ever supervised Danny Carter?
13       A.    Yes.
14       Q.    When did you supervise Danny Carter?
15       A.    I can't recall, but Carter worked for me
16   before, but I can't recall when it was.
17       Q.    Has he worked for you in the last three
18   years?
19       A.    I can't recall when it was that he worked
20   for me.
21       Q.    Was it more than five years ago he worked
22   for you?
23       A.    I can't recall when he worked for me. I
24   can't give you no exact date.
25       Q.    I'm not looking for an exact date. I'm

13

1    just trying to --
2        A.    You're talking about a time. I can't
3    recall. He worked for me. He worked underneath me
4    before, but I can't recall when it was.
5        Q.    I'm going to try and ask you a few
6    questions to try to get a general idea of when he
7    worked for you.
8            Do you think he worked for you at some
9    point after the year 2000?
10       A.    Yeah.
11       Q.    Do you think he worked for you some point
12   after the year 2005?
13       A.    I don't know. I don't know.
14       Q.    Do you remember -- and you don't remember
15   whether or not he worked for you in 2009?
16       A.    In 2009?
17       Q.    Right.
18       A.    No.
19       Q.    Have you ever supervised David Dixon?
20       A.    Yes.
21       Q.    And do you remember when you supervised
22   him?
23       A.    I supervised him -- I can't remember the
24   time, but I know he -- he worked for me last. I can't
25   remember the time frame.

4  (Pages 10 to 13)

**14**

1    Q.   Okay.  Do you have any better memory of
2 when Carter worked for you -- when Dixon worked for you
3 as opposed to Carter, or same kind of thing, you don't
4 remember?
5    A.   Carter -- Dixon worked for me last so I
6 remember more of Dixon.
7    Q.   All right.  Do you think he worked for you
8 after 2005 or do you not know?
9    A.   I don't know when Dixon left.  I don't know
10 what year he left.
11    Q.   He left in 2009.
12    A.   Okay.  So Dixon worked for me.  He worked
13 for me then.
14    Q.   So when he left, he was working for you?
15    A.   Uh-huh.  If it was 2009 when he left.
16    Q.   He was working for you as a correctional
17 officer?
18    A.   Yes.
19    Q.   And when he left had he been working for
20 you for at least all of 2009?
21    A.   No.
22    Q.   He'd only worked for you for a portion of
23 2009?
24    A.   Yeah.  I had Dixon for a couple months.
25    Q.   How about Robert McCoy?  Wayne McCoy.  Did

**15**

1 he ever work -- did you ever supervise him?
2    A.   No.
3    Q.   How about John Sandhofer?  Did you ever
4 supervise him?
5    A.   No.
6    Q.   And Debra Woodward?  You never supervised
7 her, did you?
8    A.   No.
9    Q.   In 2009 did anyone ask you your input as to
10 whether or not Danny Carter should be reappointed
11 within the Hampton sheriff's office?
12    A.   No.
13    Q.   In 2009 did anybody ask you your input as
14 to whether or not David Dixon should be reappointed
15 within the Hampton sheriff's office?
16    A.   No.
17    Q.   If Dixon only worked for you two months, I
18 guess that you didn't have occasion to write a
19 performance evaluation for him, did you?
20    A.   I didn't say two months.  I'm not sure how
21 many months, but no, I didn't get the chance to write
22 an eval for him.
23    Q.   Evals typically are done at the end of
24 calendar years; is that right?
25    A.   At the end -- end of the year.  End of the

**16**

1 year -- depends on how long you been in the department.
2    Q.   I think all the ones I've seen done are
3 either at the end of a December or the beginning of a
4 January, so is that fairly typical that they would be
5 done?
6    A.   I wouldn't say that's typical.
7    Q.   Okay.  So is it typical to do them then on
8 the anniversary date of somebody's hire?
9    A.   It depends on when somebody came.  When you
10 come into the department.
11    Q.   And so you take the date they came and then
12 every year after that, that's typically when they get
13 their eval, based on your understanding?
14    A.   No, it depends on when somebody came.  I
15 mean, when you first come to the department, it's
16 different.
17    Q.   How is it different?  Do you know how they
18 set the timing of when employees are to get
19 evaluations?
20    A.   Yes.
21    Q.   Could you describe to me what you know
22 about that process?
23    A.   As far as what?  You talking about --
24    Q.   About how they time the first evaluation
25 an employee gets after they get there.

**17**

1    A.   Yeah.  When you first come into the
2 department, you have a probation period and you have
3 the eval done in the first 90 days.  After 90 days it
4 goes to six months.  After six months it's nine months.
5 And then after nine months, then it's a year.
6    Q.   Okay.
7    A.   You have your annual.
8    Q.   Now, in your job as a shift lieutenant,
9 part of your duties is writing evaluations of your
10 subordinates; is that correct?
11    A.   I wrote my sergeants' evals.
12    Q.   All right.
13    A.   And my sergeants write the deputies' evals.
14    Q.   You sign the evals of your deputies.
15 You're the second-level reviewer of your deputies'
16 evals; is that correct?
17    A.   Yes.
18    Q.   And when was the last time you did evals,
19 last -- when was the last time you did any evals?
20    A.   The last time I did evals?
21    Q.   Yeah.
22    A.   What you mean?
23    Q.   The last time you signed evals.  Reviewed
24 them and signed them.
25    A.   I just had to do some evals.

5 (Pages 14 to 17)

18

1    Q.    And did you do the entire shift at one time
2    or did you do just a few?
3    A.    Like I say, it depends on when somebody
4    came on. I just did two evals.
5    Q.    All right. Do any of your subordinates get
6    evaluation grades of outstanding that you can remember?
7    A.    I don't even know. I don't know.
8    Q.    Sitting here, you don't remember giving any
9    of your subordinates outstanding evaluation grades
10   during your time as lieutenant?
11       MR. HUNN: Objection to form.
12   A.    No, I can't recall.
13
14   BY MR. SHOEMAKER:
15   Q.    Okay. What is the average overall
16   evaluation grade your employees receive?
17   A.    What you mean by what's the average?
18   Q.    Well, you have ratings in the system,
19   there's below average, average, above average, and
20   outstanding, I think. I think there's a fails-to-meet.
21   Does that sound right?
22   A.    That's -- what you're saying is -- that's
23   old.
24   Q.    You don't do that anymore?
25   A.    No, sir.

19

1    Q.    What evaluation scores do you give now?
2    A.    It's hard to say what it is.
3    Q.    I mean, do you give grades, or is it just
4    kind of a satisfactory, unsatisfactory?
5    A.    Yeah, it's -- each one is a performance.
6    Q.    How do you -- how are those performances
7    described in the evaluation?
8    A.    What you mean by how they described?
9    Q.    I mean, I understand they're rated on
10   performance.
11   A.    Uh-huh.
12   Q.    But I imagine you give out some sort of
13   gradations of performance levels, don't you?
14   A.    You talking about -- I mean, what you
15   saying?
16   Q.    Let me show you.
17       This evaluation -- this is Plaintiff's
18   Exhibit 3 from a previous deposition, and I'd like to
19   take a look at -- have you take a look at Plaintiff's
20   Exhibit 3.
21       MR. HUNN: Jamie, just so the record's
22   clear because I haven't -- do you know whose deposition
23   that was marked in, or are you guys continuing numbers?
24       MR. SHOEMAKER: They're joint exhibits.
25       MR. HUNN: Good enough.

20

1    A.    Okay. So?
2
3    BY MR. SHOEMAKER:
4    Q.    Why don't you take a minute and look at
5    that whole document.
6    A.    Okay.
7    Q.    These levels near the end of the
8    evaluation, the evaluation has grade levels of
9    outstanding, above average, average, fair, and below
10   average. Are those grade levels still used?
11   A.    No.
12   Q.    Are there comparable grade levels that
13   exist now in the current evaluation form?
14   A.    What you mean by comparable? Something
15   like this?
16   Q.    Yes, right.
17   A.    Yes.
18   Q.    And what are they? What are they called?
19   Do you know?
20   A.    No, I'd have to see the form to -- so I can
21   give you the right answer.
22   Q.    Back in 2009 Plaintiff's Exhibit 3 is the
23   form that was in use within the Hampton sheriff's
24   office, was it not?
25   A.    I'm not sure when we changed.

