IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

---

BOBBY BLAND, DANIEL RAY CARTER, JR.,
DAVID W. DIXON, ROBERT W. McCOY,
JOHN C. SANDHOFER, and
DEBRA H. WOODWARD,

    Plaintiffs,

v.

B.J. ROBERTS, individually and in
his official capacity as Sheriff of
the City of Hampton, Virginia,

    Defendant.

CASE NO.
4:11-CV-45

---

DEPOSITION UPON ORAL EXAMINATION
OF CRYSTAL COOKE,
TAKEN ON BEHALF OF THE PLAINTIFFS

Virginia Beach, Virginia

October 11, 2011

Appearances:

    PATTEN, WORNOM, HATTEN & DIAMONSTEIN, L.C.
    By: JAMES H. SHOEMAKER, JR., ESQUIRE
        Counsel for the Plaintiffs

    PENDER & COWARD
    By: JEFF W. ROSEN, ESQUIRE
        Counsel for the Defendant

ADAMS HARRIS REPORTING, INC.
(757)631-0458

**Exhibit 26**

Page 2

```
            INDEX

DEPONENT         EXAMINATION BY      PAGE

CRYSTAL COOKE    Mr. Shoemaker        3


            EXHIBITS

NO.   DESCRIPTION                    PAGE
None
```

Page 3

    Deposition upon oral examination of CRYSTAL
COOKE, taken on behalf of the Plaintiffs before Juanita
Harris Schar, RMR, CCR, CRR, a Notary Public for the
Commonwealth of Virginia at large, commencing at 1:11
p.m. on October 11, 2011, at the law offices of Pender
& Coward, 222 Central Park Avenue, Suite 400, Virginia
Beach, Virginia; and this in accordance with the
Federal Rules of Civil Procedure.
            - - - - -
    CRYSTAL COOKE, was sworn and deposed on
behalf of the Plaintiffs as follows:

            EXAMINATION
BY MR. SHOEMAKER:
    Q. Ma'am, would you state your full name for the record, please.
    A. Crystal Cooke.
    Q. And what is your home address, ma'am?
    A. 140 Scufflefield Road, Newport News, Virginia, 23602.
    Q. Ma'am, have you ever given a deposition before?
    A. Yes. Last week -- week before last.
    Q. Okay.
    A. I mean, I guess it was a deposition.

Page 4

    Q. What kind of case was that?
    A. No, I haven't. I'm sorry.
    Q. Okay. Well, ma'am, a deposition is sworn testimony and this testimony bears the same weight and dignity as if we were in a courtroom, and so it's important that we build as clear a record as possible. To that end, I'm going to ask you to wait until I'm through asking my question before you begin verbalizing your answer, and I'll try to wait until you're through verbalizing your answer before I move on to my next question. The problem when people start talking over each other is she can't take that down. So it's important that we kind of slow down and wait for each other to finish before we begin. I can be an offender of this just like anyone so I'll try not to be an offender this afternoon. Okay?
    A. Okay.
    Q. You have to verbalize your answers. You cannot say "uh-huh" and "uh-uh" and you cannot gesture, nod your head, because, again, she can't take that down. So you have to remember to verbalize and state clearly your answers.
    Are you under any conditions or medications here today that would affect your ability to understand my questions and to answer them fully and truthfully?

Page 5

    A. No.
    Q. Okay. How long have you worked for the Hampton sheriff's office?
    A. I started August 1st, 1994.
    Q. And you're currently a lieutenant; is that right?
    A. Yes.
    Q. How long have you been a lieutenant?
    A. I believe since 2004, maybe December, 2004.
    Q. And prior to that were you a sergeant?
    A. Yes.
    Q. And how long were you a sergeant?
    A. Maybe 1999. I'm not sure of the exact date.
    Q. What are your duties now as a lieutenant?
    A. I'm responsible for D shift, which is the night shift. I give out the assignments, make sure all the tasks are done. We move courts, we prepare people for court. We do laundry, linen, serve breakfast. Do evaluations.
    Q. Were you doing the same duties back in 2009?
    A. Yes.
    Q. Ma'am, unless my question indicates otherwise, the time period I'm asking about today is

```
                                                       6
 1   2009. Now, I may indicate in my question, if I ask you
 2   do you know anything about something, and that could
 3   refer to just what you know, but if it's a question
 4   that seems to refer to an area of time or a point in
 5   time, the time I'm referring to is 2009, if I don't
 6   state otherwise.
 7        A.   Do I need to say 2009 I was on C shift?
 8        Q.   Well --
 9        A.   A different shift, day shift. So it was
10   different.
11        Q.   All right. So that's -- is that the only
12   way your duties differed in 2009 from 2009 and now?
13        A.   Yes.
14        Q.   Do you have your own e-mail address within
15   the sheriff's office?
16        A.   Yes, I do.
17        Q.   Did you in 2009?
18        A.   Yes, I did.
19        Q.   And I guess sergeants don't? They don't
20   have their own e-mail addresses? Do you know?
21        A.   I don't know. I don't believe so. When I
22   was a sergeant, we didn't have e-mail addresses.
23        Q.   Now, as a lieutenant, you don't attend
24   senior staff meetings, do you?
25        A.   No.
```

```
                                                       7
 1        Q.   Is it your general understanding that
 2   senior staff meetings are held with captains and above?
 3        A.   Yes.
 4        Q.   Did you have anything to do with the
 5   accreditation process for CALEA?
 6        A.   No.
 7        Q.   How about the accreditation process for the
 8   ACA, American Correctional Association?
 9        A.   Could you make your question more clearer?
10        Q.   Well, do you remember that process when the
11   sheriff underwent the accreditation examination or
12   assessment from the ACA?
13        A.   Yes.
14        Q.   And did you have any formal role within the
15   sheriff's office with that?
16        A.   No, sir.
17        Q.   Were you ever a master deputy?
18        A.   No, sir.
19        Q.   How many deputies work on C shift?
20        A.   In 2009?
21        Q.   Yeah.
22        A.   It might have been 21. Between 19 and 21.
23   I'm not sure of the numbers.
24        Q.   And is D shift any different from that,
25   about the same number?
```

```
                                                       8
 1        A.   No. It's less.
 2        Q.   It's less.
 3             I'm sorry. Is C shift the night shift or
 4   day shift?
 5        A.   C shift is the day shift. Day shift have
 6   more people than night shift do.
 7        Q.   All right. I'm going to ask you a
 8   question. Has Bobby Bland ever worked under your
 9   supervision?
10        A.   No, sir.
11        Q.   Has Danny Carter ever worked under your
12   supervision?
13        A.   Yes, sir.
14        Q.   When did he work under your supervision?
15        A.   He worked under my supervision before he
16   got engaged.
17        Q.   Do you remember when that was?
18        A.   No, sir.
19        Q.   Did he work under your supervision at any
20   time after 2008?
21        A.   I will say no because his fiancée worked
22   for me.
23        Q.   Okay.
24        A.   And they both couldn't work together.
25        Q.   Fair enough. Did David Dixon ever work for
```

```
                                                       9
 1   you? And when I say "work for you," I mean work under
 2   your supervision.
 3        A.   No.
 4        Q.   Did Robert McCoy, or Wayne McCoy, ever work
 5   under your supervision?
 6        A.   Yes.
 7        Q.   Did he ever work under your supervision
 8   after 2008?
 9        A.   Yes.
10        Q.   In what capacity did he work for you?
11        A.   He was a master deputy.
12        Q.   And he was a master deputy on D shift?
13        A.   C shift.
14        Q.   C shift. Sorry. Sorry.
15             And what duties was he performing when he
16   worked for you on C shift?
17        A.   If he was a master deputy, sometimes if I
18   didn't have a sergeant for a building, because we have
19   a lieutenant, sergeant, and master deputy, a master
20   deputy can run the building. So some time he ran, you
21   know, a building for me.
22        Q.   Okay. And when you say a building --
23        A.   Like we have the annex, which is on
24   Pembroke; we have the jail, which is on 135. I would
25   run the jail and he might be running the annex for me.
```

