Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

---

BOBBY BLAND, DANIEL RAY
CARTER, JR., DAVID W. DIXON,
ROBERT W. McCOY, JOHN C. SANDHOFER
AND DEBRA H. WOODWARD,

    Plaintiffs,

    v                    4:11cv45

B. J. ROBERTS, INDIVIDUALLY,
AND IN HIS OFFICIAL CAPACITY AS
SHERIFF OF THE CITY OF HAMPTON,
VIRGINIA,

    Defendant.

---

DEPOSITION UPON ORAL EXAMINATION OF

SAMMY L. MITCHELL, SR.

Taken on behalf of the Defendant

Newport News, Virginia

December 20, 2011

INGRAM REPORTING
2520 Queens Elm Place
Virginia Beach, Virginia  23454
(757) 481-0935

Exhibit 27

Page 2

1  APPEARANCES: James A. Shoemaker, Jr.
            Patten, Wornom, Hatten & Diamonstein,
2           L. C.
            12350 Jefferson Avenue, Ste. 300
3           Newport News, Virginia 23602
            Attorneys for the Plaintiffs
4
            Jeff W. Rosen
5           Pender and Coward
            222 Central Park Avenue, Ste. 400
6           Virginia Beach, Virginia 23462
            Attorneys for the Defendant

            -----oOo-----

15 REPORTED BY: Marjorie F. Ingram

Page 3

1      Deposition of SAMMY L. MITCHELL, SR., taken
2  before Marjorie F. Ingram, Court Reporter, a Notary
3  Public for the State of Virginia at Large, by
4  Notice of counsel as to the time and place, at the
5  offices of Patten, Wornom, Hatten and Diamonstein,
6  12350 Jefferson Avenue, Ste. 300, Newport News,
7  Virginia, at 12:40 p.m., December 20, 2011, to be
8  used in the trial of the above-entitled cause.

            -----oOo-----

13     SAMMY L. MITCHELL, called as a witness,
14 having been first duly sworn, was examined and
15 testified as follows:

17            EXAMINATION

19 BY MR. ROSEN:
20    Q.  Good afternoon, Mr. Mitchell. I am
21 Jeff Rosen. I represent Sheriff Roberts in the
22 lawsuit that's been filed by several former
23 deputies, and you've been identified as a
24 witness in the case by the plaintiffs, former
25 deputies, and so that's why we're here to take

Page 4

1  your deposition.
2      Have you ever had your deposition
3  before?
4     A.  No.
5     Q.  Okay. Well, a deposition is just a
6  chance for lawyers to ask you questions in front
7  of a court reporter, and obviously, your
8  responses are being recorded. It's just a
9  chance for me to find out what you know about
10 the case and what your anticipated testimony
11 will be or could be.
12     Do you understand?
13    A.  Yes, sir.
14    Q.  Okay. All your -- since it's a
15 transcript, all your responses have to be oral,
16 so a nod or shake of the head does not show up
17 in the transcript. Okay?
18    A.  Okay.
19    Q.  So with that admonition, we can
20 begin.
21     Please state your name and address.
22    A.  Sammy Lee Mitchell. 25 North Lake
23 Loop, Hampton, Virginia 23666.
24    Q.  Okay. And just briefly describe
25 for me your educational background.

Page 5

1    A.  Excuse me. I got 15 years of
2  school, associate's degree of business
3  administration Johnson-Wales Junior College of
4  Business.
5    Q.  Where was your associate's degree
6  from where?
7    A.  Johnson Wales Junior College of
8  Business in Providence, Rhode Island.
9    Q.  Johnson-Wales. A cooking school?
10   A.  No, this is the college itself.
11   Q.  Oh, I didn't realize there was a
12 college.
13       MR. SHOEMAKER: I didn't either
14    until recently. Apparently, it's a big
15    college there.

17 BY MR. ROSEN:
18   Q.  It's a college. Cooking school is
19 a offshoot, right?
20   A.  Right.
21   Q.  So you have an associate's degree
22 in business?
23   A.  Yes. Business school.
24   Q.  All right. Business. Okay. All
25 right. And then any other college after that?

Page 6

1  A.  I went to U of Bridgewater State.
2  Q.  Uh-huh.
3  A.  And that was it. Then the rest was
4  through the military.
5  Q.  Okay. All right. So then after
6  college, did you join the military?
7  A.  Yes, I did. Twenty-one years in
8  the military, Air Force.
9  Q.  And when did you retire? What rank
10 were you?
11 A.  Tech Sergeant. I retired in '91.
12 chk
13 Q.  Okay. And after retiring in 1991,
14 is that when you joined the Sheriff's
15 Department?
16 A.  I joined the Sheriff's Department
17 in '95.
18 Q.  Okay.
19 A.  May of '95.
20 Q.  All right. So what did you do
21 between retiring from the Air Force and joining
22 the Sheriff's Department?
23 A.  I was working security out of NASA.
24 Q.  Okay. How did you come to apply
25 for a job at the Hampton Sheriff's Department?

Page 7

1  A.  I applied I think a total of three
2  times. First time I applied, I went for the
3  interview and wasn't accepted. Second time I
4  applied, didn't get to do an interview or
5  anything, and third time was I submitted it, and
6  they had me down for an interview, and
7  everything went from there.
8  Q.  Did you know anyone that worked at
9  the Sheriff's Department before you applied
10 there?
11 A.  I knew a few of the people but not
12 very close.
13 Q.  Okay. How did you hear there was
14 an opening? It was advertised?
15 A.  It was in the paper.
16 Q.  In the paper. Okay. Okay. Now,
17 in the Air Force, what was your responsibility?
18 What job did you have in the Air Force?
19 A.  Security police.
20 Q.  Security police. Okay. So you had
21 been in policing?
22 A.  Law enforcement.
23 Q.  Law enforcement for a long time.
24    All righty. And so when you began
25 with the Sheriff's Department, what did you

Page 8

1  begin? What job did you begin with?
2  A.  Just being a deputy, learning
3  everything about it as far as duty and
4  responsibilities, working on the floors.
5  Q.  So you worked in the jail?
6  A.  I worked in jail the whole time.
7  Q.  You worked in the jail the entire
8  time you were there?
9  A.  Yes, sir.
10 Q.  Okay. So you began as a floor
11 deputy?
12 A.  Yes, sir.
13 Q.  Okay. And then did you -- were you
14 promoted at any point?
15 A.  Let's see. Started in '95. I
16 think it was in '98 that I got promoted to
17 sergeant.
18 Q.  Uh-huh.
19 A.  And then it was -- I think it was
20 '08 I got promoted to lieutenant.
21 Q.  Okay. And then when you were
22 promoted to sergeant, what was your
23 responsibility?
24 A.  I was the assistant night chief and
25 responsible for the other deputies on the floor