21

1    Q.    Okay. Do you remember this form?
2    A.    Yes.
3    Q.    And do you remember using this form in the
4    past few years?
5    A.    Like I say, I'm not sure when we changed,
6    but I remember using this form before.
7    Q.    Do you remember any of your -- well, let me
8    withdraw that. Typically, when you were using this
9    form, what would most of your people get? Would they
10   get outstanding, above average, average, fair, or below
11   average?
12       MR. HUNN: Objection, form. "Typically"
13   and "most"? Vague terms.
14   A.    You -- each person is different.
15
16   BY MR. SHOEMAKER:
17   Q.    I understand.
18   A.    So it's no -- it's no average, what was the
19   average everybody get. Everybody is different.
20   Q.    I understand that. Let me ask it a
21   different way. What grade would most of your
22   subordinates get back in 2009 when you used this form?
23       MR. HUNN: Objection, form, foundation.
24   A.    It's no average.
25

22

BY MR. SHOEMAKER:
Q.   There's no average?
A.   There's no average most subordinates get. It depends on the individual.
Q.   Now, I understand that, but some organizations take -- a lieutenant told me the other day she never gave out any outstandings.  None of her people got outstandings.  Nobody.
A.   Uh-huh.
Q.   Do you remember whether or not any of your people got outstandings back when you used this form?
A.   Like I told you before, I don't remember. I don't remember.
Q.   Do you remember whether or not many of your subordinates received the score average back in 2009?
MR. HUNN:  Objection, form.
A.   I don't remember.

BY MR. SHOEMAKER:
Q.   Is there any jail guidance on how you are to assign or were to assign those scores on Plaintiff's Exhibit 3?  Did you have a policy you could go to to determine how you were to distinguish between outstanding and above average, for instance?
MR. HUNN:  Objection, form.

23

A.   What are you -- what are you saying?

BY MR. SHOEMAKER:
Q.   Do you remember ever referring to a policy document, some guidance, some written instructions, about how you were to assign these grades?
A.   No.
Q.   Were you the final -- once you sign these evaluations, what do you do with them?
A.   What do you mean?
Q.   Do you just turn them in to HR or what do you do with them?
A.   Yes, they go to HR.
Q.   Who is your -- who was your -- who do you report to?
A.   Who do I report to?
Q.   Yeah.
A.   Captain Glover.
MR. HUNN:  I don't mean to interrupt you and I don't have to have any speaking objections, but you said at the beginning of the deposition to always refer to 2009.  It was unclear to me whether that was his supervisor now or in 2009.

24

BY MR. SHOEMAKER:
Q.   Who did you report to in 2009?
A.   2009?
Q.   Yeah.
A.   I don't remember who I reported to in 2009.
Q.   Today when you do an evaluation, do you run those evaluation scores by Captain Glover?
A.   Today when I do them?
Q.   Yeah.
A.   What you mean, do I run them by Captain Glover?
Q.   Does he see them before you run them to HR?
A.   Who, the evals?
Q.   Right.
A.   No, he's -- you talking about the ones he's got to sign off on?  Which ones you talking about?
Q.   Which ones does he sign off on?  Captain Glover, today, when you're doing evaluations, which ones does he have to sign off on, just sergeants and above?
A.   Yes.
Q.   He does not sign off on rank-and-file deputies?
A.   No.
Q.   Are you involved at all in the hiring

25

process?
A.   What do you mean by involved?
Q.   Do you play any role in the hiring process at all?  Do you review candidates' applications, do you interview them?
MR. HUNN:  Objection, form.
A.   What you mean by interview them?  Sit on the interview panel?

BY MR. SHOEMAKER:
Q.   Well, either sitting on an interview panel or sitting in a room with them and ask them questions before they're hired.
A.   No.
Q.   Do you ever sit on an interview panel?
A.   Do I ever sit on an interview panel?
Q.   Yeah.
A.   What you mean?
Q.   Do you ever sit -- you used the phrase "interview panel."  What did you mean by "interview panel" when you used that phrase?
A.   When you going for a job.  I mean, they usually have an interview board you go in front of.
Q.   The Hampton sheriff's office uses interview panels to assess candidates?

7  (Pages 22 to 25)

26

1    A.    I don't know what you would call it. That
2  was just my phrase.
3    Q.    Have you ever sat on something that you
4  refer to as an interview panel for the Hampton
5  sheriff's office?
6    A.    I mean, my panel may be your board. You
7  might call it a board. I might call it a panel.
8    Q.    Okay. Have you ever sat on any type of
9  panel for the Hampton sheriff's office?
10   A.    Yes.
11   Q.    What type of panels do you sit on for the
12 Hampton sheriff's office?
13   A.    When you saying panels, I'm talking about a
14 board.
15   Q.    Okay. A board. What kind of boards have
16 you sat on for the Hampton sheriff's office?
17   A.    I've sat on a hiring board before.
18   Q.    On a hiring board?
19   A.    Yes.
20   Q.    Have you ever sat on a disciplinary board?
21   A.    I don't remember.
22   Q.    Do you know what a disciplinary board is?
23   A.    Yes.
24   Q.    How often are you asked to sit on a hiring
25 board?

27

1    A.    I don't know -- I don't think it's no time
2  frame. I don't know.
3    Q.    Have you sat on more than one?
4    A.    Yes.
5    Q.    Have you sat on more than five?
6    A.    No.
7    Q.    Is that a duty that -- when was the last
8  time you did that?
9    A.    I don't remember.
10   Q.    Can you remember any deputies who were
11 hired as a result of one of the boards that you were
12 sitting on?
13   A.    Any deputies that were hired?
14   Q.    Yes.
15   A.    'Cause of the board I was sitting on?
16   Q.    Yeah, right.
17   A.    I wouldn't say because I was sitting on it.
18 I say they got hired from the whole -- whole board.
19   Q.    Well, that's what I mean. I mean, do you
20 remember any deputies who were hired during the process
21 related to the board you were sitting on?
22   A.    Yes.
23   Q.    What deputies do you remember being hired
24 as a result of the process of the board you were
25 sitting on?

28

1    A.    I can't remember the names. You know, I
2  got a face but not a name right now.
3    Q.    Did you sit on any hiring boards in 2009 or
4  2010?
5    A.    I don't remember.
6    Q.    Typically, who sits on a hiring board?
7    A.    I don't know. HR does that.
8    Q.    They'll have an HR representative on the
9  hiring board?
10   A.    I mean HR does that.
11   Q.    HR does it, but the hiring board --
12 obviously, you were sitting on a hiring board, right?
13   A.    Yeah.
14   Q.    You're not a member of HR.
15   A.    No, HR is the one who forms the boards.
16   Q.    Okay. And when you have sat on these
17 boards, have there been officers higher in rank than
18 you on the hiring board?
19   A.    Yes.
20   Q.    And what's the highest ranking officer
21 you've ever seen on a hiring board?
22   A.    Captain.
23   Q.    And when you sat on the hiring boards, how
24 many members -- how many people were on the hiring
25 board?