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

**Page 10**

1  Q.  The annex contains a lockup, right, or does
2  it?
3  A.  No.
4  Q.  It's just offices?
5  A.  I mean, it's offices and cell pods. I'm
6  sorry.
7  Q.  Cell pods.
8  A.  Uh-huh.
9  Q.  How many prisoners could you hold at the
10 annex?
11 A.  Oh, I don't know the exact count, but at
12 that time it might have been 129.
13 Q.  At the annex?
14 A.  Yes.
15 Q.  And how does that compare to the jail
16 itself downtown? How many can you hold downtown?
17 A.  Oh, 200 and something. So maybe -- depends
18 on -- right now we've got 400 some people. 169 there
19 and the rest are at the jail.
20 Q.  And so on a shift, you as a lieutenant,
21 obviously, you had to have at least a master deputy at
22 the other building?
23 A.  Yes.
24 Q.  Obviously, your presence in the other
25 building would satisfy that requirement, right? Or did

**Page 11**

1  you have to have a sergeant with you?
2  A.  Oh, at the jail I have -- I have -- oh, I
3  had a sergeant at the lockup, what you talk about -- we
4  call it intake -- I have myself at the jail and I have
5  a sergeant at the jail. And at the annex I will have a
6  sergeant and then deputies.
7  Q.  Did John Sandhofer ever work for you?
8  A.  Yes.
9  Q.  Did he work for you after 2008?
10 A.  No.
11 Q.  He worked for you apparently some time in
12 2008?
13 A.  I don't know what the year was. Because I
14 don't even know how long he was at the sheriff's
15 office. He worked with me and got sent to work in
16 courts.
17 Q.  Okay.
18 A.  Or civil process.
19 Q.  So at some point he was working for you on
20 a shift?
21 A.  Yes.
22 Q.  As a correctional officer?
23 A.  Yes.
24 Q.  How about Debra Woodward? Did she ever
25 work for you?

**Page 12**

1  A.  No.
2  Q.  So in 2009, in late 2009, did you have any
3  opinion as to whether or not Bobby Bland should be
4  reappointed to his position, or did you simply have no
5  opinion?
6  A.  I don't have any opinion about anything.
7  Q.  I'm sure you have an opinion about
8  something.
9  A.  I mean, you know, my opinion doesn't count.
10 I mean, you know, I don't have any opinion.
11 Q.  You have no opinion with respect to Bobby
12 Bland as to whether or not he should have been
13 reappointed. Is that fair?
14 A.  You can say that.
15 Q.  Danny Carter, in late 2009 did you have any
16 opinion as to whether or not Danny Carter should have
17 been reappointed, or did you simply have no opinion?
18 A.  I have no opinion.
19 Q.  Did you have any opinion in late 2009 as to
20 whether or not David Dixon should be reappointed, or
21 did you simply have no opinion?
22 A.  No opinion.
23 Q.  In late 2009 did you have any opinion as to
24 whether or not Robert McCoy should have been
25 reappointed, or did you simply have no opinion?

**Page 13**

1  A.  No opinion.
2  Q.  In late 2009 did you have any opinion as to
3  whether or not John Sandhofer should be reappointed, or
4  did you simply have no opinion?
5  A.  No opinion.
6  Q.  In late 2009 did you have any opinion as to
7  whether or not Debra Woodward should have been
8  reappointed, or did you simply have no opinion?
9  A.  No opinion.
10 Q.  Ma'am, I'm going to switch gears a bit and
11 ask you about what you know regarding the Hampton
12 sheriff's office discipline policy. First of all, is
13 there a written document that governs how discipline is
14 meted out within the Hampton sheriff's office?
15 A.  I don't know.
16 Q.  Fair enough.
17     Have you ever -- do you know whether or not
18 the Hampton sheriff's office uses a form of discipline
19 known as progressive discipline when dealing with the
20 infractions of employees and the poor performance of
21 employees?
22 A.  Can you repeat that?
23 Q.  Do you know whether or not the Hampton
24 sheriff's office uses a practice known as progressive
25 discipline when dealing with the poor performance of