Page 9

1  and on the shift, making rounds and making sure
2  everything that was done.
3  Q.  And then when you were promoted ten
4  years later to lieutenant, then what was your
5  responsibility?
6  A.  I ran a shift and responsible for,
7  well, the number of people varied from I say 16,
8  18.
9  Q.  Per shift, 16 to 18?
10 A.  Yes, sir.
11 Q.  Okay. All right. And during the
12 course of your employment with the Hampton
13 Sheriff's Department, did you ever have any
14 disciplinary action?
15 A.  There was one issue that showed up
16 that I didn't know about until the day it
17 happened, but it was at the time Lieutenant
18 Harper had wrote me up for something. I didn't
19 know anything about it until I had to go before
20 the board, but that's about it that I can
21 remember.
22 Q.  What did Lieutenant Harper write
23 you up for?
24 A.  Failure to do something that she
25 had wanted done over at the annex.

Page 10

1  Q. Uh-huh. When was that? Do you
2  remember when that was?
3  A. No, I don't.
4  Q. All right. And was the discipline
5  action upheld or was it reversed? Do you
6  remember?
7  A. No. I just let it stay on file.
8  Q. It stayed in the file. All right.
9  Is that the only disciplinary action that you're
10 aware of?
11 A. Yes, sir.
12 Q. All right. And so when you were
13 hired, who was the sheriff?
14 A. B. J. Roberts.
15 Q. Sheriff Roberts. Okay.
16     Did you know Sheriff Roberts before
17 being hired by the Sheriff's Department?
18 A. I seen him several times at HU and
19 surround.
20 Q. At the what?
21 A. At Hampton University.
22 Q. Okay. All right. Did you work --
23 what was your relation with him?
24 A. I just knew him. That's all.
25 Q. You knew him. Okay. All right.

Page 11

1     Okay. Now, do you know what -- why
2  you were identified as a witness in this case?
3  A. Other than the fact that I was one
4  of the -- one of the 12 that got released in
5  December.
6  Q. Uh-huh. Okay. Let me ask you
7  this: Who asked you to be a witness in the
8  case? Did anyone ask you to be a witness for
9  the plaintiffs in the case?
10 A. I don't recall. I believe the
11 attorney asked me to be a witness, yes.
12 Q. Mr. Shoemaker?
13 A. Yes.
14 Q. Okay. And when did he contact you
15 to ask you to be a witness?
16 A. When?
17 Q. When? Uh-huh.
18 A. I think it was in December I think
19 it was.
20 Q. December of?
21 A. Of last year.
22 Q. 2010?
23 A. I think. Yeah, I think it was
24 December.
25 Q. Okay. And how did you come in

Page 12

1  contact with the lawyer? When did you meet with
2  the lawyer?
3  A. When?
4  Q. Uh-huh. When?
5  A. That was -- I don't recall when I
6  came here. It was -- let's see. I don't recall
7  the date.
8  Q. That's okay. All right. I'll ask
9  it another way.
10     All right. So you told me that you
11 were involved -- you were one of the deputies
12 that Sheriff Roberts did not reappoint after the
13 2009 election; is that correct?
14 A. Correct.
15 Q. And when you were not reappointed,
16 were you surprised by that?
17 A. Yes, sir.
18 Q. Okay. Did you have any feelings as
19 to why you were not reappointed?
20 A. I had no idea why.
21 Q. Okay. You didn't?
22 A. Still don't.
23 Q. Still don't know why. Okay. All
24 right. All right. After you were not
25 reappointed, were you involved in the group of

Page 13

1  deputies that were looking to take and see if
2  they had a lawsuit against Sheriff Roberts?
3  A. Yes, sir.
4  Q. Were you at the meeting, the
5  original organizational meeting when the
6  deputies met with Mr. Shoemaker and Mr. Adams?
7      MR. SHOEMAKER: I'm going to object
8  to the form of the question. It assumes a
9  fact not in evidence, and I'm going to
10 direct you not to answer any questions
11 where the only people present were
12 plaintiffs and me.
13     THE WITNESS: Okay.
14     MR. ROSEN: Fine. That meeting
15 does not apply to this objection.
16     MR. SHOEMAKER: You can ask him
17 about --
18     MR. ROSEN: I don't need speaking
19 objections, Jamie. I'll ask my questions.
20 You can make objection. That's fine.
21
22 BY MR. ROSEN:
23 Q. So my question is were you at the
24 organizational meeting where all the deputies
25 were present with Mr. Adams and Mr. Shoemaker?

**Page 14**

1  A. Yes.
2  Q. Okay. All right. And how did that
3  meeting come about?
4  A. I'm not sure, but I was told that
5  we had a meeting, and I just went.
6  Q. Okay. Then who told you you had a
7  meeting?
8  A. Oh, one of the fellow people that
9  were released.
10  Q. Okay. Who was it?
11  A. I think might have been Mr. Bland
12  or Jones.
13  Q. All right. Okay. Now, okay.
14  Before your non-reappointment, did you
15  indicate -- ever indicate to the sheriff or
16  anyone in the Sheriff's Department that you were
17  not supporting Sheriff Roberts in his
18  reelection?
19  A. No.
20  Q. In fact, did you support Sheriff
21  Roberts in his reelection?
22  A. Yes, all three of them.
23  Q. All three elections. Did you do
24  anything to help Sheriff Roberts in his
25  reelection, for example, sell tickets to the

**Page 15**

1  barbecue?
2  A. Yes.
3  Q. Did you work the poles?
4  A. Yes. I had worked the poles, but
5  this last election I didn't.
6  Q. Okay. Did you do anything that
7  would let Sheriff Roberts, or did you ever speak
8  out in support of his opponent, Mr. Adams,
9  before the election in 2009?
10  A. Did I ever what?
11  Q. Speak out supporting Mr. Adams in
12  his reelection?
13  A. No.
14  Q. Okay. Is it fair to say that
15  Sheriff Roberts would have no idea who you
16  supported in that election?
17  A. I wouldn't -- I would think that it
18  would be him.
19  Q. Okay. So you would have expected
20  Sheriff Roberts to believe you supported him
21  during that election?
22  A. Yes.
23  Q. Okay. All right. That's because
24  in fact you did support him; is that right?
25  A. Yes.