29

1    A.    I think it was four or five.
2    Q.    And the hiring board would review
3  applications for the position?
4    A.    For positions to come into the department.
5    Q.    Right.
6    A.    Yes.
7    Q.    So people would send in their applications
8  and their resumés and the hiring board would review
9  them; is that correct?
10   A.    No. This is an interview.
11   Q.    Okay. So you -- before you go into the
12 interviews, would you have seen the application
13 documents submitted by the candidate?
14   A.    No.
15   Q.    You would just go into an interview and you
16 would interview the candidate?
17   A.    Yes.
18   Q.    During that interview would you be given
19 the applicant's resumé or application documents?
20   A.    No.
21   Q.    And then the hiring board would -- would
22 the hiring board vote on the candidate?
23   A.    Would they vote?
24   Q.    Let me scratch that. I'll withdraw that.
25     How would the hiring board decide who to --

8  (Pages 26 to 29)

30

1   who to extend an offer to?
2       A.    Well, we don't decide.
3       Q.    What do you do?
4       A.    It's a phase that you go through.  Your
5   next step would be to go see the colonel or the
6   sheriff.
7       Q.    Okay.  And does the hiring board make a
8   recommendation to the colonel or the sheriff?
9       A.    Yes.
10      Q.    And when you sat on these hiring boards,
11  how many candidates would you send to the colonel or
12  the sheriff?  Would you send several candidates for
13  consideration to them, or would you simply send one
14  with a recommendation?
15      A.    I don't know.
16      Q.    Would you give the candidates a score?
17      A.    Would you give them a score?
18      Q.    Yeah.  Would you score them in any way?
19      A.    I don't remember if we score them or not.
20      Q.    You would -- but you obviously gave the
21  colonel or the sheriff some type of information so that
22  -- on which they could make their decision, correct?
23      A.    No.  We didn't give them any information.
24  It was your next step.
25      Q.    Okay.  What did you tell them about your

31

1   interviews?
2       A.    We didn't tell them anything.
3       Q.    You didn't tell them anything?
4       A.    No.
5       Q.    You didn't give them any information?
6       A.    No.
7       Q.    You just held the interview and then they
8   went and they interviewed with the colonel or the
9   sheriff?
10      A.    Yes.
11      Q.    So why did the hiring board interview the
12  person then?
13      A.    Why do we interview?
14      Q.    Yeah.
15      A.    It's your next step.
16      Q.    Okay.  But if they're not going to give --
17  I mean, the colonel or the sheriff make the final
18  decision to hire; is that right?
19      A.    No, the sheriff.
20      Q.    The sheriff makes the final decision to
21  hire?
22      A.    Yes.
23      Q.    And does he get any benefit from the hiring
24  board having interviewed the candidate at all?
25            MR. HUNN:  Objection to form.

32

1       A.    What you mean, do he get any benefit?
2
3   BY MR. SHOEMAKER:
4       Q.    I mean -- let me just ask it more simply.
5   What is the purpose of the hiring board interviewing
6   the candidate?
7       A.    It's the next step.  You have a process
8   you're going through.  It's a next step in your
9   process.  If you pass that step, then you go see the
10  sheriff.
11      Q.    Okay.  So they have to get a satisfactory
12  -- they have to pass that step?
13      A.    Yes.
14      Q.    Okay.  So they get a thumbs up or thumbs
15  down from the hiring board?
16      A.    I wouldn't say a thumbs up or thumbs down.
17  They would pass.
18      Q.    Okay.  And some don't pass, fair?
19      A.    Yes.
20      Q.    Do you have any -- other than medical
21  personnel -- well, let me ask it differently.  Do you
22  supervise medical personnel when you are shift
23  commander?
24      A.    No.
25      Q.    You supervise only correctional officers?

33

1       A.    Yes.
2       Q.    Are there -- when you are there on the
3   night shift, are there any nonuniformed personnel there
4   other than the medical personnel?
5       A.    No.
6       Q.    So it's just medical personnel who are
7   nonuniformed and correctional officers on the night
8   shift?
9       A.    What you mean by just nonuniformed?
10      Q.    Well, you're wearing a uniform today.
11      A.    Uh-huh.
12      Q.    Right?
13      A.    Yes.
14      Q.    Are there any folks there who are dressed
15  just in regular clothes, not in a uniform, on the night
16  shift?
17      A.    No.
18      Q.    The medical people are, though, right?
19      A.    Yeah.  They have a uniform.  They are in a
20  uniform.
21      Q.    Are they in that kind of uniform or
22  medical?
23      A.    Medical.  They have their own medical
24  stuff.
25      Q.    So there's nobody there at night who's just

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

34

1  dressed in civilian clothes?
2      A.   No.
3      Q.   How many master deputies are on your shift
4  now?
5      A.   How many master deputies?
6      Q.   Right.
7      A.   On my shift now?
8      Q.   Right.
9      A.   I don't have any.
10     Q.   Can you remember the last time you had a
11 master deputy working for you?
12     A.   No.
13     Q.   My understanding of the master deputy rank
14 is that you have to have at least a sergeant or above
15 in each of the jail -- the central jail or the jail
16 annex, is that correct, during the night shift?
17     A.   You say we have to have?
18     Q.   Yeah.
19     A.   No.
20     Q.   Can you leave the Pembroke Avenue annex in
21 charge of just -- in the charge of just a regular
22 rank-and-file deputy?
23     A.   Leave them in charge?  What do you mean by
24 just leave them in charge?
25     Q.   What's the lowest rank you can leave in

35

1  charge of the Pembroke Avenue annex?
2          MR. HUNN:  Objection, form.
3      A.   I mean, you always have a supervisor.
4
5  BY MR. SHOEMAKER:
6      Q.   Okay.  And those supervisors, can you leave
7  a deputy without any rank as the supervisor at the
8  Pembroke Avenue annex?  Without you being there.
9          MR. HUNN:  Objection, form.
10     A.   Can you leave any deputy?
11
12 BY MR. SHOEMAKER:
13     Q.   Right.
14     A.   I mean, you always have a supervisor there.
15     Q.   Do those supervisors have to be sergeant or
16 above?
17     A.   Yeah, that's what a supervisor is.
18     Q.   All right.  So you have to have somebody
19 sergeant or above at the Pembroke Avenue annex without
20 you being there?
21         MR. HUNN:  Objection, form.
22         Go ahead.
23     A.   You saying that I have to have and without
24 me being there.  What you're saying is not how we work
25 our operation.

36

1  BY MR. SHOEMAKER:
2      Q.   Well, I'm talking about the policies
3  generally.  Just the Hampton sheriff's office policy.
4  When you are on the night shift and let's say you're in
5  the central jail in downtown Hampton, is it within the
6  bounds of the policy for you to have a -- let me take
7  the example -- and maybe you don't know, but let's say
8  you've got a master deputy on your shift.  Can you
9  leave a master deputy in charge supervising the
10 Pembroke Avenue annex?
11         MR. HUNN:  Objection, form.
12         You can answer.
13     A.   I don't -- I don't know.
14
15 BY MR. SHOEMAKER:
16     Q.   Okay.  Did you hold any opinion at the end
17 of 2009 as to whether or not Deputy David Dixon should
18 be reappointed to the Hampton sheriff's office, or did
19 you simply have no opinion?
20         MR. HUNN:  Objection.
21         You can answer.
22     A.   You said did I do what?
23
24 BY MR. SHOEMAKER:
25     Q.   At the end of 2009 did you hold any opinion

37

1  as to whether or not Deputy David Dixon should be
2  reappointed to his position within the Hampton
3  sheriff's office, or did you -- or did you simply have
4  no opinion?
5          MR. HUNN:  Objection.
6          You can answer.
7      A.   I don't even know what you talking about,
8  did I have an opinion.  Did I hold an opinion?
9
10 BY MR. SHOEMAKER:
11     Q.   Yes, sir.  Did you hold an opinion about --
12     A.   What do you mean by did I hold an opinion?
13     Q.   Did you hold any view, opinion, belief, at
14 the end of 2009 as to whether or not David Dixon should
15 be reappointed to the office, or did you simply have no
16 opinion on the subject?
17         MR. HUNN:  Objection, form.
18         You can answer.
19     A.   I don't -- I don't have nothing do with
20 anything.
21
22 BY MR. SHOEMAKER:
23     Q.   All right.  So it's fair to say you had no
24 opinion on the subject?
25     A.   I'm still not understanding your question.

38

1          MR. HUNN:  Objection to form.

2

3   BY MR. SHOEMAKER:

4      Q.    All right.  No one asked you at the end of

5   2009 whether or not you thought David Dixon should be

6   reappointed to his position within the Hampton

7   sheriff's office, did they?

8      A.    No.

9      Q.    And no one asked you at the end of 2009

10   whether or not Deputy Danny Carter should be

11   reappointed to his position within the Hampton

12   sheriff's office, did they?

13      A.    No.

14      Q.    Did anyone anywhere near the -- did anyone

15   between, say, September 1, 2009, and the end of 2009

16   come to you and ask you your assessment or your opinion

17   of David Dixon?

18      A.    No.

19      Q.    Did anyone between September of 2009 and

20   the end of 2009 come to you and ask you your opinion

21   about Deputy Danny Carter?