**Page 14**

1 employees or the disciplinary infractions of employees?
2 A. They have a sheet that they use and it's
3 like a progressive sheet, so you get like a verbal
4 warning, maybe an oral warning, a written warning. And
5 it all depends on what the problem was.
6 Q. And do the levels of discipline go up from
7 oral warning, verbal warning, written warning up to
8 things like suspension and termination and that sort of
9 thing?
10 A. It all depends on what happened.
11 Q. Okay. I follow you, but the sheet you're
12 talking about, does it list --
13 A. No.
14 Q. -- more severe forms of discipline on it?
15 A. No.
16 Q. This sheet you're talking about, is it part
17 of a policy document?
18 A. I don't know.
19 Q. You've seen a sheet by itself, a sheet that
20 tells you about these discipline options?
21 A. It's something that you can use.
22 Q. And the sheet you're talking about, is it
23 posted somewhere or is it something that's handed out
24 to lieutenants and above or --
25 A. It's handed out.

**Page 15**

1 Q. And it's a sheet by itself? A stand-alone
2 sheet?
3 A. Uh-huh. Like a copy sheet.
4 Q. Do they have them laminated around the
5 office or...?
6 A. No.
7 Q. Ma'am, I'm going to ask you about different
8 types of infractions and whether or not you remember
9 these infractions, and, basically, what I'm seeking to
10 do here is just exhaust your memory sitting here. And
11 I don't expect you to be a computer. I don't expect
12 you to have a photographic memory, but I'm asking you
13 about what you know sitting here regarding the history
14 of discipline within the Hampton sheriff's office. So
15 I'm going to ask you about types of infractions, and
16 I'm going to start with infractions regarding loss of
17 weapons. Can you remember any incidents where deputies
18 have lost weapons?
19 A. When you say lost weapons, do you mean like
20 I left it somewhere and I don't remember?
21 Q. That's a good point. That's a good point.
22 Bad question. Do you remember any incidents where a
23 deputy has lost track of their weapon?
24 A. Do you mean, I went in the bathroom, I set
25 my weapon down and I came out of the bathroom and

**Page 16**

1 forgot it?
2 Q. Anything like that.
3 A. Years ago I remember somebody left a weapon
4 in the transport van that was inside with them.
5 Q. Do you remember who that was that left the
6 weapon in there?
7 A. No, I don't.
8 Q. Was that Sergeant Ford?
9 A. No.
10 Q. It was someone else?
11 A. Yes.
12 Q. But they left a weapon in a van?
13 A. Yes.
14 Q. Was this after the year 2000, before the
15 year 2000?
16 A. It might have been before 2000. Sergeant
17 Ford just happened maybe 2010. And that's what was
18 said. I never saw anything.
19 Q. With respect to Ford, is what you're
20 saying?
21 A. (Moved head up and down).
22 Q. What about this other incident? Do you
23 remember what deputy was involved with that other
24 incident?
25 A. No. That was years ago.

**Page 17**

1 Q. Do you remember whether it was a
2 rank-and-file deputy as opposed to maybe a sergeant or
3 a lieutenant?
4 A. No, it was just a regular deputy. Because
5 I was a sergeant, or I might have been a deputy at the
6 time.
7 Q. Do you remember if it was a man or a woman?
8 A. I believe it was a man, I think. I don't
9 remember.
10 Q. So other than this incident with the van,
11 with the person you can't remember, and Sergeant Ford,
12 you can't remember any other incident where a deputy
13 has lost track of their weapon?
14 A. Lost track as leaving it in a vehicle or
15 something, no. I don't remember.
16 Q. I'm assuming you're supposed to be
17 responsible. If you're issued a weapon, I'm assuming
18 you're supposed to have track of that weapon at all
19 times?
20 A. Yes. You should know where it is at all
21 times.
22 Q. Right. Right. That's what I'm talking
23 about. Losing track of the weapon in any manner.
24 Leaving it somewhere, having someone disarm you,
25 anything like that.

5 (Pages 14 to 17)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

**Page 18**

1  A. When you say "disarm," what do you mean by
2  that?
3  Q. Let me ask it a different way. Are you
4  away of any deputies ever being disarmed by anyone,
5  either by a prisoner or by the public?
6  A. Oh, no.
7  Q. By disarmed, I mean taking the weapon from
8  them.
9  A. Oh, no, sir. Never that.
10 Q. Okay. Are you -- do you remember any other
11 incidents involving weapons that resulted in the
12 discipline of an employee of the Hampton sheriff's
13 office?
14 A. All right. Repeat your question again.
15 Q. Are you aware of any other incidents
16 involving weapons that resulted in the discipline of an
17 employee of the Hampton sheriff's office?
18 A. Do you mean the employ -- if you bring your
19 gun inside the jail discipline or any other discipline?
20 Q. Well, let me exclude that for a second.
21 A. Okay.
22 Q. I'll ask my questions more specifically.
23 Are you aware of any accidental discharges with the
24 firearms?
25 A. Yes.

**Page 19**

1  Q. What accidental discharges are you aware
2  of?
3  A. The only one I recall is Lieutenant
4  Mitchell.
5  Q. And where was that? My understanding is
6  there were two. There was one on a firing range and
7  one in the armory?
8      MR. ROSEN: Objection, leading.
9      You can answer the question, if you can.
10 A. One happened when they were cleaning the
11 weapon in the armory, and one happened while -- after
12 qualification, I believe on the range.
13
14 BY MR. SHOEMAKER:
15 Q. Do you know if Lieutenant Mitchell was ever
16 disciplined for that?
17 A. Yes.
18 Q. Do you know what discipline he received?
19 A. I don't know what he actually received, but
20 he was missing for awhile.
21 Q. Was he a lieutenant when these incidents
22 occurred?
23 A. Yes. One of them, I believe. I don't know
24 about -- I can't remember about the range. The armory,
25 he was.