**Page 16**

1  Q. Okay. All right. All right. So
2  when you went to that organizational meeting
3  with Mr. Shoemaker, did there come a time when
4  you met with Mr. Shoemaker and he told you that
5  he was not going to take your case?
6  MR. SHOEMAKER: I'm going to object
7  to the question as it calls for a
8  privileged response, and I'm going to
9  direct you not to answer it. Okay.
10
11  BY MR. ROSEN:
12  Q. Well, why did you decide not to
13  participate in this lawsuit?
14  MR. SHOEMAKER: You can answer that
15  question.
16  A. As far as I know, my situation
17  didn't merit being a part of the lawsuit for
18  whatever reason.
19
20  BY MR. ROSEN:
21  Q. Okay. All right. All right.
22  While you were working -- while you worked at
23  the Sheriff's Department, was your tenure at the
24  jail the entire time? You always worked in the
25  jail?

**Page 17**

1  A. Yes, sir.
2  Q. Okay. Did you ever work off duty
3  in security positions while at the Sheriff's
4  Department?
5  A. Yes, sir.
6  Q. Okay. And when you did that, did
7  you wear uniforms?
8  A. Yes, sir.
9  Q. Carry weapons?
10  A. Yes, sir.
11  Q. Okay. And you were under the guise
12  of the -- under the auspices of the sheriff?
13  MR. SHOEMAKER: Object to the form
14  of the question to the extent it calls for
15  a legal conclusion. I'm going to ask you
16  to slow down. I've got a chance to assert
17  an objection. You go so fast, I can't
18  speak.
19  So I need you to slow down in case
20  I need to object, okay?
21  MR. ROSEN: Okay.
22
23  BY MR. ROSEN:
24  Q. And while you worked secondary
25  employment for the Sheriff's Department, did you

Page 18

1 have occasion to arrest people?
2    A.   I never did, no.
3    Q.   Okay. But you had the power of
4 arrest, didn't you?
5    A.   Yes, sir.
6    Q.   Okay. Did you work concerts and
7 stuff like that or what type of events would you
8 work?
9    A.   Most of the time it was with HU.
10   Q.   Uh-huh.
11   A.   For what -- we had the race track
12 and we had Colonial Downs where we did a little
13 extra duty.
14   Q.   Okay. All right.
15        And were you doing crowd control
16 and various stuff, things like --
17   A.   Yes.
18   Q.   -- responsibilities like that?
19   A.   Yes, sir.
20   Q.   Okay. All right. Okay. So after
21 your original meeting with -- with the potential
22 plaintiffs, that initial meeting, did you go to
23 any subsequent meetings with the plaintiffs --
24 potential plaintiffs?
25   A.   No.

Page 19

1    Q.   Okay. So you just went to that
2 first meeting. That was it?
3    A.   Yes, sir.
4    Q.   All right. And you said you
5 subsequently met with Mr. Shoemaker at his
6 office. After that, you went to his office to
7 meet with him?
8    A.   Yes.
9    Q.   And what was -- was that right
10 after you decided not to proceed with your
11 lawsuit?
12   A.   That was to find out.
13       MR. SHOEMAKER: I'm going to
14   object. I'm going to object to he has no
15   obligation to answer questions about
16   advice that I gave him.
17       MR. ROSEN: Well, I agree with
18   that, and again, I'm trying to find out
19   did you ever come to meet with
20   Mr. Shoemaker after you decided that you
21   are not going to proceed with the lawsuit
22   when he asked you to be a witness in the
23   case?
24       THE WITNESS: No.
25

Page 20

1 BY MR. ROSEN:
2    Q.   Okay. All right. Did there come a
3 time when Mr. Shoemaker came to you and asked
4 you to sign a declaration?
5    A.   Yes.
6    Q.   Okay. And how did that come about?
7    A.   He just wanted to know, you know,
8 what we had heard and what -- what was said.
9    Q.   Okay. Was this after -- was --
10 when was this? I guess it was in October 2011
11 when you signed it?
12   A.   Right.
13   Q.   Did he contact you before signing,
14 before you signed the declaration?
15   A.   Yes.
16   Q.   He did. Okay. And how did he
17 contact you?
18   A.   By phone.
19   Q.   Okay. And what did he ask you to
20 do? What did he ask you?
21   A.   If I would come in and sign the
22 declaration.
23   Q.   How -- who wrote the declaration?
24   A.   I did, and then they typed it up.
25   Q.   You wrote it by hand you mean?

Page 21

1    A.   Oh, let's see. No. I think they
2 asked me, and I told them what was what, and
3 that's what they typed up.
4    Q.   Did they do it at the same time or
5 did they do it two different meetings?
6    A.   No, same day.
7    Q.   Same day. Oh, so who talked to
8 you, Mr. Shoemaker?
9    A.   Yes.
10   Q.   And what did he ask you? Did he
11 ask you about these or did he tell you what he
12 wanted you to say?
13   A.   No. He asked me about that and did
14 I have anything else to add to it.
15   Q.   Okay. All right. But I'm trying
16 to find out who wrote the actual substance of it
17 though. Was it pretyped when you arrived?
18   A.   I don't recall that. I don't
19 recall that, sir.
20   Q.   Okay. All right. Let me show you
21 this: In Paragraph 3, it says, At various times
22 during my employment, I heard Major Kenneth
23 Richardson and Captain Robert McGee say to the
24 low ranking employees, quote, If you don't
25 support the sheriff, you're going to be out of

Page 22

1 here.
2      Now, did you tell Mr. Shoemaker
3 that or did he write this in here before you --
4 before you signed it?
5    A.   I told him that.
6    Q.   You told him that. Okay. And when
7 did you tell him that?
8    A.   I think that same day.
9    Q.   The same day as the declaration?
10   A.   I can't remember it was the same
11 day or -- I can't recall, sir.
12   Q.   Okay. Well, do you remember when
13 you heard Major Richardson or Captain McGee say
14 that?
15   A.   Date and time?
16   Q.   Yes.
17   A.   I have several times. I don't
18 remember the exact dates or times. I mean any
19 time, and not just this last election but the
20 other elections as well, you always heard that.
21 That was an ongoing thing.
22   Q.   Do you know anyone who was fired
23 for not supporting Sheriff Roberts?
24   A.   Yes.
25   Q.   Who do you know who was fired for

Page 23

1 not supporting Sheriff Roberts?
2    A.   You are talking about this last
3 election?
4    Q.   Well, any election. As long as you
5 were there.
6    A.   I can't remember the deputy's name
7 now. Yeah. Several of them that got fired
8 behind that. There was -- I know there was one
9 that had signs up in his yard, and they found
10 out about that, and he was fired. I believe
11 that was Eaton. I can't remember the other
12 names of the other deputies.
13   Q.   How do you know Eaton was fired
14 because he had signs in his yard for other
15 candidates? How do you know that that was the
16 reason he was fired?
17   A.   Don't know if that was the exact
18 reason, but that's the only thing we come up
19 with.
20   Q.   That was your conclusion?
21   A.   That was Eaton's conclusion as well
22 too.
23   Q.   Okay. Right, but don't know -- the
24 sheriff never told you that was why he fired
25 Eaton, did he?