22      A.    No.

23      Q.    I'm going to ask you a few questions.  This

24   document has been previously labeled Plaintiff's

25   Exhibit 15.  I'd like you to take a minute to review

39

1   that document.

2          I'm not going to ask you questions about

3   this particular case.  I'm going to ask you questions

4   about disciplinary boards in general.

5      A.    Okay.

6      Q.    Okay.  Lieutenant Lewis, do you ever

7   remember, sitting here, ever sitting on a disciplinary

8   board within the Hampton sheriff's office?

9          MR. HUNN:  Objection, asked and answered.

10      A.    Like I told you earlier, I don't remember.

11

12   BY MR. SHOEMAKER:

13      Q.    Do you ever remember any of your

14   subordinates ever being -- ever going before a

15   disciplinary board?

16      A.    We talking about 2009?

17      Q.    I'm talking about any time right now.

18      A.    Yes.

19      Q.    Who of your subordinates do you remember

20   going before a disciplinary board?

21      A.    You talking about now or in 2009?

22      Q.    At any time you can remember.

23      A.    You talking about now?

24      Q.    Well, I'm asking about any of your

25   subordinates that you remember going before a

40

1   disciplinary board, and it doesn't matter to me whether

2   or not it's now or 2009 for the purposes of this

3   question.  If it helps you, we'll start with now.  Do

4   you remember any recent -- recently, do you remember

5   any of your subordinates going before a disciplinary

6   board?

7      A.    Yes.

8      Q.    Who do you remember going before a

9   disciplinary board?

10      A.    Had a Deputy Kemper.  Had a Sergeant

11   Cherry.  Deputy Boswell.  Deputy Rogers.  That's all

12   that I can remember right now.

13      Q.    Okay.  Do you know why Deputy Kemper had to

14   go before a disciplinary board?

15      A.    Not following proper procedures.

16      Q.    Do you remember how -- do you remember what

17   he did that ended up in him being accused of not

18   following proper procedures?

19      A.    Not exactly.

20      Q.    Do you remember generally what it was

21   about?

22      A.    Not exactly.

23      Q.    Do you have any memory of that incident at

24   all?

25      A.    I know it had -- just about property.

41

1   That's the only thing.

2      Q.    Had something to do with property?

3      A.    Yes.

4      Q.    Do you remember whether or not he received

5   any discipline as a result of that incident?

6      A.    Yes.

7      Q.    What discipline did he receive?

8      A.    I'm not sure what you would call it.

9      Q.    Was he suspended?

10      A.    Yes.

11      Q.    Did he -- other than the suspension, did he

12   receive any other type of discipline?

13      A.    I don't know.

14      Q.    Sergeant Cherry, do you remember why -- is

15   that a man or woman, Cherry, by the way?

16      A.    Female.

17      Q.    Do you know her first name?

18      A.    Uh-uh.  I don't know her first name.

19      Q.    How about Kemper?  Do you know Kemper's

20   first name?

21      A.    No, I don't know his first name.

22      Q.    That's a male?

23      A.    Yes.

24      Q.    Sergeant Cherry, what infraction did she

25   allegedly commit?

42

1    A.    I can't remember.
2    Q.    Do you remember anything about it?
3    A.    Uh-huh.
4    Q.    Now, how many sergeants work for you?
5    A.    I have two.
6    Q.    Sergeant Cherry is one of them?
7    A.    Yes.
8    Q.    And how long has she been a sergeant
9    working for you?
10    A.    I'm not sure how long, how long she's been
11    working for me as a sergeant.
12    Q.    Is it more than three years?
13    A.    I'm not sure.
14    Q.    Is it more than a year?
15    A.    It's more than a year.
16    Q.    All right.  And this disciplinary board
17    was -- that was while she was working for you so that's
18    within the past year?
19    A.    I won't say it's within the past year.  I
20    don't know how long ago it was.
21    Q.    Was it while she was working for you?
22    A.    Yes.
23    Q.    And you don't remember anything about it?
24    A.    No, I remember she went to a board.
25    Q.    Do you remember anything about the

43

1    accusation that was made against her?
2    A.    No.
3    Q.    Do you remember whether or not she was
4    disciplined?
5    A.    Yes.
6    Q.    What discipline do you remember her
7    receiving?
8    A.    I remember suspension.
9    Q.    Now, is she still a sergeant working for
10    you?
11    A.    Yes.
12    Q.    Deputy Boswell, do you remember anything
13    about the incident involving Deputy Boswell?
14    A.    No.
15    Q.    Do you know Deputy Boswell's first name?
16    A.    No.  No, sir.
17    Q.    Is it a man or a woman?
18    A.    It's a man.
19    Q.    Do you remember if Deputy Boswell received
20    any form of discipline?
21    A.    Yes.
22    Q.    What discipline did he receive?
23    A.    Suspension.
24    Q.    These suspensions, do you remember how long
25    they were?

44

1    A.    No, I can't recall.
2    Q.    Deputy Rogers, do you know Deputy Rogers'
3    first name?
4    A.    No, sir.
5    Q.    Is it a man or a woman?
6    A.    It's a man.
7    Q.    And do you remember anything about the
8    allegations against Deputy Rogers?
9    A.    No, sir.
10    Q.    Do you know if Deputy Rogers was
11    disciplined as a result of this incident?
12    A.    Yes.
13    Q.    Do you remember what the discipline was?
14    A.    Suspension.
15    Q.    Are those the only subordinates of yours
16    that you can ever remember going before a disciplinary
17    board?
18    A.    Those are the ones that I remember.
19    Q.    And did any of these involve the loss of a
20    weapon?
21    A.    The loss of a weapon?
22    Q.    Yeah.
23    A.    I don't remember what -- what it was.
24    Q.    Did any of these involve any act of
25    dishonesty?

45

1    A.    I don't know what they was.
2    Q.    Now, this question was directed at people
3    who were supervised by you.  Can you remember any
4    disciplinary boards of any other employees of the
5    Hampton sheriff's office who may not have been
6    supervised by you?
7    A.    I mean, different people go to boards.
8    Q.    Can you remember any other people who went
9    before a disciplinary board other than the people you
10    just identified for me, these four people?
11    A.    No.
12        MR. HUNN:  Is this just 2009?  You warned
13    the witness at the beginning every question you don't
14    put a time period on, it would be 2009.  I'm not trying
15    to be difficult, but I'm trying to make sure everybody
16    is on the same page.
17
18    BY MR. SHOEMAKER:
19    Q.    I'm asking about any disciplinary board
20    you're aware of.  Are you aware of any disciplinary
21    board.  I think that disqualifies the time limitation.
22    Are you aware of any disciplinary boards other than the
23    ones involving Kemper, Cherry, Boswell, and Rogers?
24    A.    They have boards.  I'm not sure.  I mean, I
25    don't know.  I don't keep up with that stuff.

46

1    Q.   Have you heard of any lieutenants going
2  before a disciplinary board?
3    A.   I don't know.
4    Q.   Do you remember an incident from a few
5  years back where a Lieutenant Mitchell discharged his
6  firearm accidentally and shot himself in the hand?
7    A.   A little bit. You -- say it again. Say
8  the question again.
9    Q.   Lieutenant Mitchell. He accidentally
10 discharged his weapon and he hit himself in his hand.
11 Do you remember that?
12   A.   I remember -- I remember Mitchell hitting
13 hisself in the hand. I don't remember him being a
14 lieutenant doing that.
15   Q.   You think this happened before he was
16 promoted to lieutenant?
17   A.   I'm not sure of the time frame, but I think
18 so.
19   Q.   He became a lieutenant later, right?
20   A.   He had to.
21   Q.   Yeah. Because at some point in the late --
22 in the last years you remember him as a lieutenant,
23 correct?
24   A.   Yes.
25   Q.   Do you remember there being a second

47

1  incident where Lieutenant Mitchell, or at that time
2  perhaps he was Sergeant Mitchell, accidentally
3  discharged his weapon and hit himself in the hand with
4  the bullet?
5    A.   I don't know.
6    Q.   What do you remember about the first
7  incident?
8    A.   I just remember that it happened.
9    Q.   Do you remember there being a disciplinary
10 board as to that incident?
11   A.   I don't -- I don't know.
12   Q.   How long have you been -- you have a badge
13 on today that says: Field training officer. How long
14 have you been a field training officer?
15   A.   I don't know how long I've been field
16 training officer.
17   Q.   You've been field training officer more
18 than two years?
19   A.   Yes.
20   Q.   Have you been field training officer more
21 than five years?
22   A.   Yes.
23   Q.   Were you field training officer when
24 Lieutenant Mitchell shot himself in the hand?
25   A.   I don't know what year that was. I don't