**Page 20**

1  Q. So the second incident was the armory
2  incident and he was a lieutenant then?
3  A. Yes.
4  Q. And there was an incident prior to that.
5  Do you know how long prior to the armory incident the
6  first incident was?
7  A. No. Because I wasn't at the range the day
8  it happened.
9  Q. And you don't remember, sitting here,
10 whether or not he was a lieutenant when the first
11 incident occurred?
12 A. No, I can't remember if he was or not.
13 Q. The accidental discharge, did that happen
14 with a semi-automatic weapon? I mean, they were
15 carrying semi-automatics as opposed to revolvers?
16 A. We haven't carried revolvers in a long,
17 long time.
18 Q. All right. Can you think of any other
19 incidents involving accidental discharges of weapons?
20 A. That's the only one that I know of.
21 Q. Can you think of any incidents where an
22 employee of the Hampton sheriff's office has lost
23 equipment other than weapons?
24 A. Equipment referring to? Do you mean Mace,
25 your badge?

**Page 21**

1  Q. Anything from a badge, Mace, to ammunition,
2  to handcuffs.
3  A. No.
4  Q. Can you think of any incidents where --
5  well, let me show you a document.
6  A. All right.
7  Q. This document has been previously marked as
8  Plaintiff's Exhibit 15.
9  A. Uh-huh.
10 Q. Would you take a minute to review that?
11 And I'm going to ask you generally about disciplinary
12 boards, not about this specific incident, but I want
13 you to...
14 A. Okay.
15 Q. Ma'am, have you ever sat on a disciplinary
16 board?
17 A. Yes.
18 Q. Can you tell me how many times you've sat
19 -- or roughly how many times you've sat on a
20 disciplinary board?
21 A. Two.
22 Q. Two times. And do you remember who the
23 accused employees were on those two disciplinary boards
24 you sat on?
25 A. One was Kemp, Deputy Kemp, and the other

**Page 22**

1 one might have been Debbie Woodward.
2 Q. Okay. And those are the only two you
3 remember?
4 A. That's the only two.
5 Q. Deputy Kemp, what -- do you remember what
6 the first name is?
7 A. I don't know anybody -- very few.
8 Q. Was that a man or a woman?
9 A. A male.
10 Q. And do you remember what he was accused of
11 doing?
12 A. Calling out of work.
13 Q. Calling out of work sick when he was not
14 sick?
15 A. He wasn't sick. He didn't have a ba -- I'm
16 sorry. He didn't have a babysitter.
17 Q. Uh-huh. So was he not honest about the
18 reason he called out of work for?
19 A. I don't know. He didn't work for me. I
20 just sat on the board.
21 Q. How long ago was this?
22 A. Last year.
23 Q. Were there any other officers, lieutenant
24 or above, on that board?
25 A. Sergeant Mayes; Lieutenant Harper, who was

**Page 23**

1 Deputy Harper.
2 Q. What's Lieutenant Harper's first name? Do
3 you know?
4 A. Ver -- it might be Verdina. Something with
5 a V.
6 Q. All right. Well, was Deputy Kemp accused
7 of some kind of dishonesty in connection with this
8 incident?
9 A. It just said that he had asked for the day
10 off, he had asked for vacation. It was denied. His
11 wife went out of town, his daughter was sick, and he
12 didn't have a babysitter.
13 Q. Okay. And he told the truth about that?
14 A. I believe he --
15    MR. ROSEN: I object to the form of the
16 question.
17    You can answer it.
18
19 BY MR. SHOEMAKER:
20 Q. You can answer. What was he disciplined
21 for, for simply not coming in to work, not having a
22 valid excuse? Or was he disciplined?
23 A. He was disciplined, but I believe it was
24 for not coming in to work.
25 Q. Do you ever see these disciplinary board

**Page 24**

1 reports for your own subordinates?
2 A. No.
3 Q. Are you informed when any of your
4 subordinates go before a disciplinary board?
5 A. We just started getting informed. Before,
6 I never knew -- you know, when they had to go to the
7 board, I was as surprised as they were.
8 Q. As a lieutenant, do you have the power to
9 recommend that someone be brought before a disciplinary
10 board?
11 A. It depends on what they done.
12 Q. Let's assume somebody's been insubordinate
13 to you in some significant way. Do you have the power
14 in that instance to request a disciplinary board?
15 A. No. I can just write an incident report
16 and hand it up to the captain, and they see fit whether
17 it goes to a board or not.
18 Q. I see. Okay.
19    Have you ever done that where you have to
20 write an incident report and send it up to the captain?
21 A. Yes, I've wrote some.
22 Q. Who was your captain in 2009?
23 A. I believe Major Richardson.
24 Q. Can you remember any specific incidents
25 where you had to send incident reports up to Major

**Page 25**

1 Richardson that resulted in disciplinary boards?
2 A. No.
3 Q. Can you remember any specific incidents
4 where you sent incident reports up to Major Richardson
5 at all?
6 A. You mean for a disciplinary board or just
7 an incident?
8 Q. For an incident.
9 A. Could have been the air-conditioning wasn't
10 working so I might have wrote an incident report about
11 that.
12 Q. I'm not talking about property problems or
13 material problems. I'm talking about people problems.
14 Do you remember writing any incident reports involving
15 any Hampton sheriff's office employees?
16 A. No.
17 Q. Are you aware sitting here of any incidents
18 where a sheriff's office employee has ever been accused
19 of being insubordinate?
20 A. Are you talking about insubordinate to me
21 or just anybody?
22 Q. Insubordinate to anybody.
23 A. And they got wrote up?
24 Q. Right. Well, no. Just whether or not
25 they've ever been accused of any insubordination.

## Page 26

MR. ROSEN: Do you know what insubordinate means.

THE DEPONENT: Where they were disrespectful.

BY MR. SHOEMAKER:
Q. Disrespectful to authority, where they refused to obey proper orders of authority.
A. I can't say. If it didn't happen to me, I don't know what the other person said about them. I can only reference to myself.
Q. I'm asking are you aware of any incidents. And I'm including incidents you've heard of secondhand. Maybe you don't have direct knowledge of it but any incidents you've heard of. Are you aware of any incidents of insubordination by any employee of the Hampton sheriff's office?
A. I believe the -- Deputy Carter and the sheriff.
Q. What are you aware of about that?
A. They were fussing.
Q. How do you know about that?
A. Because, actually, I was standing at the flagpole removing the flag and once, you know, they started, I grabbed the flag and I went inside.