Page 24

1    A.   No.
2    Q.   That was a conclusion, Eaton's
3 conclusion.
4      All right. Anyone else besides
5 Eaton?
6    A.   I can't remember the names of the
7 deputies now. It's been so long. I can't
8 remember the names.
9    Q.   Okay. Did you ever hear Sheriff
10 Roberts say that if you don't support him,
11 you're going to be fired?
12   A.   Yes.
13   Q.   And when did you hear him say that?
14   A.   Well, they had a thing every year
15 when he was running.
16   Q.   Uh-huh.
17   A.   That he come to the shift.
18   Q.   Uh-huh.
19   A.   And make his little speech or
20 whatever, and basically that's what he was
21 saying. This last time we had something about
22 don't get on the short train, but, you know,
23 been there long enough, you know what he's
24 saying.
25   Q.   So you remember him saying don't

Page 25

1 get on the short train, so what did you take
2 that to mean?
3    A.   Well, he had another saying too. I
4 don't remember his thing verbatim, but it was
5 you know if you want to get up -- he was talking
6 about Jim Adams about getting on the short
7 train, you know. Get on his train, you be there
8 for a while.
9    Q.   Uh-huh.
10   A.   If not, you are out the door.
11   Q.   He didn't say -- he didn't mention
12 Jim Adams' name, did he?
13   A.   Yes, he did.
14   Q.   He said -- he mentioned Jim Adams
15 during the meeting on the shift.
16   A.   Yes.
17   Q.   And what did he say about him?
18   A.   He was -- I don't know if I can
19 remember exactly his words verbatim, but he did
20 mention Jim Adams' name during the briefing.
21   Q.   Did he say anything about finding
22 out that some deputies were on Facebook
23 supporting Adams?
24   A.   Yes, he did.
25   Q.   What did he say about that?

Page 26

```
1      A.   That he knew that some people were
2   on Facebook and supporting Jim Adams, and that's
3   when he started talking about the short train
4   and --
5      Q.   And so what did he say about the
6   short train?  Do you remember?
7      A.   Not everything.  Not verbatim.
8      Q.   What did you take the comments to
9   mean?
10     A.   I knew what it meant.  I mean I
11  didn't have to take it for what it meant.  I
12  knew what he was talking about.  I been through
13  three of his elections.
14     Q.   So what did you take it to mean?
15     A.   Either back him or you won't be
16  around.
17     Q.   Well, let me ask you this:  How
18  would the sheriff know who you voted for in the
19  voting booth?
20     A.   He doesn't know.
21     Q.   Exactly right.
22     A.   That's what I'm saying.  But you
23  ask me a question, I'm telling you, you know.
24     Q.   Okay.  So he doesn't know who you
25  are voting for in the voting booth; is that
```

Page 27

```
1   right?
2      A.   Quite true.
3      Q.   So you could say I'm going to vote
4   for him and vote for whoever you want?
5      A.   Exactly.
6      Q.   Did you ever -- strike that.
7           All right.  Then do you know
8   whether Jim -- Danny Carter was on Facebook?
9      A.   Yes.
10     Q.   Supporting?
11     A.   Jim Adams.
12     Q.   Well, strike that.  Did you see the
13  Facebook listing?
14     A.   No, I didn't.
15     Q.   So you don't know what it said, do
16  you?
17     A.   No.
18     Q.   You don't know whether it was
19  supporting him, says I support you or not, do
20  you?
21     A.   What, Carter or myself?
22     Q.   Carter.  You don't know what Carter
23  said on Adams' Facebook?
24     A.   He told me what he said.
25     Q.   What did he say?
```

Page 28

```
1      A.   I can't recall what he said, but I
2   know what he said was -- Oh, man.  He just
3   state -- I don't remember what he said, but I
4   know he said that something, you know, that he
5   was going for Jim Adams, and I know that it all
6   started at a cook-out.  Downhill from there.
7      Q.   What all started from a cook-out?
8      A.   When they want to a cook-out and
9   Jim Adams was there, and then and everything
10  else was downhill from there.  People were
11  saying so and so was there, so and so was there,
12  and by that I guess they felt you support Jim
13  Adams.
14     Q.   Were you at the cook-out?
15     A.   I went by there, yes, because it
16  was a cook-out for two deputies or a deputy
17  that was leaving.
18     Q.   Uh-huh.  It wasn't Danny Carter's
19  cook-out, was it?
20     A.   No.
21     Q.   It was his, what, sister-in-law's
22  cook-out?  Was it Ramona Larkin's cook-out?
23     A.   I believe it was.
24     Q.   It was her cook-out, wasn't it?
25     A.   Yes.
```

Page 29

```
1      Q.   It wasn't Danny Carter's cook-out?
2      A.   Right.
3      Q.   It was Ramona Larkin's and who was
4   the other deputy that was leaving?  Was it
5   those two deputies had they invited everyone on
6   their shift essentially?
7      A.   Yes.
8      Q.   Were you on that same shift?
9      A.   No.
10     Q.   Who invited you?
11     A.   Ramona.
12     Q.   Ramona.  And so what happened?  So
13  at the cook-out, Adams showed up?
14     A.   Adams was there, yes.
15     Q.   Okay.  But do you know -- does
16  anyone know who invited Adams?
17     A.   I have no idea.
18     Q.   Okay.  So what happened after the
19  cook-out?  Were there some rumors after that?
20     A.   I don't know what happened.  I
21  didn't stay that long, but I know when I got
22  back to work, I was hearing rumors about so and
23  so saying that so and so was there, so and so
24  was there.  You know, it was a lot of rumors and
25  you know.
```

Page 30

1  Q. Okay.
2  A. I didn't feed into them. I just
3  kept rolling.
4  Q. Did you hear -- were you aware of
5  anyone -- the sheriff asking who was at the
6  cook-out?
7  A. No.
8  Q. Okay. Were you aware of any of the
9  sheriff's administration asking who was at the
10 cook-out?
11 A. No.
12 Q. Well, were you at the cook-out when
13 Adams showed up?
14 A. When I got there, Adams was there.
15 Q. Was he campaigning or was he --
16 A. No.
17 Q. He was just a guest?
18 A. Just there.
19 Q. Just there. Okay. All right. So
20 why did that cause a stir, because there were
21 lots of members of the Sheriff's Department
22 there?
23 A. I guess. I don't know. I couldn't
24 tell you that.
25 Q. Okay. Everybody was at the