48

1  know how long I've been. I don't know what year that
2  was when he shot himself.
3    Q.   I think it was 2004. Does that help you at
4  all?
5    A.   I mean, do you know for sure?
6    Q.   I don't know for sure that it was 2004. I
7  think it was 2004.
8    A.   Yeah. That's why I couldn't answer that
9  question for you.
10   Q.   So you don't remember having any sort of
11 official investigation duties or any duties at all with
12 respect to that incident where Lieutenant Mitchell
13 accidentally discharged his weapon?
14   A.   You talking about me personally?
15   Q.   Right. You personally.
16   A.   No, I didn't.
17   Q.   What do your duties as field training
18 officer encompass?
19   A.   Training, training people that come
20 underneath me.
21   Q.   Training people as correctional officers?
22   A.   People that come underneath me.
23   Q.   And so you don't do any training for civil
24 process servers?
25   A.   No.

49

1    Q.   And you don't do any training for court
2  security personnel?
3    A.   No.
4    Q.   Do you do any firearms training?
5    A.   No.
6    Q.   You train solely about the correctional
7  officer's duties within the jail?
8    A.   Yes.
9    Q.   Do you remember any of your subordinates
10 ever having been disciplined for early releases?
11   A.   Like I told you, I don't remember what they
12 was going to the boards for.
13   Q.   Do you remember any early releases at all,
14 sitting here today?
15   A.   Do I remember any early releases?
16   Q.   Yeah, yeah.
17   A.   As far as dealing with who?
18   Q.   Do you remember any incidents where a
19 prisoner was released early?
20   A.   Yes.
21   Q.   Do you remember any deputies getting in
22 trouble as a result of that release?
23   A.   Yes. I remember officers getting in
24 trouble.
25   Q.   What officers do you remember getting in

13  (Pages 46 to 49)

50

```
1    trouble as a result of a release?
2        A.   I remember myself.
3        Q.   When did you get in trouble as a result of
4    a release?
5        A.   I don't recall.
6        Q.   Was it more than three years ago?
7        A.   I don't know how long ago it was.
8        Q.   Was it more than five years ago?
9        A.   I don't know how long ago it was.
10       Q.   It wasn't 20 years ago, was it?
11       A.   I don't know how long ago it was.
12       Q.   So it could have been 20 years ago?
13       A.   I ain't been working in the sheriff
14   department 20 years so it couldn't have been 20 years
15   ago.
16       Q.   Could it have been more than ten years ago?
17       A.   I'm not sure how long it's been.
18       Q.   So it could have been more than ten years
19   ago?
20       A.   I'm not sure how long it's been.
21       Q.   Were you a lieutenant when it happened?
22       A.   No.
23       Q.   Were you a sergeant when it happened?
24       A.   Yes.
25       Q.   And what happened to you as a result of
```

51

```
1    that incident?
2        A.   I went to the board, and I was suspended.
3        Q.   How long were you suspended for?
4        A.   I'm not sure how many days I got.
5        Q.   Do you remember any other incidents of
6    prisoners being released early?
7        A.   I can't remember.
8        Q.   Has it ever occurred while you were -- on
9    your shift while you were a shift lieutenant?
10       A.   While somebody got released early?
11       Q.   Yes.
12       Q.   While I'm shift lieutenant?
13       Q.   Right.  During your shift.
14       A.   I really can't recall.  I'm not sure.
15       Q.   You don't remember that ever happening?
16       A.   I'm not sure.
17       Q.   So the only early prisoner release you can
18   remember sitting here today, the only incident you can
19   remember was one that you were directly involved in?
20       A.   You saying the only one that I can remember
21   sitting here today.
22       Q.   Yes.
23       A.   I mean, yeah.  I'm not sure about others.
24       Q.   Okay.  So you don't remember any others?
25       A.   I don't know.  I'm not sure.
```

52

```
1        Q.   I don't need you to be sure.  I just want
2    to know if you remember any.  Do you remember any other
3    early prisoner releases?
4        A.   I don't know.
5        Q.   You don't know if you remember?  It sounds
6    like you don't remember.
7        A.   I mean, that's what I'm saying.  I'm not
8    sure.
9        Q.   Are you aware or do you have any knowledge
10   of any other sheriff's office employees accidentally
11   discharging their firearm?
12       A.   I don't know.
13       Q.   You've never heard -- you're not aware of
14   any other accidental discharges?
15       A.   No.  I don't know.  I never heard of
16   anything.
17       Q.   Other than Mitchell.
18       A.   Yes.
19       Q.   You've heard of Mitchell, but you've not
20   heard of another one?
21       A.   Yeah.  I just heard of Mitchell's.
22       Q.   And you have not heard of another one?
23       A.   No.  Not that I remember.
24       Q.   Do you know what reports the Hampton
25   sheriff's office is supposed to make when there is an
```

53

```
1    accidental discharge of a firearm?
2            MR. HUNN:  Objection, form.
3        A.   What you mean by what kind of reports?
4
5    BY MR. SHOEMAKER:
6        Q.   Do you know if there are any reports that
7    have to be made from the Hampton sheriff's office to
8    any other authority if a deputy accidentally discharges
9    their firearm?
10       A.   No, I don't know.  You're saying to another
11   authority.  I don't know.
12       Q.   Why don't we take a break here for a couple
13   minutes.
14           MR. HUNN:  Okay.  Good enough.
15
16           (Recess)
17
18   BY MR. SHOEMAKER:
19       Q.   Let's go back on the record.
20           Lieutenant Lewis, are you aware of any
21   employees of the Hampton sheriff's office ever
22   receiving any DUIs or driving-while-intoxicated charges
23   while employed with the office?
24       A.   No.
25       Q.   Are you aware of any employees of the
```

14 (Pages 50 to 53)

54

1    Hampton sheriff's office, including any of your
2    subordinates, ever having been accused of any act of
3    insubordination?
4        A.    What do you mean by act of insubordination?
5        Q.    An act where they were disrespectful to a
6    superior or refused to obey the order of a superior or,
7    you know, backtalk to a superior.  Are you aware of any
8    incidents where a deputy was disciplined for
9    insubordination?
10       A.    Don't remember any.  I don't remember, you
11   know, dealing with me and my subordinates.
12       Q.    Okay.  Are you aware of any employees,
13   whether they were dealing with you or not, who have
14   ever been accused of any act of insubordination?
15       A.    I don't know.
16       Q.    When you say, "I don't know," you mean, I
17   don't have any knowledge of that?  Is that what you
18   mean or do you mean, I don't know?
19       A.    I mean, that's the same thing, isn't it,
20   you saying, I don't know, or, I don't have any
21   knowledge?  I don't have any knowledge of what you
22   talking about.
23       Q.    Okay.  Fair enough.  All right.
24           Are you aware of any Hampton sheriff's
25   office employees who have ever been accused of abusing

55

1    a prisoner?
2        A.    No.
3        Q.    Are you aware of any Hampton sheriff's
4    office employees ever having gotten into -- well,
5    scratch that.
6            Are you aware of any Hampton sheriff's
7    office employees ever being accused of any act of
8    dishonesty?
9        A.    No.
10       Q.    Are you aware of any Hampton sheriff's
11   office employee ever being involved in a vehicle
12   accident with a Hampton sheriff's office vehicle that
13   involved physical injuries?
14       A.    No.
15       Q.    Are you aware of any Hampton sheriff's
16   office employees who have ever -- I talked earlier
17   about lost weapons, but who have ever lost any
18   equipment that was issued to them by the Hampton
19   sheriff's office?
20       A.    No.
21       Q.    Do you remember an incident with Sergeant
22   Theodore Ford where he was accused of losing his weapon
23   or misplacing his weapon?
24       A.    I don't know what he had to go to the board
25   for.  I know he had to go to a board, but I don't know