## Page 27

Q. They both appeared to be angry with each other?
A. Yes.
Q. Did you hear any of that conversation?
A. No, 'cause I grabbed the flag and I went inside.
Q. How did you know they appeared to be angry with each other? What about?
A. Because I heard them raise their voices. Their voices was raised.
Q. All right. Had you just attended a meeting with the sheriff when that happened?
A. No. He had met with night shift. I was day shift.
Q. The sheriff had -- apparently, when you saw this incident between Deputy Carter and the sheriff, the sheriff had just met with the night shift?
A. Yes.
Q. But you didn't attend that meeting?
A. No.
Q. Did anyone ever tell you about what happened in that meeting?
A. No.
Q. Sitting here today, you don't know what the sheriff said in that meeting?

## Page 28

A. No, 'cause I wasn't in the meeting. I just came outside to take down the flag.
Q. Fair enough.
This was at the end of night shift or the beginning of night shift?
A. I was on day shift.
Q. All right. So it's the end of day shift?
A. They were coming in for evening shift.
Q. I see. Okay.
Are you aware of any other incidents of insubordination on the part of any Hampton sheriff's office employee?
A. No, not that I can remember.
Q. Let me ask you this: When you saw the sheriff and Deputy Carter fussing at each other, was anyone standing there with them?
A. Yes.
Q. Who was standing there with them?
A. Major Richardson.
Q. Was there anyone else standing there?
A. Not that I recall.
Q. Are you aware of any employees of the Hampton sheriff's office ever having received a DUI, driving under the influence, or DWI, driving while intoxicated?

## Page 29

A. Not that I recall.
Q. Are you aware of any sheriff's office employees who have ever been accused of acting in an abusive manner toward prisoners?
A. Not that I recall.
Q. Are you aware of any Hampton sheriff's office employees who have ever been accused of any act involving alleged dishonesty of any kind?
A. Repeat that question again, please.
Q. Are you aware of any sheriff's office employees who have ever been accused of any act involving alleged dishonesty of any kind?
A. Not that I recall.
Q. Are you aware of any sheriff's office employees who, for instance, have been accused of mishandling funds from the canteen or anything like that?
A. I wouldn't know that information.
Q. You're not aware of it, sitting here?
A. No, sir.
Q. How about are you aware of any sheriff's office employee who has ever been accused of making a false statement to any official of the Hampton sheriff's office?
A. I wouldn't know that.

Page 30

1  Q. Are you aware of any Hampton sheriff's
2  office employee who has ever been terminated for cause?
3       MR. ROSEN: Objection to the form of the
4  question to the extent it calls for a legal conclusion.
5       You can answer.
6  A. Could you repeat that?
7
8  BY MR. SHOEMAKER:
9  Q. Are you aware of any Hampton sheriff's
10 office employee who has ever been fired for cause?
11 A. For cause?
12 Q. Right.
13 A. What is "for cause"?
14 Q. It means for some reason that the sheriff
15 decided to fire them for.
16      MR. ROSEN: Objection to the form of the
17 question. That's an inaccurate statement of the
18 definition of cause.
19      You can answer.
20 A. No, 'cause I don't know what cause is.
21
22 BY MR. SHOEMAKER:
23 Q. Do you know of any Hampton sheriff's office
24 employees who have ever been fired?
25 A. Yes.

Page 31

1  Q. Who? Other than the plaintiffs in this
2  case.
3  A. Most of them turn in their notice instead
4  of getting fired so I don't know anybody that got
5  fired.
6  Q. Who do you know that's turned in their
7  notice instead of getting fired?
8  A. Sergeant Hartman.
9  Q. Who else?
10 A. Deputy Wiggins.
11 Q. Is that Tameka Wiggins?
12 A. No.
13 Q. What Wiggins is this?
14 A. Her husband.
15 Q. What's his name?
16 A. (No response).
17 Q. That's okay. If you don't know, that's
18 fine.
19 A. No, I don't know.
20 Q. Who else do you remember giving their
21 notice instead of being fired?
22 A. That's it.
23 Q. You said that these people sprang to mind
24 because they gave their notice instead of being fired.
25 Had something happened that put their job in jeopardy?

Page 32

1  A. Yes, they released somebody that shouldn't
2  have been released.
3  Q. All right. When did the Hartman incident
4  occur?
5  A. Maybe 2006 or 2007.
6  Q. When did the Wiggins incident occur?
7  A. Might have been 2008.
8  Q. Now, were they working for you when this
9  happened?
10 A. Yes.
11 Q. Both of them were?
12 A. Yes.
13 Q. Had Sergeant Hartman -- was that a man or a
14 woman?
15 A. A man.
16 Q. When Sergeant Hartman -- and you don't
17 remember his first name, do you?
18 A. I believe it's Thomas.
19 Q. When Sergeant Hartman made this improper
20 release, had he ever been disciplined in the past for
21 anything that you're aware of?
22 A. No, because when he made the improper
23 release I wasn't even at work. I was out.
24 Q. I know, but he worked for you, right?
25 A. Yes.

Page 33

1  Q. Are you aware prior to that time, prior to
2  the time that Sergeant Hartman made this improper
3  release, had he ever been disciplined for anything in
4  the past?
5  A. Not that I recall.
6  Q. How about Deputy Wiggins? When he made his
7  improper release, had he ever been disciplined for
8  anything in the past?
9  A. Not that I recall.
10 Q. As lieutenant, do you perform performance
11 evaluations?
12 A. Yes.
13 Q. And back in 2009 you would do performance
14 evaluations for what, roughly 30 people?
15 A. No.
16 Q. For how many people would you do
17 performance evaluations?
18 A. I only did it for the sergeant and the
19 master deputy.
20 Q. Did you sign the performance evaluations
21 for the lower-ranking personnel?
22 A. No.
23 Q. You didn't have to have your signature on
24 it?
25 A. No.