Page 31

1  cook-out. I just don't know what the big deal
2  is.
3  A. I don't either.
4  Q. All right. Sheriff never said you
5  can't have a cook-out and invite Mr. Adams, did
6  he?
7  A. Not that I know of.
8  Q. Okay. All right. Did you know
9  that on the posting on Danny Carter's -- I mean
10 on Mr. Adams' Facebook page, Danny Carter had
11 his picture and his wife's picture on the
12 posting?
13 A. Might have been. I don't know.
14 Q. Danny Carter and his wife's picture
15 was on there. Do you know that?
16 A. No, I didn't.
17 Q. You know Danny Carter's wife was
18 reappointed, right?
19 A. Uh-huh.
20 Q. Okay. Now, you mentioned in
21 Paragraph 4 of your affidavit that after the
22 shifts change meeting you were at, it says, I
23 attended shift change meeting during the 2009
24 fall campaign at which Sheriff Roberts spoke in
25 either late August or early September 2009. The

Page 32

1  sheriff had learned that some deputies were on
2  Facebook supporting the campaign of his
3  opponent, Jim Adams.
4      Now, how did you learn that? The
5  sheriff tell you that?
6  A. That was -- well, it was a known
7  thing. It was going around.
8  Q. So you knew that from gossip? A
9  rumor?
10 A. You can call it that if you want,
11 but it was what was happening.
12 Q. Well, you said the Sheriff had
13 learned that deputies were on Facebook. You
14 didn't know if the sheriff knew that or not?
15 A. I did know it.
16 Q. How did you know the sheriff knew
17 it?
18 A. He would mention things about
19 Facebook in the meeting.
20 Q. At the meeting. At the meeting you
21 are referring to?
22 A. Yes.
23 Q. Okay. He mentioned Facebook, and
24 what did he say about the Facebook specifically?
25 A. Just that he knew some people were

Page 33

1  on Facebook saying things, and that was, you
2  know.
3  Q. Okay. All right. And what did he
4  say about that? Do you remember the best you
5  can recall?
6  A. No. I don't remember what he said,
7  but shortly thereafter is when he started
8  talking about the short train and long train
9  thing.
10 Q. Okay. And as far as the short
11 train, long train, what do you remember about
12 him saying that?
13 A. You can get on the short train or
14 you can get on the long train.
15 Q. Okay. And you understood that to
16 mean you support him, he was the long train, and
17 Adams was the short train?
18 A. Yes.
19 Q. Anything else you remember about
20 what he said about the train?
21 A. No.
22 Q. Okay. Okay. And then it says,
23 During my shift change meeting, he gave a speech
24 in which he clearly communicated that if he
25 found out about his employees supporting Jim

Case 4:11-cv-00045-RAJ-TEM Document 29-27 Filed 12/23/11 Page 10 of 16 PageID# 720
10 (Pages 34 to 37)

Page 34

1  Adams, they would be terminated. That's a
2  summary.
3      That wasn't your words. That was
4  Mr. Shoemaker's words, wasn't it?
5      A.   No. That was -- I think that was
6  my words as well too.
7      Q.   All right. Well, I'm saying but
8  what did you say? Mr. Shoemaker had to convert
9  this into an affidavit, and so I'm trying to
10 find out what you told him versus what he wrote,
11 so you don't have anything in writing as to what
12 you told him, do you?
13     A.   No.
14     Q.   Okay. So he talked to you before
15 preparing the affidavit or did he give you the
16 affidavit and said, is that right?
17     A.   He talked to me before, and then
18 that's when what he showed me, and that's when I
19 signed it.
20     Q.   Okay. He talked to you and showed
21 you that, but was there time from the time he
22 talked to you initially about the affidavit
23 until the time he presented it to you or at the
24 same meeting he talked to you, and he said, this
25 is what I prepared?

Page 35

1      A.   If my memory serves me right. I
2  didn't write all this stuff down or take notes
3  but came in, we talked, and when I came in, I
4  signed it.
5      Q.   So it was already prepared?
6      A.   Yeah. He took from what I gave
7  him, that's what he wrote down, yes.
8      Q.   Okay. So after interviewing you,
9  he prepared this. Okay.
10         Did you make any changes?
11     A.   No.
12     Q.   Okay. All right. And then you say
13 after this meeting in which the sheriff spoke,
14 he approached Carter, and it was clear to me the
15 sheriff was very angry. You didn't hear the
16 content of the conversation. How did you happen
17 to see Carter and the sheriff talking?
18     A.   Well, Carter was sitting in the
19 first seat, and after he got finished with his
20 speech and whatever, on his way out, he started
21 speaking with Carter, and he said something
22 about, Well, you know you could come talk to me,
23 and Carter said, Well, I'll talk to you now, and
24 they went outside, and they had their
25 conversation. What was said I don't know. I

Page 36

1  know it was heated though.
2      Q.   Okay. All right. And do you know
3  if Carter was mad because his wife had been
4  disciplined by the sheriff for leaving the door
5  of the jail open?
6      A.   He probably was, but I don't know
7  for sure.
8      Q.   Who -- what?
9      A.   You asked me if Carter was mad
10 because of that.
11     Q.   Uh-huh.
12     A.   I said he probably was, but I don't
13 know for sure.
14     Q.   Okay. Were you a friend of
15 Carter's while you were with the department?
16     A.   Yes.
17     Q.   Did you socialize with him?
18     A.   Work related, yes.
19     Q.   Okay. And were you his supervisor?
20     A.   Yes.
21     Q.   Okay. And how long had you worked
22 with Carter?
23     A.   Let's see. Probably about three
24 years.
25     Q.   Uh-huh. Did Carter tell you he was

Page 37

1  supporting Adams before the election?
2      A.   I don't recall him telling me that,
3  no.
4      Q.   So you didn't know who he was
5  supporting before the election?
6          Okay. Did you hear when Carter had
7  put a posting on Adams' Facebook page? Did you
8  hear about that?
9      A.   I heard about it, yes.
10     Q.   What did you think about that?
11     A.   I didn't really feed into it.
12     Q.   Well, did you think that was a
13 smart thing for him to do as a Sheriff
14 Department employee?
15     A.   Carter is Carter. He's going to do
16 what he wants to do.
17     Q.   Did you think that was a good thing
18 that would help his career by doing that?
19     A.   Do I think it was a good idea?
20     Q.   Yeah.
21     A.   I don't know. I mean people do
22 their own thing, and Carter is a strong-willed
23 person, and if that's what he felt he had to do,
24 he did it. I mean I can't tell him it was
25 wrong.