56

1    what it was for.
2        Q.    Okay.  Do you remember him being fired
3    after going to that board?
4        A.    I don't know -- I don't know if he -- I
5    don't know what happened, actually.  I know he's not
6    with us no more.  I don't know what happened.
7        Q.    Do you remember him ever being disciplined
8    before he had to go to that board?
9        A.    I don't know.
10       Q.    Do you remember a Deputy Eley ever being
11   disciplined for anything?
12       A.    Deputy Eley?
13       Q.    Right.
14       A.    I don't know.  I don't know if she ever
15   been or not.
16       Q.    Do you remember a Deputy Margaret Evans
17   ever being disciplined for an act of insubordination?
18       A.    For an act of insubordination?
19       Q.    Yes.
20       A.    I don't remember.
21       Q.    Do you remember a Deputy Margaret Evans
22   ever being disciplined for anything?
23       A.    I remember her going to the board before.
24       Q.    Okay.  Do you remember if she was punished
25   as a result of going to the board or received some

57

1    discipline as a result of going to the board?
2        A.    I'm not sure.  I think she did.  I'm not
3    sure.
4        Q.    And you don't know anything about that
5    incident?
6        A.    No.
7        Q.    That incident had something to do with a
8    Lieutenant Snelling.  Do you remember him?
9        A.    I don't know no Lieutenant Snelling.
10       Q.    Do you remember a Lieutenant John
11   Snellenberger (phonetic), or something like that?  I
12   can't read my writing here.
13       A.    No.  We had a Sergeant Snelling, not a
14   Lieutenant Snelling.
15       Q.    A Sergeant Snelling.  Was his first name
16   John, the sergeant?
17       A.    Uh-huh.
18       Q.    That's yes?
19       A.    Yes.
20       Q.    Did he ever work for you?
21       A.    Yes, he did.
22       Q.    Did he work for you at the time that he
23   left the department?  Or the office?
24       A.    No.
25       Q.    Do you remember when he worked for you?

58

1    A.    Not exactly. He worked for me a few years
2    ago. But not exactly.
3    Q.    Do you remember Margaret Evans being
4    insubordinate to Sergeant Snelling?
5    A.    I don't -- I never had both of them work
6    for me at the same time so I don't know.
7    Q.    Do you know why Sergeant Snelling left the
8    office, why his employment ended?
9    A.    Sergeant Snelling is still at the office.
10   Q.    Oh, he is?
11   A.    Yes. As far as I know, he's still at the
12   office.
13   Q.    Do you remember an incident where a deputy
14   was insubordinate or disrespectful to Captain McGee?
15   A.    No, I don't know anything about that.
16   Q.    Do you remember an incident where Deputy
17   Michael Johnson was disciplined?
18   A.    No.
19   Q.    Do you remember -- did Deputy Coronado ever
20   work for you?
21   A.    No.
22   Q.    Do you remember an incident where Deputy
23   William Johnson was disciplined for something?
24   A.    William Johnson?
25   Q.    Right.

59

1    A.    I don't even know who that is.
2    Q.    Do you remember an incident where a Deputy
3    Ron Rose was disciplined for an early release of an
4    inmate?
5    A.    Yeah, I remember Ron had an incident. I'm
6    not sure what it was.
7    Q.    Did he ever work for you?
8    A.    Yeah, he -- we would work together. We
9    both were sergeants working together.
10   Q.    Did you work -- you worked on the same
11   shift?
12   A.    Yes. One time.
13   Q.    One time. You mean one day?
14   A.    No. I'm saying we worked -- we worked
15   together on the same shift. Then I ended up getting
16   promoted and left the shift.
17   Q.    You left before he was terminated? You
18   were promoted before he was terminated?
19   A.    I don't know if he got terminated or he
20   left on his own. I'm not sure.
21   Q.    Were you working together when he left the
22   office, when he left the Hampton sheriff's office
23   permanently?
24   A.    No.
25   Q.    How about John Eaton? Do you remember John

60

1    Eaton being disciplined for the early release of an
2    inmate?
3    A.    I don't remember.
4    Q.    Do you remember a Deputy Pershard or
5    Pushard (phonetic)?
6    A.    Deputy Pershard?
7    Q.    Yeah.
8    A.    No. Uh-uh.
9    Q.    Do you remember a Deputy Hill being
10   disciplined for failing to report a breach in security,
11   when a door was apparently left open?
12   A.    No.
13   Q.    Were you promoted to lieutenant shortly
14   after your discipline for the premature release of a
15   prisoner?
16   A.    No.
17   Q.    How long after -- you were a sergeant when
18   that premature release occurred, right?
19   A.    Yes.
20   Q.    How long after that premature release were
21   you promoted to lieutenant?
22   A.    I'm not sure.
23   Q.    Was it more than a year?
24   A.    I'm not sure how long it was.
25   Q.    Have you ever seen the Hampton sheriff's

61

1    office policy guidance for how discipline is to be
2    handled within the office?
3    A.    No.
4    Q.    Have you ever heard anyone use the phrase,
5    quote, "progressive discipline," end quote, when
6    describing the Hampton sheriff's office disciplinary
7    process?
8    A.    You saying what now? What you saying?
9    Q.    Have you ever heard anyone use the phrase
10   "progressive discipline" when describing the Hampton
11   sheriff's office disciplinary process?
12   A.    Progressive discipline.
13   Q.    Progressive discipline.
14   A.    I mean, what do you mean by that?
15   Q.    Well, there's been testimony earlier that
16   the department, the office, employed a system of
17   progressive discipline, where a supervisor might be
18   empowered to give out a verbal warning, then a written
19   warning, then a suspension. Different levels of
20   discipline. Are you aware of that?
21   A.    We have a progressive form.
22   Q.    A progressive form.
23   A.    Uh-huh.
24   Q.    Is that a form that is posted on a bulletin
25   board somewhere?

16  (Pages 58 to 61)

62

```
1       A.    No.
2       Q.    Where -- do you have a copy of that form at
3  your office?
4       A.    Yes.
5       Q.    Where do you keep it?
6       A.    I keep it in my file cabinet.
7       Q.    And I'd like for you to tell me as best you
8  can -- and I understand.  I don't have a photographic
9  memory.  If somebody asks me what's on a document, I'd
10 have a hard time telling them, but I'd like for you to
11 tell me what's on that document.
12      A.    As far as like what?
13      Q.    Whatever writing is on that document.
14      A.    I remember it has the individual's name,
15 you have to put the person's name, the subordinate's
16 name on there.  Your name.  The violation.
17      Q.    Okay.  So it's a form you fill out when
18 someone gets disciplined?
19      A.    Uh-huh.  Yes.
20      Q.    I'm going to ask you some questions about
21 the election campaign of 2009.
22      A.    Okay.
23      Q.    Do you remember there being a time when
24 there was a shift change in either August or September
25 of 2009 and the sheriff, Sheriff Roberts, came to speak
```

63

```
1  to your shift?
2       A.    Yes.
3       Q.    And what do you remember the sheriff saying
4  when he came to speak to your shift?
5       A.    I remember the sheriff coming around,
6  telling my staff that he is going to run again.
7       Q.    Okay.  And did he say anything else?
8       A.    Just telling the staff that he's going to
9  run and do they have any questions.
10      Q.    Is that all he said, he's going to run and
11 asked people if they had any questions, or did he say
12 anything else?
13      A.    I can't remember exactly what he said.
14      Q.    All right.  Do you remember him using the
15 phrases "long train" and "short train"?
16      A.    "Long train" and "short train"?
17      Q.    Right.
18      A.    No.
19      Q.    Do you remember him mentioning Facebook at
20 all?
21      A.    No.
22      Q.    He didn't use the word "Facebook" when he
23 spoke to your shift?
24      A.    No.
25            MR. HUNN:  Objection, asked and answered.
```