**Page 34**

1   Q.   So the lower-ranking personnel would be
2   evaluated by a sergeant?
3   A.   Oh, I'm sorry. Yes. My signature would be
4   on it. The deputy's signature, the sergeant's
5   signature, and then mine would be the overseer.
6   Q.   All right. Back then in 2009 what
7   percentage of your deputies would receive above-average
8   evaluations as opposed to average evaluations? If you
9   can remember.
10  A.   Oh, I can't remember that.
11  Q.   Would more people receive average
12  evaluations than would receive above-average
13  evaluations?
14  A.   Not necessarily.
15  Q.   Why do you say that?
16  A.   Because all people don't work the same so
17  it all depends on what their performance was.
18  Q.   Do you remember roughly how many people
19  would receive average versus an above-average
20  evaluation?
21  A.   No.
22       MR. ROSEN: Objection, asked and answered.
23
24  BY MR. SHOEMAKER:
25  Q.   Do you remember how many people would

**Page 35**

1   receive outstanding evaluations as opposed to a lesser
2   evaluation?
3   A.   Nobody.
4   Q.   Nobody?
5   A.   Nobody.
6   Q.   So on your shift the best anyone would hope
7   to get would be an above-average evaluation, generally
8   speaking?
9   A.   Yes.
10  Q.   And why was that? Was that a philosophy of
11  yours? I know lots of managers have a philosophy.
12  A.   No, I have never -- I've been there since
13  1994. I've never received an outstanding.
14  Q.   Does the sheriff have a policy that nobody
15  is perfect so nobody is going to get an outstanding
16  evaluation?
17       MR. ROSEN: Object to the form of the
18  question.
19       You can answer.
20
21  BY MR. SHOEMAKER:
22  Q.   If you know.
23  A.   I don't know that.
24  Q.   You've never heard anything like that?
25  A.   No.

**Page 36**

1        MR. SHOEMAKER: I'm getting ready to shift
2   topics here. Why don't we take a quick break, say a
3   five-minute break. We'll come back in five minutes.
4        THE DEPONENT: Okay.
5
6        (Recess)
7
8   BY MR. SHOEMAKER:
9   Q.   Let's go back on the record.
10       Ma'am, do you remember there coming a time
11  in August or September of 2009 when it came to light
12  that there was a cookout or a picnic attended -- or
13  given by Ramona Larkin?
14  A.   Yes.
15  Q.   Okay. Did Ramona Larkin work for you?
16  A.   Yes.
17  Q.   And how did you learn about that event?
18  A.   It was her birthday weekend and she was
19  having a cookout so she invited the shift.
20  Q.   Did you go?
21  A.   No.
22  Q.   Did you come to learn that Jim Adams
23  attended that event?
24  A.   Yes.
25  Q.   How did you learn about that?

**Page 37**

1   A.   When they came back to work on Monday they
2   were talking about it.
3   Q.   Who was talking about it?
4   A.   Larkins.
5   Q.   And who else?
6   A.   The people who were there.
7   Q.   Who was that? Who do you remember talking
8   about it?
9   A.   Captain Glover, Lieutenant Harris, and I
10  can't remember who else went.
11  Q.   And what were they saying about it?
12  A.   They just said they had a cookout and he
13  came.
14  Q.   Did Glover or Harris go to the cookout?
15  A.   Yes. They were there.
16  Q.   They were there.
17  A.   Uh-huh.
18  Q.   Did you ask Ramona Larkin any questions
19  about the cookout?
20  A.   No, I didn't care 'cause I didn't go.
21  Q.   Do you know if any other officers asked
22  Ramona Larkin about who was at the cookout?
23  A.   No.
24  Q.   Did Major Richardson ever ask you any
25  questions about that cookout?

Page 38

1   A.   I don't know because I wasn't at the
2 cookout.
3   Q.   Well, that doesn't stop him from asking you
4 questions about the cookout.
5   A.   He couldn't ask me questions because since
6 I didn't attend, I wouldn't have known anything about
7 the cookout. I just know she had a cookout, she said
8 that Adams showed up at the cookout. And I didn't --
9 since I wasn't there, I didn't say anything else.
10   Q.   Did she tell you that Danny Carter had
11 invited Jim Adams?
12   A.   Yes, she said he had invited him.
13   Q.   And did you know that Ramona Larkin and
14 Danny Carter are brother and sister-in-law?
15   A.   They're not brother and sister-in-law.
16   Q.   They're not?
17   A.   No.
18   Q.   Ramona Larkin is not related to Danny
19 Carter's wife?
20   A.   No. Her father -- Larkins' father and
21 Carter's wife's mother used to go together. That don't
22 make them brothers and sisters. They weren't married.
23 They went together. They were never married. And if
24 they were, they would be step.
25   Q.   Okay.

Page 39

1      MR. ROSEN: You're absolutely right.
2   A.   There's no bloodline through there. Just
3 because you go with somebody don't make them your
4 brother or your sister, whether you claim it or not.
5
6 BY MR. SHOEMAKER:
7   Q.   Okay. So just so I'm clear, Ramona Larkin
8 -- what is her relationship with Danny Carter's wife?
9 Are they just friends?
10   A.   Nothing. Her father went with the mother.
11   Q.   Did you understand that Danny Carter was
12 also responsible for putting this picnic or cookout on?
13   A.   No.
14   Q.   Did Major Richardson ever ask you if you
15 attended the cookout?
16   A.   No.
17   Q.   Did anyone ever ask you whether or not you
18 attended the cookout?
19   A.   No.
20   Q.   Did anybody ever ask you any questions at
21 all about the cookout?
22   A.   No, because I didn't know anything about
23 the cookout. Only that Larkins said that Adams showed
24 up.
25   Q.   What exactly do you remember Lieutenant