INGRAM REPORTING
Virginia Beach, Virginia

Page 38

1    Q.   Okay. All right. But you heard
2  about it after he had done it?
3    A.   Uh-huh.
4    Q.   Was that the talk among the
5  Sheriff's Department?
6    A.   Yes.
7    Q.   What were they all saying about
8  that?
9    A.   He was crazy.
10   Q.   They are saying he's crazy to do
11 that?
12   A.   Yes.
13   Q.   They thought that that would not be
14 good for his career?
15   A.   Right.
16   Q.   Okay. Did he -- did he -- did you
17 hear that it was a mistake, he didn't think his
18 comments would be posted on Facebook at the
19 time? Did you hear that?
20   A.   No.
21   Q.   Okay. All right. Now, Paragraph
22 5, it says, It was obvious to me during my
23 service at the Hampton Sheriff's office that
24 political loyalty to the sheriff was a condition
25 of employment for all the employees, including

Page 39

1  the lowest ranking employees.
2         Now, you didn't tell Mr. Shoemaker
3  that. He wrote that, didn't he?
4    A.   Say that again.
5    Q.   Let me show it you, the paragraph.
6  Paragraph 5 of the affidavit. That's a
7  conclusion that Mr. Shoemaker wrote. You didn't
8  tell him that, did you?
9         MR. SHOEMAKER: Object to the form
10    of the question. Go ahead and answer it
11    to the best of your ability.
12   A.   No. I knew when he asked me about
13 that I made -- I made a comment, and I don't
14 know it was worded the same way, but basically,
15 it's what I was saying. Since I've been there,
16 I know that from past experience if you didn't
17 support the sheriff, you would be history.
18
19 BY MR. ROSEN:
20   Q.   Uh-huh.
21   A.   And that's what I signed.
22   Q.   Okay. So was that your words in
23 Paragraph 5 or was that Jamie Shoemaker's words?
24   A.   It was my words.
25   Q.   Those are your words. Okay.

Page 40

1         All right. Now, when you signed
2  that declaration, was any of the other witnesses
3  in the room at the time or any of the parties in
4  the room?
5    A.   No.
6    Q.   Were you alone?
7    A.   I was alone.
8    Q.   What?
9    A.   I was alone.
10   Q.   Anyone else come with you here?
11 Did you come with anyone else?
12   A.   No.
13   Q.   Okay. And why are you cooperating
14 with the plaintiffs in this case?
15   A.   Why?
16   Q.   Yeah.
17   A.   Because something needs to be done
18 about it.
19   Q.   What do you mean by that? I don't
20 know what you mean by that. Be done about what?
21   A.   The way things are being done at
22 the Hampton Sheriff's office.
23   Q.   So you're not happy with how the
24 Sheriff's office is being run?
25   A.   I mean in all honesty, if you are

Page 41

1  fired, they should give you a reason why you're
2  being fired, not just come up with something
3  about not being rehired or you know. I mean if
4  there was a reason or something that I wasn't
5  doing, I think that should have been addressed
6  versus just letting 12 people go.
7    Q.   Uh-huh. Well, did you realize when
8  you were hired that you serve at the will of the
9  sheriff?
10   A.   I'm well aware of that, yes.
11   Q.   So the sheriff doesn't need to have
12 a reason under the Virginia law to take and let
13 anyone go?
14   A.   I understand.
15   Q.   You don't think that's fair?
16   A.   No.
17   Q.   No. Okay. Have you found another
18 job?
19   A.   No.
20   Q.   No. Are you looking for another
21 job?
22   A.   I'm retired, and I'm working a
23 little part-time job right now.
24   Q.   Uh-huh. So you are retired from
25 the military?

Page 42

1  A. Retired from the military and what
2  I can get from the Sheriff's Department.
3  Q. So you were eligible for retirement
4  as well from the Sheriff's Department, so you
5  are collecting retirement from the Sheriff's
6  Department as well?
7  A. Uh-huh.
8  Q. So I have a few other questions for
9  you.
10     Now, did you know Mr. Adams while
11 he worked at the Sheriff's Department?
12 A. Yes.
13 Q. Were you a friend of his?
14 A. Yes.
15 Q. Did you socialize with him outside
16 of the Sheriff's Department?
17 A. Outside, no.
18 Q. At the Sheriff's Department?
19 A. Yes.
20 Q. Were there social events that you
21 would attend with him?
22 A. Yes.
23 Q. Did you play softball on the team
24 with him or was there a softball team?
25 A. Yes.

Page 43

1  Q. So you played with him on the team?
2  A. Yes.
3  Q. Did Adams tell you when he left the
4  department he was going to run for sheriff?
5  A. Yes.
6  Q. He did tell you that?
7  A. Yes.
8  Q. So you knew before he announced?
9  A. Yes.
10 Q. Okay. All right. And did you
11 disclose that to the sheriff or anyone else in
12 the administration?
13 A. No.
14 Q. So you kept that secret?
15 A. I don't know about secret. I just
16 kept it to myself.
17 Q. Okay. All righty. Did you do
18 anything to support Adams' candidacy?
19 A. No.
20 Q. Did you do any campaign
21 contributions or anything like that?
22 A. No.
23 Q. Okay. And so you said you knew
24 Carter. You supervised Carter, and he was in
25 your division?

Page 44

1  A. Yes.
2  Q. And how about David Dixon? Did you
3  know him?
4  A. Yes.
5  Q. Is he in your division as well?
6  A. No.
7  Q. Okay. Did you socialize with him
8  in the department?
9  A. Just the department functions.
10 Q. Was he on the team with you?
11 A. No. He was a firearms instructor
12 as well.
13 Q. You were a firearms instructor too?
14 A. Yes.
15 Q. So you knew him in that capacity.
16 Did you teach at the academy together?
17 A. Yes.
18 Q. Okay. How about McCoy?
19 A. Yes. Same thing.
20 Q. He was in your division?
21 A. He's on another shift as well.
22 Q. Another shift. Was he a firearms
23 instructor too?
24 A. Yes.
25 Q. So you knew him as well. How about

Page 45

1  Sandhofer?
2  A. Sandhofer, I knew him, but he was
3  on another shift. I didn't have any connection
4  with him.
5  Q. Okay. How about Debra Woodward?
6  Did you know her?
7  A. Yes, she's in charge of training.
8  Q. So as a firearms instructor, would
9  you have close contact with her?
10 A. Yes. Like I say, she was head of
11 training. She took care of all the training we
12 had, whether it be in-house training, firearms
13 or whatever. She kept all the schedules up.
14 Q. All right. So did you know that --
15 how about Bobby Bland?
16 A. Yes.
17 Q. Did you know him?
18 A. Yes.
19 Q. How did you know him?
20 A. Well, for one, he goes to my
21 church, and then I knew him and his wife. His
22 wife worked as well for a while, and he was in
23 finance officer.
24 Q. Uh-huh. All right. Now, before
25 the election, December 2009 election, did you