64

```
1  BY MR. SHOEMAKER:
2       Q.    Did there come a time either in August or
3  September of 2009 when you learned that Danny Carter
4  was on Jim Adams' campaign Facebook page?
5       A.    You say what?
6       Q.    Did there come a time in -- let me broaden
7  my question a little bit.  Did there come a time in
8  2009 when you learned that Danny Carter had made an
9  entry and appeared on Jim Adams' campaign Facebook
10 page?
11      A.    No.
12      Q.    Do you know what Facebook is?
13      A.    Yes.
14      Q.    Do you ever use it?
15      A.    No.
16      Q.    Have you ever been on it?
17      A.    To see my kids.
18      Q.    Your kids have Facebook pages?
19      A.    Yes.
20      Q.    And you monitor your kids' Facebook pages?
21      A.    Every once in awhile.
22      Q.    Were they using Facebook back in 2009?
23      A.    I don't even know.
24      Q.    Did there -- so you don't ever remember
25 learning that Danny Carter had appeared on Jim Adams'
```

65

```
1  campaign Facebook page?
2       A.    No.
3       Q.    Do you ever remember learning that Robert
4  McCoy, who also goes by Wayne McCoy -- do you ever
5  remember learning that he had appeared on Jim Adams'
6  campaign Facebook page?
7       A.    No.
8       Q.    Do you ever remember learning about a
9  cookout in late August of 2009 that was attended by
10 Danny Carter and Jim Adams?
11      A.    A cookout?
12      Q.    Right.  Or a picnic.
13      A.    No.
14      Q.    You didn't attend a cookout or a picnic at
15 Buckroe Beach given by Danny Carter or Ramona Larkin in
16 August, 2009, did you?
17      A.    No.
18      Q.    Have you ever heard about this event before
19 my question to you about it?
20      A.    Uh-uh.
21      Q.    That's no?
22      A.    No.
23      Q.    So you never heard about this at all prior
24 to my question to you?
25      A.    No.  Not a cookout.
```

17 (Pages 62 to 65)

ADAMS HARRIS REPORTING, INC.
(757)631-0458

66

1    Q.   When Sheriff Roberts came to your shift, he
2    came to your shift and he asked you -- he told you that
3    the election was about to be held.  Did he say that?
4        A.   I can't remember exactly what he said.  He
5    informed my shift that he is running for reelection.
6        Q.   And did he ask them for their support?
7        A.   I'm not sure of the kind of phrase he puts
8    it in, but he's just saying that he's running.  He
9    asked them if they had any questions.
10       Q.   That's all you remember him saying?
11       A.   Yeah.  I'm not sure -- like I say, I don't
12   know exactly what he said.
13       Q.   Was it just your shift at that
14   particular --
15       A.   Yes.
16       Q.   -- meeting?
17           I'm sorry.  I think I was partially guilty
18   there.  The answer to that question was yes, right?
19       A.   Yes.
20       Q.   Do you remember -- Danny Carter wasn't
21   there, was he?
22       A.   He wasn't on my shift.
23       Q.   But do you remember David Dixon being
24   there?
25       A.   I don't think Dixon was on my shift.

67

1        Q.   You don't think he was on your shift as of
2    September, 2009?
3        A.   I don't -- I don't know when he came to my
4    shift.
5        Q.   All right.  But you don't have a memory of
6    him being there, sitting here today?
7        A.   What?
8        Q.   At that meeting where the sheriff spoke.
9        A.   I don't know.  I don't know if he was there
10   or not.
11       Q.   Do you remember Colonel Bowden being there?
12       A.   No, the colonel wasn't there.
13       Q.   Do you remember Major Richardson being
14   there?
15       A.   I don't remember the major being there.
16       Q.   Do you remember any other officers,
17   lieutenant or above, being there other than you?
18       A.   No.
19       Q.   Did any of your employees ask any questions
20   during this meeting?
21       A.   Yes, some people asked questions.
22       Q.   Do you remember any of the questions that
23   were asked?
24       A.   No.
25       Q.   Did you participate at all in the -- in

68

1    supporting the sheriff in the 2009 campaign?
2        A.   Was 2009 the year that he ran?
3        Q.   Yes.
4        A.   That's when the election was, in '09?
5        Q.   That's when the last election was, 2009.
6        A.   Yes.
7        Q.   And what did you do for the sheriff in
8    2009?
9        A.   Passed out literature.
10       Q.   Okay.  And where did you pass out
11   literature?
12       A.   Different neighborhoods.  Passed out signs.
13       Q.   Did you ever do that while you were on
14   duty?
15       A.   No.
16       Q.   How many days do you remember spending
17   passing out literature?
18       A.   Weekends.  We off -- my schedule is we're
19   off every other weekend.  I'm not sure how many -- how
20   many -- I would do mine in the morning, you know, when
21   I was off.  I'm not sure how many times I did it.
22       Q.   Did you do it more than, say, three times
23   in the fall of 2009?
24       A.   I'm not sure.
25       Q.   Would you sign up a sheet -- would you sign

69

1    a sheet saying that you were going to do it on a
2    particular day?
3        A.   No.
4        Q.   How would -- how would you be asked -- how
5    would it come about that you would do this?  Would
6    someone come to ask you to do it?
7        A.   No.
8        Q.   You would go to someone and volunteer to do
9    it?
10       A.   Yes.
11       Q.   Who would you go to and volunteer to do it?
12       A.   Well, after -- after work I would call,
13   call the captain or the major, and I would ask them:
14   Do you have any literature?
15           Or I would get with -- I'm a member of the
16   Democratic Party, and get the stuff from the Democratic
17   Party, pass it out.
18       Q.   All right.  Would you do that a couple of
19   times a week?
20       A.   No.  I wouldn't do it a couple times a
21   week.
22       Q.   You'd do it once a week?
23       A.   Once, I do it once a week.  I would do it
24   when I had an opportunity.
25       Q.   Other than take signs around and hand out

18 (Pages 66 to 69)

70

1  literature, did you do anything else to support the
2  sheriff during the 2009 election campaign?
3      A.    Just pass out literature.
4      Q.    Did you work the polls on election day?
5      A.    No, I worked. I was working. I was on
6  duty on election day.
7      Q.    Did you go to the golf tournament?
8      A.    I worked the golf tournament.
9      Q.    Were you at the golf tournament?
10     A.    I worked. No.
11     Q.    You worked at the jail during the golf
12  tournament?
13     A.    Yes.
14     Q.    Did you sell any tickets to the golf
15  tournament?
16     A.    Yes.
17     Q.    Who did you sell them to?
18     A.    Family members. People that go every year.
19  To the golf tournament.
20     Q.    Do you remember how many you sold?
21     A.    It was like five.
22     Q.    And you sold them to -- you actually gave
23  the tickets to five other people other than yourself?
24     A.    Yes.
25     Q.    And they gave you the money for the

71

1  tickets?
2      A.    Yes.
3      Q.    And you gave the money to whom?
4      A.    I turned it in.
5      Q.    Who did you turn it in to?
6      A.    I turned it in to the representative from
7  the board, group of people who set it up.
8      Q.    Do you remember who that was?
9      A.    Not back in 2009.
10     Q.    You didn't turn the money in to Major
11  Richardson?
12     A.    I don't know if I did or not.
13     Q.    Did Major Richardson ever talk to you about
14  that golf event?
15     A.    Did he ever talk to me about it?
16     Q.    Yeah.
17     A.    What you mean?
18     Q.    Did he ever come and talk to you about the
19  golf event?
20     A.    No.
21     Q.    Do you remember the names of the five
22  people you sold the tickets to?
23     A.    Yeah.
24     Q.    Who were they?
25     A.    I gave them to my neighbor. His name is

72

1  Charlie. His wife. Her name is Toni. Gave it to my
2  uncle. His name is Saint Jackson (phonetic). I gave
3  it to my other neighbor, Harold, and his wife.
4      Q.    And did you make these people pay you for
5  these tickets or did you just give them to them?
6      A.    I don't make nobody pay me for the tickets.
7      Q.    Okay. Did they pay you for the tickets or
8  did you just give them to them?
9      A.    Yes. They gave me money for the tickets.
10     Q.    All of them gave you money for the tickets?
11     A.    Yes.
12     Q.    Do you remember Major Richardson ever
13  coming around to your shift and asking deputies to help
14  sell tickets to the golf tournament?
15     A.    No, he doesn't come around to the shift.
16     Q.    Do you remember any officer of the rank of
17  lieutenant or above coming around and asking any of
18  your employees to assist with selling golf tournament
19  tickets?
20     A.    No.
21     Q.    Did you ever hear about an incident between
22  Frances Pope and David Dixon at the polls in November
23  of 2009?
24     A.    An incident like what?
25     Q.    Any incident between Frances Pope and David

73

1  Dixon at the polls in 2009.
2      A.    What's supposed to be the incident?
3      Q.    Well, so you don't remember anything
4  occurring between David Dixon and Frances Pope?
5      A.    No, not between those two people.
6      Q.    Do you remember anything else occurring at
7  the polls in November of 2009 that you remember that
8  stands out?
9      A.    You mean like what? Like anything? It's a
10  regular election.
11     Q.    All right. Did Frances Pope -- she was a
12  deputy, right?
13     A.    She is a deputy now.
14     Q.    Was she a deputy back then?
15     A.    I don't know if she was a deputy or not.
16     Q.    Does she work under you?
17     A.    No.
18     Q.    Have you ever asked any of your
19  subordinates to support the sheriff?
20     A.    I told them -- asked them what I was going
21  to do. See if anybody wanted to assist.
22     Q.    And what did you say to them?
23     A.    I said: It's golf tournament time. I
24  said: If anybody wants to sell any tickets, let me
25  know.