Page 40

1 Lewis saying about the cookout?
2   A.   I didn't talk to Lieutenant Lewis about the
3 cookout.
4   Q.   I thought you just testified that you heard
5 him speaking about it.
6   A.   Lewis?
7   Q.   Yes.
8   A.   I never said Lewis' name.
9   Q.   Who did you say, Harris?
10   A.   I said Harris.
11   Q.   Okay. Harris.
12   A.   They just said they went to the cookout.
13   Q.   All right.
14   A.   They -- Captain Glover said he went to the
15 cookout. Adams was there. I never talked to anybody
16 about what they did at the cookout because like I say,
17 if I wanted to know, I would have went, but I didn't
18 go. And I was glad I didn't go 'cause then I don't
19 know anything. So nobody never came to say, Well, this
20 person did this, this person did this, or this person
21 said this. They just say he came to the cookout. They
22 never said what went on during the cookout or what was
23 said. They just -- she said she had a cookout and
24 Colonel Adams came. That was it.
25   Q.   Did she express surprise that Colonel Adams

Page 41

1 attended the cookout?
2   A.   Yes.
3   Q.   What did she say specifically about it?
4   A.   She said she had a cookout and he came.
5 And she said she hadn't invited him.
6   Q.   Do you know if -- now, she just came up to
7 you and volunteered that?
8   A.   We were just talking about -- she was
9 talking about her cookout, and I don't know if she
10 asked me, you know, I didn't come or why I didn't come.
11   Q.   So if she were to say that you came up and
12 inquired of her about who was at the cookout, that
13 would be incorrect?
14   A.   That would be incorrect.
15   Q.   Did there ever come a time when you learned
16 there were some pictures from that cookout online?
17   A.   No. I never saw or heard of any pictures
18 from the cookout online.
19   Q.   You never heard about that?
20   A.   No.
21   Q.   Other than Harris and Glover, Larkin and
22 Carter, did you become aware of any other Hampton
23 sheriff's office employees attending that cookout?
24   A.   I believe McCoy said he went to the
25 cookout. Could have been Cadu (phonetic). And she

42

1 probably went to the cookout. Because like I say, the
2 people who were on the shift, she invited everybody to
3 the cookout from the shift.
4     Q.    Okay.
5     A.    But I don't know who all went.
6     Q.    And this cookout was late August of 2009?
7     A.    The end of August, I believe.
8     Q.    Do you ever remember a shift change meeting
9 either in August or September of 2009 at which the
10 sheriff spoke to your shift?
11     A.    No.
12     Q.    That never happened?
13     A.    I mean, if he did, I might have been on
14 vacation. I just don't recall being in a meeting with
15 him. He met with all shifts, but when he met with my
16 shift, I don't recall being there.
17     Q.    How do you know he met with all shifts?
18     A.    Because they say he was coming to all
19 shifts.
20     Q.    Who's "they"?
21     A.    Captain Richardson said the sheriff will be
22 coming to all shifts.
23     Q.    Was Captain Richardson a captain back then
24 or was he a major?
25     A.    Captain.

43

1     Q.    He made major after 2009?
2     A.    Yes.
3     Q.    When Captain Richardson said the sheriff
4 was going to come to all shifts, did he say what he was
5 going to talk about?
6     A.    No.
7     Q.    Did you ever hear the sheriff ever give a
8 talk to employees where he talked about a long train
9 and a short train?
10     A.    No.
11     Q.    Did you ever hear any officer in the
12 Hampton sheriff's office, lieutenant or above, so any
13 lieutenants, captains, majors, colonels, or the sheriff
14 himself, ever say anything to employees of the office
15 like, quote, "Be sure you are supporting the right
16 person," end quote?
17     A.    No, sir.
18     Q.    Did you ever hear any senior officers
19 within the Hampton sheriff's office -- and, again, I'm
20 defining senior officers as lieutenants, captains,
21 majors, colonels, or the sheriff himself -- say
22 anything like, quote, "It is in your best interest to
23 support the sheriff," end quote?
24     A.    No.
25     Q.    Did you ever hear any senior officers in

44

1 the Hampton sheriff's office ever say, "Supporting the
2 sheriff could help you," end quote?
3     A.    No.
4     Q.    And I think you told me that of the six
5 plaintiffs in this case, that the only one that worked
6 for you in 2009 was McCoy; is that right?
7     A.    Yes.
8     Q.    Did there ever come a time when you learned
9 that McCoy and Carter were on Jim Adams' campaign
10 Facebook page?
11     A.    If you had Facebook and you were their
12 friends, you could see it.
13     Q.    All right.
14     A.    That's what I was told. I don't know. I'm
15 not on Facebook.
16     Q.    Who told you that?
17     A.    Somebody was talking about it. And, you
18 know, they were friends.
19     Q.    Now, do you have a home computer?
20     A.    Yes, I do.
21     Q.    Do you ever go on Facebook?
22     A.    No, never go on there.
23     Q.    You've never been on there?
24     A.    Uh-uh.
25     Q.    And so you've never seen Jim Adams'

45

1 campaign Facebook page?
2     A.    I have seen his campaign page, but I don't
3 have Facebook. But you could just pull his campaign up
4 for a candidate.
5     Q.    Okay. And when you pulled that up, did you
6 see Carter or McCoy on there?
7     A.    I don't recall what was on there. Just had
8 picnics [sic] of them at -- him doing a picnic thing,
9 wearing an apron. And I don't know was it at some car
10 place or they were doing a thing with old cars or what
11 it was.
12     Q.    Why did you go on his campaign website
13 page?
14     A.    I just looked at it.
15     Q.    Do you remember -- when you looked at that
16 campaign website page, do you remember seeing any
17 employees of the Hampton sheriff's office on that page
18 at all? In any way, either photographs of them or
19 statements by them. Anything.
20     A.    I saw ex-employees, but I don't know if I
21 saw present employees. I can't even remember.
22     Q.    Do you remember what ex-employees you saw
23 there?
24     A.    I believe I saw Tony Chamberlin, Rose, and
25 that's all I can recall.

**Page 46**

1  Q. Now, did you do anything to support the
2  sheriff's reelection campaign in 2009?
3  A. Anything like?
4  Q. Did you buy tickets to the golf tournament?
5  A. Yes.
6  Q. How many tickets did you buy to the golf
7  tournament?
8  A. Five.
9  Q. And did you sell all five?
10 A. Uh-huh.
11 Q. Who did you sell them to? Do you remember?
12 A. I bought them and I actually gave them
13 away.
14 Q. All right. And you took them to the event?
15 A. Did I take them to the event? I gave them
16 to the people to go to the event.
17 Q. Did they go to the event?
18 A. I don't know. I didn't go.
19 Q. You didn't go?
20 A. No.
21 Q. But you bought five tickets?
22 A. Uh-huh. We were working.
23 Q. What did you pay, $50 for those five
24 tickets?
25 A. Yes.