Page 46

1 know whether Bobby Bland was --
2     MR. SHOEMAKER: December.
3
4 BY MR. ROSEN:
5   Q. November 2009, did you know whether
6 Bobby Bland was supporting Mr. Adams?
7   A. Not that I know of. I had no idea
8 who he was supporting.
9   Q. How about Danny Carter? You knew
10 from his Facebook posting that he was supporting
11 Adams?
12   A. Yes.
13   Q. Okay. And he told you that?
14   A. Yes.
15   Q. Did he tell you that?
16   A. More or less, yes.
17   Q. So he told you before the election
18 he was supporting Adams. You didn't tell anyone
19 about what Carter told you, did you?
20   A. No.
21   Q. You don't know whether Sheriff
22 Roberts knew that Carter was supporting Adams?
23   A. Just rumor had it that he knew,
24 yes.
25   Q. As far as David Dixon now, did he

Page 47

1 tell you he was supporting Adams before the
2 election?
3   A. No.
4   Q. So you didn't know who he was
5 supporting?
6   A. No.
7   Q. And how about Robert McCoy? Did he
8 tell you who he was supporting during the
9 election?
10   A. No.
11   Q. You didn't know who he was
12 supporting either. How about Plaintiff John
13 Sandhofer? Did you know who he was supporting
14 during the election?
15   A. No.
16   Q. How about Debra Woodward? Did you
17 know who she was supporting during the election?
18   A. No.
19   Q. How about Mr. Bland? You didn't
20 know who he was supporting either?
21   A. No.
22   Q. Okay. All right. In the lawsuit
23 that was filed, it's alleged that Sheriff
24 Roberts used sheriff's office employees,
25 including low level non-supervisory employees to

Page 48

1 plan, manage, staff and carry out political
2 activities and events while on paid status.
3   Do you know anything about that?
4   A. No.
5   Q. It's alleged that Sheriff Roberts
6 has used prisoners to set up tents, buffet
7 tables, etc. for campaign fundraising events.
8   A. Yes.
9   Q. What do you know about that?
10   A. Well, his golf course. I mean the
11 golf tournament. Any time he had a golf
12 tournament, he used the inmates to pitch the
13 tents and fish fry, and they have been doing I
14 think putting up signs and stuff too.
15   Q. Who, the inmates were?
16   A. Yes.
17   Q. And how do you know that? Were you
18 involved in that?
19   A. No. I wasn't involved, no, but I
20 seen it myself.
21   Q. So you saw it occur?
22   A. Uh-huh.
23   Q. How many occasions?
24   A. Probably twice.
25   Q. Twice. During this last election

Page 49

1 or previous election?
2   A. Previous.
3   Q. So not the last election?
4   A. No.
5   Q. When I say last election, I mean
6 November 2009.
7   A. No. The last election, no.
8   Q. Okay. So you saw that prior to the
9 last election?
10   A. Yes.
11   Q. And previous elections.
12   Okay. It's also alleged that
13 Roberts had used office material, equipment,
14 property, meeting space for his own political
15 purposes.
16   Are you aware of that occurring?
17   A. I heard it, but as far as, you
18 know, knowing firsthand, no.
19   Q. No. You don't have firsthand
20 knowledge of it?
21   A. No.
22   Q. Who did you hear it from?
23   A. I don't recall what.
24   Q. All right. So it's alleged that
25 sheriff has coerced employees to sell tickets

Page 50

1 and to buy tickets to campaign fundraising
2 events. Were you ever coerced?
3   A.   Yes.
4   Q.   You were coerced. Who coerced you?
5   A.   Captain Richardson.
6   Q.   Captain what?
7   A.   Captain Richardson. It got to the
8 point where he said we can't sell them, we had
9 to pay for them, and it was always, you know,
10 it's always pressure to do it.
11   Q.   Uh-huh.
12   A.   So --
13   Q.   Did you always do it?
14   A.   No. I would buy a ticket to
15 support, you know, like the golf tournament or
16 whatever, but as far as buying all the tickets,
17 no, because I think they gave everyone five
18 tickets I believe it was.
19   Q.   And how much were the tickets a
20 piece?
21   A.   The golf tickets were I think ten
22 dollars.
23   Q.   Okay. So each year you were asked
24 to sell five. You only bought one.
25   A.   Uh-huh.

Page 51

1   Q.   So you were not coerced into buying
2 five tickets, were you?
3   A.   No. But that was the message that
4 was sent along with it.
5   Q.   Well, do you know if everyone else
6 bought all five tickets or --
7   A.   No. I mean at the point everyone
8 said they weren't going to do it. I mean you
9 buy a ticket, you still had to get the food
10 so --
11   Q.   So as far as you knew, most people
12 were not buying all the tickets? Is that
13 what --
14   A.   I don't know what everybody else
15 was doing. I'm talking about myself right now.
16   Q.   Right. Well, I'm asking. All
17 right. So you only bought -- did you always
18 just buy one ticket every year?
19   A.   Well, and prior to that I would
20 sell them all.
21   Q.   So, you would sell them. Okay.
22 Before 2009, you sold them all?
23   A.   Uh-huh.
24   Q.   So you didn't have to buy them. You
25 could have sold them, right?

Page 52

1   A.   Uh-huh.
2   Q.   And so prior to 2009, you sold
3 them?
4   A.   Right.
5   Q.   In 2009, you decided to only buy
6 one?
7   A.   Right.
8   Q.   And you turned the rest back in?
9   A.   Yes.
10   Q.   Why didn't you sell the rest in
11 2009?
12   A.   Again, shift work that you are
13 working. You know, I was working night shift
14 and didn't come in contact with a lot of people
15 like I did when I was working day shift so --
16   Q.   So you bought one, turned the rest
17 back to the Captain Richardson?
18   A.   Yes.
19   Q.   All right. All right. You don't
20 believe that was why you were fired, do you?
21 Let me rephrase that. You don't believe that
22 was not why you were not reappointed, do you?
23   A.   I would hope not.
24   Q.   Okay. It's alleged that before the
25 2009 election, during prior election cycles,