19  (Pages 70 to 73)

74

```
 1      Q.    And when did you tell your -- when did you
 2  say this to your employees?  Did you say it to them
 3  more than once?
 4      A.    No.
 5      Q.    You said it to them just once?
 6      A.    Yes.
 7      Q.    Where did you say it to them, at a shift
 8  change?
 9      A.    No.  We out in the parking lot going home.
10      Q.    And they all happened to be there?
11      A.    Man, you say it to one building one day,
12  you say it to another building another day, say it to
13  another building another day.
14      Q.    And do you remember selling tickets to any
15  of your subordinates in 2009?
16      A.    I don't sell tickets to my subordinates.
17      Q.    Do you remember giving any tickets to your
18  subordinates in 2009?
19      A.    Couple people sold tickets.
20      Q.    Who do you remember selling tickets in
21  2009?
22      A.    I don't remember exactly who, but I know
23  couple of people sold tickets.
24      Q.    Have you ever served on any committees in
25  support of any of the sheriff's reelection efforts
```

75

```
 1  either in 2009 or before 2009?
 2      A.    No.
 3      Q.    Did you ever ask any of your subordinates
 4  whether or not they were supporting the sheriff?
 5      A.    No.
 6      Q.    Did any of them tell you whether or not
 7  they were supporting the sheriff?
 8      A.    No.
 9      Q.    Did you ever hear Major Richardson -- did
10  Major Richardson ever ask you or ask any of your
11  subordinates to support the sheriff for reelection in
12  2009?
13      A.    No.
14      Q.    Did Major Richardson ever even mention the
15  2009 election to you in any context?
16      A.    You talking about -- what do you mean by
17  mention the....?
18      Q.    Did he ever come to you on any occasion and
19  mention the 2009 election to you at all?
20      A.    No.  He didn't never come to me and mention
21  it to me, no.
22      Q.    Did Colonel Bowden ever mention anything
23  about the 2009 election to you back in 2009?
24      MR. HUNN:  Objection, form.
25      You can answer.
```

76

```
 1      A.    No.
 2
 3  BY MR. SHOEMAKER:
 4      Q.    Did any officer at the rank of lieutenant
 5  or above ever have any discussion with you about the
 6  2009 election?
 7      MR. HUNN:  Objection, form.
 8      A.    Not that I can recall.
 9      MR. SHOEMAKER:  Okay.  Lieutenant Lewis,
10  I'm going to take a few minutes to go over my notes,
11  but I think I'm pretty close to being done.
12
13      (Recess)
14
15      MR. SHOEMAKER:  I don't have any additional
16  questions.
17      MR. HUNN:  He'll read and sign.
18
19      (Signature not waived.)
20
21      (Whereupon, the deposition was
22  concluded at 12:48 p.m.)
23
24
25
```

77

DEPOSITION ERRATA SHEET

Case Caption:  Bland, et al. v. Roberts
Deponent:      Harry Lewis, Jr.
Deposition Date: October 12, 2011

        I have read the entire transcript of my deposition
taken in the captioned matter or the same has been read
to me.  I request that the following changes be entered
upon the record for the reasons indicated.  I have
signed my name to the Errata Sheet and the appropriate
Certificate and request both to be attached to the
original transcript.

Page/Line Nos.    Correction/Reason

11  _____    _____
12  _____    _____
13  _____    _____
14  _____    _____
15  _____    _____
16  _____    _____
17  _____    _____
18  _____    _____
19  _____    _____
20  _____    _____
21  _____    _____
22  _____    _____
23  _____    _____
    Signature:_____        Date:_____
24      Harry Lewis, Jr.
25

20  (Pages 74 to 77)

78

```
 1        CERTIFICATE OF DEPONENT
 2   COMMONWEALTH OF VIRGINIA
 3   CITY OF _____
 4
 5        Before me, this day, personally appeared Harry
     Lewis, Jr., who, being duly sworn, states that the
 6   foregoing transcript of this deposition, taken in the
     matter, on the date and at the place set out on the
 7   title page hereof, constitutes a true and complete
     transcript of said deposition.
 8
 9
10
11        ------------------------
          Harry Lewis, Jr.
12
13
14
15        SUBSCRIBED and SWORN to before me this _____
     day of _____, 2011, in the jurisdiction
16   aforesaid.
17
18
19
20   My Commission Expires        Notary Public
21
22
23
24
25
```

79

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2        I, Juanita Harris Schar, RMR, CCR, CRR, a
     Notary Public for the Commonwealth of Virginia at large,
 3   of qualification in the Circuit Court of the City of
     Virginia Beach, Virginia, and whose commission expires
 4   April 30, 2014, do hereby certify that the within named
     deponent, HARRY LEWIS, JR., appeared before me at
 5   Virginia Beach, Virginia, as hereinbefore set forth, and
     after being first duly sworn by me, was thereupon
 6   examined upon his oath by counsel for the respective
     parties; that such examination was recorded in Stenotype
 7   by me and reduced to computer printout under my
     direction; and that the foregoing constitutes a true,
 8   accurate, and complete transcript of such examination to
     the best of my ability.
 9
10        I further certify that I am not related to
     nor otherwise associated with any counsel or party to
11   this proceeding, nor otherwise interested in the event
     thereof.
12        Given under my hand and notarial seal this
     25th day of October, 2011, at Virginia Beach, Virginia.
13
14
15
16        Notary Public
17
     Certified Court Reporter No. 0313085
18
19
20
21
22
23
24
25
```

JUANITA HARRIS SCHAR
Notary Public
Commonwealth of Virginia
214040
My Commission Expires Apr 30, 2014

21 (Pages 78 to 79)

ADAMS HARRIS REPORTING, INC.
(757)631-0458

DEPOSITION ERRATA SHEET

Case Caption:    Bland, et al. v. Roberts

Deponent:        Harry Lewis, Jr.

Deposition Date: October 12, 2011

      I have read the entire transcript of my deposition
taken in the captioned matter or the same has been read
to me.  I request that the following changes be entered
upon the record for the reasons indicated.  I have
signed my name to the Errata Sheet and the appropriate
Certificate and request both to be attached to the
original transcript.

Page/Line Nos.          Correction/Reason

72 / 2                  Name is Son Jackson not Saint Jackson

Signature: _Harry Lewis, Jr._          Date: 11-20-11

```
 1                    CERTIFICATE OF DEPONENT

 2   COMMONWEALTH OF VIRGINIA

 3   CITY OF  Hampton

 4

 5        Before me, this day, personally appeared Harry
     Lewis, Jr., who, being duly sworn, states that the
 6   foregoing transcript of this deposition, taken in the
     matter, on the date and at the place set out on the
 7   title page hereof, constitutes a true and complete
     transcript of said deposition.

 8

 9

10

11        ------------------------------------------
                    Harry Lewis, Jr.
12

13

14

15        SUBSCRIBED and SWORN to before me this 21st
     day of November , 2011, in the jurisdiction
16   aforesaid.

17

18

19   Oct. 31, 2014                    S. Lawson
20   My Commission Expires              Notary Public

21

22

23

24

25
```