**Page 47**

1  Q. Did you do that in 2008, too?
2  A. Yes. I sold five.
3  Q. You sold five?
4  A. I bought two and sold three.
5  Q. Did you put signs out for the sheriff in
6  2009?
7  A. I live in -- 2009? I either was living in
8  Newport News or Yorktown. I haven't lived in the City
9  of Hampton since a long time ago.
10 Q. But did you go out to other people's
11 properties and put signs out in 2009?
12 A. No.
13 Q. Did you work the polls in 2009?
14 A. Yes.
15 Q. You remember which poll you worked in 2009?
16 A. Bethel High School.
17 Q. And how long that day did you work?
18 A. I believe I worked in the morning and I
19 came back at -- in the evening at 4:00.
20 Q. Did you take vacation that day or were you
21 paid for that?
22 A. I was off.
23 Q. So a day of vacation was charged to you for
24 doing that?
25 A. No, I was off of work.

**Page 48**

1  Q. Oh, you weren't scheduled to work at all?
2  A. No.
3  Q. You were working day shift then, right?
4  A. Yes.
5  Q. And so were you on sick leave?
6  A. No. If we work the weekend, we are off
7  Monday and Tuesday. If I'm off the weekend, I work
8  Monday and Tuesday. So that had to be my weekend to
9  work. I got off Sunday so I came back to work on
10 Wednesday.
11 Q. Did you distribute any campaign literature
12 for the sheriff in 2009?
13 A. No.
14 Q. Have you ever spoken to your employees in
15 support of the sheriff's campaign for reelection?
16 A. No, because since I don't live in the City
17 of Hampton, I can't do anything. And I don't know that
18 many people who live in Hampton.
19 Q. Do you remember learning about an incident
20 between David Dixon and Frances Pope at the polls on
21 election day in 2009?
22 A. No.
23 Q. Ma'am, that's all I have. Thank you very
24 much.
25 A. All right.

**Page 49**

1       MR. ROSEN: We'll read.
2       You're finished.
3
4       (Signature not waived.)
5
6       MR. SHOEMAKER: I want to go on the record
7  for one thing unrelated to the witness.
8       Jeff, you -- I've asked for some more
9  deposition dates and you've responded in writing
10 telling me your only deposition date is -- the only
11 date you're available is the 22nd of November?
12      MR. ROSEN: I'm not going to have a
13 conversation on the record with you. Okay? We can
14 talk off the record.
15      MR. SHOEMAKER: Jeff --
16      MR. ROSEN: The deposition is over. If you
17 want to talk to me, I'll talk to you. I don't have to
18 have a conversation on the record with you.
19      MR. SHOEMAKER: Okay. Fine.
20      MR. ROSEN: I do want to talk to you, but
21 I'm not talking on the record.
22
23      (Whereupon, the deposition was
24      concluded at 2:17 p.m.)
25

13 (Pages 46 to 49)

ADAMS HARRIS REPORTING, INC.
(757) 631-0458

```
                                                     50
 1              DEPOSITION ERRATA SHEET
 2
 3   Case Caption:   Bland, et al. v. Roberts
 4   Deponent:       Crystal Cooke
 5   Deposition Date: October 11, 2011
 6
         I have read the entire transcript of my deposition
 7   taken in the captioned matter or the same has been read
     to me. I request that the following changes be entered
 8   upon the record for the reasons indicated. I have
     signed my name to the Errata Sheet and the appropriate
 9   Certificate and request both to be attached to the
     original transcript.
10
     Page/Line Nos.    Correction/Reason
11
     _____    _____
12
     _____    _____
13
     _____    _____
14
     _____    _____
15
     _____    _____
16
     _____    _____
17
     _____    _____
18
     _____    _____
19
     _____    _____
20
     _____    _____
21
     _____    _____
22
     _____    _____
23
     Signature:_____ Date: _____
24        Crystal Cooke
25
```

```
                                                     51
 1            CERTIFICATE OF DEPONENT
 2   COMMONWEALTH OF VIRGINIA
 3   CITY OF _____
 4
 5
 6
         Before me, this day, personally appeared Crystal
 7   Cooke, who, being duly sworn, states that the foregoing
     transcript of this deposition, taken in the matter, on
 8   the date and at the place set out on the title page
     hereof, constitutes a true and complete transcript of
 9   said deposition.
10
11
12
            ---------------------------
13               Crystal Cooke
14
15
16
         SUBSCRIBED and SWORN to before me this _____
17   day of _____, 2011, in the jurisdiction
     aforesaid.
18
19
20
21   _____    _____
     My Commission Expires      Notary Public
22
23
24
25
```

```
                                                     52
 1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
 2        I, Juanita Harris Schar, RMR, CCR, CRR, a
     Notary Public for the Commonwealth of Virginia at large,
 3   of qualification in the Circuit Court of the City of
     Virginia Beach, Virginia, and whose commission expires
 4   April 30, 2014, do hereby certify that the within named
     deponent, CRYSTAL COOKE, appeared before me at Virginia
 5   Beach, Virginia, as hereinbefore set forth, and after
     being first duly sworn by me, was thereupon examined
 6   upon her oath by counsel for the respective parties;
     that such examination was recorded in Stenotype by me
 7   and reduced to computer printout under my direction; and
     that the foregoing constitutes a true, accurate, and
 8   complete transcript of such examination to the best of
     my ability.
 9
         I further certify that I am not related to
10   nor otherwise associated with any counsel or party to
     this proceeding, nor otherwise interested in the event
11   thereof.
12        Given under my hand and notarial seal this
     25th day of October, 2011, at Virginia Beach, Virginia.
13
14
15
                  -----------------
16                  Notary Public
17
             Certified Court Reporter No. 0313085
18
19
20
21
22
23
24
25
```