Page 53

1 Roberts actively sought to coerce certain
2 employees from supporting his opponents. Are
3 you aware of anything Sheriff Roberts did to
4 coerce employees supporting his opponents?
5   A.   No.
6   Q.   Did you know McCoy was on Adams'
7 Facebook page?
8   A.   I don't deal with Facebook.
9   Q.   So you're not aware of that?
10   A.   No.
11   Q.   Okay. You had not heard that from
12 the rumors in the jail?
13   A.   No.
14   Q.   Okay. Was the cook-out on
15 August 29, 2009, a campaign event for Adams?
16   A.   Not that I know of.
17   Q.   And you were there, right?
18   A.   Yes.
19   Q.   Okay. I presume you were not at
20 the poles on November 3rd, 2009, when you heard
21 Dixon make a statement about Roberts?
22   A.   I wasn't.
23   Q.   Okay. So if I understand what you
24 said, at the shift meeting, when Sheriff Roberts
25 spoke, that was when he talked about the long

Page 54

1  train and short train?
2    A.  Yes.
3    Q.  And he said, as I understand it,
4  you need to get on the long train or the short
5  train, and you understood him to be referring to
6  Adams being the short train?
7    A.  Yes.
8    Q.  And at that meeting, did he say if
9  you get on the short train, I'm going to fire
10 you?
11   A.  No.
12   Q.  Okay. So but you concluded from
13 the conversation that if he found out you were
14 supporting Adams --
15   A.  Yes.
16   Q.  -- it would not be good for your
17 career?
18   A.  Yes.
19   Q.  Okay. Did at that staff meeting,
20 did Sheriff -- did the sheriff say I'm going to
21 have this job as long as I want it?
22   A.  Yes.
23   Q.  Did he say that he fed Adams for 16
24 years?
25   A.  Yes.

Page 55

1    Q.  Did he say this is a bad economy
2  and people are knocking down my door for these
3  jobs?
4    A.  Yes.
5    Q.  Do you feel that you were treated
6  unfairly by Sheriff Roberts?
7    A.  As far as being let go, yes.
8    Q.  Uh-huh. Okay. I'm just about done
9  with that. Let's see if I have any other
10 questions for you.
11       It says that you also had
12 information about damages that the plaintiff
13 sustained, so what do you know of damages that
14 any of the plaintiffs have suffered --
15 sustained? Do you know?
16   A.  No.
17   Q.  Okay. All right. Do you know --
18 you don't know what damages any of the
19 plaintiffs have suffered as a result --
20   A.  No.
21   Q.  -- of their not being rehired,
22 reappointed?
23       Okay. Are you close personal
24 friends with any of the plaintiffs? Do you see
25 them since you left the department?

Page 56

1    A.  Like I said, Mr. Bland goes to my
2  church, and I see him every now and then.
3    Q.  Okay. And how's he doing?
4    A.  He's doing well.
5    Q.  He's doing well. You don't notice
6  any visual changes in him or anything?
7    A.  Not that I know of.
8    Q.  Have you seen -- do you know
9  whether he got a job or not?
10   A.  He hasn't yet, no.
11   Q.  Do you know if he's looking for a
12 job actively?
13   A.  Yes.
14   Q.  You say he is?
15   A.  Yes.
16   Q.  How do you know that? What has he
17 told you about it?
18   A.  Well, I ask him everyday when I see
19 him in church. He said he's still looking.
20 He's had several interviews.
21   Q.  He's retired also from the
22 military?
23   A.  I believe so, yes.
24   Q.  So he's collecting the military
25 retirement, and do you know if he is collecting

Page 57

1  retirement from the Sheriff's department too?
2    A.  I have no idea.
3    Q.  All right. But other than that, he
4  seems to be fine. No physical problems that
5  you're aware of that he had --
6    A.  Right.
7    Q.  -- since his non-reappointment?
8    A.  None that I know of, sir.
9        MR. ROSEN: Okay. All righty.
10 Thank you, sir. That is all the questions
11 I have. Thank you very much.
12       MR. SHOEMAKER: I have no
13 questions. You have the right to review
14 the deposition or waive that right. You
15 can choose either one. You can choose to
16 review it before it's finalized or you can
17 waive that right.
18       THE WITNESS: I would like to
19 review it before it's finalized. Is that
20 done today?
21       MR. SHOEMAKER: No. It will be
22 done later. Okay. Thank you.
23       (The deposition recessed at
24 1:35 p.m.)
25

## Page 58

```
 1              CERTIFICATE
 2
 3   COMMONWEALTH OF VIRGINIA
 4   CITY OF NEWPORT NEWS, to-wit:
 5
 6       I, Marjorie F. Ingram, Court Reporter,
 7   certify that the foregoing deposition of
 8   Sammy L. Mitchell, Sr., was duly sworn to before
 9   me and taken by me at the time and place and for
10   the purpose in the caption mentioned.
11       I further state that I am not a relative or
12   employee or attorney or counsel of any of the
13   parties, or a relative or employee of such attorney
14   or counsel, or financially interested in the
15   action.
16       Given under my hand this
17   day of        , 2011.
18
19
20
21   _____
             Notary Public
22
23   Registration Number: 195724
24   My commission expires 9-30-2014.
25
```

## Page 60

```
 1       I, Sammy L. Mitchell, Sr.,, have read
 2   the foregoing deposition this _____day of
 3   _____, 2011; and the same is true
 4   and correct to the best of my knowledge.
 5
 6
 7   _____
 8              DEPONENT
 9
10
11   CITY OF
12   STATE OF
13
14       I hereby certify that Sammy L.
15   Mitchell, Sr., appeared before me this
16   _____day of _____, 2011, and affixed
17   his/her signature to the foregoing deposition.
18
19
20   _____
21              Notary Public
22
23
24   My commission expires:
25
```

## Page 59

```
        INGRAM REPORTING
        2520 Queens Elm Place
        Virginia Beach, Virginia 23454


        December 21, 2011


Sammy L. Mitchell, Sr.
%James A. Shoemaker, Jr.
Patten, Wornom, Hatten & Diamonstein, L. C.
12350 Jefferson Avenue, Ste. 300
Newport News, Virginia  23602

Dear Mr. Mitchell,

    Your deposition taken on December 20, 2011,
in the matter of Bobby Bland, et al v B. J. Roberts
is enclosed for your review and signature.  Please
sign the deposition on Page 60 where it says
deponent.  Do not write in the transcript. There is
an errata sheet attached for any corrections you
may wish to make. Please return to me the original
signature page and errata sheet so that I may
forward them to counsel.
    According to the Rules of Court, you have 30
days to attend to this matter.

            Sincerely,


            MARJORIE F. INGRAM
            Court Reporter
```

## Page 61

```
              ERRATA SHEET


PAGE        LINE        CHANGE TO READ
```